UNITED STATES, Plaintiff,

v.

Joseph GIAMPA, Gennaro Vittorio, a/k/a "Gerry Giampa," Joseph Gaito, James McManus, Benjamin Segarra, Elliot Porco and John Capra, a/k/a "Johnny Hooks," Defendants.

Crim. A. No. 94–403 (AJL).

United States District Court,
D. New Jersey.

Aug. 17, 1995.

236

**246**

Faith S. Hochberg, United States Attorney, Jose P. Sierra, Kevin E. McCarthy, Mariellen Dugan, Asst. U.S. Atty., Office of United States Attorney, Newark, New Jersey, for U.S.

Thomas R. Ashley, Raymond L. Hamlin, Ashley & Charles, Newark, New Jersey, for Joseph Giampa.

Robert J. Fettweis, Fleming, Roth & Fettweis, Newark, New Jersey, for Gennaro Vittorio.

James C. Patton, Livingston, New Jersey, for Joseph Gaito.

Cathy L. Waldor, Waldor, Carlesimo & Biancone, Montclair, New Jersey, for James McManus.

James J. Culleton, Culleton, Marinaccio & Foglia, Englewood, New Jersey, for Benjamin Segarra.

George L. Santangelo, Richard A. Medina, Santangelo, Santangelo & Cohen, New York City, for John Capra.

Bruce Cutler, New York City, for Elliot Porco.

TABLE OF CONTENTS

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .250
 The Redacted Superseding Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .250
 A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .250

B. The Defendants ................................................251
 1. Giampa .................................................251
 2. Vittorio ................................................251
 3. Gaito ..................................................252
 4. McManus ..............................................252
 5. Segarra ................................................252
 6. Porco .................................................252
 7. Capra..................................................252
C. Count One: Conspiracy to Engage in Racketeering ......................252
D. Count Two: Substantive RICO .......................................253
E. Count Three: Conspiracy to Distribute Narcotics ......................253
F. Count Four: Distribution of Heroin .................................254
G. Count Five: Conspiracy to Import Narcotics .........................254
H. Count Six: Conspiracy to Deal in Firearms ...........................254
I. Count Seven: Transfer of Machine Gun...............................254
J. Counts Eight and Nine: Selling Firearms to a Felon ..................255
K. Count Ten: Shipping Gun with Altered Serial Number................255
L. Count Eleven: Transferring Unregistered Machine Gun ................255
M. Count Twelve: Conspiracy to Steal and Transport Stolen Property.....255
N. Count Thirteen: Transportation of Stolen Property ....................256
O. Count Fourteen: Possession of Stolen Property........................256
P. Count Fifteen: Conspiracy to Transport Stolen Vehicles.................256
Q. Count Sixteen: Conspiracy to Establish Gambling Operations.............257
R. Count Seventeen: Conspiracy to Make Extortionate Loan ...............257
S. Count Eighteen: Conspiracy to Deal in Counterfeit Money...............257
T. Count Nineteen: Conspiracy to Conceal Evidence......................257
U. Count Twenty: Attempt to Conceal Evidence..........................258
V. Counts Twenty–One Through Forty–Six: Travel/Telephone Use in Aid of Racketeering .......................................................258
W. The Jury Verdict .................................................258
 1. Giampa .................................................258
 2. Vittorio ................................................259
 3. Gaito ..................................................259
 4. McManus ..............................................259
 5. Segarra ................................................259
 6. Porco .................................................259
 7. Capra..................................................259
Discussion .......................................................259
I. Pre–Trial Matters ...............................................259
A. Severance ......................................................262
 1. Joinder Pursuant to Rule 8...............................262
 2. Severance Pursuant to Rule 14 ..........................264
 3. Severance From the Trial of McManus....................267
B. Motion to Dismiss the Redacted Superseding Indictment for "Outrageous" Government Conduct .....................................270
C. Motions to Dismiss the Redacted Superseding Indictment for Failure to Properly Allege the Crimes Charged..............................270
D. Motions to Strike Surplusage.......................................271
E. Motion by McManus to Suppress the Second Redacted McManus Statement.........................................................272
 1. *Miranda* .............................................273
 2. Voluntariness of Statement ..............................274
F. *In Limine* Motions to Suppress the Second Redacted McManus Statement.........................................................277
G. Motion to Dismiss the Redacted Superseding Indictment for Failure to Bring McManus Before a Magistrate Judge Without "Unnecessary Delay" ..........................................................277
H. Motion to Suppress the Fruits of the Lanteri Wiretap ..................278
I. Requests for a Bill of Particulars ...................................278
J. Pretrial Disclosure of <u>Brady</u> and <u>Giglio</u> and Jencks Act Material .........280
 1. <u>Brady</u> Material ............................................280

2. Giglio Material .................................................281
3. Jencks Act Material............................................282
K. FRE 404(b) Material ..............................................282
1. Timing of FRE 404(b) Disclosure ...............................283
2. Pre–Trial Determination of Admissibility of FRE 404(b) Evidence.....283
L. Co–Conspirator Statements ........................................284
1. Pre–Trial Disclosure of Co–Conspirator Statements .................284
2. Hearing on Admissibility of Co–Conspirator Statements ..............286
M. Disclosure of the Identity of Confidential Informants.....................286
N. Access to Grand Jury Materials ......................................287
O. Date Certain for Production of Transcripts ..............................289
P. Preservation of Rough Notes and Reports ..............................289
Q. Request for Leave to File Additional Motions ..........................290
R. Reciprocal Discovery ...............................................290
S. Jury Selection Procedures...........................................291
T. Hearings on Objections to Audio and Video Taped Evidence..............291
U. In Limine Motions Concerning the Admissibility of 404(b) Material.....293
1. Past Charged and Uncharged Criminal Activity ....................294
2. Accidental Shooting of Gaito .....................................295
3. Racial Epithets .................................................296
4. Drug Use .....................................................296
II. Trial Motions and Objections .........................................297
A. Objections to Explanation of Taped References ........................297
B. Motions for Mistrial ...............................................301
1. Giampa's Motions for Mistrial.....................................302
2. Vittorio's Motions for Mistrial.....................................304
3. Segarra's Motion for Mistrial .....................................307
4. Capra's Motion for Mistrial.......................................309
C. Gaito's Request for an Entrapment Defense Charge ....................309
1. The Entrapment Defense .........................................310
a. Inducement .................................................310
b. Non–Predisposition ...........................................311
2. Inappropriateness of an Entrapment Charge in the Instant Case.....311
3. Gaito's Initiation of Contact With Sabol ...........................316
4. Motion for Reconsideration ......................................317
D. Motions for Judgment of Acquittal Under Rule 29(a) ...................319
1. Count One: Conspiracy to Engage in Racketeering..................320
a. Giampa's Rule 29 Motion on Count One .......................321
b. Vittorio's Rule 29 Motion on Count One .......................321
c. Gaito's Rule 29 Motion on Count One .........................321
d. McManus' Rule 29 Motion on Count One ......................322
e. Segarra's Rule 29 Motion on Count One ........................322
f. Porco's Rule 29 Motion on Count One .........................322
g. Capra's Rule 29 Motion on Count One.........................322
2. Count Two: Substantive RICO ....................................325
a. Giampa's Rule 29 Motion on Count Two .......................325
b. Vittorio's Rule 29 Motion on Count Two .......................326
c. McManus' Rule 29 Motion on Count Two ......................326
The Narcotics Counts (Counts Three through Five) .....................326
3. Count Three: Conspiracy to Distribute Narcotics...................326
a. Vittorio's Rule 29 Motion on Count Three.......................327
b. Gaito's Rule 29 Motion on Count Three........................327
c. McManus' Rule 29 Motion on Count Three......................327
4. Count Four: Distribution of Heroin ...............................328
a. Gaito's Rule 29 Motion on Count Four.........................328
b. McManus' Rule 29 Motion on Count Four ......................328
5. Count Five: Conspiracy to Import Narcotics........................329
a. Giampa's Rule 29 Motion on Count Five .......................329
b. Vittorio's Rule 29 Motion on Count Five .......................329
c. McManus' Rule 29 Motion on Count Five ......................329
d. Porco's Rule 29 Motion on Count Five.........................329

 e. Capra's Rule 29 Motion on Count Five .........................329

The Firearms Counts (Counts Six through Eleven) ......................330

 6. Count Six: Conspiracy to Deal in Firearms.........................330

 7. Count Seven: Transfer of Machine Gun .............................331

 8. Count Eight: Selling Firearm to a Felon...........................331

 9. Count Nine: Selling Firearm to a Felon ...........................331

 10. Count Ten: Shipping Gun with Altered Serial Number ..............331

 11. Count Eleven: Transferring Unregistered Machine Gun..............331

 a. Vittorio's Rule 29 Motion on the Firearms Counts ...............332

 b. Gaito's Rule 29 Motion on the Firearm Counts ..................332

 c. McManus' Rule 29 Motion on Firearms Counts ..................332

 d. Segarra's Rule 29 Motion on Firearms Counts .................332

The Stolen Fur Counts (Counts Twelve Through Fourteen)..............336

 12. Count Twelve: Conspiracy to Steal and Transport Stolen Property.....336

 13. Count Thirteen: Transportation of Stolen Property .................336

 14. Count Fourteen: Possession of Stolen Property ....................336

 a. Giampa's Rule 29 Motion on the Stolen Fur Counts ............337

 b. Vittorio's Rule 29 Motion on the Stolen Fur Counts ............337

 c. Gaito's Rule 29 Motion on the Stolen Fur Counts ..............337

 15. Count Fifteen: Conspiracy to Transport Stolen Vehicles .............338

 a. Giampa's Rule 29 Motion on Count Fifteen .....................338

 b. Vittorio's Rule 29 Motion on Count Fifteen .....................339

 c. Segarra's Rule 29 Motion on Count Fifteen .....................339

 d. Porco and Capra's Rule 29 Motions on Count Fifteen...........339

 16. Count Sixteen: Conspiracy to Establish Gambling Operations ........340

 a. Giampa's Rule 29 Motion on Count Sixteen .....................340

 b. Vittorio's Rule 29 Motion on Count Sixteen .....................340

 c. Porco's Rule 29 Motion on Count Sixteen ......................340

 d. Capra's Rule 29 Motion on Count Sixteen......................340

 17. Count Seventeen: Conspiracy to Make Extortionate Loan............341

 a. Giampa's Rule 29 Motion on Count Seventeen ..................341

 b. Vittorio's Rule 29 Motion on Count Seventeen ..................342

 18. Count Eighteen: Conspiracy to Deal in Counterfeit Money ..........343

 Vittorio's Rule 29 Motion on Count Eighteen....................343

The Concealing Evidence Counts (Counts Nineteen and Twenty) ..........344

 19. Count Nineteen: Conspiracy to Conceal Evidence ..................344

 20. Count Twenty: Attempt to Conceal Evidence ......................344

 a. Giampa's Rule 29 Motion on Counts Nineteen and Twenty.....344

 b. Vittorio's Rule 29 Motion on Counts Nineteen and Twenty.....344

 c. McManus' Rule 29 Motion on Counts Nineteen and Twenty.....344

The Travel/Telephone Counts (Counts Twenty–One through Forty–Six).....345

 21. Counts Twenty–One Through Forty–Six: Travel/Telephone Use in
 Aid of Racketeering.........................................345

 a. Giampa's Rule 29 Motion on the Travel/Telephone Counts ........346

 b. Vittorio's Rule 29 Motion on the Travel/Telephone Counts ........346

 c. Gaito's Rule 29 Motion on the Travel/Telephone Counts ..........346

 d. McManus' Rule 29 Motion on the Travel/Telephone Counts.....346

 e. Segarra's Rule 29 Motion on the Travel/Telephone Counts........347

 f. Porco's Rule 29 Motion on the Travel/Telephone Counts.........347

III. Post Trial Motions.....................................................348

 A. Declaration of Mistrial as to Deadlocked Counts .......................348

 B. Motions for Judgment of Acquittal Under Rule 29(c)....................353

 C. Motions for Bail Pending Sentencing...................................356

 1. 18 U.S.C. § 3143(a) ..............................................357

 a. Risk of Flight ...............................................358

 b. Danger to the Community .......................................358

 2. Inappropriateness of Bail in the Instant Case ......................358

 a. Giampa.....................................................358

 b. Gaito.......................................................360

 c. McManus...................................................360

 d. Porco and Capra.............................................361

Conclusion ................................................................ 363

## OPINION

LECHNER, District Judge.

A fifty-one count indictment (the "Indictment") was filed on 10 August 1994 against defendants Joseph Giampa ("Giampa"), Gennaro Vittorio (a/k/a "Gerry Giampa") ("Vittorio"), Joseph Gaito ("Gaito"), James McManus ("McManus"), Guy Fatato ("Fatato")[1], Benjamin Segarra ("Segarra"), Louis Dorval (a/k/a "Louie") ("Dorval")[2], Elliot Porco ("Porco") and John Capra (a/k/a "Johnny Hooks") ("Capra").

The Indictment charged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(1), (5), 1962(d), conspiracy to import and distribute heroin and cocaine, 21 U.S.C. §§ 963, 846, distribution of heroin, 21 U.S.C. §§ 841(a)(1), 846, conspiracy to deal in firearms, 18 U.S.C. § 922(a)(4), (d)(1), (k), 26 U.S.C. § 5861(e), dealing in firearms, 18 U.S.C. § 922(a)(4), (d)(1), (k), 26 U.S.C. § 5861(e), conspiracy to steal and transport stolen property, 18 U.S.C. §§ 2, 659, 2314, 2315, transportation and possession of stolen property, 18 U.S.C. §§ 2, 2314, 2315, conspiracy to transport stolen vehicles, 18 U.S.C. § 2312, conspiracy to establish an illegal gambling business, 18 U.S.C. § 1955, conspiracy to make an extortionate loan, 18 U.S.C. §§ 892, 2, conspiracy to deal in counterfeit money, 18 U.S.C. § 473, conspiracy to conceal evidence, 18 U.S.C.

§§ 1512(b), 2, and travel and telephone use in aid of racketeering, 18 U.S.C. §§ 1952, 2.

On 8 February 1995, a superseding indictment (the "Superseding Indictment") was filed. The Superseding Indictment eliminated Dorval who is deceased. Aside from eliminating references to Dorval, the Superseding Indictment is identical to the Indictment in most respects. The United States (the "Government") submitted a redacted version of the Superseding Indictment (the "Redacted Superseding Indictment"), on 12 July 1995, which eliminated references to Fatato.[3]

This opinion addresses the rulings made prior to, during the course of and after trial in this matter.

*Facts*

*The Redacted Superseding Indictment*

### A. Background

According to the Redacted Superseding Indictment, the Lucchese Crime Family (the "Lucchese Crime Family") "was a wholly illegal entity consisting of individuals associated in fact as an enterprise," as defined in 18 U.S.C. 1961(4), "which was engaged in, and the activities of which affected, interstate commerce." Count 1, ¶ 1(a). The Redacted Superseding Indictment alleges the Lucchese Crime Family was a criminal enterprise[4]

---

**1.** On 27 April 1995, Fatato pleaded guilty to one count of conspiracy to violate RICO pursuant to Section 1962(d) of Title 18 of the United States Code.

**2.** Shortly after the Indictment was filed, Dorval was murdered. *See, e.g., Gary Witherspoon & Robert E. Kessler, Bit Player Among Wiseguys,* Newsday, Aug. 19, 1994, at A7 (detailing how Dorval was found, on 16 August 1994, "stuffed inside a 2–by–3 foot black-plastic tool trunk floating in the Atlantic Ocean"); *Body Identified,* Balt. Sun, Aug. 19, 1994, at 3A (reporting that Dorval "had been shot once in the head"); *Mafia Associate Found Dead in Sea,* Rocky Mountain News, Aug. 20, 1994, at 41A (same).

**3.** Defendants Giampa, Vittorio, Gaito, McManus, Segarra, Porco and Capra are collectively referred to as the "Defendants." References to the

Indictment or Superseding Indictment by the Defendants or the Government in their submissions have been construed as references to the Redacted Superseding Indictment. For the purposes of this opinion, the Redacted Superseding Indictment will be used. The Redacted Superseding Indictment was the version of the Indictment which was charged to the Jury. Specific Counts of the Redacted Superseding Indictment are cited as "Count ___, ¶ ___."

**4.** An enterprise is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

which was highly structured and had a well defined chain of command. Count 1, ¶ 1(b).

The Redacted Superseding Indictment alleges that at the top of the Lucchese Crime Family's hierarchy was the "Boss" who exercised absolute control over the operation of the Lucchese Crime Family. *Id.* The Redacted Superseding Indictment further alleges that subordinate to the Boss were the "Underboss," and "Consigliere" or "Advisor." *Id.* Below the Boss, Underboss and Consigliere were "Captains," also known as "Caporegimes" or "Capos" or "Skippers." *Id.*

According to the Redacted Superseding Indictment each of the Captains was in charge of one or more groups or "Crews" of individual "Soldiers" or "members of the [Lucchese Crime Family] who had been formally initiated or 'made' as members of the enterprise." *Id.* The Redacted Superseding Indictment alleges these Soldiers then recruited and controlled the activities of various associates, each of whom sought the protection and economic benefits such association afforded. *Id.*

The Redacted Superseding Indictment alleges the object and purpose of the Lucchese Crime Family

> [were] to make money for those associated with it through the conduct of diverse criminal activities including, but not limited to, loansharking, extortion, illegal gambling, and trafficking in stolen property, narcotics and firearms.

*Id.,* ¶ 1(c). Additionally, the Redacted Superseding Indictment alleges individuals associated with the Lucchese Crime Family were required to pay to their superiors a percentage of the proceeds from criminal activity in which they or their subordinates participated. *Id.*

### B. *The Defendants*

#### 1. *Giampa*

According to the Redacted Superseding Indictment, Giampa "was a made member and a high ranking '[C]aporegime' in the Lucchese Crime Family." *Id.,* ¶ 2(a). The Redacted Superseding Indictment alleges he was the leader of a group of "made" members and associates of the Lucchese Crime

Family (the "Giampa Crew"). *Id.* The Redacted Superseding Indictment further alleges Giampa reported to the Boss and Underboss of the Lucchese Crime Family "for any transgression against the fundamental rules of the [Lucchese Crime Family] by those members below him in the chain of command." *Id.*

The Redacted Superseding Indictment charges Giampa with violating RICO, Counts 1, 2, Conspiracy to Import Narcotics, Count 5, Conspiracy to Steal and Transport Stolen Property, Count 12, Transporting Stolen Property, Count 13, Possession of Stolen Property, Count 14, Conspiracy to Transport Stolen Vehicles, Count 15, Conspiracy to Establish a Gambling Operation, Count 16, Conspiracy to Make an Extortionate Loan, Count 17, Conspiracy to Conceal Evidence, Count 19, Attempt to Conceal Evidence, Count 20, and Travel/Telephone Use in Aid of Racketeering. Counts 34, 36, 37, 40, 42.

#### 2. *Vittorio*

The Redacted Superseding Indictment alleges Vittorio was associated with Giampa and was a member of the Giampa Crew. Count 1, ¶ 2(b). According to the Redacted Superseding Indictment, Vittorio, who reported directly to Giampa, supervised other associates including Gaito, McManus and Fatato. *Id.*

Vittorio is charged in the Redacted Superseding Indictment with violating RICO, Counts 1, 2, Conspiracy to Distribute Narcotics, Count 3, Distribution of Heroin, Count 4, Conspiracy to Import Narcotics, Count 5, Conspiracy to Deal in Firearms, Count 6, Transfer of Machine Gun, Count 7, Selling Firearms to a Felon, Counts 8, 9, Shipping a Gun with an Altered Serial Number, Count 10, Transferring an Unregistered Machine Gun, Count 11, Conspiracy to Steal and Transport Stolen Property, Count 12, Transporting Stolen Property, Count 13, Possession of Stolen Property, Count 14, Conspiracy to Transport Stolen Vehicles, Count 15, Conspiracy to Establish a Gambling Operation, Count 16, Conspiracy to Make an Extortionate Loan, Count 17, Conspiracy to Deal in Counterfeit Money, Count 18, Conspiracy to Conceal Evidence, Count 19, At-

tempt to Conceal Evidence, Count 20, and Travel/Telephone Use in Aid of Racketeering. Counts 21–27, 29, 30, 37, 43.

### 3. *Gaito*

The Redacted Superseding Indictment alleges Gaito was associated with Giampa, to whom he reported, and Vittorio. Count 1, ¶ 2(c). Gaito is charged in the Redacted Superseding Indictment with violating RICO, Count 1, Conspiracy to Distribute Narcotics, Count 3, Distribution of Heroin, Count 4, Conspiracy to Deal in Firearms, Count 6, Transfer of Machine Gun, Count 7, Selling Firearms to a Felon, Counts 8, 9, Shipping a Gun with an Altered Serial Number, Count 10, Transferring an Unregistered Machine Gun, Count 11, Conspiracy to Steal and Transport Stolen Property, Count 12, and Travel/Telephone Use in Aid of Racketeering. Counts 22–25, 27.

### 4. *McManus*

According to the Redacted Superseding Indictment, McManus was associated with Vittorio, to whom he reported, Porco and Capra. Count 1, ¶ 2(d). The Redacted Superseding Indictment charges McManus with violating RICO, Count 1, 2, Conspiracy to Distribute Narcotics, Count 3, Distribution of Heroin, Count 4, Conspiracy to Import Narcotics, Count 5, Conspiracy to Deal in Firearms, Count 6, Transfer of Machine Gun, Count 7, Selling Firearms to a Felon, Counts 8, 9, Shipping a Gun with an Altered Serial Number, Count 10, Transferring an Unregistered Machine Gun, Count 11, Conspiracy to Steal and Transport Stolen Property, Count 12, Transporting Stolen Property, Count 13, Possession of Stolen Property, Count 14, Conspiracy to Transport Stolen Vehicles, Count 15, Conspiracy to Establish a Gambling Operation, Count 16, Conspiracy to Conceal Evidence, Count 19, Attempt to Conceal Evidence, Count 20, and Travel/Telephone Use in Aid of Racketeering. Counts 27–32, 37, 38, 41, 44–46.

### 5. *Segarra*

The Redacted Superseding Indictment alleges Segarra was associated with Porco, to whom he reported, McManus and Capra. Count 1, ¶ 2(e). Segarra is charged in the Redacted Superseding Indictment with violating RICO, Count 1, Conspiracy to Deal in Firearms, Count 6, Transfer of Machine Gun, Count 7, Selling Firearms to a Felon, Count 9, Transferring an Unregistered Machine Gun, Count 11, Conspiracy to Transport Stolen Vehicles, Count 15, Conspiracy to Establish a Gambling Operation, Count 16, and Travel/Telephone Use in Aid of Racketeering. Count 33.

### 6. *Porco*

The Redacted Superseding Indictment alleges Porco, who reported to Capra, was an associate of the Lucchese Crime Family and a member of "a different crew than the Giampa Crew." Count 1, ¶ 2(f). Porco is charged in the Redacted Superseding Indictment with violating RICO, Count 1, Conspiracy to Import Narcotics, Count 5, Conspiracy to Transport Stolen Vehicles, Count 15, Conspiracy to Establish a Gambling Operation, Count 16, and Travel/Telephone Use in Aid of Racketeering. Counts 29, 30, 33, 35, 39.

### 7. *Capra*

According to the Redacted Superseding Indictment, Capra was a "made" member of the Lucchese Crime Family and "a member of a different crew than the Giampa Crew." Count 1, ¶ 2(g). Capra is charged in the Redacted Superseding Indictment with violating RICO, Count 1, Conspiracy to Import Narcotics, Count 5, Conspiracy to Transport Stolen Vehicles, Count 15, and Conspiracy to Establish a Gambling Operation. Count 16.

### C. *Count One: Conspiracy to Engage in Racketeering*

The Redacted Superseding Indictment charges that from on or about 21 October 1992, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, the Defendants,

> employed by and associated with Lucchese Crime Family, an enterprise which was engaged in, and the activities of which affected, interstate commerce, did knowingly and wilfully conspire with each other and with others to conduct and to partici-

pate, directly and indirectly, in the conduct of the affairs of the Lucchese Crime Family through a pattern of racketeering activity. . . .

Count 1, ¶ 3.

*Manner and Means*

According to the Redacted Superseding Indictment, in order to extend the power and influence of the Lucchese Crime Family and to increase profits, the Defendants took steps to expand the geographical control of the Lucchese Crime Family into New Jersey. Count 1, ¶ 5. The Redacted Superseding Indictment alleges this was done by, among other things, "the establishment of, and attempts to establish, a multi-kilogram heroin and cocaine distribution network[,] contacts for the sale and distribution of stolen property, firearms and counterfeit money[,] an import-export company for the importation of narcotics[,] and exportation of stolen vehicles and illegal gambling operations." *Id.*

Count One alleges Defendants "did agree, together, with each other and with other co-conspirators, that members and associates of the Lucchese Crime Family would commit and aid, abet, counsel, command, induce, procure and willfully cause the commission of at least two [r]acketeering [a]cts," as set forth in 18 U.S.C. § 1961(1). *Id.,* ¶ 160. Count One describes eight acts of racketeering committed by Defendants: (1) a conspiracy to import and distribute narcotics, 21 U.S.C. §§ 963, 846, (2) the distribution of heroin, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, (3) a scheme to steal and transport stolen property, 18 U.S.C. §§ 2, 659, 2314, 2315, (4) a scheme to export stolen vehicles, 18 U.S.C. § 2312, (5) a scheme to establish an illegal gambling business, 18 U.S.C. § 1955, 1955(b)(1), (6) a conspiracy to establish import/export company through extortionate loan, 18 U.S.C. §§ 892, 2, (7) a scheme to deal in counterfeit money, 18 U.S.C. § 473, and (8) a scheme to conceal evidence, 18 U.S.C. §§ 1512(b), 2. *Id.,* ¶¶ 161–68.

### D. *Count Two: Substantive RICO*

Count Two re-alleges the "allegations contained in paragraphs 1, 2, 4 through 159, 161 through 163, 166 and 168 of Count 1 . . . [and] incorporate[s] [those allegations] by reference . . . ." Count 2, ¶ 1.

Count Two charges that from on or about 21 October 1992, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio and McManus

employed by and associated with the Lucchese Crime Family, an enterprise which was engaged in, and the activities of which affected, interstate commerce, did knowingly and wilfully conduct and participate, directly and indirectly, in the conduct of the affairs of the Lucchese Crime Family through a pattern of racketeering activity, as defined in Title 18, United States Code, Section 1961(1) and (5). . . .

Count 2, ¶ 2.

Count Two alleges Giampa, Vittorio and McManus "committed and aided and abetted, counseled, commanded, induced, procured and willfully caused the commission of the [r]acketeering [a]cts set forth below." *Id.,* ¶ 3. Count Two lists five racketeering acts, which are described in Count One, allegedly committed by Giampa, Vittorio and McManus in violation of 18 U.S.C. § 1962(c): (1) a conspiracy to import and distribute heroin and cocaine, (2) the distribution of heroin, (3) a scheme to steal and transport stolen property, (4) a scheme to establish import/export company through extortionate loan, and (5) a scheme to conceal evidence. *Id.,* ¶ 3.

### E. *Count Three: Conspiracy to Distribute Narcotics*

Count Three re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 . . . [and] incorporate[s] [those allegations] by reference . . . ." Count 3, ¶ 1. Count Three charges that from on or about 21 October 1992, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, Vittorio, Gaito and McManus

knowingly and intentionally did combine, conspire, and agree with each other, and with others, to distribute, and to possess with intent to distribute, more than 5 kilograms of heroin, a Schedule I narcotic drug controlled substance, and more than

5 kilograms of cocaine, a Schedule II narcotic drug controlled substance, contrary to Title 21, United States Code, Section 841(a)(1). In violation of Title 21, United States Code, Section 846.

Count 3, ¶ 2.

### F. Count Four: Distribution of Heroin

Count Four re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 4, ¶ 1. Count Four charges that on or about 22 November 1993, in the District of New Jersey, and elsewhere, Vittorio, Gaito and McManus "knowingly and intentionally did possess, with intent to distribute, one ounce of heroin, a Schedule I narcotic drug controlled substance" in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count 4, ¶ 2.

### G. Count Five: Conspiracy to Import Narcotics

Count Five re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 5, ¶ 1. Count Five charges that on or about 21 October 1992, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio, McManus, Porco and Capra

knowingly and intentionally did combine, conspire, and agree with each other, and with others, to import more than 5 kilograms of heroin, a Schedule I narcotic drug controlled substance, and more than 5 kilograms of cocaine, a Schedule II narcotic drug controlled substance, from a place outside the United States, contrary to Title 21, United States Code, Section 952. In violation of Title 21, United States Code, Section 963.

Count 5, ¶ 2.

### H. Count Six: Conspiracy to Deal in Firearms

Count Six re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 6, ¶ 1. Count Six charges that on or about 21

October 1992, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, Vittorio, Gaito, McManus, and Segarra

knowingly and willfully did combine, conspire, confederate and agree with each other, to:

a. transport in interstate commerce a fully automatic RPB Industries .9mm submachine gun, contrary to Title 18, United States Code, Section 922(a)(4);

b. sell and otherwise dispose of a firearm and ammunition, to a person, knowing, and having reasonable cause to believe that such person has been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, contrary to Title 18, United States Code, Section 922(d)(1);

c. knowingly transport, ship and receive in interstate commerce a firearm which had the manufacturer's serial number removed, obliterated and altered, contrary to Title 18, United States Code, Section 922(k);

d. to transfer unregistered firearms in violation of Title 26, United States Code, Section 5841, namely a fully automatic RPB Industries .9mm submachine gun and silencer, contrary to Title 26, United States Code, Section 5861(e).

Count 6, ¶ 2.

The Redacted Superseding Indictment alleges that in furtherance of the conspiracy Vittorio, Gaito, McManus and Segarra committed nineteen overt acts, in violation of 18 U.S.C. § 371, in the District of New Jersey, and elsewhere. *Id.* at 51. The Redacted Superseding Indictment lists the overt acts, each with a corresponding paragraph in Count One that describes it: (i.e. the first overt act is described in Count 1, ¶ 23, the second overt act is described in Count 1, ¶ 24, ... the nineteenth overt act is described in Count 1, ¶ 41.) *Id.*

### I. Count Seven: Transfer of Machine Gun

Count Seven re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorpo-

rate[s] [those allegations] by reference...." Count 7, ¶1. Count Seven charges that on or about 15 December 1993, in the District of New Jersey, and elsewhere, Vittorio, Gaito, McManus, and Segarra "knowingly and willfully did transport in interstate commerce a fully automatic RPB Industries .9mm submachine gun. In violation of Title 18, United States Code, Sections 922(a)(4) and 2." Count 7, ¶2.

### J. *Counts Eight and Nine: Selling Firearms to a Felon*

Counts Eight and Nine re-allege the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Counts 8–9, ¶1. Counts Eight and Nine charge that on or about the dates listed below, in the District of New Jersey, and elsewhere, Vittorio, Gaito, McManus and Segarra "knowingly and willfully did sell and otherwise dispose of a firearm and ammunition to a person, knowing, and having reasonable cause to believe, that such person has been convicted in a court of a crime punishable by imprisonment for a term exceeding one year." Counts 8–9, ¶2. Count Eight alleges that on 13 December 1993, Vittorio, Gaito and Segarra sold a Rossi .38 caliber revolver and hollow tip bullets. *Id.* Count Nine alleges that on 15 December 1993, Vittorio, Gaito, McManus and Segarra sold a RPB Industries .9mm submachine gun, ammunition and a silencer. *Id.* The Redacted Superseding Indictment alleges that these sales were in violation of 18 U.S.C. §§ 922(d)(1) and (2). *Id.*

### K. *Count Ten: Shipping Gun with Altered Serial Number*

Count Ten re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 10, ¶1. Count Ten charges that on or about 13 December 1993, in the District of New Jersey, and elsewhere, Vittorio, Gaito and McManus "did knowingly and willfully transport, ship and receive in interstate commerce a firearm, namely a Rossi .38 caliber revolver, which had the manufacturer's serial num-

ber removed, obliterated and altered. In violation of Title 18, United States Code, Sections 922(k) and 2." Count 10, ¶2.

### L. *Count Eleven: Transferring Unregistered Machine Gun*

Count Eleven re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 11, ¶1. Count Eleven charges that on or about 15 December 1993, in the District of New Jersey, and elsewhere, Vittorio, Gaito, McManus and Segarra "knowingly and willfully did transfer unregistered firearms in violation of Title 26, United States Code, Section 5841, namely a fully automatic RPB Industries .9mm submachine gun and silencer. In violation of Title 26, United States Code, Section 5861(e) and Title 18, United States Code, Section 2." Count 11, ¶2.

### M. *Count Twelve: Conspiracy to Steal and Transport Stolen Property*

Count Twelve re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 12, ¶1. Count Twelve charges that on or about 21 October 1992, through in or about January 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio, Gaito and McManus

knowingly and willfully did combine, conspire, confederate and agree with each other, and with others, to:

a. embezzle, steal and unlawfully take and carry away and conceal, and by fraud and deception did obtain, from a storage facility, with intent to convert to his own use, goods and chattels moving as, and which were a part of and which constituted, an interstate shipment of freight, express and property, contrary to Title 18, United States Code, Section 659.

b. transport, transmit and transfer in interstate commerce goods, wares and merchandise having a value of more than $5,000, knowing that the goods, wares and merchandise was stolen, converted and taken by fraud, contrary to Title 18, United States Code, Section 2314.

c. receive, possess, conceal, store, barter, sell and dispose of goods, wares and merchandise having a value of more than $5,000, which have crossed a [s]tate boundary after being stolen, unlawfully converted and taken, and knowing that the goods, wares and merchandise was stolen, unlawfully converted and taken, in violation of Title 18, United States Code, Sections 2315 and 2.

Count 12, ¶ 2.

The Redacted Superseding Indictment lists twenty-one overt acts committed by Giampa, Vittorio, Gaito and McManus in the District of New Jersey, and elsewhere. *Id.* at 57. The Redacted Superseding Indictment alleges that these overt acts were committed in violation of 18 U.S.C. § 371 and were "[i]n furtherance of the conspiracy and in order to effect its objects." *Id.* Each overt act is listed with a corresponding paragraph in Count One that describes it: (i.e. the first overt act is described in Count 1, ¶ 42, the second overt act is described in Count 1, ¶ 43, ... the twenty-first overt act is described in Count 1, ¶ 62). *Id.*

### N. *Count Thirteen: Transportation of Stolen Property*

Count Thirteen re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 13, ¶ 1. Count Thirteen charges that from on or about 22 December 1993, through in or about January 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio and McManus

knowingly and willfully did transport, transmit and transfer in interstate commerce goods, wares and merchandise having a value of more than $5,000, namely, fur coats from Filenes Basement, knowing that [the] fur coats were stolen, converted and taken by fraud. In violation of Title 18, United States Code, Sections 2314 and 2.

Count 13, ¶ 2.

### O. *Count Fourteen: Possession of Stolen Property*

Count Fourteen re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 14, ¶ 1. Count Fourteen charges that from on or about 22 December 1993, through in or about January 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio and McManus

knowingly and willfully did receive, possess, conceal, store, barter, sell and dispose of goods, wares and merchandise having a value of more than $5,000, which have crossed a [s]tate boundary after being stolen, unlawfully converted and taken, and knowing that the goods, wares and merchandise was stolen, unlawfully converted and taken. In violation of Title 18, United States Code, Sections 2315 and 2.

Count 14, ¶ 2.

### P. *Count Fifteen: Conspiracy to Transport Stolen Vehicles*

Count Fifteen re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 15, ¶ 1. Count Fifteen charges that from on or about 6 January 1994, through in or about January 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio, McManus, Segarra, Porco and Capra "knowingly and willfully did combine, conspire, confederate and agree with each other, and with others, to transport, in interstate and foreign commerce, motor vehicles, knowing that the motor vehicles were stolen, contrary to Title 18, United States Code, Section 2312." Count 15, ¶ 2.

The Redacted Superseding Indictment lists twelve overt acts committed by Giampa, Vittorio, McManus, Segarra, Porco and Capra in the District of New Jersey, and elsewhere. *Id.* at 60–61. The Redacted Superseding Indictment alleges that these overt acts were committed in violation of 18 U.S.C. § 371 and were "[i]n furtherance of the conspiracy and in order to effect its objects." *Id.* Each overt act is listed with a corresponding paragraph in Count One that describes it: (i.e. the first overt act is described in Count 1, ¶ 79, the second overt act is

described in Count 1, ¶ 80, ... the twelfth overt act is described in Count 1, ¶ 90). *Id.*

### Q. *Count Sixteen: Conspiracy to Establish Gambling Operations*

Count Sixteen re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 16, ¶ 1. Count Sixteen charges that from on or about 20 December 1993, through on or about 11 August 1993, in the District of New Jersey, and elsewhere, Giampa, Vittorio, McManus, Segarra, Porco and Capra "knowingly and willfully did combine, conspire, confederate and agree with each other, and with others, to conduct, finance, manage, supervise, direct and own all of and part of an illegal gambling business," as defined in 18 U.S.C. § 1955(b)(1), and contrary to 18 U.S.C. § 1955. Count 16, ¶ 2.

The Redacted Superseding Indictment lists twenty-eight overt acts committed by Giampa, Vittorio, McManus, Segarra, Porco and Capra in the District of New Jersey, and elsewhere. *Id.* at 62–63. The Redacted Superseding Indictment alleges that these overt acts were committed in violation of 18 U.S.C. § 371 and were "[i]n furtherance of the conspiracy and in order to effect its objects." *Id.* Each overt act is listed with a corresponding paragraph in Count One that describes it: (i.e. the first overt act is described in Count 1, ¶ 91, the second overt act is described in Count 1, ¶ 92, ... the twenty-eighth overt act is described in Count 1, ¶ 118). *Id.*

### R. *Count Seventeen: Conspiracy to Make Extortionate Loan*

Count Seventeen re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 17, ¶ 1. Count Seventeen charges that on or about 24 January 1994, in the District of New Jersey, and elsewhere, Giampa and Vittorio "knowingly and willfully did conspire to make a $10,000 extortionate extension of credit. In violation of Title 18, United States Code, Section 892." Count 17, ¶ 2.

### S. *Count Eighteen: Conspiracy to Deal in Counterfeit Money*

Count Eighteen re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 18, ¶ 1. Count Eighteen charges that from on or about 24 January 1994, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, Vittorio

knowingly and willfully did combine, conspire, confederate and agree with others, to buy, sell, exchange, transfer, receive and deliver false, forged, counterfeited and altered obligations of the United States with the intent that such obligations be passed, published and used as true and genuine, contrary to Title 18, United States Code, Section 473.

Count 18, ¶ 2.

The Redacted Superseding Indictment lists four overt acts committed by Vittorio in the District of New Jersey and elsewhere. *Id.* at 65. The Redacted Superseding Indictment alleges that these overt acts were committed in violation of 18 U.S.C. § 371 and were "[i]n furtherance of the conspiracy and in order to effect its objects." *Id.* Each overt act is listed with a corresponding paragraph in Count One that describes it: (i.e. the first overt act is described in Count 1, ¶ 143, the second overt act is described in Count 1, ¶ 144, ... the fourth overt act is described in Count 1, ¶ 146). *Id.*

### T. *Count Nineteen: Conspiracy to Conceal Evidence*

Count Nineteen re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 19, ¶ 1. Count Nineteen charges that from on or about 25 January 1994, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio and McManus

did knowingly and willfully combine, conspire, confederate and agree with each other, and with others, to corruptly persuade Richard Sabol ["Sabol"], and engage in misleading conduct toward Sabol, with in-

tent to 1) influence, delay and prevent Sabol's testimony in an official proceeding; 2) cause and induce Sabol to conceal an object, namely, $10,000 in U.S. currency, with intent to impair the integrity and availability of the currency for use in an official proceeding; and 3) hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission of a Federal offense, contrary to Title 18, United States Code, Section 1512(b).

Count 19, ¶ 2.

The Redacted Superseding Indictment lists thirteen overt acts committed by Giampa, Vittorio and McManus in the District of New Jersey and elsewhere. *Id.* at 66–67. The Redacted Superseding Indictment alleges that these overt acts were committed in violation of 18 U.S.C. § 371 and were "[i]n furtherance of the conspiracy and in order to effect its objects." *Id.* at 66. Each overt act is listed with a corresponding paragraph in Count One that describes it: (i.e. the first overt act is described in Count 1, ¶ 147, the second overt act is described in Count 1, ¶ 148, ... the thirteenth overt act is described in Count 1, ¶ 159). *Id.* at 67.

U. *Count Twenty: Attempt to Conceal Evidence*

Count Twenty re-alleges the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Count 20, ¶ 1. Count Twenty charges that from on or about 25 January 1994, through on or about 11 August 1994, in the District of New Jersey, and elsewhere, Giampa, Vittorio and McManus

did knowingly and willfully corruptly persuade [Sabol], and engage in misleading conduct toward Sabol, with intent to 1) influence, delay and prevent Sabol's testimony in an official proceeding; 2) cause and induce Sabol to conceal an object, namely, $10,000 in U.S. currency, with intent to impair the integrity and availability of the currency for use in an official pro-

ceeding; and 3) hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission of a Federal offense. In violation of Title 18, United States Code, Section 1512(b) and 2.

Count 20, ¶ 2.

V. *Counts Twenty–One Through Forty– Six: Travel/Telephone Use in Aid of Racketeering*

Counts Twenty–One through Forty–Six re-allege the allegations "contained in Paragraphs 1 and 2 and 4 through 159 of Count 1 ... [and] incorporate[s] [those allegations] by reference...." Counts 21–46, ¶ 1. Counts Twenty–One through Forty–Six charge that on the dates listed below, in the District of New Jersey, and elsewhere, the defendants named below

knowingly and willfully did travel in interstate commerce and use a facility in interstate commerce, and caused the travel in interstate commerce and use of a facility in interstate commerce, with the intent to promote, manage, establish and carry on, and facilitate the promotion, management, establishment and carrying on, of an unlawful activity, and thereafter did perform, attempt to perform, and cause the performance of, an act to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity.... In violation of Title 18, United States Code, Sections 1952 and 2.

Counts 21–46, ¶ 2.

The Redacted Superseding Indictment then lists, for Counts Twenty–One through Forty–Six, the date, the defendant or defendants charged, whether travel or telephone use was employed in aid of racketeering and the unlawful activity involved. *Id.* at 69–71.

W. *The Jury Verdict* [5]

1. *Giampa*

The jury was unable to reach a unanimous decision as to Giampa on Counts One, Two,

5. *See infra* at 348–51 (discussing the circumstances surrounding the taking of the verdict in the instant case).

Five, Twelve, Fifteen and Seventeen. Trial Tr. at 4857–65. Giampa was found not guilty on Counts Thirteen, Fourteen, Nineteen and Twenty. *Id.* at 4863–65. Giampa was found guilty on Counts Sixteen, Thirty–Four, Thirty–Six, Thirty–Seven, Forty, Forty–Two. *Id.* at 4864–68.

### 2. *Vittorio*

The jury was unable to reach a unanimous decision as to Vittorio on Counts One, Two, Seventeen and Eighteen. *Id.* at 4857–65. Vittorio was found not guilty on Counts Nineteen through Twenty–Two and Thirty. *Id.* at 4865–67. Vittorio was found guilty on Counts Three, Four, Five, Six, Seven through Eleven, Twelve, Thirteen through Sixteen, Twenty–Three through Twenty–Seven, Twenty–Nine, Thirty–Seven and Forty–Three. *Id.* at 4858–68.

### 3. *Gaito*

The jury was unable to reach a unanimous decision as to Gaito on Count One. *Id.* at 4857. Gaito was found not guilty on Count Twenty–Two. *Id.* at 4866. Gaito was found guilty on Counts Three, Four, Six, Seven through Eleven, Twelve, Twenty–Three through Twenty-five and Twenty–Seven. *Id.* at 4858–66.

### 4. *McManus*

The jury was unable to reach a unanimous decision as to McManus on Counts One and Two. *Id.* at 4857–58. McManus was found not guilty on Counts Six, as to paragraph A, C and D, Seven through Eleven, Nineteen, Twenty and Thirty. *Id.* at 4859–62, 4865, 4867. McManus was found guilty on Counts Three, Four, Five, Six, as to paragraph B, Twelve, Thirteen through Sixteen, Twenty–Seven through Twenty–Nine, Thirty–One,

Thirty–Two, Thirty–Seven, Thirty–Eight, Forty–One and Forty–Four through Forty–Six. *Id.* at 4858–64, 4866–69.

### 5. *Segarra*

Segarra was found not guilty on Counts One, Six, Seven, Nine, Eleven, Fifteen, Sixteen and Thirty–Three. *Id.* at 4857–65, 4867.

### 6. *Porco*

The jury was unable to reach a unanimous decision as to Porco on Counts One, Five, Sixteen, Twenty–Nine, Thirty–Three, Thirty–Five and Thirty–Nine. *Id.* at 4857–59, 4864–65, 4867–68. Porco was found not guilty on Count Thirty. *Id.* at 4867. Porco was found guilty on Count Fifteen. *Id.* at 4864.

### 7. *Capra*

The jury was unable to reach a unanimous decision as to Capra on Counts One, Five, and Sixteen. *Id.* at 4857–59, 4864–65. Capra was found guilty on Count Fifteen. *Id.* at 4864.

Because of the interrelatedness of the evidence and arguments, notwithstanding the acquittals and deadlocked counts in the instant case [6], all motions are addressed to provide the appropriate background and a complete understanding of this case. Without doing so, it would be difficult to understand how the evidence fits together and how relationships were developed and trust gained between and among the Defendants and with Sabol.

### *Discussion* [7]

### I. *Pre–Trial Matters*

The Defendants made the following pre-trial motions: [8] Giampa sought: (1) disclo-

---

**6.** The Government advised that it did not intend to retry any of the Defendants on counts which the jury was unable to reach a unanimous decision. *See infra* note 133.

**7.** Citations to the trial transcript are cited as the "Trial Tr. at ___". The opening statements of counsel are separately paginated and are cited as "Opening Statements Tr. at ___". In all, there are more than 4700 pages of trial transcript.

**8.** In support of their pre-trial motions, Defendants submitted: Memorandum of Law in Support of Pre–Trial Motions on Behalf of Defendant, Joseph Giampa (the "Giampa Brief"); Brief in Support of Defendant Gennaro Vittorio's Pretrial Motions (the "Vittorio Brief"); Affidavit of Robert J. Fettweis, Esq., attorney for Vittorio (the "Fettweis Aff."), attaching Exhibits A through C; Memorandum in Support of Omnibus Motions Filed on Behalf of Joseph Gaito (the "Gaito Brief"); Certification of James Patton,

sure of material pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*"Brady"*), (2) a bill of particulars, (3) disclosure of the identity of any confidential informant, (4) disclosure of any agreement between the United States Justice Department and any Government Witness, (5) disclosure of prior criminal records, pending criminal offenses and/or ongoing investigations of Government witnesses, (6) disclosure of co-conspirator statements the Government intended to introduce pursuant to Federal Rules of Evidence ("FRE") 801(d)(2)(E), (7) leave to join in appropriate motions filed on behalf of his co-defendants, (8) severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure ("Rule 14"), (9) disclosure of discovery pursuant to the Jencks Act, 18 U.S.C. § 3500 (the "Jencks Act")[9], and (10) disclosure of the grand jury minutes.

Vittorio sought: (1) an order striking from the Redacted Superseding Indictment any reference to a prior conviction and other "scandalous" and highly prejudicial material, (2) access to the grand jury minutes, (3) suppression of the contents and fruits of a wiretap on Michael L. Lanteri (the "Lanteri Wiretap"), (4) an order compelling Government agents to preserve notes and reports, (5) disclosure of information discoverable pursuant to the Jencks Act in advance of trial, and (6) a date certain for production by the Government of final transcripts of recorded conversations.[10]

Gaito sought: (1) dismissal of the Redacted Superseding Indictment for outrageous conduct by the Government, (2) disclosure of other crimes evidence pursuant to FRE 404(b), (3) an order compelling Government agents to preserve notes and reports, (4) an order compelling the Government to both comply with the discovery order (the "Discovery Order") and disclose all *Brady* material, and (5) leave to join in the applicable motions filed by his co-defendants.

McManus sought: (1) suppression of custodial statements pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure ("Rule 12(b)(3)")[11], (2) dismissal of the Redacted Superseding Indictment or suppression of all evidence based on the failure to bring him before a magistrate judge without "unnecessary delay" pursuant to Rule 5(a) of the Federal Rules of Criminal Procedure ("Rule 5(a)") and 18 U.S.C. § 3501, (3) suppression of evidence obtained from a search of his automobile or a hearing on the propriety of such search, (4) preclusion of evidence seized from his automobile pursuant to FRE

---

attorney for Gaito (the "Patton Cert."), attaching Exhibits A through S; Memorandum of Law in Support of Defendant James McManus' Pre–Trial Motions (the "McManus Brief"); Affirmation in Support of Pre–Trial Motions of Pat V. Stiso, attorney for McManus (the "Stiso Aff."), attaching Exhibits A and B; Memorandum of Law in Support of Defendant Benjamin Segarra's Pre–Trial Motions (the "Segarra Brief"); Affidavit of James J. Culleton, attorney for Segarra (the "Culleton Aff."), attaching Exhibits A and B; Memorandum of Law in Support of Defendant John Capra's and Elliot Porco's Joint Pre–Trial Motions (the "Capra and Porco Brief"); Affidavit of Richard A. Medina, attorney for Capra and Porco (the "Medina Aff.").

In opposition to the pre-trial motions, the Government submitted: Government's Memorandum in Opposition to Defendants' Pre–Trial Motions and in Support of Government's Cross Motion (the "Government Brief"), attaching Exhibits A through D.

A hearing was held on 12 April 1995 (the "12 April Hearing"). References to the transcript of the 12 April Hearing are cited as "12 April Hearing Tr. at ___."

**9.** Giampa's notice of motion referred to this as a request for an order requiring the Government to disclose to defense counsel all discovery pursuant to FRE 3500. Based on Giampa's pre-trial submission, it appeared this was intended to refer to a request for disclosure of Jencks Act material.

**10.** By letter, dated 22 February 1995 (the "22 February 1995 Vittorio Letter"), Vittorio additionally sought to join in the motions by Porco, Capra and Segarra for (1) dismissal of Count One for failure to properly plead a RICO conspiracy; (2) for severance pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (*"Bruton"*), regarding the statement of McManus; and (3) for a bill of particulars. *See* 22 February 1995 Vittorio Letter. Also Vittorio sought to join in the motions by Gaito and Segarra for pre-trial disclosure of evidence pursuant to FRE 404(b). *Id.*

**11.** Testimony concerning the motion to suppress the statement of McManus was heard on 26 April 1995 (the "26 April Hearing"). References to the transcript of the 26 April Hearing are cited as "26 April Hearing Tr. at ___."

404(b) and 403,[12] (5) leave to join in the applicable motions of his co-defendants, and (6) to reserve his right to make further motions as they became appropriate.

Segarra sought: (1) dismissal of the Redacted Superseding Indictment for failure to allege sufficient facts to establish the crimes charged, (2) an order striking from the Redacted Superseding Indictment any reference to "scandalous" and highly prejudicial material, (3) severance of his trial from that of McManus pursuant to *Bruton*, (4) severance pursuant to Rule 14, (5) an order compelling disclosure of *Brady* material, (6) an order requiring Government agents to preserve notes and reports, (7) a bill of particulars, (8) notification of other crimes evidence, and (9) leave to join in appropriate motions by his co-defendants.

Capra and Porco sought: (1) severance of the trial of Capra from McManus pursuant to *Bruton*, (2) severance of their trial from the trial of their remaining co-defendants pursuant to Rule 12(b)(5) and Rule 14, (3) a bill of particulars, (4) dismissal of the Redacted Superseding Indictment because it does not allege a crime, and (5) leave to file further motions, as they became appropriate.

According to the Government, Fatato by letter, dated 13 February 1995, formally joined in the motions of his co-defendants. Government Brief at 13 n. 3. In light of Fatato's 27 April 1995 guilty plea, pre-trial motions, to the extent they relate to Fatato, are not addressed.[13]

Additionally, the Defendants made the following motions *in limine:* [14] Giampa moved *in limine* to suppress and require the redaction from all audiotapes, videotapes and transcripts any references: (1) to Giampa's prior criminal history, including all references to his 1992 trial, (2) to uncharged and alleged criminal activity, (3) to any unproven conclusions, opinions, and/or allegations of wrongdoing or association made by Sabol, (4) to any conversations by Sabol, and/or alleged co-conspirator's or other uncharged individuals with respect to allegations of criminal conduct for which Giampa is charged, (5) to the purchase of his automobile and its cost, (6) to fees paid to attorneys in the past for any type of criminal matter, and (7) to his owning a social club.

Vittorio moved *in limine* to suppress and require the redaction from all audiotapes, videotapes and transcripts any references: (1) to his prior criminal record, service of time in jail or probationary status, (2) relat-

**12.** At the 12 April Hearing the Government stipulated it would not offer the evidence it had seized from McManus' car. 12 April Hearing Tr. at __. Accordingly, McManus' motions to preclude evidence seized from his automobile was mooted.

**13.** As indicated, Giampa, Gaito, McManus and Segarra sought leave to join in all appropriate pre-trial motions filed by their co-defendants and Vittorio sought leave to join in specific motions filed by his co-defendants. According to the Government, with regard to the Defendants joining in the pre-trial motions of their co-defendants, "[t]o the extent that a particular motion applies to a particular defendant, the Government has no objection...." Government Brief at 62.

Leave to join in all appropriate pre-trial motions filed by co-defendants was granted to the Defendants. Although, all Defendants were deemed to have joined in all motions, as appropriate, reference in each motion will only be to the Defendants who submitted moving papers.

**14.** In support of their motions *in limine,* Defendants submitted: letter-brief in support of Giampa's motions *in limine* (the "Giampa *In Limine* Brief"); addendum to Giampa's motions *in li-*

*mine* (the "Giampa Addendum"), attaching transcript pages of specific references he sought to suppress or redact; Brief in Support of Vittorio's *In Limine* Motions (the "Vittorio *In Limine* Brief"); memorandum of law in support of Gaito's motions *in limine* (the "Gaito *In Limine* Brief"); letter-brief in support of McManus' motions *in limine* (the "McManus *In Limine* Brief"); letter-brief in support of Segarra's *in limine* motion, (the "Segarra *In Limine* Brief"); letter-brief in support of Capra's *in limine* motions (the "Capra *In Limine* Brief").

In support of its *in limine* motion and in opposition to the Defendants' motions *in limine,* the Government submitted: letter-brief in support of *in limine* motion, dated 31 March 1995 (the "31 March Government *In Limine* Brief"); letter-brief in opposition to the *in limine* motions of Giampa, Vittorio, Gaito and Segarra, dated 10 April 1995 (the "10 April Government *In Limine* Brief"); letter-brief in opposition to the *in limine* motions of Capra and McManus and in further opposition to the *in limine* motion of Giampa, dated 19 April 1995 (the "19 April Government *In Limine* Brief").

The *in limine* motions were addressed at the 26 April Hearing.

ing to the accidental shooting of Gaito, (3) by persons other than Vittorio to uncharged criminal activity, (4) by Vittorio to his own uncharged criminal activity, and (5) to drug use by Vittorio or any racial epithets uttered by him. Also, Vittorio moved *in limine* to suppress the post-arrest statement of Mc-Manus, for leave to file additional *in limine* motions after the Government identifies all evidence to be relied upon at trial, and for leave to join in co-defendants' *in limine* motions relevant to him.

Gaito moved *in limine* to suppress and require the redaction from all audiotapes, videotapes and transcripts any references: (1) to his prior criminal history, (2) to the accidental shooting of him, (3) to any unproven conclusions or allegations of wrongdoing or association made by Sabol, and (4) to racial epithets uttered by him.

McManus moved *in limine:* (1) to redact from the transcripts references to his uncharged criminal activity, (2) to permit him to file additional *in limine* motions as may become appropriate, and (3) to permit him to join in the *in limine* motions of any co-defendant which are applicable to him.

Segarra moved *in limine:* (1) for a pretrial ruling on the admissibility of alleged co-conspirator statements concerning Segarra as the source of firearms, (2) to strike from the Redacted Superseding Indictment references to him made by McManus as an "assassin" and on the "lam," and (3) to redact from the transcripts references to a pending case in the Southern District of New York in which Segarra is charged with importation of heroin into the United States.

Capra moved *in limine:* (1) to preclude admission of the custodial statements of Mc-Manus, (2) to redact and exclude from all audio tapes, video tapes and transcripts any reference to Capra's prior criminal history, (3) to redact and eliminate any attributions contained in the transcription of any and all video tapes referring to Capra as "Hooks," [15] (4) to permit him to file additional *in limine* motions as may become appropriate, and (5) to permit him to join in the *in limine* motions of any co-defendant which are applicable to him.

By letter, dated 7 April 1995, Porco requested leave to join in the *in limine* motions of his co-defendants, as appropriate. Accordingly, analysis of the motions *in limine* will similarly apply to Porco.[16]

Another pre-trial matter addressed in this opinion is a request which was made by the Government to limit the amount of information, regarding prospective jurors, provided during the jury selection process.[17]

## A. Severance

Giampa, Segarra, Capra and Porco requested severance of their trials from the trial of their co-defendants pursuant to Rule 14. Giampa Brief at 10–16; Segarra Brief at 9–12; Capra and Porco Brief at 5–7. Additionally, Segarra, Capra, Porco and Vittorio requested severance of their trials from the trial of McManus pursuant to *Bruton.* Segarra Brief at 7–8; Capra and Porco Brief at 2–4; 22 February 1995 Vittorio Letter.

### 1. Joinder Pursuant to Rule 8

 Rule 8 of the Federal Rules of Criminal Procedure ("Rule 8") permits joinder of offenses and defendants.[18] Joinder of

---

15. According to the Government: "All of the attributions to Capra contained in transcripts have been changed to 'J. CAPRA.'" 19 April Government *In Limine* Brief at 5. Pursuant to this representation, this motion was mooted.

16. As indicated, Vittorio, McManus and Capra sought leave to join in all appropriate *in limine* motions filed by their co-defendants. Leave to join in all appropriate *in limine* motions filed by co-defendants was granted to the Defendants. Again, although all Defendants are deemed to have joined in all *in limine* motions, as appropriate, reference in each motion will only be to the Defendants who submitted moving papers.

17. In support of its request to limit the information concerning prospective jurors the Government submitted a letter, dated 14 April 1995 (the "Government Jury Letter").

In opposition to the Government's request counsel for McManus submitted a letter, dated 13 April 1995 (the "McManus Jury Letter").

18. Rule 8 provides:

(a) Joinder of offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same

offenses and defendants promotes economy of judicial and prosecutorial resources, as well as the public interest in avoiding expensive and duplicative trials. *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814, *reh'g denied*, 475 U.S. 1104, 106 S.Ct. 1507, 89 L.Ed.2d 907 (1986); *United States v. Gorecki*, 813 F.2d 40, 42 (3d Cir.1987); *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981). "There is a preference in the [F]ederal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993). When distinct offenses have both a logical and temporal relationship, joinder permits the Government to present its evidence in an efficient manner. *See United States v. Eisenberg*, 773 F.Supp. 662, 696 (D.N.J.1991).

■ Rule 8(b) "provides substantial leeway to prosecutors who would join racketeering defendants in a single trial." *United States v. Eufrasio*, 935 F.2d 553, 567 (3d Cir.) *cert. denied*, 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991). It permits joinder of defendants alleged to have participated in the "same series of acts or transactions constituting an offense or offenses." Fed. R.Crim.P. 8(b). Acts or transactions have been considered part of the "same series" when they are performed "pursuant to a common scheme or plan." *United States v. Curry*, 977 F.2d 1042, 1049 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993); *United States v. Bledsoe*, 674 F.2d 647, 656 (8th Cir.) (Although conspiracy need not be alleged, "facts must be alleged which at least suggest the existence of an overall scheme encompassing all the defendants and all the charged offenses."), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); *Natanel*, 938 F.2d at 307 (joinder proper as long as some common activity binds objecting defendant with all other indictees and that common activity encompasses all charged offenses).

■ Similarly, "[w]hen the facts underlying each offense are so closely related that proof of such facts is necessary to establish each offense, joinder of defendants and offenses is proper.... By contrast, when there is no substantial identity of facts or participants between the offenses, there is no 'series' of acts in the Rule 8(b) sense." *United States v. Coppola*, 788 F.2d 303, 306 (5th Cir.1986); *see also Curry*, 977 F.2d at 1049–50 & n. 1 ("logical relationship" between counts insufficient for joinder pursuant to Rule 8(b), however, overlap of evidence tends to show "same series"); *United States v. Wilson*, 894 F.2d 1245, 1253 (11th Cir.) ("[G]overnment must demonstrate that the acts alleged are united by some substantial identity of facts and/or participants.") (citation omitted), *cert. denied*, 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990).

■ Unlike the requirements of Rule 8(a), the requirements of Rule 8(b) are not met by a mere similarity of offenses committed by two or more defendants.

> Rule 8(b) requires that there be some common activity involving all of the defendants which embraces all the charged offenses even though every defendant need not have participated in or be charged with each offense.

*Bledsoe*, 674 F.2d at 656 (citing *United States v. Ford*, 632 F.2d 1354, 1372–73 (9th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981)).

■ When the literal requirements of Rule 8 are met, a presumption arises in favor of joinder. *See United States v. Swift*, 809 F.2d 320, 322 (6th Cir.1987) (Rule 8(b) "can, and should, be 'broadly construed in favor of initial joinder'...."). Indeed, there is a presumption against severance because it is "assum[ed] that closely related charges are be-

---

or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8.

ing tried together...." *United States v. Velasquez,* 772 F.2d 1348, 1355–56 (7th Cir. 1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986); *see United States v. Serubo,* 604 F.2d 807, 819 (3d Cir. 1979); *United States v. Wofford,* 562 F.2d 582, 585 (8th Cir.1977) ("Ordinarily, if defendants are jointly indicted and similar evidence from the related series of events is used to convict each defendant, the defendants should be tried together."), *cert. denied,* 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978).

■ If offenses or defendants have been improperly joined, however, severance is required as a matter of law under Rule 8. *United States v. Andrews,* 765 F.2d 1491, 1496 (11th Cir.1985) ("Misjoinder under Rule 8(b) is prejudicial per se...."), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *Bledsoe,* 674 F.2d at 654 (misjoinder is inherently prejudicial); *United States v. Vastola,* 670 F.Supp. 1244, 1261 (D.N.J.1987) (citing *United States v. Somers,* 496 F.2d 723, 729 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974)).

■ When determining whether joinder is appropriate, a court generally looks to the indictment. *Eufrasio,* 935 F.2d at 567; *Curry,* 977 F.2d at 1049; *Wilson,* 894 F.2d at 1253. Nevertheless, "[t]rial judges may look beyond the face of the indictment to determine proper joinder in limited circumstances. Where representations made in pretrial documents other than the indictment clarify factual connections between counts, reference to those documents is permitted." *McGill,* 964 F.2d at 242 (court referred to proffer by Government of evidence it would adduce at trial).

In the instant case, Giampa contended "it is clear from the [Redacted Superseding Indictment] that the different conspiracies [were] not, and cannot, be linked to a common transaction which would justify a joint trial of the [D]efendants." Giampa Brief at 10. Giampa argued that the Redacted Superseding Indictment alleges numerous conspiracies and transactions to which Giampa is not a party. *Id.* Additionally, Giampa argued the Redacted Superseding Indictment fails to allege that he had any relationship

with his co-defendants other than Vittorio and Gaito. *Id.*

According to Giampa, the Redacted Superseding Indictment alleges his stepson, Vittorio, knew the other co-defendants and reported to Giampa. *Id.* at 11. Nonetheless, Giampa argued discovery had not revealed any independent proof that Vittorio or Gaito reported to Giampa, nor that Giampa conspired or acted in concert with any of his other co-defendants. *Id.* Giampa contended "a joint trial would result in an incurable, prejudicial effect upon his defense. A lengthy trial would undoubtedly focus on the alleged activities of ... Vittorio, Gaito, McManus, Porco, Fatato, Segarra, Dorval and Capra and would have a 'spill over' effect with respect to ... Giampa." *Id.* at 11–12.

The Government pointed out, however, that Count One of the Superseding Indictment

> alleges facts which demonstrate that each defendant was associated with a criminal enterprise known as the "Lucchese Crime Family," and that each defendant committed or agreed to commit predicate acts in furtherance of the conspiracy. Thus, the [Redacted Superseding] Indictment, on its face, alleges facts which are sufficient to support an inference of a single agreement—which is all that is required to sustain joinder under Rule 8(b).

Government Brief at 23.

■ Indeed, as indicated, Rule 8(b) permits joinder of defendants alleged to have participated in the "same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). Further, acts or transactions have been considered part of the "same series" when, as here, they were allegedly performed "pursuant to a common scheme or plan." *Curry,* 977 F.2d at 1049; *Natanel,* 938 F.2d at 307; *Bledsoe,* 674 F.2d at 656. Accordingly, joinder of the Defendants in the Redacted Superseding Indictment is proper pursuant to Rule 8(b).

### 2. *Severance Pursuant to Rule 14*

As discussed, Giampa, Segarra, Capra and Porco requested severance of their trials

from the trial of their co-defendants pursuant to Rule 14. Giampa Brief at 10–16; Segarra Brief at 9–12; Capra and Porco Brief at 5–7.

Rule 14 provides in relevant part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.

■■■■ Severance under Rule 14 is within the discretion of the trial court. *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir.) (citing *United States v. Sandini*, 888 F.2d 300, 305–06 (3d Cir.1989), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990)), *cert. denied*, 507 U.S. 962, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993); *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir.1978). Rule 14 authorizes a trial court to sever counts or defendants where, despite an indictment's technical compliance with Rule 8, joinder would result in a "manifestly unfair trial." *Vastola*, 670 F.Supp. at 1261 (citing *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981)). In *Zafiro*, the Supreme Court stated:

We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Zafiro*, 506 U.S. at 539, 113 S.Ct. at 938.

■■■■ Defendants bear a "heavy burden" when moving for severance under Rule 14. *See Eufrasio*, 935 F.2d at 568; *Sandini*, 888 F.2d at 305; *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *United States v. De Peri*, 778 F.2d 963, 983 (3d Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. DiPasquale*, 740 F.2d 1282, 1293 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). Mere allegations of prejudice are insufficient to meet this burden. Defendants must "pinpoint 'clear and substantial prejudice' resulting in an unfair trial." [19] *McGlory*, 968 F.2d at 340 (quoting *Eufrasio*, 935 F.2d at 568); *see also Gorecki*, 813 F.2d at 43; *United States v. Wright–Barker*, 784 F.2d 161, 175 (3d Cir.1986). Defendants are not entitled to severance "merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540, 113 S.Ct. at 938; *see McGlory*, 968 F.2d at 340.

■■■ Frequently, where there is a risk of prejudice, it may be cured by proper jury instructions.[20] *Zafiro*, 506 U.S. at 540, 113

**19.** In the instant case, Defendants had a unique opportunity to discover and articulate alleged prejudice which would warrant severance. Defendants were given video and audio taped evidence, and the corresponding transcripts, weeks before the start of trial. This amounted to virtually all of the Government's evidence.

Additionally, Defendants were given numerous opportunities to place objections to the taped evidence on the record during pre-trial hearings. *See* transcript of hearings on objections to transcripts of audio and video taped evidence, held on 2 May 1995 through 17 May 1995 (the "Objection Hearings"), cited as "Objection Hearings Tr. at __;" *see also infra* at 291–93.

**20.** On numerous occasions it was explained that if defense counsel or the Government wanted a limiting instruction the procedure was to draft and submit to the court the requested instruction. *See, e.g.*, Objection Hearings Tr. at 700 ("Now, I have been reading what's going on in the [O]bjection [H]earings that we have been having. A number of you have made reference to limiting instructions. If any of you believe limiting instructions are appropriate, I direct that you should submit them to me in advance...."); Trial Tr. at 40 ("If there is another limiting instruction you want on this, I've invited you to give it to me."); *id.* at 99 ("I have been asking for limiting instructions for more than a month now.... If you folks don't hand me limiting instructions, I'm going to assume that you don't want them."); *id.* at 85 (same); *id.* at 87 (same); *id.* at 89 (same); *id.* at 94 (same); *id.* at 264 (same); *id.* at 267 (same); *id.* at 409 (same); *id.* at 414 (same); *id.* at 420 (same); *id.* at 757–58 (same); *id.* at 806–07 (same); *id.* at 2729 (same); *id.* at 3263 (same); *id.* at 4106 (same).

Nonetheless, there were only a few instances when defense counsel submitted limiting instructions. *See* Trial Tr. at 94; *id.* at 99; *id.* at 205–06; *id.* at 303; *id.* at 428–29; *id.* at 1014; *id.* at 2729–31; *id.* at 3265.

S.Ct. at 939. " '[J]uries are presumed to follow their instructions.' " *Id.* (quoting *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987)). Accordingly, the question is "whether the jury can reasonably be expected to compartmentalize the evidence against each defendant." *McGlory,* 968 F.2d at 340 (citing *Eufrasio,* 935 F.2d at 568). As the jury verdicts reflect, the jury was able to and did in fact compartmentalize the evidence and used the evidence as instructed.

In the instant action, Giampa, Segarra, Capra and Porco argued severance was proper because a single trial would result in a prejudicial "spillover effect." Giampa Brief at 12; Segarra Brief at 11; *see* Capra and Porco Brief at 7. Giampa, Segarra, Capra and Porco argued they would be prejudiced because the jury would be unable to compartmentalize the evidence against them while evidence was presented which implicates their co-defendants. Giampa Brief at 12, 15–16; Segarra Brief at 11–12; Capra and Porco Brief at 7.

The Government argued severance was inappropriate because the Defendants were involved in a single conspiracy and were employed by or associated with the Lucchese Crime Family; an enterprise which was engaged in racketeering activity. Government Brief at 27. According to the Government:

> Although many of the substantive offenses in the [Redacted Superseding] Indictment charge only some of the [D]efendants, all of those counts are charged as schemes in connection with the RICO conspiracy. Thus, although each defendant may have had a different role in the RICO conspiracy, all defendants were centrally involved in the conspiracy.

*Id.* at 27–28; *see United States v. Lane,* 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986) (explaining that joinder of multiple defendants in a single trial is proper under Rule 8 when an indictment "charge[s] all the defendants with one overall count of conspiracy"); *United States v. Price,* 13 F.3d 711, 719 (3d Cir.1994) (holding that there was a sufficient basis for joinder of seven defendants in a single trial where "all the defen-

dants were charged with participation in a single overarching drug conspiracy"), *cert. denied,* — U.S. ——, 115 S.Ct. 1372, 131 L.Ed.2d 227 (1995); *United States v. Thornton,* 1 F.3d 149, 152–53 (3d Cir.) (same), *cert. denied,* — U.S. ——, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993); *United States v. Boylan,* 898 F.2d 230, 245 (1st Cir.) ("[W]e have squarely held joinder to be proper where, as here, a single RICO count 'embrace[s] all of the acts and transactions upon which the other ... counts [are] based.' ") (quoting *United States v. Tashjian,* 660 F.2d 829, 833 (1st Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981)), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).

As indicated, the Redacted Superseding Indictment charges all Defendants with violations of RICO in Count One. Superseding Indictment, Count 1, ¶ 3. In support of their motions, Giampa, Segarra, Capra and Porco essentially contended that severance was proper because the Defendants were not similarly charged in each count of the Redacted Superseding Indictment. As such, they did little more than make conclusory allegations of prejudice and, accordingly, failed to meet their burden of pinpointing clear and substantial prejudice which would result from a joint trial. *McGlory,* 968 F.2d at 340.

█ In this case, the danger of a possibly prejudicial "spillover effect" was avoided by an appropriate instruction. The jury was instructed to consider separately the evidence against each defendant on each count. Trial Tr. at 3268. This case was not one where "the risk that the jury [would] not, or [could not], follow instructions [was] so great, and the consequence of failure so vital to the defendant, that the practical and human limitations cannot be ignored." *Bruton,* 391 U.S. at 135, 88 S.Ct. at 1627. Because there was not a risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt, *Zafiro,* 506 U.S. at ——, 113 S.Ct. at 937, the motions for severance, pursuant to Rule 14, by Giampa, Segarra, Capra and Porco were denied.[21]

21. Even if Giampa, Segarra and/or Capra and

Porco's trial had been severed from the trial of

### 3. *Severance From the Trial of McManus*

Segarra, Capra, Porco and Vittorio requested severance of their trials from the trial of McManus pursuant to *Bruton.* Segarra Brief at 7–8; Capra and Porco Brief at 2–4; 22 February 1995 Vittorio Letter. The requests for severance from the trial of McManus stemmed from a statement McManus gave to Agents of the United States Customs Service (the "Customs Agents") on 31 March 1994, which referenced certain of his co-defendants. Segarra Brief at 7; Capra and Porco Brief at 3.

In *Bruton,* the Supreme Court held that a defendant's rights under the Confrontation Clause of the Sixth Amendment are violated when a non-testifying co-defendant's confession names him or her as a participant in a crime, despite a jury instruction that the confession was only to be considered against the declarant. 391 U.S. at 137, 88 S.Ct. at 1628. The Court explained:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

391 U.S. at 135–36, 88 S.Ct. at 1627–28 (citations omitted).

The statement at issue is different from the one faced by the Court in *Bruton.* The statement from McManus was redacted by the Government (the "First Redacted McManus Statement") so that McManus' co-defendants were each referenced by a random letter of the alphabet. *See* Exhibit A to the Government Brief. Nonetheless, Segarra, Capra and Porco argued the Government's redaction was inadequate to protect their Sixth Amendment right of confrontation as articulated in *Bruton.* Segarra Brief at 7 ("Even a redacted statement would still

their co-defendants, it appears statements by co-defendants' would have been admissible against

create an inevitable association with [Segarra] which in this case is compelling in that all [D]efendants are charged in a RICO conspiracy. The ease with which a jury could fill in the blanks compels a severance."); Capra and Porco Brief at 3 ("If any reference in McManus's statement to Capra and Porco is omitted, when linked to any other evidence the effect upon the jury would be the same as if no redaction had occurred at all.").

As the Government pointed out, the Supreme Court in *Richardson,* 481 U.S. at 206–07, 107 S.Ct. at 1706–07, explained that *Bruton* was a "narrow exception" to the assumption that juries can and generally do follow limiting instructions. Government Brief at 29–30 & n. 9. The *Richardson* Court explained:

> The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process. On the precise facts of *Bruton,* involving a facially incriminating confession, we found that accommodation inadequate.... [T]he calculus changes when confessions that do not name the defendant are at issue.... We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with the proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

*Richardson,* 481 U.S. at 211, 107 S.Ct. at 1709.

According to the *Richardson* Court, when faced with a statement which, like the statement at issue, is not "facially incriminating," but is potentially incriminating by inference, a jury instruction

> may well be successful in dissuading the jury from entering onto the path of inference in the first place.... [W]hile it may not always be simple for the ... jury to

them pursuant to FRE 801(d)(2)(E) as statements of co-conspirators.

obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule. *Id.* at 208, 107 S.Ct. at 1708. Nevertheless, the Court "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at 211 n. 5, 107 S.Ct. at 1709 n. 5.

The Circuits have, however, held redacted statements, which do not on their face incriminate the defendant, can be admitted with a limiting instruction. *See, e.g., United States v. Chrisman,* 965 F.2d 1465, 1472–73 (7th Cir.1992) (holding that admission of statement with references to "we" or "they," which did not directly implicate defendant, did not violate defendant's confrontation rights); *United States v. Washington,* 952 F.2d 1402, 1405 (D.C.Cir.1991) (holding that when "all references to the defendant in a codefendant's statement are replaced with indefinite pronouns or other general terms, the Confrontation Clause is not violated by the redacted statement's admission if, when viewed together with other evidence, the statement does not create an inevitable association with the defendant, and a proper limiting instruction is given"), *cert. denied,* 503 U.S. 1009, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992); *United States v. Donahue,* 948 F.2d 438, 444 (8th Cir.1991) (holding that two or three references to "everyone" and "they" in testimony about confession did not violate *Bruton* because testimony did not implicate the defendant expressly, nor was it incriminating on its face); *United States v. Williams,* 936 F.2d 698, 701 (2d Cir.1991) ("If the confession, when ... viewed [in isolation from other evidence], does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant."); *United States v. Vasquez,* 874 F.2d 1515, 1518 (11th Cir.1989) ("[A] redacted confession only violates *Bruton* if it compels a direct, rather than indirect, implication of the complaining defendant."), *cert. denied,* 493 U.S. 1046, 110 S.Ct. 845, 107 L.Ed.2d 840 (1990).

Segarra relied on *United States v. Long,* 900 F.2d 1270, 1279 (8th Cir.1990), *United States v. Petit,* 841 F.2d 1546, 1550 (11th Cir.), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988) and *United States v. Pendegraph,* 791 F.2d 1462 (11th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 235, 93 L.Ed.2d 160 (1986). These cases, however, are distinguishable from the instant action. They involve situations where the jury was either invited to speculate as to the identity of the referenced individual or despite the redaction the jury could easily identify the defendant. Further, more recent cases in the Eight and Eleventh Circuits, have approved the admission of redacted statements such as the one at issue.

The Eighth Circuit explained in *Donahue,* that in *Donahue* unlike *Long,* "[t]here was no improper linkage between the statement and [defendant], nor was there an improper invitation to speculate." *Donahue,* 948 F.2d at 444. In *Petit,* although references in a confession to "unloaders" and to a "friend" did not directly implicate the defendant, the court held that, based on other evidence, the reference to a "friend" "could reasonably be understood *only* as referring to [the defendant]." 841 F.2d at 1556 (emphasis added). According to the *Petit* court, such references "sufficiently inculpated [the defendant] so as not to fall under the clear exception to *Bruton* provided by the Court's decision in *Richardson.*" *Id.* Moreover, the Eleventh Circuit in *Vasquez,* citing *Pendegraph,* explained: "The standard in this circuit, which is consistent with [*Richardson* ], is that a redacted confession only violates *Bruton* if it compels a direct, rather than indirect, implication of the complaining defendant." *Vasquez,* 874 F.2d at 1518.

As mentioned, the First Redacted McManus Statement did not directly implicate any of McManus' co-defendants. It replaced named individuals with letters of the alphabet ("A" through "F") which had no direct connection to the Defendants. Moreover, by letter, dated 25 April 1995, the Government submitted a further redaction of the First Redacted McManus Statement (the "Second Redacted McManus Statement"). The Sec-

ond Redacted McManus Statement only made reference to an "individual" or "individuals." [22]

 Neutral references in a statement can be admitted without offending a defendant's confrontation rights. *United States v. Evangelista*, 813 F.Supp. 294, 300 (D.N.J.1993) (adopting the reasoning of the Second Circuit in *Williams*). This appears to be an appropriate approach and is consistent with *Bruton* and *Richardson*. In addition, the jury in this case heard evidence of other individuals with whom McManus was involved. This further distanced his co-defendants from the Second Redacted McManus Statement. *See, e.g.* 294 TR at 13–15 (McManus explaining some of the hierarchy in the Lucchese Crime Family and mentioning individuals other than the Defendants). Accordingly, the motions for severance from the trial of McManus, pursuant to *Bruton*, were denied.

 Segarra also moved for severance of his trial from the trial of McManus because he alleged McManus had exculpatory testimony to offer on his behalf. Segarra Brief at 7–8. The Third Circuit has articulated four factors which should be analyzed in determining whether a defendant should be granted severance: "(1) What is the likelihood that co-defendants will testify? (2) What is the degree to which such testimony would be exculpatory? (3) What is the degree to which the testifying co-defendants could be impeached? (4) What is the effect on judicial economy?" *United States v. Gonzalez*, 918 F.2d 1129, 1137 (3d Cir.1990) (citing *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978)), *cert. de-*

*nied*, 498 U.S. 1107, 111 S.Ct. 1015, 112 L.Ed.2d 1097 (1991).

" 'Bare assertions that co-defendants will testify are insufficient.' " *Id.* (quoting *Boscia*, 573 F.2d at 832). In the instant action, Segarra had offered "[n]othing more than a bare, unattributed assertion that ... McManus might testify...." Government Brief at 29; *see* Segarra Brief at 8 ("McManus can exculpate [Segarra] and would testify at a separate trial that [Segarra] was not involved in the firearm related offenses charged in the [Redacted Superseding] Indictment."). Segarra failed to demonstrate the "likelihood" of McManus testifying if a severance was granted. *Boscia*, 573 F.2d at 832.

As for the exculpatory nature of the testimony, it was weak at best. Segarra relied upon a statement made by McManus, that "he had no direct knowledge that [Segarra] supplied the MAC–10 passed to ... Giampa." Segarra Brief at 8 (citing Exhibit A of the Culleton Aff.). The full sentence, which Segarra relied upon states: "McManus said that [Segarra] was the person to contact for firearms, but he had no direct knowledge that [Segarra] supplied the MAC–10 passed to ... Giampa." Culleton Aff., Exhibit A. Also, it appeared that Segarra had similarly failed to make any showing regarding the degree to which McManus may be subject to impeachment nor had he adequately shown how separate trials would further judicial economy. *Boscia*, 573 F.2d at 832.

 Segarra had failed to make a proper showing that severance of his trial from the trial of McManus was warranted. Accordingly, his motion for severance of his trial from the trial of McManus was denied.

---

22. The Second Redacted McManus Statement provides, in part:

> McManus advised that in 1990–91, he was approached and invited into a crew to protect gambling machines. According to McManus, members of the crew operate a large scale gambling operation in the New York City area and that individuals are about to open a new gambling hall in the vicinity of the Kingsbridge Armory, Bronx, New York.
> McManus stated that he was approached by an individual to manage the new location near the Kingsbridge Armory. This facility would store

> gambling machines and have a "VIN Stamping" or "chop-shop" operation. Individuals were making a lot of money on gambling and stolen cars, and a member was looking for ways to hide illicit proceeds.
> McManus said that he (McManus) was interviewed by DEA about a heroin smuggling case. McManus stated that he had to report to another individual if he was arrested....
> McManus advised that he has been associated with a crew of the Lucchese Crime Family since late 1992, early 1993.
> Second Redacted McManus Statement.

B. *Motion to Dismiss the Redacted Superseding Indictment for "Outrageous" Government Conduct*

Gaito moved for dismissal of the Redacted Superseding Indictment because of allegedly "outrageous" conduct on the part of the Government. Gaito Brief at 1–4. Gaito alleged he was not involved in illegal activity when approached by Sabol, but instead was digging ditches to support his family. *Id.* at 1. Gaito alleged he began selling, at the urging of Sabol and a Federal agent, "distressed merchandise," and was "repeatedly reassured ... [that it] was a legitimate enterprise." *Id.* at 2.

Gaito further alleged that after becoming financially dependent on Sabol, Gaito began running errands for Sabol. *Id.* "Some of these errands were innocuous ... [o]ther errands, the [G]overnment contends, were not...." *Id.*

According to the Government:

Although Gaito portrays himself as merely a receiver and vendor of 'distressed,' *viz.*, stolen, merchandise, the record is clear that it was Gaito who, acting alone, or in concert with other [D]efendants, 1) accepted $5,000 from Sabol on November 19, 1993, for the purchase of one ounce of heroin; 2) delivered one ounce of heroin to Sabol on November 22, 1993; 3) accepted $1400 from Sabol for silencer-equipped weapons on November 24, 1993; 4) delivered a .38 caliber revolver to Sabol on December 13, 1993; 5) delivered a .9mm machine gun to Sabol on December 15, 1993; and attended a meeting with Sabol to discuss trafficking kilogram quantities of heroin and cocaine on December 15, 1993.

Government Brief at 15.

"In certain extreme cases it is possible that 'the conduct of law enforcement agents [may be] so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction.'" *United States v. Gonzales*, 927 F.2d 139, 144 (3d Cir.1991) (quoting *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). The Circuit explained, however, that

"we must not be quick to find government conduct that outrageous for, ... '[w]e must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable....'" *Gonzales*, 927 F.2d at 144 (quoting *United States v. Jannotti*, 673 F.2d 578, 607 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)).

■ In *Gonzales*, the Circuit rejected a claim of "outrageous" governmental conduct stemming from the use of a paid informant in a "reverse sting" operation in which Government agents posed as sellers of narcotics. *Id.* Notwithstanding Gaito's allegations, the observation of the *Gonzales* Court is just as apt in the instant motion: "We are at a loss to understand what the government did that was outrageous...." *Id.* Gaito's motion to dismiss the Redacted Superseding Indictment for "outrageous" governmental conduct was denied.

C. *Motions to Dismiss the Redacted Superseding Indictment for Failure to Properly Allege the Crimes Charged*

Segarra, Capra, Porco and Vittorio sought dismissal of the Redacted Superseding Indictment because it did not properly plead the crimes charged. Segarra Brief at 2–3; Capra and Porco Brief at 8–12; 22 February 1995 Vittorio Letter.

Capra and Porco conceded that in the Third Circuit, "to be convicted of a RICO conspiracy, the defendant need only to agree to the commission of the predicate acts and need not agree to commit those acts personally." Capra and Porco Brief at 9 (citing *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985)). Nonetheless, Segarra, Capra and Porco requested a departure from Third Circuit law: "[I]t is respectfully submitted that the requirement that the defendant must agree to personally commit the predicate acts is the more well reasoned dictate." *Id.; see* Segarra Brief at 3. Such departure from Circuit precedent was not appropriate.

■ A criminal indictment serves the limited function of putting a defendant on

notice of the offenses he or she is charged with and protecting him or her against further prosecution for the same crime. *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Sebetich,* 776 F.2d 412, 427 (3d Cir.1985), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988); *United States v. Michael,* 456 F.Supp. 335, 346 (D.N.J.1978), *aff'd,* 605 F.2d 1198 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 702, 62 L.Ed.2d 667 (1980).

The Circuit has held an indictment is sufficient if

> it includes the elements of the offense intended to be charged, apprises the defendant of what he or she must be prepared to meet at trial, and enables the defendant to show with accuracy to what extent he or she may plead an acquittal or conviction as a bar to subsequent prosecution.... "[N]o greater specificity than [tracking] the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."

*United States v. Shirk,* 981 F.2d 1382, 1389 (3d Cir.1992) (quoting *United States v. Olatunji,* 872 F.2d 1161, 1166 (3d Cir.1989)), *vacated on other grounds,* — U.S. —, 114 S.Ct. 873, 127 L.Ed.2d 70 (1994); *see also United States v. Debrow,* 346 U.S. 374, 377–78, 74 S.Ct. 113, 115–16, 98 L.Ed. 92 (1953) (indictment sufficient when the charges "followed substantially the wording of the statute, which embodies all the elements of the crime, and such charges clearly inform the defendants of that with which they were accused, so as to enable them to prepare their defense and to plead the judgment in bar of any further prosecutions for the same offense.")

■ In the instant action, the Redacted Superseding Indictment tracks the relevant statutory language of the crimes charged and includes sufficient facts to enable the Defendants to prepare their defense. *See Debrow,* 346 U.S. at 377–78, 74 S.Ct. at 115–16; *Shirk,* 981 F.2d at 1389; *Olatunji,* 872 F.2d at 1166. The Redacted Superseding Indictment "includes the elements of the offense[s]

... charged, apprises the [D]efendant[s] of what [they] must be prepared to meet at trial, and enables the [D]efendant[s] to show with accuracy to what extent [they] may plead an acquittal or conviction as a bar to subsequent prosecution." *Shirk,* 981 F.2d at 1389. Accordingly, the motions to dismiss the Redacted Superseding Indictment for failure to plead the crimes charged were denied.

### D. *Motions to Strike Surplusage*

Vittorio and Segarra moved to strike language from the Redacted Superseding Indictment pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure ("Rule 7(d)"). Vittorio Brief at 3–6; Segarra Brief at 5–6.

"The court on motion of the defendant may strike surplusage from the indictment or information." Fed.R.Crim.P. 7(d). "The purpose of [this rule] is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in the indictment." *United States v. Gatto,* 746 F.Supp. 432, 455 (D.N.J.1990), *rev'd on other grounds,* 924 F.2d 491 (3d Cir.1991); *see United States v. Fahey,* 769 F.2d 829, 841–42 (1st Cir.1985).

"A motion to strike surplusage from an indictment is addressed to the sound discretion of the [d]istrict [c]ourt and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory or prejudicial matter." *Gatto,* 746 F.Supp. at 455; *see Eisenberg,* 773 F.Supp. at 700; *Vastola,* 670 F.Supp. at 1254. "It is an exacting standard which is met only in rare cases." *Eisenberg,* 773 F.Supp. at 700; *see United States v. Wecker,* 620 F.Supp. 1002, 1006 (D.Del.1985); *United States v. Fischbach and Moore, Inc.,* 576 F.Supp. 1384, 1398 (W.D.Pa.1983).

■ "[I]f the [G]overnment intends to properly prove a matter at trial, then it is proper for the indictment to include those matters, even if they are not 'essential elements' of the crime charged." *United States v. Hill,* 799 F.Supp. 86, 89 (D.Kan.1992). Furthermore, language in an indictment will not be stricken where, "while not essential to

the charges," it is "in a general sense relevant to the overall scheme charged in the indictment." *Wecker*, 620 F.Supp. at 1006; *see Hill*, 799 F.Supp. at 89 ("[I]t is proper for the indictment to contain relevant background information.").

Vittorio sought to strike references in the Redacted Superseding Indictment concerning the existence of a prior weapons charge, his presence in jail for such charge and McManus' statement that he "shoots people." Vittorio Brief at 3, 6. Segarra sought to strike statements by McManus in the Redacted Superseding Indictment that he "was an assassin who did a lot of work,"[23] that he was on the "lam" and that he "loved silencer-equipped handguns." Segarra Brief at 5–6; Count One, ¶ 35.

The Government contended the language which Vittorio and Segarra sought to strike was "highly relevant and [would] constitute an essential part of the Government's proof[ ] at trial." Government Brief at 40. According to the Government, the challenged language "speaks directly to the RICO conspiracy; it shows the relationship between the [D]efendants and ... Sabol and it evidences a willingness on the part of defendants to engage in illegal acts with Sabol." *Id.* The Government also argued that the challenged language provides important background information concerning "knowledge, experience and familiarity with unlawful weapons".[24] *Id.* at 41.

The language Vittorio and Segarra sought to strike from the Redacted Superseding Indictment was "relevant to the overall scheme charged in the [Redacted Superseding] [I]ndictment." *Wecker*, 620 F.Supp. at 1006; *see Hill*, 799 F.Supp. at 89. Additionally, it appeared the Government would attempt to prove the matters contained in the challenged language at trial. Furthermore, a jury instruction stating the Redacted Superseding Indictment was not evidence

against Defendants, and afforded no inference of guilt, protected against improper reliance by the jury on the Redacted Superseding Indictment.

 In light of the apparent relevance of the challenged language to the Redacted Superseding Indictment, it was not deemed as surplusage. Accordingly, the motions to strike surplusage were denied.

### E. *Motion by McManus to Suppress the Second Redacted McManus Statement*

McManus moved to suppress the Second Redacted McManus Statement which he gave to the Customs Agents on 31 March 1994. McManus Brief at 3–7; Affidavit in Support of Pre–Trial Motions of McManus (the "McManus Aff."), attached as Exhibit A to the Stiso Aff. McManus contended that he never was apprised of his *Miranda*[25] rights, and even if given the appropriate language, he did not voluntarily waive such rights. McManus Brief at 4–5.

McManus alleged that on 31 March 1994 at approximately 4:00 o'clock p.m., while driving in Bronx, New York, he was pulled over by two vehicles. McManus Aff., ¶¶ 2–3. McManus alleged he was "swarmed by 8 to 10 [Customs] [A]gents, all of whom, to the best of [his] recollection had there (sic) weapons drawn." *Id.*, ¶ 4. McManus alleged he was dragged from his vehicle while a gun was pressed against his head, was thrown against the trunk of his automobile and handcuffed by three to four Customs Agents. *Id.*, ¶ 6.

According to McManus he was then thrown into a van, together with four Customs Agents. *Id.*, ¶ 6. McManus alleges two Customs Agents drove off in his automobile. *Id.*, ¶ 7. After the van traveled approximately one quarter of a mile, McManus alleged Customs Agents told him he was free

---

**23.** This reference was removed from the Redacted Superseding Indictment. *See* Count One, ¶ 29. Accordingly, the motion by Segarra to strike this reference was mooted.

**24.** The Government also pointed out that the statements of Vittorio and McManus were admissible and appropriate pursuant to FRE

801(d)(2)(E) and 404(b). Government Brief at 40 n. 15. Admissibility of these statements under FRE 801(d)(2)(E) and 404(b) is discussed, *infra* at 119–28, 219–27.

**25.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

to leave. *Id.*, ¶ 8. According to McManus, the Customs Agents

actions [of the Customs Agents] were not consistent with their words. I asked for my vehicle and they refused to give it back, stating 'we don't know where it is.' I asked them to remove the cuffs and they refused. In fact, none of the [Customs] [A]gents exited the vehicle, so as to clear a path for my alleged departure, ... two [Customs] [A]gents were seated next to me blocking the only exit from the rear seat of the van. The door of the van was never opened.

*Id.*

McManus alleged the van was then driven and he was taken to the Cross Bronx Expressway, on the way to New Jersey. *Id.*, ¶ 9. Throughout the trip, McManus alleged he was "verbally attacked" by the Customs Agents. *Id.*, ¶¶ 9–10. McManus alleged he was taken to a building in New Jersey, and placed in a conference room with approximately twelve Customs Agents. *Id.*, ¶ 12.

McManus alleged:

I repeatedly asked the [Customs] [A]gents to release me, I was laughed at and told 'you're not going anywhere.' ... [O]ne [Customs] [A]gent placed a stack of papers in front of me and said the only way I was leaving was if I signed the papers. This was approximately 2½ hours after my arrest. I did not read these papers nor were they explained to me. I was never read my *Miranda* warnings.

*Id.*, ¶ 13. According to McManus, "[s]ome seven hours after [his] arrest [he] was finally allowed to leave the building." *Id.*, ¶ 14.

### 1. *Miranda*

The *Miranda* Court held that an individual questioned by law enforcement officers after being "taken into custody or otherwise deprived of his [or her] freedom of action in any significant way" must first "be warned that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612; *accord, e.g., Stansbury v. California,* —— U.S. ——, ——, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994) (per curiam); *Berkemer v. McCarty,* 468 U.S. 420, 428–29, 104 S.Ct. 3138, 3144–45, 82 L.Ed.2d 317 (1984).

"[The] obligation to administer *Miranda* warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him [or her] "in custody." ' " *Stansbury,* —— U.S. at ——, 114 S.Ct. at 1528 (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)); *see also, e.g., Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) ("*Miranda* was meant to preserve the privilege [against self-incrimination] during 'incommunicado interrogation of individuals in a police-dominated atmosphere.' ... '*Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.' " (citations omitted)); *Roberts v. United States,* 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980) ("*Miranda*'s requirement of specific warnings ... does not apply outside the context of the inherently coercive custodial interrogations for which it was designed."); *Beckwith v. United States,* 425 U.S. 341, 345, 96 S.Ct. 1612, 1615, 48 L.Ed.2d 1 (1976) ("The narrow issue before the Court in *Miranda* was ... 'the admissibility of statements obtained from an individual who is subjected to [c]ustodial police interrogation.' [*Miranda,*] 384 U.S. at 439 [86 S.Ct. at 1609].... In subsequent decisions, the Court specifically stressed that it was the [c]ustodial nature of the interrogation which triggered the necessity for adherence to the specific requirements of ... *Miranda*...." (citations omitted)); *United States v. Walton,* 10 F.3d 1024, 1028 (3d Cir.1993) (explaining "[t]his is not a *Miranda* case" because the conversation the defendant had with Federal agents "occurred in a noncustodial setting").

According to McManus "[a]ssuming arguendo that [he] was read his *Miranda* warnings, it must further be established that

any statements made were voluntary." [26] McManus Brief at 5.

## 2. *Voluntariness of Statement*

[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his [or her] trial, he [or she] is entitled to a reliable and clear cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove by at least a preponderance of the evidence that the confession was voluntary.

*Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972); *see Colorado v. Connelly,* 479 U.S. 157, 169, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986).

■ Where voluntariness is concerned, "the question in each case is whether the defendant's will was overborne at the time he [or she] confessed." *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *see Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963). "Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances...." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991); *see Miller v. Fenton,* 796 F.2d 598, 604 (3d Cir.) ("To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant."), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).

■ The factors to be considered include: the youth of the accused; his [or her] lack of education or his [or her] low intelligence; the lack of any advice to the accused of his [or her] constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Miller,* 796 F.2d at 604 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)); *see Anderson,*

929 F.2d at 99 (listing among factors to be considered: "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials").

The Circuit has emphasized

that the test for voluntariness is not a but-for test: we do not ask whether the confession would have been made in the absence of the interrogation. Few criminals feel impelled to confess to the police purely out of their own accord, without any questioning at all.

*Miller,* 796 F.2d at 604; *see Stein v. New York,* 346 U.S. 156, 186, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953) ("Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous.... But in this sense, no criminal confession is voluntary.).

■ "It is well established that an involuntary confession may result from psychological, as well as physical, coercion." *Miller,* 796 F.2d at 603; *see Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 1253, 113 L.Ed.2d 302 (1991) ("[C]oercion can be mental as well as physical...."). The Supreme Court, however, has stated, with respect to its involuntary confession jurisprudence: "While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct." *Connelly,* 479 U.S. at 163–64, 107 S.Ct. at 520. Moreover, "while a *per se* involuntariness rule applies when an interrogation is accompanied by physical violence, no such rule applies when the alleged coercion is psychological." *Miller,* 796 F.2d at 604 (citations omitted); *see Stein,* 346 U.S. at 182, 184, 73 S.Ct. at 1091–92, 1093.

"That a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise.... [I]t is clear that the voluntariness of a confession does not depend

---

**26.** McManus provided no evidence at the 26 April Hearing that he was not informed of his *Miranda* rights. As explained below, the testimony offered by the Government, at the 26 April Hearing, clearly established that such warnings were given. *See infra* at 276.

solely upon whether it was made in response to promises. Instead, we must determine voluntariness by judging the totality of the circumstances." *Walton,* 10 F.3d at 1028 (citing *Fulminante,* 499 U.S. at 284–85, 111 S.Ct. at 1251).

"[T]he real issue is not whether a promise was made, but whether there was a causal connection between [the officer's] assurance and [the defendant's] statement." *Id.* at 1029.

> Causation in this sense is not "but for" causation ... but requires an inquiry into "whether [the agent's] statements were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." Again, the focus of our inquiry is on the totality of the circumstances....

*Id.* at 1029–30 (quoting *Miller,* 796 F.2d at 605).

In *Walton,* the Third Circuit found the defendant's statement to Federal agents was not voluntary because the defendant was "assured ... in advance that his statement would not be used against him." *Id.* at 1031.

> In this case, the Government contended it will prove, through the testimony of law enforcement personnel, that [McManus] was advised of his constitutional rights and knowingly and voluntarily waived them. Furthermore, the Government will demonstrate that [the Customs] [A]gents who interviewed McManus did not coerce him to make any statements. The facts will show that [McManus] voluntarily waived his rights, chose to speak to [the Customs] [A]gents, and chose to cooperate with [the Customs] [A]gents.... Although [McManus] initially declined to sign a *Miranda* Waiver Form, he soon changed his mind and waived his *Miranda* rights in writing.

Government Brief at 34–35.

At the 26 April Hearing, Customs Agent James Delia ("Agent Delia") testified that on 31 March 1994, after conducting surveillance of McManus, the Customs Agents planned to stop his automobile while McManus was in route to work. 26 April Hearing Tr. at 94. Agent Delia testified that the plan was to approach McManus, briefly detain him, handcuff him and search him for weapons. *Id.* at 94–95. When it was determined that McManus was not a threat to his or the other Customs Agents' safety, Agent Delia testified he would then attempt to recruit McManus as an informant. *Id.* at 93–95.

Agent Delia testified that after stopping McManus in his automobile, McManus was handcuffed and driven five blocks to a restaurant parking lot, which was the first available place where he could speak to McManus. *Id.* at 104. Agent Delia explained that it was necessary to move McManus from the initial location because some twenty-five to thirty youths in a park across the street began approaching the scene.[27] *Id.* at 99.

Agent Delia testified that once at the restaurant parking lot, and informed that McManus was unarmed, he instructed the Customs Agents to remove McManus' handcuffs. *Id.* at 105. Agent Delia instructed McManus that he (Agent Delia) had been involved in an investigation of McManus, Vittorio and others and that McManus was not under arrest and was free to leave at anytime. *Id.* at 106. Agent Delia testified that he repeated that McManus was free to leave at anytime at least three times during their conversation. *Id.*

Agent Delia testified he informed McManus that he had McManus recorded on some videotapes and audio tapes and would like for him to come back with the Customs Agents to the Newark Office of the United States Customs Service (the "Newark Office") to review such tapes. *Id.* Agent Delia testified he explained to McManus that he did not have to say anything in regard to the audio or videotapes and if McManus wished he could review the tapes and leave. *Id.* McManus agreed to go with the Customs Agents to the Newark Office. *Id.*

---

**27.** Agent Delia explained that a potentially "volatile" situation was unfolding, which precipitated the move. 26 April Hearing Tr. at 103–04.

Agent Delia testified that McManus was never handcuffed again. *Id.* at 107. After viewing approximately forty-five minutes of video tapes in a conference room at the Newark Office McManus indicated that he was willing to cooperate with the Customs Agents in their investigation. *Id.* at 112–14. Agent Delia testified he then informed Mc-Manus of his *Miranda* rights. *Id.* at 114–15. According to Agent Delia, McManus indicated that he understood his rights and was willing to answer questions, but did not want to sign the *Miranda* waiver form, marked as exhibit SH–1. *Id.* at 115. Agent Delia testified that he filled out the *Miranda* waiver form, with himself and another Agent signing as witnesses. *Id.*

Agent Delia began conducting the interview of McManus, which was summarized in the Second Redacted McManus Statement. *Id.* at 116. At some point the interview was stopped and McManus was asked for his consent to search his automobile. *Id.* at 116–17. Agent Delia testified he read McManus a consent to search form, marked as exhibit SH–2, which McManus signed. *Id.* at 117. Agent Delia testified that, before resuming the interview, McManus agreed to initial the *Miranda* waiver form to indicate he was informed of his rights. *Id.*

McManus presented one witness, John De-Celestino ("DeCelestino"), a friend of Mc-Manus, who testified he viewed the Customs Agents stop of McManus' automobile from approximately fifteen to twenty feet away. *Id.* at 168–71. DeCelestino's version of the events surrounding the stopping of Mc-Manus' automobile and movement from the scene was akin to the account alleged by McManus in his affidavit requesting a hearing. *See supra* at 66.

Even assuming, however, that McManus was initially placed in custody, when his automobile was stopped, McManus offered no evidence to challenge Agent Delia's testimony that he was thereafter repeatedly informed that he was free to leave.[28] Mc-

Manus provided no evidence, through cross examination or otherwise, that his statement was anything but voluntary. Further, Mc-Manus provided no evidence, nor did it appear to be the case, that, after a review of the totality of the circumstances, his "will was overborne," *Haynes,* 373 U.S. at 513, 83 S.Ct. at 1343, or that he was deprived " 'of his ability to make an unconstrained, autonomous decision.' " *Walton,* 10 F.3d at 1030 (quoting *Miller,* 796 F.2d at 605).

The initialling of the *Miranda* waiver form by McManus and his signing of the consent to search form were inconsistent with a finding that his will was overborne. Similarly, after an initial brief period of detention, Mc-Manus was never again handcuffed and was repeatedly told that he was free to leave. Based on the totality of the circumstances, it appeared that McManus had the "ability to make an unconstrained, autonomous decision." *Walton,* 10 F.3d at 1030 (quoting *Miller,* 796 F.2d at 605). Moreover, it appeared that there was no "substantial element of coercive ... conduct," that the Supreme Court explained is always present in cases which find involuntariness. *Connelly,* 479 U.S. at 163–64, 107 S.Ct. at 520 (explaining that with respect to its involuntary confession jurisprudence: "While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct.").

■ Based on a review of the totality of the circumstances, it appeared that Mc-Manus' "will was [not] overborne" when he gave the statement to the Customs Agents. *Haynes,* 373 U.S. at 513, 83 S.Ct. at 1343. The Government established by a preponderance of the evidence that the statement was given by McManus voluntarily. *Walton,* 10 F.3d at 1028. Accordingly, the motion by McManus to suppress the Second Redacted McManus Statement was denied.

---

28. At the close of the testimony, the court addressed McManus:

> THE COURT: ... [Y]ou realize you have a right to testify if you want to in this hearing, don't you?

> THE DEFENDANT [McManus]: Yes.
> THE COURT: You decided not to?
> THE DEFENDANT [McManus]: Yes.
> 26 April Hearing Tr. at 183–84.

F. *In Limine Motions to Suppress the Second Redacted McManus Statement*

Vittorio and Capra moved *in limine* to exclude the Second Redacted McManus Statement. Vittorio *In Limine* Brief at 15; Capra *In Limine* Brief at 1–2. Vittorio argued: "To date, the Government has provided no proposed redaction of [McManus'] statement. The Confrontation Clause of the United States Constitution bars the admission at a joint trial of the statement of a non-testifying defendant which incriminates another defendant." Vittorio *In Limine* Brief at 15 (citing *Cruz v. New York*, 481 U.S. 186, 193–94, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987) and *Bruton*). Additionally, Capra argued "in an attempt to exculpate himself, [McManus] implicated others, including ... Capra and ... Porco." Capra *In Limine* Brief at 1 (citing *Williamson v. United States*, — U.S. —, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) and attaching to brief an unredacted version of McManus' statement).

It appeared, however, that at the time of Vittorio's submissions, dated 31 March 1995, and Capra's submissions, dated 7 April 1995, they were already in possession of the First Redacted McManus Statement. As mentioned, the First Redacted McManus Statement was attached as Exhibit A to the Government Brief, which is dated 17 February 1995. Moreover, as discussed, the Government had since made further redactions of the statement given by McManus to the Customs Agents, as demonstrated by the Second Redacted McManus Statement.

█ In light of the Second Redacted McManus Statement, there was no basis for either Vittorio or Capra to challenge its admission. The Second Redacted McManus Statement makes no references, either directly or indirectly, to any of McManus' co-defendants. The Second Redacted McManus Statement only refers to "individual(s)." *See supra* note 22. As discussed, such redaction eliminates any *Bruton* argument that might

be advanced. *See supra* at 267–69. Further, because it could no longer be said that by his statement McManus had inculpated his co-defendants, arguments based on *Williamson*, were similarly misplaced. Accordingly, the *in limine* motions of Vittorio and Capra to exclude the Second Redacted McManus Statement were denied.

G. *Motion to Dismiss the Redacted Superseding Indictment for Failure to Bring McManus Before a Magistrate Judge Without "Unnecessary Delay"*

McManus moved to dismiss the Redacted Superseding Indictment or in the alternative to suppress any evidence seized by Customs Agents on 31 March 1994 because he was not brought before a magistrate judge in a timely manner. McManus Brief at 9. Rule 5(a) provides: "An officer making an arrest under a warrant ... or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available [F]ederal magistrate judge...." Fed.R.Crim.P. 5(a).

McManus contended the Customs Agents never brought him before a magistrate judge. McManus Brief at 9. McManus argued: "[I]nstead the [Customs] [A]gents decided to 'un-arrest' him, despite the seizure of incriminating evidence, because the [G]overnment thought they had 'turned' [him] into a cooperating witness." McManus Brief at 9.

The Government argued that although the Customs Agents had probable cause to arrest McManus, and even though McManus may have briefly been in the custody of the Customs Agents on 31 March 1994, "he was neither placed under arrest nor charged with any crime at that time." Government Brief at 36. According to the Government, "shortly after McManus was approached and detained ... [the Customs] [A]gents repeatedly advised McManus that he was *not* under arrest, and was free to leave at any time."[29] *Id.* (emphasis in original). The Government argued, therefore, that Rule 5(a) was inappli-

---

**29.** The Government noted that the temporary detention of McManus was necessary to insure the security of the Customs Agents and McManus given that gun trafficking violations were among the crimes being investigated. Government Brief at 36 n. 14. According to the Government: "The discovery of weapons in the trunk of McManus's car, confirmed the prudence of this procedure." *Id.*

cable and McManus' motion should be denied.

■ At the 26 April Hearing Agent Delia testified that, as per his instructions, McManus was never placed under arrest on 31 March 1994. 26 April Hearing Tr. at 94, 102. McManus provided no evidence at the 26 April Hearing that he was ever placed under arrest. Accordingly, McManus' motion to dismiss the Redacted Superseding Indictment for failure to bring him before a magistrate judge without "unnecessary delay," pursuant to Rule 5(a), was denied.

### H. *Motion to Suppress the Fruits of the Lanteri Wiretap*

Vittorio moved to suppress evidence obtained through the use of the Lanteri Wiretap. Vittorio Brief at 10–13. Vittorio argued an order entered by Judge Harold A. Ackerman ("Judge Ackerman"), on 13 February 1994 (the "13 February 1994 Order"), authorizing the Lanteri Wiretap, was improper because it was in violation of the procedure outlined in 18 U.S.C. § 2518(3). *Id.* at 10.

Section 2518(3) of Title 18 permits a Federal judge to enter an *ex parte* order authorizing the interception of wire communications "within the territorial jurisdiction of the court in which the judge is sitting.…" 18 U.S.C. § 2518(3). Vittorio argued the 13 February 1994 Order was improper because Judge Ackerman, sitting in Newark, New Jersey, authorized the interception of a telephone line originating in the Southern District of New York. Vittorio Brief at 10.

As the Government pointed out, however, Vittorio conceded that the Federal courts which have addressed the issue have held that interception of wire communications, for the purposes Section 2518(3), occurs not only where the wiretapped telephone is located, but also where law enforcement agents monitoring conversations are located. *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992); *United States v. Burford*, 755 F.Supp. 607, 611 (S.D.N.Y. 1991).

In the instant action, law enforcement agents who intercepted and monitored the Lanteri Wiretap were located in New Jersey. Government Brief at 57. The Lanteri Wiretap was monitored in New Jersey by employing a "slave line" which transmitted the intercepted communications to New Jersey. *Id.* The Government argued, therefore, that the 13 February 1994 Order was proper because the employment of a "slave line" was held by the *Rodriguez* court to be consistent with 18 U.S.C. § 2518(3). *Id.; see Rodriguez*, 968 F.2d at 136 ("[F]or the purposes of § 2518(3)'s jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communications are first to be heard.").

■ Vittorio argued Section 2518(3) should be read to limit the jurisdiction of a wiretap order to the district in which the authorizing judge sits. Vittorio Brief at 11–13. Vittorio, however, did not cite a Federal court opinion which has so held. Moreover, there appeared no reason to depart from the Second Circuit's interpretation of this issue in *Rodriguez*. Accordingly, the 13 February 1994 Order was found to be consistent with the territorial limitations of Section 2518(3) and Vittorio's motion to suppress the evidence obtained through the use of the Lanteri Wiretap was denied.

### I. *Requests for a Bill of Particulars*

Giampa, Segarra, Vittorio, Capra and Porco demanded a bill of particulars. Giampa Brief at 17–21; 22 February 1995 Vittorio Letter; Capra and Porco Brief at 8; Segarra Brief at 12–15. Giampa demanded that the Government set forth:

the time, place, date and the attendant circumstances of each [D]efendant's alleged entry in the conspiracy in the [Redacted Superseding] [I]ndictment[;] … the specific date on which the conspiratorial acts were alleged to have occurred in reference to each [D]efendant[;] … the specific location or locations where the conspiratorial acts were said to have occurred as to each [D]efendant[;] … each overt act which the [G]overnment intends to rely upon at trial against each [D]efendant[;]

... the words and conduct of each [D]efendant which the [G]overnment claims constituted the overt and conspiratorial acts of the said [D]efendant[;] ... the identity and addresses of all individuals whom the [G]overnment knows to have been present at the time that the overt and conspiratorial acts alleged in the [Redacted Superseding] [I]ndictment occurred.

Giampa Brief at 20–21.

Segarra demanded the Government, as to racketeering act one, conspiracy to import narcotics, racketeering act four, scheme to export stolen vehicles, racketeering act five, scheme to establish an illegal gambling business and Count Six, conspiracy to deal in firearms

> [s]tate and describe the date, time and place that it is alleged that ... Segarra agreed to [the crime charged][;] ... [s]tate whether it is alleged that ... Segarra agreed that others would [commit the crime charged] and state and describe the alleged date, time and place of said agreement[;] ... [s]tate any and all acts of ... Segarra, verbal and non-verbal that would entitle a trier of fact to infer that Segarra agreed that he or others would [commit the crime charged][;] ... [s]tate and describe the manner, method and means by which the [D]efendants would allegedly [commit the crime charged] pursuant to any agreement by ... Segarra.

Segarra Demand For Bill of Particulars, attached as Exhibit B to the Culleton Aff.

Capra and Porco demanded the Government, as to racketeering act one, conspiracy to import narcotics, racketeering act four, scheme to export stolen vehicles and racketeering act five, scheme to establish an illegal gambling business,

> [s]tate and describe the date, time and place that it is alleged that ... Porco and Capra, agreed to [the crime charged][;] ... [s]tate whether it is alleged that ... Porco and Capra agreed that others would [commit the crime charged] and state and describe the alleged date, time and place of said agreement[;] ... [s]tate any and all acts of ... Porco and Capra, verbal and non-verbal that would entitle a trier of fact to infer that Capra and Porco agreed that they or others would [commit the crime charged][;] ... [s]tate and describe the manner method and means by which the Defendants would allegedly [commit the crime charged] pursuant to any agreement by Capra and Porco.

Capra and Porco Demand For a Bill of Particulars.

Federal Rule of Criminal Procedure 7(f) ("Rule 7(f)")[30] allows defendants, under certain circumstances, to obtain information through a bill of particulars. A bill of particulars serves a function analogous to an indictment by providing the defendant with notice of the charges against him. A bill of particulars

> should be granted whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise.

*United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir.1989) (citing *United States v. Addonizio*, 451 F.2d 49, 62–63 (3d Cir.1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972)); *see United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir.1988) (purpose is " 'to identify with sufficient particularity the nature of the charge pending against [defendant], thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense' ") (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987) (*per curiam*)); *accord Adams*, 759 F.2d at 1113.

The purpose of a bill of particulars "is not to permit 'wholesale discovery of the Government's evidence.' " *Eufrasio*, 935 F.2d at 575 (quoting *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir.), *cert. denied*,

---

**30.** Rule 7(f) provides:

The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

Fed.R.Crim.P. 7(f).

423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975)). It should be granted when, in the trial court's discretion, it appears the indictment is too vague to inform the defendant of the nature of the charges against him or her. *Rosa,* 891 F.2d at 1067; *Addonizio,* 451 F.2d at 63–64; *United States v. Zolp,* 659 F.Supp. 692, 706 (D.N.J.1987).

■ Although Rule 7(f) is construed liberally, it does not permit a defendant to receive wholesale discovery of the Government's evidence. *Rosa,* 891 F.2d at 1066; *Addonizio,* 451 F.2d at 64. The Third Circuit has stated:

> [T]rial judges must be allowed to exercise broad discretion in order to strike a prudent balance between the defendant's legitimate interest in securing information concerning the [G]overnment's case and numerous countervailing considerations ranging from the personal security of witnesses to the unfairness that can result from forcing the [G]overnment to commit itself to a specific version of the facts before it is in a position to do so.

*Rosa,* 891 F.2d at 1066.

Segarra argued that the Redacted Superseding Indictment "fails to provide [him] with the minimal level of information needed for him to investigate the charges against him and to prepare his defense." Segarra Brief at 12. Giampa argued he needed the additional information requested in order to "understand the charges and properly prepare a defense." Giampa Brief at 20. Capra and Porco argued the information requested "is absolutely vital" to the preparation of their defense. Capra and Porco Brief at 8.

Notwithstanding these contentions, the Redacted Superseding Indictment "provides more than simply a bare bones description of the charges against [D]efendants; it presents a detailed picture of the RICO conspiracy and the substantive counts charged therein." Government Brief at 43. In the instant case,

the seventy-one page Redacted Superseding Indictment provides significant detail regarding the racketeering activity, the roles of Defendants, the means and manner in which the conspiracies were carried out and the predicate acts. In addition, the Government had provided substantial discovery. "The [Government] had disclosed and made available to [D]efendants hundreds of audiotapes and videotapes with corresponding transcripts recorded between October 10, 1992 and April 1, 1994.... In addition, defense counsel were notified of the opportunity to examine any tangible evidence in the Government's possession." [31] *Id.*

■ Further, the Government represented it had provided all *Brady* material, and had and would continue to comply with the Discovery Order. *See infra* at 281. Accordingly, the motions for a bill of particulars were denied.

## J. Pretrial Disclosure of Brady and Giglio [32] and Jencks Act Material

Giampa, Segarra, Gaito and Vittorio moved for pretrial disclosure of *Brady, Giglio* and/or Jencks Act material. Giampa Brief at 9, 24–26; Segarra Brief at 19–22; Gaito Brief at 7–8; Vittorio at 14.

### 1. Brady Material

In *Brady,* the Supreme Court held the Government's failure to disclose evidence favorable to the defendant who specifically requested it violated the accused's Due Process rights when the evidence was material to either guilt or punishment.[33] 373 U.S. at 87, 83 S.Ct. at 1196–97; *United States v. Bagley,* 473 U.S. 667, 674–75, 105 S.Ct. 3375, 3379–80, 87 L.Ed.2d 481 (1985). In *Giglio,* the Supreme Court held the *Brady* rule includes information that might be used to impeach the credibility of Government witnesses when the reliability of the witness could be determinative of guilt or innocence. *Giglio,* 405

---

**31.** There were 231 audio and video tapes with corresponding transcripts totalling more than 3300 pages. This represented virtually all of the evidence.

**32.** *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (*"Giglio"*).

**33.** This rule was modified in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) to require the Government to disclose exculpatory evidence even when the defendant has not requested the information. *United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir.1991).

U.S. at 154, 92 S.Ct. at 766; *accord Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380; *United States v. Starusko,* 729 F.2d 256, 260 (3d Cir.1984); *United States v. Higgs,* 713 F.2d 39, 42 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984).

■■■■■ Ordinarily, *Brady* material must be disclosed "in time for its effective use at trial." *Higgs,* 713 F.2d at 44. A district court has general discretionary authority to order the pretrial disclosure of *Brady* material "to ensure the effective administration of the criminal justice system." *Government of Virgin Islands v. Martinez,* 847 F.2d 125, 127 (3d Cir.1988); *Starusko,* 729 F.2d at 261; *Higgs,* 713 F.2d at 42. In exercising this discretion, the Circuit has indicated that district courts should "perpetuate [its] long-standing policy of encouraging early production." *Starusko,* 729 F.2d at 261 (citing *United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 739 (3d Cir.1978); *United States v. Kaplan,* 554 F.2d 577, 578 (3d Cir. 1977); *Government of Virgin Islands v. Ruiz,* 495 F.2d 1175, 1179 (3d Cir.1974)); *United States v. Bethea,* 787 F.Supp. 75, 77 (D.N.J.1992).

■■■■ In the instant case, the Government stated that it was fully aware of its obligations to disclose all exculpatory material, pursuant to *Brady.* Government Brief at 47–48. With respect to *Brady* material, the Government stated it was "fully aware of its obligation to disclose all such exculpatory material under the ... [D]iscovery [O]rder. It has complied with [the Discovery Order] and fully intends to continue complying should exculpatory material come into its possession." *Id.* Also, the Government stated it was "aware of its obligation to disclose, at the appropriate time, information bearing directly on the credibility of its major witnesses." *Id.* at 48. The Government's representations were accepted. Accordingly,

the motions for early disclosure of *Brady* material were denied as moot.[34]

### 2. *Giglio* Material [35]

With respect to *Giglio* material, the law of the Circuit indicates the Government is not obligated to disclose such material prior to trial. "Because *Brady* [and *Giglio* ] rest [ ] on the requirements of due process, focus must be on when disclosure is necessary to insure [the defendant] a fair trial." *United States v. Higgs,* 713 F.2d 39, 43 (3d Cir.1983); *see United States v. Kubiak,* 704 F.2d 1545, 1549 (11th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983). The Third Circuit has held that due process does not require *Giglio* material be disclosed prior to trial:

> The *Brady* material in this case was information that [defendants] could use on cross-examination to challenge the credibility of [G]overnment witnesses. For that type of material, we think [defendants'] right to a fair trial will be fully protected if disclosure is made the day that the witness testifies. Disclosure at that time will fully allow [defendants] to effectively use that information to challenge the veracity of the [G]overnment's witnesses.

*Higgs,* 713 F.2d at 44.

■■■■ The *Higgs* court held it was an abuse of discretion for the trial court to order disclosure of the *Giglio* material a week prior to trial. The purpose of requiring disclosure of impeachment information is not to assist the defense in a general pretrial investigation, but only to give the defense an opportunity to effectively cross-examine the Government's witnesses at trial. *See Higgs,* 713 F.2d at 44–45. In accordance with this holding, requests for pretrial production of *Giglio* material have consistently been denied. *See United States v. Cannistraro,* 800 F.Supp. 30, 92 (D.N.J.1992); *Eisenberg,* 773 F.Supp. at 684–85; *Vastola,* 670 F.Supp. at

---

**34.** Similarly, Gaito's request for an order compelling the Government to comply with the Discovery Order was denied.

**35.** Included in this analysis is Giampa's motions for disclosure of any agreement between the United States Justice Department and any Government Witness scheduled to testify against the

Defendants and for disclosure of prior criminal records, pending criminal offenses and/or ongoing investigations of Government witnesses. Giampa Brief at 24–26. Giampa argued disclosure of this information was needed for impeachment purposes and mandated by *Giglio. Id.*

1267. Accordingly, under the *Higgs* principle, there is no requirement that the Government provide *Giglio* material to Defendants prior to trial.

In the instant case, Defendants had not demonstrated that a special need existed for early disclosure of *Giglio* material. Nevertheless, the Government stated it "recognizes the interest of the [c]ourt and all parties to conduct the trial efficiently and without interruptions. Accordingly the [Government] ... voluntarily disclose[d] all *Giglio* material in its possession three days before the testimony of each witness." Government Brief at 50.

■ The Government's representation was accepted. *See Cannistraro,* 800 F.Supp. at 90; *Eisenberg,* 773 F.Supp. at 688. The motions for early disclosure of *Giglio* material were denied.

### 3. *Jencks Act Material*

Under the Jencks Act,[36] and Rule 26.2 of the Federal Rules of Criminal Procedure which incorporates the substance of the Jencks Act, a Federal criminal defendant may request the pretrial statements of a Government witness which relate to the testimony of that witness, once the witness has finished testifying on direct examination.

The Jencks Act states: "[N]o statement or report in the possession of the United States which was made by a Government witness ... shall be the subject of subpena (sic), discovery, or inspection *until said witness has testified on direct examination* in the trial of the case." 18 U.S.C. § 3500(a) (emphasis added). The Third Circuit has consistently explained that a district court cannot

compel early production of Jencks Act material. *See, e.g., Higgs,* 713 F.2d at 44–45; *United States v. Murphy,* 569 F.2d 771, 773 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978); *United States v. Kenny,* 462 F.2d 1205, 1212 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). As the Circuit stated in *Murphy:*

> The blunt command of the statute together with the unequivocal legislative history has led to unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of direct examination at the trial.

569 F.2d at 773.

■ In this case, to avoid delays at trial, the Government volunteered to produce the Jencks Act material three days before the anticipated testimony of witnesses. Government Brief at 47. Earlier disclosure of Jencks material was not, and could not, be mandated. *See Cannistraro,* 800 F.Supp. at 91; *Eisenberg,* 773 F.Supp. at 685 n. 15. Accordingly, the motions for early disclosure of Jencks Act material were denied.

### K. *FRE 404(b) Material*

Gaito, Segarra and Vittorio requested immediate notification of "other crimes" evidence under FRE 404(b) which the Government intended to offer at trial. Gaito Brief at 5; Segarra Brief at 16–17; 22 February 1995 Vittorio Letter. They also sought a pretrial determination of FRE 404(b) evidence.[37] Gaito Brief at 5; Segarra Brief at 16–17.

---

**36.** Section 3500 of Title 18 provides in pertinent part:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena (sic), discovery, or inspection *until said witness has testified on direct examination* in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as

hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500 (emphasis added).

**37.** McManus also sought a pre-trial determination of the admissibility of weapons seized by Customs Agents from his automobile pursuant to FRE 404(b) and FRE 403. McManus Brief at 11–13. As indicated, however, this motion became moot because the Government stipulated it would not offer the evidence seized from his automobile. *See supra* note 12.

## 1. Timing of FRE 404(b) Disclosure

FRE 404(b) provides, in pertinent part: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, *provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.*

Fed.R.Evid. 404(b) (emphasis added).

 FRE 404(b), as amended effective 1 December 1991, requires the Government "provide reasonable notice in advance of trial;" it does not, however, specify a time frame for such disclosure. The purpose of the pre-trial notice requirement of FRE 404(b) is "to reduce surprise and promote early resolution on the issue of admissibility." *United States v. Williams,* 792 F.Supp. 1120, 1133 (S.D.Ind.1992) (quoting FRE 404(b), Notes of Committee on the Judiciary, Senate Report No. 93–1277 U.S.Code Cong. & Admin.News 1974 p. 7051). The determination of "what constitutes a reasonable request or disclosure will depend largely on the circumstances." *Id.* (quoting FRE 404(b), Notes of Committee on the Judiciary, Senate Report No. 93–1277); *cf. United States v. Kern,* 12 F.3d 122, 124 (8th Cir.1993) (notice fourteen days prior to trial is sufficient under FRE 404(b)); *Evangelista,* 813 F.Supp. at 302 (notice ten business days prior to trial is sufficient under FRE 404(b)); *Williams,* 792 F.Supp. at 1133 (creating general ten-day rule); *United States v. Alex,* 791 F.Supp. 723, 729 (N.D.Ill.1992) (ordering notice seven days before trial).

 The Government represented it "intends to fully disclose [FRE 404(b) ] evidence in advance of trial," in compliance with the "reasonable notice" requirement of the rule. Government Brief at 52 & n. 18. There was no support for Gaito's and Segarra's request for immediate notification of what, if any, FRE 404(b) evidence the Government intended to offer at trial. Accordingly, the motions for then immediate notification of FRE 404(b) material were denied; the Government was directed to provide the Defendants with notice of the general nature [38] of the FRE .404(b) evidence two weeks prior to trial.[39]

## 2. Pre–Trial Determination of Admissibility of FRE 404(b) Evidence

The Supreme Court in *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), rejected the contention that a jury must not be exposed to similar acts evidence until "the trial court has heard the evidence and made a determination under [FRE] 104(a) that the defendant committed the similar act." *Id.* at 686–87, 108 S.Ct. at 1499.

FRE 104(a), governing questions of admissibility in general, must be read as subject to the special provisions of "conditional relevancy" in subdivision (b) of the rule.[40] Fed.

---

**38.** Segarra stated: "Pretrial disclosure of [FRE 404(b) ] evidence is vital not only for [him] to investigate the evidence identified but also so that if this [c]ourt deems any such evidence to be admissible, [he] can argue against the evidence in his opening statement to the jury." Segarra Brief at 16. FRE 404(b) does not provide for detailed disclosure; it requires only that the Government disclose "the general nature of such evidence." Fed.R.Evid. 404(b); *see Williams,* 792 F.Supp. at 1133 (The defendant need only receive sufficient notice "to apprise the defense of the general nature of the evidence of extrinsic acts") (quoting FRE 404(b), Notes of Committee on the Judiciary, Senate Report No. 93–1277); *Alex,* 791 F.Supp. at 728 (demand for dates, times, places, and persons involved wholly overbroad); *United States v. Long,* 814 F.Supp. 72, 73 (D.Kan.1993) (compliance with notice requirement is prerequisite to admissibility of FRE 404(b) material; failure to provide notice of general nature of evidence may result in exclusion).

**39.** A copy of this information was also directed to be provided to the court when it was provided to Defendants.

**40.** FRE 104 provides:

(a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court,

R.Evid. 104 advisory committee's note. Nowhere in the text of Rule 104 does it state that a preliminary hearing is warranted to determine the admissibility of prior bad acts. As the *Huddleston* Court stated: "Petitioner's reading of [FRE] 404(b) as mandating a preliminary finding by the trial court that the act in question occurred not only superimposes a level of judicial oversight that is nowhere apparent from the language of that provision, but it is simply inconsistent with the legislative history behind [FRE] 404(b)." *Huddleston*, 485 U.S. at 688, 108 S.Ct. at 1500.

■■■■ Generally, objections as to the admissibility of prior bad acts under FRE 404(b) are properly asserted during trial, not at the pretrial stage. *Luce v. United States*, 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984); *accord Eisenberg*, 773 F.Supp. at 685; *see also Vastola*, 670 F.Supp. at 1268 (it would be "unduly speculative" to rule on the admissibility of "other acts" evidence before hearing the factual context at trial).[41]

■■■ The Government stated: "Should the Government decide to introduce evidence of other crimes and similar acts, it will notify the [c]ourt and [D]efendants in advance.

> subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
> **(b) Relevancy conditioned on fact.** When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
> Fed.R.Evid. 104(a), (b).

**41.** Federal Rule of Criminal Procedure 12(d)(2) requires the Government give notice of its intention to use evidence at the request of the defendant. This rule, however, is limited to evidence needed for a defendant's motion to suppress and evidence discoverable under Federal Rule of Criminal Procedure 16 ("Rule 16"). Although a defendant's prior criminal record is discoverable under Rule 16, evidence of prior bad acts is not. *See Eisenberg*, 773 F.Supp. at 685; *United States v. Fischbach & Moore, Inc.*, 576 F.Supp. 1384, 1397–98 (W.D.Pa.1983); *United States v. Ramirez*, 602 F.Supp. 783, 794 (S.D.N.Y.1985) (defendant's request for pretrial hearing to determine admissibility of alleged prior or subsequent similar act denied; defendant instructed to seek ruling during course of trial).

This will give the [c]ourt adequate time to weigh the probative value of the evidence against its prejudicial impact...." Government Brief at 54. Accordingly, determination as to the admissibility of prior bad acts under FRE 404(b) was deferred until an appropriate time during trial. *See infra* at 291–293 (discussing hearings which were held on FRE 404(b) objections and the admission of such material).

### L. Co–Conspirator Statements

### 1. Pre–Trial Disclosure of Co–Conspirator Statements

Giampa sought an order compelling the Government to disclose all statements made by co-conspirators which it intended to introduce pursuant to FRE 801(d)(2)(E).[42] Giampa Brief at 27–28. Giampa argued "[t]he alleged conspiracy spanned over approximately two years and involved several individuals who have not been indicted. As such, the defense has no way of knowing what statements the Government intends to use, and no way to prepare to rebut or impeach such statements." *Id.* at 27. Giampa explained that the instant request was made pursuant to Rule 16(a)(1)(A).[43] *Id.*

According to the Government:

**42.** According to FRE 802(d)(2)(E), a statement is not hearsay if it is "offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

**43.** Rule 16 provides, in relevant part:

> **Discovery and Inspection**
> **(a) Disclosure of Evidence by the Government**
> **(1) Information Subject to Disclosure**
> **(A) Statement of Defendant.** Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent; and recorded testimony of the defendant before a grand jury which relates to the offense charged....

Many of the co-conspirator statements which the Government will seek to introduce at trial have already been provided to [D]efendants in discovery. The Government has fully complied with its obligations under [Rule] 16 and is not required to turn over any additional co-conspirator statements at this time. If the Government offers any additional co-conspirator statements at trial, their admissibility, like the admissibility of the statements already disclosed, can be determined at [that] time. . . .

Government Brief at 55.

Some courts have held that on a broad reading of Rule 16(a)(1)(A), it is possible to regard the statements of co-conspirators made during the course of and in furtherance of a conspiracy as the statements of the defendant and discoverable as such. *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir.) (statements of a co-conspirator may be imputed to a defendant under Rule 801(d)(2)(E) and are discoverable under Rule 16(a)(1)(A)), *cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985); *United States v. Konefal*, 566 F.Supp. 698, 705–07 (N.D.N.Y.1983). *See also* 2 C. Wright, *Federal Practice and Procedure*, § 253 n. 17 (1982 & Supp.1987).

■ Even under this broad interpretation of Rule 16(a)(1)(A), however, discovery of the statements of co-conspirators may only be permitted on a Rule 16 motion if the Government does not intend to call such co-conspirators as witnesses at trial. *Jackson*, 757 F.2d at 1491; *Konefal*, 566 F.Supp. at 706. If the Government intends to call such co-conspirators as witnesses, the Jencks Act, 18 U.S.C. § 3500, expressly makes statements of Government witnesses, including co-conspirators, not discoverable until such time as the witness testifies. 18 U.S.C. § 3500(a). This broad interpretation of Rule 16(a)(1)(A) was not followed in the instant case. *Cannistraro*, 800 F.Supp. at 90; *Eisenberg*, 773 F.Supp. at 680–83.

Fed.R.Crim.P. 16(a)(1)(A).

**44.** In the instant case, to avoid delays at trial, the Government volunteered to produce the Jencks

The weight of authority does not support extending Rule 16(a)(1)(A) beyond its literal mandate requiring disclosure of a defendant's own statements. *See, e.g., United States v. Mayberry*, 896 F.2d 1117, 1122 (8th Cir.1990); *United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C.Cir.) (holding Rule 16(a)(1)(A) does not include statements made by co-conspirators even if those statements can be attributed to the defendant for purposes of the rule against hearsay), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *United States v. Orr*, 825 F.2d 1537, 1541 (11th Cir.1987) (Rule 16(a)(1)(A) does not apply to co-conspirators' statements); *United States v. Roberts*, 811 F.2d 257 (4th Cir.1987) (*en banc*) (plain language of Rule 16(a)(1)(A) does not mention and is not intended to apply to statements made by co-conspirators; such statements are more properly governed by the Jencks Act); *United States v. Percevault*, 490 F.2d 126, 130–32 (2d Cir.1974) (Rule 16(a) does not encompass statements made by co-conspirators who are potential government witnesses and the Jencks Act does not permit their disclosure). *See also In re United States*, 834 F.2d 283, 284–86 (2d Cir.1987) (Second Circuit cited with favor its previous decision in *Percevault*, 490 F.2d at 126); *Fischbach & Moore, Inc.*, 576 F.Supp. at 1390 (rejecting broad interpretation of Rule 16 and expressing the view that co-conspirators' statements are within the purview of the Jencks Act and not within the reach of Rule 16).

■ The Government pledged to comply with its obligations under *Brady*. Government Brief at 47–48; *see supra* at 281. In addition, as mentioned, the statements of co-conspirators might have been discoverable under the Jencks Act, if the co-conspirators testified at trial. *Roberts*, 811 F.2d at 259; *Fischbach & Moore*, 576 F.Supp. at 1390; *United States v. Wolczik*, 480 F.Supp. 1205, 1209 (W.D.Pa.1979).[44] Accordingly, the request by Giampa under Rule 16 for pre-trial disclosure of statements of co-conspirators was denied.

Act material three days before the anticipated testimony of witnesses, although it was not required to do so. Government Brief at 47; *see supra* at 282.

### 2. Hearing on Admissibility of Co–Conspirator Statements

Segarra requested a hearing to determine the admissibility of statements by co-conspirators. Segarra *In Limine* Brief at 1. This request was made pursuant to *United States v. James,* 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) (*"James"*). Segarra *In Limine* Brief at 3.

■ The Circuit has recognized that "the control of the order of proof at trial is a matter committed to the discretion of the trial judge." *United States v. Gambino,* 926 F.2d 1355, 1360 (3d Cir.) (quoting *United States v. Continental Group, Inc.,* 603 F.2d 444, 456–57 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980)), *cert. denied,* 502 U.S. 956, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991). In some cases, because of their complexity or for other reasons, it may be inconvenient or impossible for the Government to prove the existence of the conspiracy and/or the participation therein of each of the alleged co-conspirators, prior to seeking admission of a co-conspirator's statement. *See, e.g., Gambino,* 926 F.2d at 1360–61; *Continental Group,* 603 F.2d at 457. In such cases, a practical evidentiary rule has developed whereby a co-conspirator's statement is conditionally admitted into evidence, subject to the Government's obligation to prove the conspiracy's existence and each conspirator's participation therein before the close of the Government's case. *See, e.g., Gambino,* 926 F.2d at 1360–61; *De Peri,* 778 F.2d at 981; *Ammar,* 714 F.2d at 245–47; *In re Fine Paper Antitrust Litigation,* 685 F.2d 810, 820–21 (3d Cir.1982), *cert. denied,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983); *Continental Group,* 603 F.2d at 456.

The danger inherent in conditionally admitting a co-conspirator's statement lies in its potential for prejudicing a defendant in the eyes of the jury before a conspiracy is proven to exist. *Gambino,* 926 F.2d at 1360. In the event the Government fails sufficiently to connect the defendant to the conspiracy, the "connection up" rule of admitting co-conspirator statements can lead to a mistrial. *Id.*

Although the Circuit has indicated such a procedure "should be carefully considered and sparingly utilized by the district courts," *see id.* (quoting *Continental Group,* 603 F.2d at 457), Segarra did not point to a case in which the Circuit required the holding of a *James* hearing to determine the admissibility of co-conspirator statements prior to trial. *Cf. Gambino,* 926 F.2d at 1360–61 (upholding admission of co-conspirator testimony subject to later connection); *Ammar,* 714 F.2d at 245–47 (same); *Fine Paper,* 685 F.2d at 820–21 (same); *Continental Group,* 603 F.2d at 457 (same); *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 195 (3d Cir.1970) (same), *cert. denied,* 401 U.S. 948, 91 S.Ct. 929, 28 L.Ed.2d 231 (1971).

■ Because of the complexity of the case and the numerous defendants, a hearing would have required a protracted "mini-trial" within the trial. *See Gambino,* 926 F.2d at 1360–61; *Ammar,* 714 F.2d at 247; *Zolp,* 659 F.Supp. at 709. Moreover, such a pretrial hearing would have required the Government to divulge the bulk of its case in advance of trial. Segarra did not advance any persuasive reason or circumstances why this case, more than any of the aforementioned Third Circuit cases, warranted such a pretrial hearing. Accordingly, Segarra's request for a pretrial *James* hearing on the admissibility of co-conspirators' statements was denied and the statements were admitted subject to connection by the Government.[45] *See Gambino,* 926 F.2d at 1361.

### M. Disclosure of the Identity of Confidential Informants

Giampa moved for the disclosure of the identity of any confidential informants. Giampa Brief at 22–23. "Because it can be inferred from the discovery granted to

---

**45.** Segarra also argued, in the context of his *in limine* request for a *James* hearing, that the Government failed to prove, with evidence independent of the co-conspirator statements and by a preponderance of the evidence, his involvement in the alleged conspiracy. Segarra *In Limine* Brief at 1–2. This argument was again advanced at the close of the Government's case-in-chief by counsel for Segarra and by counsel for Giampa, and is discussed *infra* at 332–333.

[Giampa] that confidential informants [were] involved in the case, fundamental fairness requires full disclosure of the informants' real names and addresses and aliases." *Id.* at 22.

In response the Government explained that, as provided in the Redacted Superseding Indictment and discovery, "the confidential informant involved in the investigation of this case was [Sabol]." Government Brief at 63. Pursuant to the Government's representation, Giampa's motion to disclose the identity of confidential informants was denied as moot.

### N. *Access to Grand Jury Materials*

■ Giampa and Vittorio requested disclosure of grand jury materials in the instant case. Giampa Brief at 29–32; Vittorio Brief at 7–9. Disclosure of grand jury material is contrary to the "long established policy that maintains the secrecy of grand jury proceedings in the [F]ederal courts." *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 424, 103 S.Ct. 3133, 3138, 77 L.Ed.2d 743 (1983) (quoting *United States v. Procter & Gamble Co.,* 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)); *In re Grand Jury Investigation,* 903 F.2d 180, 182 (3d Cir. 1990); *Eisenberg,* 773 F.Supp. at 707. This general rule of grand jury secrecy is codified in Rule 6(e) of the Federal Rules of Criminal Procedure.[46]

■ Rule 6(e) applies "not only to information drawn from transcripts of grand jury proceedings, but also to anything which may reveal what occurred before the grand jury." *In re Grand Jury Matter,* 682 F.2d 61, 63 (3d Cir.1982); *see Fund for Constitutional Gov't v. National Archives & Records Serv.,* 656 F.2d 856, 869 (D.C.Cir.1981) (scope of grand jury secrecy encompasses anything which would reveal "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the

like") (quoting *SEC v. Dresser Indus., Inc.,* 628 F.2d 1368, 1382 (D.C.Cir.), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)).

■ The secrecy of grand jury proceedings is not absolute. *Grand Jury Investigation,* 903 F.2d at 182. Rule 6(e)(3)(C) authorizes disclosure by court order and states, in pertinent part:

> Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—(i) when so directed by a court preliminarily to or in connection with a judicial proceeding; [or] (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury....

Fed.R.Crim.P. 6(e)(3)(c)(i), (ii).

■ The party moving for court-ordered disclosure bears a heavy burden of demonstrating to the court that (1) "the material [he or she] seek[s] is needed to avoid a possible injustice in another judicial proceeding," (2) "the need for disclosure is greater than the need for continued secrecy" and (3) "[his or her] request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979) (footnote omitted); *Eisenberg,* 773 F.Supp. at 707.

■ The most significant factor which a party seeking disclosure must show is a "particularized need" for the information. *United States v. Mechanik,* 475 U.S. 66, 75, 106 S.Ct. 938, 944, 89 L.Ed.2d 50 (1986); *Sells Engineering,* 463 U.S. at 434, 103 S.Ct. at 3143; *Illinois v. Abbott & Assocs., Inc.,* 460 U.S. 557, 567, 103 S.Ct. 1356, 1361, 75 L.Ed.2d 281 (1983); *United States v. Canino,* 949 F.2d 928, 943 (7th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *In re Lynde,* 922 F.2d 1448, 1452

---

**46.** Rule 6(e)(2) states, in pertinent part:

A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(iii) of this

subdivision shall *not disclose* matters occurring before the grand jury, except as otherwise provided for in these rules.... A knowing violation of Rule 6 may be punished as a contempt of court.

Fed.R.Crim.P. 6(e)(2).

(10th Cir.1991); *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir.1989); *In re Disclosure of Grand Jury Material*, 645 F.Supp. 76, 78 (N.D.W.Va.1986); *see also Hernly v. United States*, 832 F.2d 980, 984 (7th Cir. 1987) ("secrecy is not broken 'except where there is a compelling necessity' for the material") (quoting *Procter & Gamble*, 356 U.S. at 686, 78 S.Ct. at 988).

 There is a presumption of regularity in grand jury proceedings. *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301, 111 S.Ct. 722, 728, 112 L.Ed.2d 795 (1991); *United States v. Educational Development Network Corp.*, 884 F.2d 737, 740 (3d Cir.1989), *cert. denied*, 494 U.S. 1078, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990); *United States v. Chimurenga*, 609 F.Supp. 1070, 1075 (S.D.N.Y.1985), *aff'd*, 800 F.2d 1129 (2d Cir.1986). For a party to obtain information about the conduct of grand jury proceedings, that party must offer evidence of a "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir.1972), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972); *Eisenberg*, 773 F.Supp. at 707; *United States v. Dioguardi*, 332 F.Supp. 7, 20 (S.D.N.Y.1971).

 Conclusory or speculative allegations about what went on in a grand jury proceeding give no cause to question the regularity of the grand jury's functioning. *United States v. Zuluaga*, 651 F.Supp. 746, 748 (E.D.N.Y.1986); *United States v. Gordon*, 493 F.Supp. 814, 817 (N.D.N.Y.1980), *aff'd*, 655 F.2d 478 (2d Cir.1981). Nor do such allegations outweigh the need for secrecy. *Zuluaga*, 651 F.Supp. at 748; *United States v. Beatty*, 587 F.Supp. 1325, 1334–35 (E.D.N.Y.1984).

 In considering the effects of disclosure on grand jury proceedings, the Supreme Court has stated:

[C]ourts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries.... Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties.

*Douglas Oil*, 441 U.S. at 222, 99 S.Ct. at 1674; *accord Hernly*, 832 F.2d at 984; *Grand Jury Material*, 645 F.Supp. at 78; *In re Grocery Products Grand Jury Proceedings of 1983*, 637 F.Supp. 1171, 1174 (D.Conn. 1986); *see also In re Petition of Tribune Co.*, 784 F.2d 1518, 1522 (11th Cir.1986) ("courts retain an obligation ... to preserve the secrecy of grand jury proceedings and the privacy of jurors"). Even after a grand jury has completed its investigation, a court is not relieved of its obligation to apply the criteria set forth in *Douglas Oil*. *Lynde*, 922 F.2d at 1454; *Shell v. Wall*, 760 F.Supp. 545, 547 (W.D.N.C.1991); *In re Grand Jury Proceedings (Daewoo)*, 613 F.Supp. 672, 679 (D.C.Or. 1985). As the *Lynde* court stated:

[A]s the reasons for protecting grand jury proceedings become less significant the burden of showing justification lessens accordingly. However, when the relevant grand jury proceedings have been concluded, as in the present case, "the interests in grand jury secrecy, although reduced, are not eliminated." There must still be a sufficient showing of the factors announced in *Douglas Oil* ....

922 F.2d at 1454 (quoting *Douglas Oil*, 441 U.S. at 222, 99 S.Ct. at 1674); *accord Hernly*, 832 F.2d at 984; *Shell*, 760 F.Supp. at 547. Moreover, "one's right to disclosure may not ... rest simply upon the weakness of the public interest considerations in favor of secrecy; there must be some real showing of need on the part of the moving party." *In re Grand Jury Proceedings*, 800 F.2d 1293, 1300, 1302 (4th Cir.1986); *Shell*, 760 F.Supp. at 548.

As mentioned, there is a presumption of regularity in grand jury proceedings, *Chimurenga*, 609 F.Supp. at 1075; *Gordon*, 493 F.Supp. at 816–17. For a party to obtain information about the conduct of grand jury proceedings, therefore, that party must demonstrate a "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *Budzanoski*, 462 F.2d at 454; *accord Eisenberg*, 773 F.Supp. at 707; *Dioguardi*, 332 F.Supp. at 20.

In the instant action, Giampa argued he should be permitted access to the grand jury minutes because "there is insufficient information provided through discovery which supports the [g]rand [j]ury's return of an indictment against him. As such, [Giampa was] concerned about the manner in which this information was presented to the [g]rand [j]ury." Giampa Brief at 29–30.

Vittorio argued he should be permitted access to the portion of the grand jury minutes, including testimony and colloquy, which concerns references to his prior weapons charge and conviction and that he "shot people." Vittorio Brief at 7. Vittorio argued in light of the references to this information in the Indictment, it is clear that such information was presented to the grand jury. *Id.* Vittorio contended only with access to the grand jury materials he sought could "it be determined whether the context and manner in which these matters were presented was so inflammatory as to render fundamentally unfair the return of an indictment against Vittorio...." *Id.*

The Government argued Giampa "seeks to use the grand jury transcripts as a discovery device" and Vittorio has not provided a "sufficient factual basis to give rise to a finding that proceedings before the grand jury were irregular." Government Brief at 61.

 The arguments advanced by Giampa and Vittorio did not "justify the extraordinary step of disclosing grand jury materials...." *Id.* Giampa and Vittorio did not adequately demonstrate a "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *Budzanoski,* 462 F.2d at 454. Accordingly, the motions for disclosure of grand jury materials were denied.

---

**47.** The Government provided defense counsel with a final draft of the transcripts in mid-April 1995. Objection Hearings Tr. at 148, 164. This was, as represented, at least thirty days before the trial started on 22 May 1995. *See infra* at 291–292 (explaining the circumstances surrounding the commencement of the trial). It appeared any subsequent changes made to the transcripts were infrequent and, in most cases, were not of a substantive nature. The Government explained, on 4 May 1995, during the Objection Hearings:

### O. Date Certain for Production of Transcripts

Vittorio moved for an order setting a date certain for the production of transcripts of recorded materials. Vittorio Brief at 16. According to Vittorio: "There [were] hundreds of draft transcripts of recorded conversations or meetings in this case. There [were], additionally, certain potentially relevant recorded conversations for which no draft transcript has yet to be prepared." *Id.*

The Government represented: "Defendants have received drafts of all transcripts of all audio and video recordings. Moreover, the Government will provide counsel with a final draft of all transcripts which the Government will introduce at trial at least 30 days before trial (April 1, 1995)." In light of the Governments representation, Vittorio's motion was denied as moot.[47]

### P. Preservation of Rough Notes and Reports

Vittorio, Gaito and Segarra moved for an order compelling law enforcement agents to preserve their rough notes, interview notes, report drafts and final reports prepared in connection with the instant action. Vittorio Brief at 15; Gaito Brief at 6; Segarra Brief at 18–19. The Government stated it

> is aware of its obligations under *United States v. Ammar,* 714 F.2d 238 (3d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983), and *United States v. Ramos,* 27 F.3d 65 (3d Cir.1994), to preserve notes of interviews and handwritten drafts of reports, and the Government will abide by this requirement.

Government Brief at 51.

In *Ammar,* the Third Circuit stated: "[T]he [G]overnment must retain and, upon

> [A]ll transcripts of all the meetings and telephone calls that the Government intends to play have been provided to counsel.... [S]ince the transcripts ... were provided two weeks ago, there have been some changes [after] ... Sabol ... review[ed] the tape and the transcript[,] ... [to] clarify an unintelligible or change something that was mistyped.

Objection Hearings Tr. at 147–48. The Government further stated that it would point out the minor changes that were made to the transcripts. *Id.* at 165.

motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced." 714 F.2d at 259; *Ramos,* 27 F.3d at 68 (quoting the same language from *Ammar*); *see also United States v. Vella,* 562 F.2d 275, 275–76 (3d Cir.1977) ("To avoid future misunderstandings, we specifically adopt the precepts announced in *United States v. Harrison,* 524 F.2d 421 (D.C.Cir. 1975), as the law in this circuit, to-wit, the rough interview notes of … agents should be kept and produced so that the trial court can determine whether the notes should be made available to the appellant under the rule of [*Brady*], or the Jencks Act."), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978).

Because the Government represented it had and would comply with its obligations under *Ammar,* the motions to preserve rough notes and reports were denied as moot. *See Eisenberg,* 773 F.Supp. at 692.

### Q. *Request for Leave to File Additional Motions*

McManus, Capra and Porco requested leave to file additional motions in the future as may be appropriate. McManus Brief at 2; Capra and Porco Brief at 2. Also, Vittorio, McManus and Capra request leave to file additional *in limine* motions, as may be appropriate. Vittorio *In Limine* Brief at 16; McManus *In Limine* Brief at 3; Capra *In Limine* Brief at 1 and Notice of Motion. The Government contended such request should be conditionally granted:

To the extent this need arises from any further disclosure of discovery materials, pursuant to the Government's continuing discovery obligation, the Government does not oppose [D]efendants' request. However, [D]efendants should not be permitted to enlarge the time for filing motions that could have been brought based upon discovery materials provided long ago.

Government Brief at 62. Because circumstances could have arisen which would have made it appropriate and necessary for Defendants and the Government to file additional motions in the future as to new materials obtained in discovery, Vittorio, McManus, Capra and Porco's motions for leave to file addition motions, if appropriate, was conditionally granted. In fact, all subsequent motions were accepted, regardless of the date filed.

### R. *Reciprocal Discovery*

The Government requested reciprocal discovery under Rule 16(b).[48] Government Brief at 64. Courts have not hesitated to order pretrial discovery in favor of the Government where the Government has complied with the defendant's discovery requests. *See United States v. Burger,* 773 F.Supp. 1419, 1429 (D.Kan.1991) (ordering production of documents sought in reciprocal discovery request fifteen days prior to trial); *United States v. Kraselnick,* 702 F.Supp. 480, 487 (D.N.J.1988) (once the Government is determined to have complied with defendant's discovery requests, "the [G]overnment may request discovery and defendant[ ] will be obliged to comply or face possible sanction by the court.").

**48.** Rule 16(b)(1)(A) states, in pertinent part:
 **(b) The Defendant's Disclosure of Evidence.**
 **(1) Information Subject to Disclosure.**
 **(A) Documents and Tangible Objects.** If the defendant requests disclosure under subdivision (a)(1)(C) or (D) of this rule, upon compliance with such request by the government, the defendant, on request of the government, shall permit the government to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.
 **(B) Reports of Examinations and Tests.** If the defendant requests disclosure under subdi-

vision (a)(1)(C) or (D) of this rule upon compliance with such request by the government, the defendant, on request of the government, shall permit the government to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness' testimony.
Fed.R.Crim.P. 16(b)(1)(A), (B).

In the instant case, despite its 30 August 1994 request, the Government stated it had received no reciprocal discovery from Defendants.[49] The Government contended it had complied with all discovery requests made by Defendants. Government Brief at 47–48, 50 n. 17. The Defendants did not dispute this contention, nor did they object to the Government's request for reciprocal discovery.

 Defendants received discovery from the Government and "[r]eciprocal discovery is a two way street." *United States v. Stackpole*, 811 F.2d 689, 697 (1st Cir.1987). Accordingly, Defendants were directed to immediately provide the Government with pretrial discovery and that failure to do so could result in appropriate sanctions.

## S. *Jury Selection Procedures*

The Government requested limits on the information the parties would be furnished with regard to jury selection. According to the Government proposal, the parties would only be told of the county of residence of prospective jurors and other information such as whether a prospective juror lived in an urban, suburban or rural location. Government Jury Letter at 1. Additionally, the Government requested prospective jurors only describe the nature of their or family members' employment rather than specifying the name or location of employers. *Id.*

In opposition to the Government's request, counsel for McManus argued such procedures "would deprive the defendant of a full and fair opportunity to obtain relevant information necessary to uncover juror bias and to secure and preserve an impartial jury." McManus Jury Letter at 1. Further, counsel for McManus argued denial of the juror information was inappropriate in the absence of a showing by the Government that there was some potential of crimes against prospective jurors or a showing of prior violence such as murder charged in the Redacted Superseding Indictment. *Id.* at 2–3.

 At the 26 April Hearing, the Government's request was granted. 26 April Hearing Tr. at 88. There appeared to be no prejudice which would result from the failure to identify the city of residence of prospective jurors; inquiries would be made as to whether a juror lived in a urban, suburban or rural location. *Id.* at 88–89. Additionally, there appeared to be no reason to identify the employer of either a prospective juror or his or her spouse as long as the parties were informed of the nature and duties of such employment. *Id.* at 89. As it turned out, however, through an error in the jury department, the information sought concerning place of residence was provided to the Defendants. This was done through the inclusion of the data requested on the jury roster used during jury selection.

## T. *Hearings on Objections to Audio and Video Taped Evidence*

At a scheduling conference, on 23 September 1994, a trial date was set for 1 May 1995. *See* Minutes of Proceeding. The 1 May 1995 trial date was scheduled after a careful review of the availability of defense counsel and the Government.[50] All counsel represented to the court that no existing or future obligations would interfere with the commencement of trial on 1 May 1995.

Through no fault of counsel for Capra, a trial in the United States District Court for the Southern District of New York, in which he was participating, ran longer than was represented by the presiding judge.[51] As 1 May 1995 approached, it appeared counsel for Capra would still not be available for a

---

49. The Government pointed out that its prior request for reciprocal discovery was not addressed to Vittorio and Segarra because they were fugitives at that time. Government Brief at 64 n. 21. The Government's motion for reciprocal discovery was directed to all Defendants (including Vittorio and Segarra). *Id.* Similarly, the instant order requiring reciprocal discovery was directed to all Defendants.

50. At a status conference, on 15 September 1994, counsel were each requested to submit a letter to the court outlining their upcoming trial schedules so a trial date could be set. *See* Minutes of Proceeding.

51. Inquiries were made of the judges who were presiding over cases in which counsel were participating to insure the court had an accurate indication of when counsel would be available to try the instant case.

few weeks. Because all counsel had cleared their schedules as of 1 May 1995, it was determined that, between 1 May 1995 and the start of trial,[52] defense counsel[53] would be given the opportunity, during the Objection Hearings,[54] to put on the record objections they had to the audio and video taped evidence the Government intended to admit at trial.[55]

> As explained to counsel on 5 May 1995:

> The whole idea of this exercise is to allow defense and the Government to articulate their respective positions and [the court] then to review the transcript to make rulings on these matter. Obviously, if we were doing this during the course of the trial we would be in here very early every morning or be here very late every night. As I've stressed, we're not going to hold up the jury once the jury comes in [for trial].

Objection Hearings Tr. at 154. Defense counsel were instructed to state their objections to particular passages (page and line)[56] of a particular transcript and explain the legal and factual basis for such objection. *See, e.g., id.* at 315–16. The Government was then instructed to respond to such objection and defense counsel would then move on to their next objection. *Id.*

On numerous occasions during the Objection Hearings, defense counsel were informed that if they did not make specific objections to the audio and video recorded evidence, such objections would be deemed waived. For example, on 2 May 1995, during the first day of the Objection Hearings, it was explained:

> I understand some of you folks want to leave. The whole idea of [the Objection Hearings] is to give you an opportunity to put on the record right now your arguments as to why something should be excluded or why something should be in. If you want to walk out of here, you ... [may], but you will waive your argument.
>
> . . . .
>
> It's my intent to give [the Defendants] the opportunity to work with your counsel today to put on the record objections to these transcripts, not only the transcripts themselves, but the content.
>
> I'm not going to force you to stay here right now. But if you walk out, you will waive any argument that you may have in this case with regard to these transcripts.

*Id.* at 10. Counsel, *and each of the Defendants,* were asked if they understood that all objections to the content of the recordings and the transcripts had to be raised on the record during the Objection Hearings. *Id.* at 11. It was again explained, that if objections were not raised during the Objection Hearings, the right "to object to anything in the transcripts" would be waived.[57] *Id.* ("[FRE] 403, [FRE] 401, whatever they are, you've got to make them now or you're waiving them."); *see also, e.g., id.* at 16 (court explaining to defense counsel if objections were not made during Objection Hearings they would be waived); *id.* at 30 (same); *id.* at 156 (same); *id.* at 165 (same); *id.* at 415 (same); *id.* at 701 (same); *id.* at 702 (same).

On 12 May 1995, after all defense counsel had an opportunity to place their objections on the record, the court again reiterated the

---

**52.** The trial began on 22 May 1995.

**53.** An associate of counsel for Capra, represented Capra in this regard.

**54.** The Objection Hearings started on 2 May 1995 and continued until 17 May 1995.

**55.** As indicated, there were 231 audio and video tapes with corresponding transcripts totalling more than 3300 pages. The transcripts from the Objection Hearings themselves totalled more than 900 pages; the Objection Hearings concerned *only* the objections the Defendants had to the audio and video taped evidence, which the Government intended to admit at trial. As men-

tioned, the transcript of the trial totalled more than 4700 additional pages.

**56.** It was explained that counsel were to go over the transcripts of the taped evidence "word-by-word, line-by-line[.]" Objection Hearings Tr. at 19.

**57.** A procedure was agreed upon by defense counsel and the Government whereby each defense attorney would be given more time to go over the transcripts with his or her client. Objection Hearings Tr. at 13–22. Each defense attorney then scheduled a day or two with the Government to place their objections on the record. *Id.*

procedures to be followed during the Objection Hearings:

> I again stress to all of you, that the idea of the[ ] [Objection] [H]earings is to permit you the opportunity to put on the record now your basis, legal and factual, for any objection, [FRE] 401, [FRE] 403 or any other objection that you may have with regard to the tapes or the transcripts of the tapes.

> I also point out to the Government, this is your opportunity to put on the record the factual and legal basis why you believe it should be admitted. If you don't do it, you've waived it. I want you to understand that.

> . . . .

> Does anybody have a question as to the[ ] [Objection] [H]earings?

> I'm telling you now, it is my intent to paint all of you, Government and the defense, into a corner. I want to give you fair notice. I've said this a dozen times or more. I've said it in front of your clients. I need the opportunity to look at this.

*Id.* at 701–02.

Additionally, at this time the court gave all counsel another opportunity to place on the record any additional objections they had to the transcripts:

> I invite you back [before the anticipated start of trial on 22 May 1995]. If you think you have anything else you want to put on the record or any other objection, I'm not cutting you off.

> . . . .

> [I]f there is something that you think you didn't cover, something you want to put on the record, I'll be happy to have you back ... we'll arrange a time for you. The Government will be here, the court reporter will be here and you can put it on the record.

> If you don't do it, you've waived any objection you may have to either the transcript or the tape.

*Id.* at 702.[58]

### U. *In Limine Motions Concerning the Admissibility of 404(b) Material*

As the *Huddleston* Court explained: "The threshold inquiry a court must make before admitting similar acts evidence under [FRE] 404(b) is whether that evidence is probative of a material issue other than character." 485 U.S. at 686, 108 S.Ct. at 1499. "If offered for such a proper purpose, the evidence is subject only to general strictures limiting admissibility such as [FRE] 402 [59] and 403 [60]." *Id.* at 688, 108 S.Ct. at 1500.

The drafters of FRE 404(b) "contemplated that [the rule] would be construed as a rule of 'inclusion' rather than 'exclusion.' They intended to emphasize admissibility of "other crime" evidence.' " *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d Cir.) (quoting *United States v. Long,* 574 F.2d 761, 766 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978)), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). "The possible uses of other crimes evidence listed in the [r]ule—motive, opportunity, intent, preparation, plan, knowledge, identity,

---

**58.** The review of the tapes and corresponding transcripts, together with the seventy-one page Redacted Superseding Indictment and numerous motions, afforded the parties an extraordinary opportunity to object to and respond to the taped evidence the Government sought to admit. A similar review, along with the more than 900 pages of transcripts from the Objection Hearings, was of significant assistance in ruling on such evidence. A review of this material demonstrates why all of the admitted material was relevant. Without it, it would not have been possible, for example, for the Government to demonstrate how and why the relationships, and resulting trust, between and among the Defendants and Sabol developed. Without this background the existence of the various conspiracies could not have been explained or proved.

**59.** FRE 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." Fed.R.Evid. 402.

**60.** FRE 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

and absence of mistake—are not the only proper ones." *Id.*

The objections to the taped evidence, regarding 404(b) material, for the most part concerned four categories: (1) past charged and uncharged criminal activity; (2) references to an accidental shooting of Gaito; (3) racial epithets; and (4) references to drug use.

### 1. *Past Charged and Uncharged Criminal Activity*

Giampa, Vittorio, Gaito, McManus and Capra contested the admissibility of FRE 404(b) evidence concerning references to their past charged and uncharged criminal activity sought to be introduced by the Government. Giampa *In Limine* Brief at 7; Vittorio *In Limine* Brief at 4–6, 9–12; Gaito *In Limine* Brief at 6; McManus *In Limine* Brief at 1; Capra *In Limine* Brief at 2. The Government argued these statements made by Sabol concerning prior bad acts committed by the Defendants were admissible pursuant to FRE 404(b). According to the Government:

> Sabol engaged in conversation regarding his own illicit conduct as well as that of several [D]efendants in order to establish credibility with the [D]efendants and gain acceptance into their criminal enterprise. The transcripts demonstrate that Sabol's knowledge of and participation in criminal activity involving members of organized crime, including several of the [D]efendants, was the foundation upon which his relationship with the [D]efendants was based. That Sabol had previously engaged in criminal endeavors with several [D]efendants and that he knew of other criminal activity involving the [D]efendants was crucial to their acceptance of him into their virtually impenetrable, clandestine criminal enterprise.
>
> Thus, Sabol's statements are highly probative and valuable because they demonstrate the continuing relationship between and among Sabol and the [D]efendants and the mutual trust that developed between Sabol and the [D]efendants. Sabol's statements also explain how the [D]efendants

came to trust Sabol and why they allowed him to join their criminal enterprise.

10 April Government *In Limine* Brief at 3–4.

As the Government pointed out, such evidence was "necessary to demonstrate [Sabol's] continuing relationship with the [D]efendants, the [D]efendants' intent and knowledge with respect to the offenses with which they [were] charged, and the absence either of mistake on the [D]efendants' part or of entrapment on the part of the Government." 31 March Government *In Limine* Brief at 2.

Additionally, with regard to references made by Defendants of their own and other Defendants' prior bad acts, the Government explained:

> The tapes and transcripts reflect that the [D]efendants, in an effort to affirm and re-affirm their trustworthiness and loyalty to the Lucchese Crime Family, recount their own prior bad acts and the prior bad acts of other [D]efendants. Such evidence is crucial to the jury's understanding of the development and continuity of the criminal conspiracy in this case because it shows how their illicit relationship developed, how they engendered mutual trust, and how they established credibility with one another.

10 April Government *In Limine* Brief at 5.

The Defendants did not appear to contest that the evidence of criminal activity was being offered for a permitted purpose—other than for character or propensity. Instead, the focus of the Defendants' opposition to such evidence was FRE 403 because of its contended unfairly prejudicial effect. *See, e.g.,* Giampa *In Limine* Brief at 7 ("[T]he prejudicial impact of [references to criminal activity, among other things] ... will outweigh its probative value and therefore ... should be excluded pursuant to [FRE] 403"); Vittorio *In Limine* Brief at 5–10 (arguing that information regarding Vittorio's criminal background "will dramatically prejudice [him] in the eyes of the jury ... [and that] the potential for prejudice far outweighs any probative value that might come from informing the jury of ... uncharged and imaginary activities"); Gaito *In Limine* Brief at 6 (arguing that information concerning Gaito's criminal history "will unfairly prejudice [him]

in the eyes of the jury and should be precluded [and] ... references to uncharged criminal conduct ... should be redacted, as the prejudicial impact of these statements outweighs any probative value the evidence may have").

▮ Notwithstanding the Defendants' assertions of unfair prejudice, the Circuit has explained: "[E]vidence that bears on a relevant issue in the case, though possessing the potential to damage the defendant's cause, is not inadmissible for that reason alone." *Scarfo*, 850 F.2d at 1019. The Defendants were unable to articulate how the probative value of evidence of prior charged and uncharged criminal activity was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," to warrant preclusion under FRE 403. Fed.R.Evid. 403.[61] Accordingly, such evidence was admitted.

Additionally, as indicated, Segarra moved to exclude references in the transcripts to a pending case in the United States District Court for the Southern District of New York in which he is charged with importation of heroin into the United States. 26 April Hearing Tr. at 33–37. Segarra argued that the pending charge is not relevant to show his knowledge and plan with regard to a discussion on 6 January 1993 about the forming of an import/export company because during such conversation there was no mention of drugs or that such company was not going to be a legitimate business. *Id.* at 33–34.

On 4 May 1995, during the Objection Hearings, counsel for Segarra explained that the references to Segarra's pending trial were contained in 102 TR and 104 TR. Objection Hearings Tr. at 91. At this point, the Government had not decided if it would offer 102 TR and 104 TR in evidence. *Id.* at 91–92. Accordingly, the Government and counsel for Segarra requested that objections and responses to the references at issue not be placed on the record at that time in the hope of resolving the matter on their own. *Id.*

On 12 May 1995, counsel for Segarra informed the court that the Government had still not made a decision as to whether to offer 102 TR and 104 TR in evidence. *Id.* at 703. Although, no further reference is found in the record concerning the Government's decision on such taped evidence, 102 TR and 104 TR were never admitted in evidence at trial. Accordingly, the instant motion became moot.

### 2. *Accidental Shooting of Gaito*

Vittorio and Gaito also sought to preclude references to an incident, on 20 December 1993, when Gaito was accidentally shot. Vittorio *In Limine* Brief at 7–8; Gaito *In Limine* Brief at 6. According to taped conversations regarding the incident, Vittorio and Gaito were unloading items from the trunk of a car when one of them dropped a duffle bag on the ground causing a loaded gun, which was in the duffle bag, to fire and strike Gaito in the groin. Vittorio *In Limine* Brief at 7.

Gaito and Vittorio argued reference to the incident should be precluded pursuant to FRE 403 because the gun in the duffle bag was not one which they were charge with supplying in the Redacted Superseding Indictment, nor was it clear who owned the duffle bag or if either knew about the gun. Vittorio *In Limine* Brief at 7–8; Gaito *In Limine* Brief at 6.

Additionally, Vittorio argued exclusion was warranted because he "and others, including ... Sabol, display amusement about what happened to Gaito, primarily because of the bodily location in which he was wounded." Vittorio *In Limine* Brief at 7. Vittorio argued his "reaction to the situation, although tempered by his contemporaneous expressions of concern for Gaito, will inevitably have the effect of turning the jury against

---

61. Additionally, the Government pointed out that the Defendants had the opportunity to cross-examine Sabol about any such statements at trial. 10 April Government *In Limine* Brief at 4. This further supported inclusion pursuant to FRE 403 because there was less of a danger of

unfair prejudice to the Defendants given their ability to challenge such evidence at trial. *Cf. Price*, 13 F.3d at 719 (explaining that although absence of surprise is not sufficient to offset unfair prejudice, "unfair surprise is a factor to be considered under [FRE] 403").

him on a matter totally unrelated to the charges in this case." *Id.*

According to the Government:

References to this shooting incident [were] extremely important to provide the jury with a complete and accurate version of the events in this case. Without this information, jurors [might have] wrongly conclude[d] that Gaito dropped out of the criminal conspiracy of his own accord, when in reality, he was prevented from participating in the criminal conduct because of his injuries. The shooting incident, which [was] described in the [Redacted Superseding] Indictment, [was] a circumstance that clearly affected the conspiracy.

10 April Government *In Limine* Brief at 8.

■■■ References to the shooting incident were admitted because such incident was determined to be probative of the involvement of Gaito in the conspiracy, the sudden absence of Gaito from the events in the Redacted Superseding Indictment and for FRE 404(b) purposes concerning knowledge or absence of mistake. Further the assertion of prejudice concerning Vittorio's "amusement," over the incident appeared to be offset by Sabol's shared sentiment. Vittorio *In Limine* Brief at 7. Vittorio and Gaito failed to articulate the unfairly prejudicial effect of reference to this incident which would have made exclusion pursuant to FRE 403 appropriate.

### 3. *Racial Epithets*

Vittorio and Gaito moved *in limine* to exclude racial epithets uttered by them in recorded conversations. Vittorio *In Limine* Brief at 13–14; Gaito *In Limine* Brief at 7. Vittorio and Gaito argued their "sporadic" use of racial epithets were easy to redact. Vittorio *In Limine* Brief at 13–14; Gaito *In Limine* Brief at 7. Further, they argued such redaction was necessary to insure the verdict rendered by the jury was based on a determination of their criminal culpability rather than whether they were racists. Vittorio *In Limine* Brief at 13; Gaito *In Limine* Brief at 7.

The Government argued the racial epithets were so frequent in the transcripts that redaction could not be accomplished without altering the substance of the conversations. 10 April Government *In Limine* Brief at 9. The Government relied on *Price,* where after reviewing the transcript in question, the Circuit affirmed the district court's refusal to redact racial epithets where such redaction could not be accomplished without altering the substance of the conversations. 13 F.3d at 720.

At the 26 April Hearing the parties were instructed to conference and remove all racial epithets that were not descriptive in nature and alleged by the Government to be necessary to identify the person being referred to in the transcripts. 26 April Hearing Tr. at 62. Following the conference, no additional objections were offered concerning the racial epithets which remained in the tapes and transcripts for descriptive purposes.

### 4. *Drug Use*

Vittorio moved *in limine* to exclude references to his drug use. Vittorio *In Limine* Brief at 13. Vittorio argued "[these] references [were] easily excisable, and [had] no probative value, and, if admitted, [had] a potential for substantial prejudicial impact on the jury." *Id.*

■■■ As the Government pointed out: "Statements regarding Vittorio's prior drug use [were] relevant because they show[ed] opportunity to engage in drug trafficking, knowledge and experience in the drug trade, and intent to traffic drugs." 10 April Government *In Limine* Brief at 7–8. Vittorio failed to articulate how such probative value was substantially outweighed by unfair prejudice to preclude admission pursuant to FRE 403. Accordingly, references to Vittorio's prior drug use were admitted pursuant to FRE 404(b).

## II. Trial Motions and Objections

### A. Objections to Explanations of Taped References [62]

During the Government's direct examination of Sabol, audio and video tapes of recorded conversations were played. At certain points, the Government stopped the tape being played to ask Sabol questions about the recorded conversations. Sabol testified as to his understanding of various recorded remarks made by Defendants, during conversations which he was a participant, or as to what Sabol meant by a particular recorded remark he made. Counsel for the Defendants, on numerous occasions, objected to such inquiries. Except as indicated below, these objections were overruled.

The Third Circuit has explained:

Under [FRE] 701,[63] lay witnesses may state their understanding of the use of another person's statements "only if rationally based on the perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue."

*United States v. De Peri,* 778 F.2d 963, 977 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986) (quoting *United States v. Cox,* 633 F.2d 871, 875 (9th Cir.1980), *cert. denied,* 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981)).

In *De Peri,* the district court allowed the Government's chief witness, Joseph Alvaro ("Alvaro") to testify as to his understanding of tape recorded conversations between him and defendant James Martin ("Martin"). *Id.* According to the Circuit, allowing such testimony was not an abuse of discretion. *Id.* at 977–78. The Circuit explained:

Martin's language on the tapes is sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous

references to events that are clear only to Martin and his audience. To the uninitiated listener, Martin speaks as if he were using code. Alvaro's opinions are based upon his direct perception of the event, are not speculative, and are helpful to the determination of Martin's involvement in the protection scheme and the subsequent attempt to silence [Government Witness Albert] Ricci with "hush money."

*Id.* at 977–78. Additionally, the Circuit reasoned that "the trial court vigorously policed the Government's examination of Alvaro to ensure that he was not asked to interpret relatively clear statements." *Id.* at 978.

In *United States v. Dicker,* 853 F.2d 1103, 1110–11 (3d Cir.1988), the Circuit reversed a conviction because a witness was permitted to interpret clear statements in recorded conversations. The Circuit explained: "While the trial judge was certainly correct in his assertion that interpretation of code words by a witness is permissible, the interpretation of *clear* statements is not permissible, and is barred by the helpfulness requirement of both [FRE] 701 and [FRE] 702." *Id.* at 1109 (emphasis in original) (footnote omitted).

The Circuit distinguished *Dicker,* in the context of interpreting recorded conversations by an expert, in *United States v. Theodoropoulos,* 866 F.2d 587, 591–92 (3d Cir. 1989). The Circuit stated: "*Dicker* did not deal with ascribing roles to members of an illegal narcotics conspiracy." The Circuit further distinguished *Dicker* because "the witness' interpretations of what he said and what the defendant said did not meet the helpfulness standard for lay opinions under Rule 701." *Id.* at 591. According to the

---

**62.** During a sidebar conference, on 26 May 1995, all defense counsel requested that they each be permitted to join in any objection made by any individual attorney without voicing an objection. Trial Tr. at 268–69. This request was granted, however, defense counsel were instructed if there was any unique fact or legal theory particular to their client they were required to articulate the same to the court. *Id.* at 269.

Accordingly, all objections have been construed as if made by each Defendant. When a particular objecting attorney is referred to in this opinion it is only because that attorney raised a

particular objection; the objection has still been construed as if raised by all defense counsel.

**63.** FRE 701 provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Fed.R.Evid. 701.

Circuit: "*Dicker* is inapposite [to *Theodoropoulos*] because the conversations which the witness was permitted to interpret were clear. We held therefore it was improper for the agent to 'ascribe[ ] his own illicit meaning to straightforward, potentially legitimate statements.'" *Id.* (quoting *Dicker*, 853 F.2d at 1110).

The Circuit in *Theodoropoulos* stated:

> In dealing with organized crime or illegal narcotics operations, a lay jury is unlikely to have knowledge as to the structure of the organizations or the interrelationships between the participants. We have previously held admissible testimony as to the structure of organized crime families an explanation of Italian words such as *capi* and *consigliere* in the context of an organized crime family.

*Id.* 866 F.2d at 592 (citing *United States v. Riccobene*, 709 F.2d 214, 230–31 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)).

In *Theodoropoulos* the organization was complex and there was confusion in the recorded conversations between the participants. *Id.* The confusion was created by the participants' use of different codes, two languages and truncated sentences. *Id.* As the Circuit explained it has "permitted even lay testimony of a witness' understanding of a tape recorded conversation when the language was 'abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that [were] clear only to [defendant] and [the witness].'" *Id.* (quoting *De Peri*, 778 F.2d at 977); *see also United States v. Wright*, 921 F.2d 42, 43 (3d Cir.1990) (discussing, with apparent approval, informants testimony at trial that tape recorded statements "'me try for, take care of some things'" and "'me don't want to come up empty handed,'" meant informant did not want to go to Philadelphia without drugs and that he understood the defendant's

reference to "'the powder business,'" to mean cocaine), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2803, 115 L.Ed.2d 976 (1991).

According to the Circuit: "The district court in its discretion could reasonably have decided that . . . testimony as to defendants' roles in the organization could have assisted the jury in making sense of otherwise incoherent phone conversations." *Theodoropoulos*, 866 F.2d at 592.

In *Theodoropoulos* there was no evidence that the witness was explaining what were otherwise clear statements. *Id.* Instead, the Circuit reasoned that because of the use of code words which were interwoven throughout the conversations, often in confusing contexts, the witness' testimony was helpful in setting the stage for understanding the nature of the defendants' enterprise. *Id.*

In the beginning of Sabol's direct testimony there was one objection made specifically on the ground that the Government was asking Sabol questions about clear statements,[64] which did not need interpretation.[65] Trial Tr. at 261. On direct examination, Sabol was asked what he meant by needing "'someone who's strong,'" when he said to Gaito: "'I need somebody who's strong and that if I step on anybody's toes, I don't have a . . . problem.'" Trial Tr. at 261 (quoting 105 TR at 36).[66] Counsel for Giampa objected, stating "The transcript speaks for itself, *United States v. Dicker.*" *Id.*

After the objection was overruled, Sabol explained this reference meant he

> need[ed] somebody that has a lot of influence in this area that if we step on somebody's toes, meaning if we rob something from somebody else without knowing who we're robbing it from, that we wouldn't run into a problem. . . . I needed somebody who was strong, who could give us protection in this area of New Jersey, to help us

---

64. As explained below, this statement, as all others the Government was permitted to ask about, was not clear and an explanation by Sabol was helpful to the jury.

65. As discussed below, defense objections to questions asked Sabol, concerning the taped conversations, were merely articulated as based on

FRE 701 in general, on relevancy grounds, FRE 401, or as unduly prejudicial under FRE 403.

66. "__ TR" refers to the transcripts of the recorded conversations, both audio and video, which the Government offered in its case-in-chief.

unload different merchandise and we wouldn't run into any problems. *Id.* at 261–62.

At sidebar [67], counsel for Porco contended that the Government should not be permitted to ask Sabol what he meant by particular recorded remark. *Id.* at 265. According to counsel for Porco: "[Sabol] doesn't know anything, he doesn't mean anything, and anything he does know or mean, or anything in the back of his mind is irrelevant. He's an agent of the Government." *Id.*

Counsel for Giampa argued: "Sabol is interpreting . . . what he meant and what other people mean. What I am saying under Rule 701, he should not be able or permitted to interpret what is the clear language of the conversation." *Id.* at 266. The court responded: "That's just the point. . . . [T]his is fair comment under the lay opinion rule, based upon the foundation he's laid with his experience in this area and based upon his perceptions." *Id.*

At another sidebar conference [68], counsel for Giampa again objected to Sabol's interpretation of the taped conversations. *Id.* at 324. Counsel for Giampa explained the basis for his objection was that "[i]t's irrelevant and it's very, very prejudicial to these defendants." *Id.*

Besides the above example, defense counsel did not object on the ground that Sabol was explaining something which was clear, instead objections were made on relevance grounds, under FRE 403 or what appeared to be under FRE 701 in general. Nonetheless, as explained below, the information elicited was relevant to show background and relationships of the Defendants among themselves and with Sabol. Moreover, the explanations sought were based on Sabol's rational perception and were helpful to the jury, as required by FRE 701.

Counsel for Giampa objected to Sabol's "interpretation . . . and under [FRE] 401" when Sabol was asked to what the "envelopes" referred. *Id.* at 288. This question concerned a recorded conversation between Gaito and Sabol regarding how Gaito would introduce Sabol to Giampa. *See* 105 TR at 78–79. In that conversation Gaito proposes to tell Giampa:

> J. Gaito: I know him [Sabol] all my life, and he's, he's, a mover. He gets a lot of things, he can't, he needs a little protection. With, ah, you get a piece every week from him.
>
> R. Sabol: Yeah, he'll get an envelope. I'll give him, I'll give him, the envelope personally.
>
> J. Gaito: Right.

*Id.* at 78–79.

Sabol testified: "The envelope is cash payment for protection for being with him, or an end, or a score that we did, or activity that we're involved in that—because if Joey's with him, Joey has to kickback to him for his protection." Trial Tr. at 288–89.

On one occasion counsel for Capra objected on relevance grounds when Sabol was asked what he understood Gaito's comment " 'Joey G. hooked me up with him,' " meant. Trial Tr. at 255 (quoting 105 TR at 28). Sabol explained that he understood this to mean that Giampa "[p]ut him with him to earn money." *Id.* at 255–56.

An objection was made on FRE 401 and 403 grounds when Sabol was asked what he meant by "tubes." *Id.* at 278. Sabol explained that it was a plastic cylinder about twenty-two inches high and five inches in diameter, "with a pedestal in the middle." *Id.* Sabol explained that the "tubes" were filled with water and placed in diners and deli's and that the public would drop quarters in the "tubes" and win a prize if the quarter they dropped in landed on the pedestal. *Id.* Sabol testified he had permission from charitable organizations to put the charity name on the "tube," by promising the charity a share of the gross revenues (fifteen or twenty-five percent). *Id.* at 279–83. Sabol testified that the charity did not always get the amount agreed upon and in some instances got nothing. *Id.* at 282–83.

Another objection made by counsel for Giampa to Sabol "interpreting what . . . Gai-

---

**67.** This sidebar conference was requested by counsel for Porco. Trial Tr. at 263.

**68.** This sidebar conference was requested by counsel for Giampa. Trial Tr. at 323–24.

to is saying" or what was "about to lead to that," Trial Tr. at 294, concerned the following portion of a recorded conversation between Sabol and Gaito:

R. Sabol: ... I didn't know Joey G, was who you were with. Remember a long time you said they guy.

J. Gaito: Well.

R. Sabol: On Gun Hill Road was.

J. Gaito: I didn't know, that, yeah, see, I was partners with them in business.

R. Sabol: Oh.

J. Gaito: And, Joey G was supposed to get a piece of that from me.

105 TR at 83. Counsel for Giampa objected when the Government asked Sabol what the reference to "Gun Hill Road" meant. Trial Tr. at 294. Sabol explained Gun Hill Road is an area in the Bronx and that Gaito had told him a long time ago that he was with someone in that area, but Sabol did not realize Gaito was referring to Giampa. *Id.* at 295.

Additionally, counsel for Giampa and Patton objected under FRE 701 when Sabol was asked what he understood Gaito to mean when he explained: " 'They're together. Him [Mikey] and Joey are together. Same thing.' " *Id.* at 298–99 (quoting 106 TR at 6). Sabol explained this reference meant to him "[t]hat they're together with the same crew, same crime family and that they're both made members." *Id.* at 299.

Also, counsel for Giampa objected under FRE 701, to questions asked of Sabol concerning the following conversation:

J. Gaito: No, no, no, not really, not a 1,000. I went to him with the paintings too.

R. Sabol: See, I know he's, I know he's a skipper his father.

J. Gaito: Yeah.

R. Sabol: He's not a ..., he's a skipper.

J. Gaito: Yeah. Right.

R. Sabol: He's higher than just one of these guys.

J. Gaito: Yeah, I know.

R. Sabol: Yeah, he's got a lot of guys underneath, (laughs) him.

J. Gaito: Right.

R. Sabol: Alright? And, Gerry had the green light, listen I.

107 TR at 337–38. Sabol explained that he understood the "him," when Gaito said "I went to him," to be Giampa. Trial Tr. at 337. Further, Sabol explained that the discussion that followed, regarding the "he" being a "skipper" also referred to Giampa. *Id.* at 338. Finally, Sabol explained that the reference to the "green light" meant: "The green light to do whatever he wants to do out in the street without really having to worry about any problems...." *Id.*

Sabol was asked what his understanding of the phrase "somebody above him" meant when Gaito said: "Maybe he spoke to, ah, somebody above him and they said to do it that way...." *Id.* at 379 (quoting 107 TR at 82). This question was objected to under FRE 701 by counsel for Giampa. *Id.* Sabol testified that this reference meant someone "[h]igher ranking." *Id.* at 380.

On occasion Sabol was asked questions regarding recorded conversations, which sought an interpretation of language clear on its face. Such interpretation was not permitted. An example of this concerned a recorded conversation between Sabol and Vittorio, the relevant portion of which follows:

G. Vittorio: Well, this guy, a friend of mine, Elliot has a machine route. Because we go and he gives a couple hundred for the day.

R. Sabol: Why? He's afraid he's gonna get robbed?

G. Vittorio: Yeah, so we go over, me and Jimmy. Once a week, ah, once a month, whatever, once every two weeks. Whatever he wants to do.

153 TR at 16. Sabol explained that the "he" referred to Porco and the "getting robbed" referred to "[s]omebody sticking [Porco] up for the money, coming out of the machines, the gambling machines." Trial Tr. at 607. Sabol was then asked what his understanding was of the "once a week," and "once a month" reference. *Id.* at 608. The objection made by counsel for Vittorio, based on FRE 701 and FRE 403, was sustained because such interpretation was neither necessary nor helpful to the jury. *Id.*

In the instant case, the explanations offered by Sabol with regard to the role in the organization played by the Defendants, as well as interpretation of the phrases and words used by Sabol and the Defendants, assisted the jury in "making sense of otherwise incoherent phone conversations." *Theodoropoulos,* 866 F.2d at 592. Code words and phrases were used. Moreover, it was clear the Defendants were concerned whether the telephones were safe and many were reluctant to discuss anything in detail over the telephone. As seen by references throughout this opinion, Defendants often used truncated sentences, abbreviated sentences, unfinished sentences and references to events and people that were clear only to the participants of the conversation.

In this case, the language used by the Defendants can be characterized as sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events clear only to the Defendants and Sabol. *De Peri,* 778 F.2d at 977–78. Additionally, to the uninitiated listener, such as a member of the jury, the Defendants spoke as if they were using code. Sabol and the Defendants more often than not used pronouns or only first names in describing individuals about whom they were conversing, as well as using descriptive terms, such as "the Irish kid" or "the father." The conversations which were recorded were reflective of an ongoing transaction and needed to be explained by a participant. Sabol was not asked to interpret relatively clear statements. *Id.*

█ Uninitiated listeners, such as the jurors in this case, would have had difficulty in understanding the abbreviated, unfinished sentences and the various conversations which were loaded with references that were clear only to Sabol and the other participants. Sabol's statements were based upon his direct perception of the event as a participant in the conversations, were not specula-

tive and were helpful to the determination of the involvement of the Defendants in the schemes charged. To the extent the conversations were face-to-face, Sabol had an opportunity to observe the gestures, facial expressions and body language of the Defendants who were speaking. It was clearly helpful to the jury to allow explanations of various terms and to allow the identity of various people who were referred to by the use of pronouns or nicknames. All these matters were central to the facts at issue and within Rule 701.[69]

### B. *Motions for Mistrial*

Defense counsel made several motions for mistrial during the course of trial. These motions concerned the admission of various evidence or the Government's summation.

"The decision whether to grant a mistrial is within the sound discretion of the trial court...." *United States v. Saldarriaga,* 987 F.2d 1526, 1531 (11th Cir.1993); *see United States v. Clair,* 934 F.2d 943, 945 (8th Cir.1991); *United States v. Rocha,* 916 F.2d 219, 234 (5th Cir.1990), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); *United States v. Bertoli,* 854 F.Supp. 975, 1047 (D.N.J.1994), *aff'd in part, sentencing vacated,* 40 F.3d 1384 (3d Cir.1994); *United States v. Crosley,* 634 F.Supp. 28, 32 (E.D.Pa. 1985), *aff'd,* 787 F.2d 584 (3d Cir.1986). "[T]he single most important factor in making [this] determination is the extent to which the defendant has been prejudiced." *United States v. Tarantino,* 846 F.2d 1384, 1413 (D.C.Cir.1988); *see United States v. Moore,* 917 F.2d 215, 220 (6th Cir.1990), *cert. denied,* 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991); *United States v. Vastola,* 899 F.2d 211, 235 (3d Cir.), *vacated on other grounds,* 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990); *Bertoli,* 854 F.Supp. at 1047; *Brown v. Doe,* 803 F.Supp. 932, 942 (S.D.N.Y.1992), *aff'd,* 2 F.3d 1236 (2d Cir.

---

**69.** Guidance was sought from the Circuit's opinion in *Wright. See* 921 F.2d at 43. As mentioned, in *Wright,* the Circuit discussed, with apparent approval, the testimony of a Government informant concerning what he understood taped references to mean. *Id.* As the Circuit explained, the informant testified at trial that the

tape recorded statements " 'me try for, take care of some things' " and " 'me don't want to come up empty handed,' " meant the informant did not want to go to Philadelphia without drugs and that he understood the defendant's reference to " 'the powder business,' " to mean cocaine. *Id.*

1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1088, 127 L.Ed.2d 403 (1994).

▓▓▓▓▓▓ Even if a trial court improperly admits evidence,[70] this "does not automatically mandate a new trial. There must be prejudice that affects a substantial right of the defendant." *United States v. Newby*, 11 F.3d 1143, 1147 (3d Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994). Moreover, under most circumstances, an instruction to the jury to disregard a question or response will cure any prejudice resulting from that question or response. *United States v. Clair*, 934 F.2d 943, 945 (8th Cir.1991); *accord United States v. Canino*, 949 F.2d 928, 937 (7th Cir.1991); *United States v. Eyster*, 948 F.2d 1196, 1214 (11th Cir.1991); *Bertoli*, 854 F.Supp. at 1047 n. 133 (opining that "if a curative instruction is sufficient to prevent a mistrial when improper comments are heard by the jury, no mistrial should be necessary when the comments were neither improper nor heard by the jury").

### 1. *Giampa's Motion for Mistrial*

Counsel for Giampa argued the jury heard a taped reference to a prior murder trial of Giampa, which he argued was supposed to be excluded by the Government pursuant to a stipulation. Trial Tr. at 243 (referring to 105 TR at 60). Additionally, counsel for Giampa contended he had moved pre-trial for the exclusion from evidence of any references to Giampa's prior trial. *Id.* at 244.

It was explained, with regard to Giampa's pre-trial motion, that counsel at the Objec-

---

**70.** This is not to suggest that it was improper to admit the evidence at issue in the motions for mistrial.

**71.** As pointed out, there did not appear to be any bad faith on the part of the Government in failing to redact the reference at issue. Trial Tr. at 413. In response to the argument that the Government agreed to redact all related references, the Government argued:

> We spent over two weeks going through the transcripts page-by-page and in a painstakingly manner with all attorneys who had concerns about portions of the transcripts.
>
> . . . . .
>
> Now, the Government stated its intention to [counsel for Giampa] that [it] would consent to

tion Hearings had "an opportunity for a hearing for two and a half weeks before this trial commenced." *Id.* at 245. It was pointed out that counsel for Giampa, while making numerous objections over many days to specific transcript references (including page and line citations) during the Objection Hearings, made no objection on the record to the reference at issue. *Id.* at 245–46. Further, as explained, counsel and defendants were instructed on many occasions during the Objection Hearings that "general" or "blanket" objections would not be accepted and that failure to object to a specific reference would result in a waiver. *Id.* at 246, 315, 413.

In denying the motion for mistrial, it was stated:

> Now, your [pre-trial] motion was superseded to the extent that everybody was ordered in here and directed to put on the record specific page-by-page, line-by-line, word-by-word objections concerning these transcripts. You came in and did that. You and [counsel for Vittorio] clearly have more in the way of objections on these 930 pages of objections than everybody else combined. . . .
>
> You were meticulous in the way you pointed things out and you pointed specific areas out, not only line-by-line, but word-by-word.
>
> . . . .
>
> Now, the Government agreed to make certain redactions. I don't recall reading anything in the transcripts where the Government agreed to undertake on your behalf to go through and find areas that they thought you might find objectionable.[71]

> objected-to portions that relate[d] to … Giampa's trial in New York. . . .
>
> It was not the Government's intention to state that it would undertake a review of the entire transcript and essentially find the defense objections. . . . It was the Government's intention just to consent to areas objected to along those lines by the defense and that's what the Government did do.
>
> *Id.* at 248–49.

You didn't point [the reference at issue] out.

*Id.* at 412–13.

The court suggested the parties work out a limiting instruction with regard to the reference at issue. *Id.* at 414. Counsel for Giampa, thereafter, provided the court with a stipulated cautionary instruction. *Id.* at 428. The jury was then instructed as follows:

> There was a reference in one tape-recorded conversation to a murder. Be advised that Mr. Giampa was not responsible for the commission of any murder and the reference in the conversation, the taped conversation should not be considered by you in any way whatsoever in determining whether Mr. Giampa is guilty of the crimes charged in this indictment. The Government has consented to delete any reference to the murder from the tapes. The reference has also been removed from your transcript.
>
> Again, I caution you not to consider any reference to a murder in any way whatsoever in making your decision in this case.
>
> Now, is there anyone who feels he or she could not follow this limiting instruction or, indeed, any of the other limiting instructions I've given to you during the course of this trial?
>
> All right. Fine.
>
> We'll resume.

*Id.* at 467–68.

As indicated, all counsel were instructed on several occasions that if they did not raise objections to specific portions of the taped recorded evidence all objections to admissions of such evidence would be waived. *See supra* at 292–293. *Cf. United States v. Bertoli,* 40 F.3d 1384, 1398 (3d Cir.1994) (explaining that the "contemporaneous objection rule, [provides] that the failure contemporaneously to assert a right constitutes a waiver of that right"); *Government of the Virgin Islands v. Williams,* 892 F.2d 305, 309 (3d Cir.1989) ("[T]he 'contemporaneous objection' rule of appellate review, . . . requires a party to a judicial proceeding to object contemporaneously to any matter believed to be erroneous, at peril of relinquishing the opportunity to challenge the matter on appeal."), *cert.*

*denied,* 495 U.S. 949, 110 S.Ct. 2211, 109 L.Ed.2d 537 (1990).

 Counsel for Giampa failed to identify prejudice suffered by Giampa to warrant a mistrial. *See Newby,* 11 F.3d at 1147. The reference at issue appeared to be rather insignificant when compared to the weeks of taped evidence offered by the Government in this case. Further, any possible significance placed on such reference by the jury was negated by the instruction given. *Clair,* 934 F.2d at 945; *Canino,* 949 F.2d at 937; *Eyster,* 948 F.2d at 1214; *Bertoli,* 854 F.Supp. at 1047 n. 133. Accordingly, Giampa's motion for mistrial was denied.

Another motion for mistrial made by Giampa concerned a response made by United States Customs Service Agent Lawrence Hardie ("Agent Hardie") during cross examination by counsel for McManus. Counsel for McManus questioned Agent Hardie regarding the Second Redacted McManus Statement. Trial Tr. at 2806–07. As indicated, all references to the Defendants, with the exception of McManus, had been redacted from the Second Redacted McManus Statement. *See supra* at 56. Nonetheless, when pressed by counsel for McManus, Agent Hardie mentioned Giampa:

> Q Thank you. These are not . . . McManus' words, with the exception of the quotation, excuse my language, "I'm screwed"?
>
> A That's right. It's paraphrasing what he said.
>
> Q Paraphrasing meaning somebody else's words?
>
> A Yes. I think I represented it as a summary. That's what it is.
>
> Q So, in other words, words like alignment fees, that would not be . . . McManus' words?
>
> A No.
>
> Q Would that be something . . . McManus said, the words "alignment fees"?

A He used words indicating that, that he was beholding to ... Giampa.

Trial Tr. at 2806–07.

At this point, counsel for McManus began to ask another question when the Government requested a sidebar conference. *Id.* at 2807. The Government indicated that it believed counsel for McManus was "getting very close to opening the door on getting all the redacted stuff [from the Second Redacted McManus Statement] in." *Id.* at 2808. The court explained that the manner in which the question was asked was an invitation for an open-ended response and suggested using "very tight cross-examination questions." *Id.* at 2809.

As the Government pointed out: "[O]ne problem area here is that [the Second Redacted McManus] [S]tatement has been painstakingly rewritten and redacted under the supervision of the [c]ourt and after speaking with the [defense] attorneys.... [Q]uestion[s] along the lines whether those are [Agent Hardie's] words, ... open[ ] the door to all that." *Id.* Further, the court explained the line of questioning by counsel for McManus "suggests the Government's manufacturing stuff when you know it's all been redacted to handle the other problems"—the original references to all of the Defendants. *Id.*

Counsel for Giampa argued that the door was not opened by the inquiry of Agent Hardie. *Id.* at 2811. Further, counsel for Giampa contended Agent Hardie knew he was not to mention the Defendants and used the question by counsel for McManus "as a means to slip it under the rug." *Id.* Nonetheless, while arguing the mention of Giampa by Agent Hardie was "in violation of ... the [c]ourt's redaction[,]" counsel for Giampa acknowledged that "the [c]ourt has already told the jury ... that [they] are not to use [the

Second Redacted McManus Statement] ... against any other [D]efendant." *Id.*

In denying the application for a mistrial, the court explained:

> There is so much evidence in this case from the tapes where McManus said that he is aligned with the father,[72] he reports to the father, he wouldn't steal from the father, et cetera.
>
> This information came out on cross-examination. The cross-examination question was anything but tight. I do not view this witness as trying to slip something in. There is no basis to say that. I reject it utterly.
>
> I'm making my observations based upon the demeanor [of Agent Hardie] and the way this witness has [been] responding [to cross examination].

*Id.* at 2811–12.

■ Again counsel for Giampa failed to identify prejudice suffered by Giampa to warrant a mistrial. *See Newby,* 11 F.3d at 1147. As indicated, this reference was rather insignificant when compared to numerous similar references in the taped evidence in this case. Further, any possible significance placed on such reference by the jury was negated by the instruction given that the jury was not to use the Second Redacted McManus Statement as evidence against any of the other Defendants. *Clair,* 934 F.2d at 945; *Canino,* 949 F.2d at 937; *Eyster,* 948 F.2d at 1214; *Bertoli,* 854 F.Supp. at 1047 n. 133. Accordingly, Giampa's motion for mistrial was denied.

### 2. *Vittorio's Motions for Mistrial*

Counsel for Vittorio made a motion for mistrial after Sabol testified about two prior bad acts alleged to have been committed by Vittorio.[73] Trial Tr. at 416–18. The first prior act Sabol testified about concerned the circumstances surrounding the first time he

---

**72.** The term "father" referred to Giampa.

**73.** Counsel for Vittorio and the Government were asked by the court to provide written submissions on this mistrial application. Trial Tr. at 420. Vittorio submitted: letter-brief in support of Vittorio's application for mistrial, dated 30 May 1995 (the "Vittorio Mistrial Brief"). The Government submitted: letter-brief in opposition

to Vittorio's application for mistrial, dated 30 May 1995, (the "Government Mistrial Brief").

Counsel for Vittorio was invited to submit a limiting instruction in the event the motion for mistrial was denied. Trial Tr. at 420. No such limiting instruction was offered. *See infra* note 74.

met Vittorio in 1991 at Angelo Prisco's ("Prisco") "after-hours club" (the "Prisco Club"). *Id.* at 308. The second prior act Sabol testified about concerned an alleged disturbance Vittorio caused at the Prisco Club. *Id.* at 391.

With regard to the meeting in 1991, Sabol testified Vittorio threatened him and his two friends with a gun outside of the Prisco Club. *Id.* at 309. According to Sabol he and his friends were planning to retaliate against Vittorio later that day, but decided not to after learning Vittorio was the step-son of Giampa, a captain in the Lucchese Crime Family. *Id.* Sabol testified that Steven Serge ("Serge"), an associate of the Lucchese Crime Family, brought him to see Vittorio a few days later and "cleared the air." *Id.* at 311. At this point, Sabol testified he and Vittorio became friends and "started hanging out with each other...." *Id.*

As for the incident at the Prisco Club, Sabol testified Vittorio "started shooting up the place, he started shooting all the windows out" and also that someone received eleven stitches after Vittorio beat him up. *Id.* at 391–92. Sabol testified there was a subsequent "sit down" and the matter was straightened out. *Id.* at 392.

According to counsel for Vittorio:

The effect of this testimony—all of which concerns matters ostensibly occurring prior to the charged conduct in the indictment—is to prejudice Vittorio overwhelmingly in the eyes of the jury. He has been painted as a violent organized crime thug whose conduct shows a frighteningly reckless disregard for human life and for the physical safety of others. The effect of this testimony, both standing alone and in combination with the prior evidence regarding Vittorio's weapons offense, is to paint Vittorio in the eyes of the jury as a person whose character makes it very likely that he did commit the offenses charged in the indictment. The testimony will surely inflame the jury against him. Under these circumstances, the harm to Vittorio can be cured only by granting his application for a mistrial.

Vittorio Mistrial Brief at 2–3.

The Government argued it gave counsel for Vittorio notice that Sabol would testify about the events surrounding his first meeting of Vittorio and that it would introduce taped evidence, provided to the defense in discovery, regarding the subsequent incident at the Prisco Club. Government Mistrial Brief at 2, 4. The Government pointed out that the circumstances of the first meeting between Sabol and Vittorio was "crucial to the jury's understanding of how the illicit relationship . . . began" and how their association "was based upon their common organized crime connections." *Id.* at 3.

Additionally, the Government explained that the incident at the Prisco Club provided "highly relevant background information regarding Vittorio's position in the Lucchese Crime Family in 1993." *Id.* at 5. According to the Government, Vittorio's discussion of this incident was part of an update given to Sabol, who had been incarcerated for the past two years, on a dispute between a faction of the Lucchese Crime Family and the Genovese Crime Family. *Id.* As the Government explained:

Vittorio provided this update to Sabol . . . to establish his credentials as an associate in the Lucchese Crime Family . . . [and to] advise[ ] Sabol of the status of a dispute between two factions of organized crime so that Sabol would understand the rules of the game once they began their criminal endeavors. Vittorio's statements to Sabol are critical to the evolution of their relationship and illustrate the type of communication between members of organized crime which is described in . . . Count One of the [Redacted] Superseding Indictment.

*Id.* at 6. "This type of evidence is extremely relevant in a case such as this involving a joint venture between two Lucchese [Crime Family] factions." *Id.*

In denying the motion for mistrial, it was explained that the references at issue were "crucial to the Government's case...." Trial Tr. at 502.

Not only do they explain how . . . Vittorio, . . . [and] Sabol met and how their relationship began, it goes to explain an awful lot of the background of the Government's

allegations, the organized crime families, how they work and how they operate.

The reference to Serge, ... is absolutely crucial as well. Not only mediating that ... first meeting between ... Vittorio and ... Sabol, but ... [also] at a later point [Serge is] referenced by Sabol when he speaks with ... Vittorio as a way to have ... Vittorio accept ... Sabol. Sabol talks about his "credentials" not only with organized crime, but with Serge and his relationship to organized crime.

[A]ll of th[ese] data [are] highly relevant with regard to not only ... Vittorio's position with organized crime, but where Sabol ... and where other people fit in.... It seems that each is trying to establish their credentials with the other.

*Id.* at 502–03.[74]

As was discussed, with regard to the *in limine* motions concerning FRE 404(b) material, notwithstanding the assertions of unfair prejudice, the Circuit has explained: "[E]vidence that bears on a relevant issue in the case, though possessing the potential to damage the defendant's cause, is not inadmissible for that reason alone." *Scarfo,* 850 F.2d at 1019.

▆ As explained, the references at issue were probative of "material issue[s] other than character" and, therefore, admissible under FRE 404(b) subject to FRE 402 and FRE 403. *Huddleston,* 485 U.S. at 686, 108 S.Ct. at 1499. Further, the probative value of the prior bad acts at issue was not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," to warrant preclu-

sion under FRE 403. Fed.R.Evid. 403. Accordingly, Vittorio's motion for mistrial was denied.

Additionally, counsel for Vittorio moved for a mistrial based on the remarks made by the Government during rebuttal summation regarding a scheduled trip to Harlem for a drug transaction.[75] Trial Tr. at 4442. The Government's remarks concerned the following conversation:

R. Sabol: But, ah, so, what do you want to do now, Guy?

G. Vittorio: You want to (UI)?

G. Fatato: Gonna take, give him a key, this week, tomorrow.

G. Vittorio: Well, we can do it tonight if you want it.

J. McManus: Ha.

G. Vittorio: Let's do it tomorrow. I'll bring it to Ralphie.

R. Sabol: I, I alright, well, we got to go over there.

G. Vittorio: So, let's do it Friday, 'cause Thursday, I'm gonna be, aren't we gonna be in Harlem all day?

J. McManus: Ah huh.

G. Vittorio: Well, we'll do it Thursday. Then I could go with Joey and Benny, right?

152 TR at 43.

The Government argued in summation that "Ralphie, you will recall, was a person ... Sabol testified about as someone he introduced ... Vittorio to in 1991, a drug dealer in Washington Heights." Trial Tr. at 4420. Further, the Government argued the "Benny" reference, like many similar references, referred to Segarra. *Id.*

---

**74.** Despite the invitation to submit a limiting instruction in the event the motion for mistrial was denied, Trial Tr. at 402, as indicated, no such instruction was provided by counsel for Vittorio. Instead, counsel for Vittorio argued that "[n]o curative instruction could resolve the problem." Vittorio Mistrial Brief at 5.

According to counsel for Vittorio:
 The [c]ourt has instructed, however, that counsel for Vittorio consider whether to submit a proposed curative instruction in the event this application is denied. In light of this admonition and in the event that this ap-

plication is denied, Vittorio requests that Sabol's testimony regarding both his first meeting with Vittorio and the incident at [the] Prisco[ ] [C]lub be stricken and that the jury be instructed to disregard it.
*Id.* Given the relevance of the references at issue, and the propriety of admission of such evidence pursuant to FRE 404(b) and FRE 403, the requests made by counsel for Vittorio were denied.

**75.** Counsel for Segarra and McManus joined in this motion for mistrial. Trial Tr. at 4443.

Counsel for Vittorio argued the remarks concerned propensity to engage in drug trafficking, rather than a permissible purpose under FRE 404(b). *Id.* at 4443. Counsel for Vittorio also argued the Government presented the narcotics transaction as a separate drug deal and, therefore, inferred that these defendants were involved in narcotics. *Id.* at 4444.

As the Government argued, however, Vittorio was charged with having engaged in such a conspiracy. "This is part of the evidence that indicates and goes to ... Vittorio's intent as to whether he was involved knowingly, intentionally, as we have to prove by the statute.... There is no 404(b) argument here." *Id.* at 4443. Further, the transcript reference at issue was not objected to during the Objection Hearings, thus arguments regarding the admission of such evidence had been waived.

■■■ Counsel for Vittorio argued that it was the manner in which the Government presented the material which was objectionable. This argument was not accepted nor was counsel able to identify prejudice suffered to warrant a mistrial. *See Newby*, 11 F.3d at 1147. Accordingly, the motion for mistrial was denied.

3. *Segarra's Motion for Mistrial*

Counsel for Segarra made an application for a mistrial after the Government in summation reviewed a portion of a transcript of a meeting among McManus, Vittorio and Sabol on 21 December 1993. Trial Tr. at 3112. The Government argued that at this meeting McManus told Sabol that Segarra was the source of the firearms. *Id.* The reference at issue provides:

J. McManus: I heard this story, the guy, an old man he has, you know, 25's with the things, alright? But he loves them. He, he's, those are his toys. He's saving them.

R. Sabol: For what? How old is this guy?

J. McManus: 50 something, but he does a lot of work. Tons of work you know, that's his forte, and and, ah.

R. Sabol: You know this guy he's talking about?

J. McManus: He knows him.

G. Vittorio: Yeah.

J. McManus: Yeah, [t]his, this is his thing. That's it. That's all he's good for.

R. Sabol: (Laughs).

G. Vittorio: He is just an assassin.

J. McManus: Yeah, that's it, and, ah, but he, you know, I got a lot of.

164 TR at 7.

During summation, the Government stopped reading the above passage after McManus said: "That's all he's good for." Trial Tr. at 3113. Counsel for Segarra argued a mistrial was appropriate because the jury was following along with the Government and the next entry was Vittorio saying "[h]e is just an assassin." *Id.* at 3123.

Counsel for Segarra did not object to this reference at the Objection Hearings. Further, counsel for Segarra acknowledged that there was never any agreement with the Government to redact such reference. *Id.* ("that was not one of the places where we removed that"). *Id.* Nonetheless, counsel for Segarra argued:

I still have an objection to that on the grounds that we didn't remove that originally because there is really no reference here to my client and they're talking about some old guy with .25s could be anyone.

[The Government] has now identified in ... summation that the person that they're referring to here is ... Segarra.... It's an uncharged crime and it's completely prejudicial.

*Id.* at 3123–24.

As discussed further below, there were numerous references made by the Defendants that a man named "Benny" was the source of the firearms. *See infra* at 224–27. Counsel for Segarra argued references to "Benny" or an "old man," or "an assassin," prior to Segarra's appearance at a 6 January 1994 meeting, were to someone else. *Id.* at 3111, 3121, 3123–24, 3444.

■■■ Counsel for Segarra did not demonstrate how Segarra had been prejudiced to warrant a mistrial. *See Newby*, 11 F.3d at 1147. The "assassin" reference, like the oth-

ers mentioned, do appear to refer to Segarra. Such references were probative of "material issue[s] other than character," namely the identification issue raised by counsel for Segarra and, therefore, were admissible under FRE 404(b) subject to FRE 402 and FRE 403.[76] *Huddleston,* 485 U.S. at 686, 108 S.Ct. at 1499. It did not appear that the probative value of the "assassin" reference was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," to warrant preclusion under FRE 403. Fed.R.Evid. 403. Moreover, any prejudice the reference "[h]e's just an assassin" might have had was minimized by the Government not reading it and the Defendants laughing during this taped discussion.[77] Accordingly, Segarra's motion for mistrial was denied.

The importance of the identification of Segarra was further demonstrated by the arguments made during the summation of counsel for Segarra. *See, e.g.,* Trial Tr. at 3411 ("no one expected ... Segarra to show up that day.... Segarra was unknown to anyone prior to January 6, 1994"); *Id.* at 3421 ("[I]f some guy named Ben Schwartz had sat down [at the Plaza Diner on 6 January 1994], he would be seated behind me, or Ben O'Reilly. If they dug up Ben Franklin and he walked in there, he would be in this courtroom charged...."); *Id.* at 3444 ("The name Benny just happened to pop up and, unfortunately for ... Segarra, he shows up at this meeting.").

Because counsel for Segarra had argued the Government failed to establish Segarra

to be the same "Benny" referenced prior to 6 January 1994, as the source of the firearms, the Government requested permission to argue in rebuttal that inferences could be drawn from a 6 January 1994 conversation between McManus and Sabol relevant to the identification of Segarra. Trial Tr. at 4102. This conversation, which took place after the meeting at the Plaza Diner, provides in relevant part:

> R. Sabol: But, you know, I didn't like to be put in this ... trap today with the three other guys, and—
>
> J. McManus: I, yeah, that.
>
> R. Sabol: —and, and, (UI) [a]nd then you got Benny.
>
> J. McManus: Yeah (laughs).
>
> R. Sabol: What the ...!
>
> J. McManus: (Laughs)
>
> R. Sabol: You know what I mean?
>
> J. McManus: Yeah, I know. No.
>
> R. Sabol: I don't know if there's to put two in the coconut for me. You know what I mean?
>
> J. McManus: Ah, yeah, I know what you're saying.
>
> R. Sabol: You know—
>
> J. McManus: Well, in the diner you don't have nothing to worry about.
>
> R. Sabol: Yeah, that's what you think.
>
> J. McManus: Just don't take any rides for dinner.

218 TR at 9–10.

As the Government pointed out, counsel for Segarra had opened the door for it to argue that the person Sabol and McManus were referring to was the same person previ-

---

**76.** Counsel for Segarra in his application for mistrial appeared to regard the reference at issue as improper 404(b) material. Trial Tr. at 3124 ("It's an uncharged crime and it's completely prejudicial."). Nonetheless, it appeared the reference could also be admitted because it was not offered for the truth of the matter asserted, that Segarra was "an assassin." It did not matter whether the "Benny" or the "old man" referred to was an assassin or whether the Defendants believed, although laughing, that this individual was an assassin. Instead, references to an "assassin" like this one, and others discussed below, were probative of the identification of Segarra as the source of the firearms.

**77.** Additionally, any potential undue prejudice from the references at issue could have been minimized had counsel for Segarra submitted a limiting instruction. *Clair,* 934 F.2d at 945 ("Under most circumstances, an instruction to the jury to disregard the question or response will cure any resulting prejudice."); *accord Canino,* 949 F.2d at 937; *Eyster,* 948 F.2d at 1214; *Bertoli,* 854 F.Supp. at 1047 n. 133. As indicated, all counsel were repeatedly advised to submit limiting instructions whenever they believed one was appropriate. *See supra* note 20. Further, counsel for Segarra was asked to submit a limiting instruction if he desired one regarding references used to identify Segarra. *See infra* at 308.

ously described by Vittorio as an assassin. Trial Tr. at 4103. The Government explained such argument could be accompanied by a limiting instruction indicating that it is only to be considered for the purpose of establishing the identification of Segarra. *Id.*

The Government was permitted to make the identification argument. *Id.* at 4106. It was explained to counsel for Segarra that if he wanted a limiting instruction he should draft one with the Government. *Id.* ("If you don't give it to me, I'll assume you don't want it, but I am willing to give a limiting instruction ... [that] it's to be used only for the purposes of identification....").[78]

#### 4. *Capra's Motion for Mistrial*

At the close of the Government's summation, the Government discussed the actions of the Defendants after the compromise of the investigation. Trial Tr. at 3260–61. The Government argued that after receiving information that Sabol was an informant, Vittorio called Sabol. *Id.* While requesting return of the $10,000.00 Vittorio had given Sabol, Vittorio acknowledged his responsibility for being involved in criminal activity with Sabol. *Id.* The Government argued Vittorio was trying to insulate Giampa from the $10,000.00 payment and that the Defendants all held Vittorio responsible for introducing Sabol to them. *Id.*

The Government also argued McManus acknowledged his responsibility when he gave information to the Customs Agents, as recorded in the Second Redacted McManus Statement. *Id.* at 3261. The Government argued: "You know how all these other defendants acknowledge[d] their responsibility? By not returning one call to ... Sabol, by not wanting to come anywhere near him. That's their way of saying whether they were involved in illegal activities or legal activities." *Id.*

Counsel for Capra argued the Government's summation argument, referenced above, indicated that "none of these defendants owned up, none of these people, other defendants told the truth, in effect, about

what their roles were. Thereby implying and telling directly to the jury that they may have some obligation to do something here." *Id.* at 3263. Counsel for Capra requested either a mistrial or an instruction from the court "that the [D]efendants have absolutely no obligations to do anything in this case, nor did they have any obligation to do anything prior to the [Redacted Superseding] [I]ndictment in this case. They are presumed innocent and they may not testify." *Id.*

As explained to counsel, the remarks at issue were not interpreted as comments on the Fifth Amendment rights of the Defendants. *Id.* Nonetheless, a fifteen minute recess was called to allow defense counsel and the Government to work on an appropriate limiting instruction. *Id.* at 3264. After the recess, the court gave the following instruction:

> Ladies and gentlemen, before we begin with defense summations, I want to remind you that any statements by Mr. McManus to U.S. Customs Service agents are not to be considered by you as against any other defendant in this case.
>
> Furthermore, every defendant in this case is presumed to be innocent and this presumption follows each of the defendants throughout the entire trial and into your deliberations. There is no obligation for any defendant in a criminal case to make any statement of any kind to anyone.

Trial Tr. at 3268.

#### C. *Gaito's Request for an Entrapment Defense Charge*

On 26 June 1995 a conference was held, out of the presence of the jury, concerning the "Government's Request to Charge" (the "Government's Charge") and the Defendants' objections or requested revisions or supplements to the Government's Charge (the "26 June Charge Conference"). Trial Tr. at 3008–36. At the 26 June Charge Conference Gaito reiterated his request that the jury be charged on an entrapment defense for

---

**78.** As indicated, counsel for Segarra did not submit a limiting instruction on this issue.

charges relating to drugs and firearms.[79] *Id.* at 3031.

### 1. *The Entrapment Defense*

"Entrapment is a 'relatively limited defense' that may defeat a prosecution only 'when the Government's deception actually implants the criminal design in the mind of the defendant.'" *United States v. Fedroff,* 874 F.2d 178, 181 (3d Cir.1989) (quoting *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973)); *see also Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) ("[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal"); *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932) (entrapment may occur when Government officials "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute"); *United States v. McCalla,* 38 F.3d 675, 679 (3d Cir.1994) ("[T]he defense of entrapment serves to protect against a deception on the part of the [G]overnment that induces a criminal act by 'actually implant[ing] the criminal design in the mind of the defendant.'" (quoting *Russell,* 411 U.S. at 436, 93 S.Ct. at 1645)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1968, 131 L.Ed.2d 857 (1995).

The entrapment defense consists of two related elements: Government inducement to commit a crime and a defendant's lack of predisposition to engage in such criminal conduct. *Mathews,* 485 U.S. at 62, 108 S.Ct. at 886; *Fedroff,* 874 F.2d at 181; *see also United States v. El–Gawli,* 837 F.2d 142 (3d Cir.) ("Entrapment occurs when a defendant who was not predisposed to commit the crime does so as a result of the [G]overnment's inducement."), *cert. denied,* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 34 (1988).

"The defendant has the burden of producing evidence of both inducement and nonpredisposition to commit the crime." *United States v. Wright,* 921 F.2d 42, 44 (3d Cir.

1990) (citing *Fedroff,* 874 F.2d at 181; *United States v. Marino,* 868 F.2d 549, 551 n. 3 (3d Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989)). As the Third Circuit has explained: "[T]he trial court will not instruct on entrapment unless the defendant has produced sufficient evidence on both prongs of the defense." *Fedroff,* 874 F.2d at 181; *Wright,* 921 F.2d at 44; *see also United States v. Engler,* 806 F.2d 425, 428 (3d Cir.1986) ("To be entitled to an entrapment charge in this circuit, 'a defendant must first present evidence both that the [G]overnment initiated the crime ... and that the defendant was otherwise not predisposed to commit the crime.'" (quoting *United States v. Gambino,* 788 F.2d 938, 943 (3d Cir.), *cert. denied,* 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986))), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987); *cf. Gambino,* 788 F.2d at 944 ("Where the evidence is undisputed that the defendant had no predisposition to commit the crimes with which he [or she] is charged, and was induced to do so only by trickery, persuasion or fraud of the [G]overnment, entrapment is established as a matter of law.").

#### a. *Inducement*

"'It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of [an] offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises.'" *Jacobson v. United States,* 503 U.S. 540, 548, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992) (quoting *Sorrells,* 287 U.S. at 441, 53 S.Ct. at 212).

The Circuit has explained that inducement is more than mere solicitation by Government agents, and may include "persuasion, fraudulent representation, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy or friendship." *El–Gawli,* 837 F.2d at 149; *Marino,* 868 F.2d at 552 & n. 6; *Wright,* 921 F.2d at 45. According to the Circuit, such standard is consistent with the Supreme Court's pro-

---

**79.** Gaito's initial request to supplement the Government's Charge with an entrapment defense charge was made by letter from his counsel, dated 17 March 1995.

nouncement in *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1987), that " '[o]f course evidence that [G]overnment agents merely afforded an opportunity or facilities for the commissions of the crime would be insufficient to warrant ... an [entrapment defense] instruction.' " *Marino*, 868 F.2d at 552 (quoting *Mathews*, 485 U.S. at 66, 108 S.Ct. at 888); *cf. Jacobson*, 503 U.S. at 549–50, 112 S.Ct. at 1541 (defendant was the target of twenty-six months of repeated solicitations before he ordered child pornography); *Sherman*, 356 U.S. at 373, 78 S.Ct. at 821 (informant played upon defendant's common sympathy for informant's narcotics addiction and withdrawal symptoms); *Sorrells*, 287 U.S. at 440–41, 53 S.Ct. at 212 (agent played upon sentiment of "one former war buddy ... for another" to buy liquor during prohibition); *United States v. Kessee*, 992 F.2d 1001, 1003 (9th Cir.1993) (agent made "repeated suggestions" which succeeded only after defendant lost his job and needed the money for his family's food and rent); *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir.1993) (agent used intimidation and threats against defendant's family); *United States v. Groll*, 992 F.2d 755, 759 (7th Cir.1993) (agents called every day, threatened defendant and were "belligerent"); *United States v. Sullivan*, 919 F.2d 1403, 1419 & n. 21 (10th Cir.1990) (agent told defendant agent was suicidal and in desperate need of money), *cert. denied*, 506 U.S. 900, 113 S.Ct. 285, 121 L.Ed.2d 211 (1992); *United States v. Rodriguez*, 858 F.2d 809, 812–15 (1st Cir.1988) (agent engaged in "forceful" solicitation and "dogged insistence" until the defendant capitulated).

b. *Non–Predisposition*

"The element of non-predisposition to commit the offense is the primary focus of an entrapment defense." *Fedroff*, 874 F.2d at 182.

Generally, the entrapment defense centers on the evidence adduced to meet the burden on the non-predisposition prong. "The entrapment defense theorizes that an individual not otherwise predisposed to criminal conduct was corrupted by some inducement on the part of the law enforcement officer. Thus the focus is on the intent or predisposition of the defendant to commit the crime."

*Wright*, 921 F.2d at 45 (quoting *United States v. Berkery*, 889 F.2d 1281, 1283 (3d Cir.1989)).

■ "[P]redisposition may be defined as the defendant's inclination to engage in the crime for which he [or she] was charged, measured before his initial exposure to [G]overnment agents." *Fedroff*, 874 F.2d at 182; *Wright*, 921 F.2d at 45; *see also Jacobson*, 503 U.S. at 553, 112 S.Ct. at 1543 ("When the Government's quest for conviction leads to the apprehension of an otherwise law-abiding citizen who, if left to his [or her] own devices, likely would have never run afoul of the law, the courts should intervene."). According to the Circuit, however, "lack of prior illegal conduct alone will not satisfy the defendant's burden of production on non-predisposition." *Fedroff*, 874 F.2d at 183.

The Circuit has identified five factors which, although not dispositive, are relevant in the determination of the absence or presence of predisposition:

[1] the character or reputation of the defendant, including any criminal record;

[2] whether the suggestion of criminal activity was initially made by the Government;

[3] whether the defendant was engaged in the criminal activity for profit;

[4] whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and

[5] the nature of the inducement or persuasion supplied by the Government.

*United States v. Wright*, 921 F.2d 42, 45 (1990) (citing *Fedroff*, 874 F.2d at 183 (quoting *United States v. Reynoso–Ulloa*, 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978))).

2. *Inappropriateness of an Entrapment Charge in the Instant Case*

At the 26 June Charge Conference counsel for Gaito was questioned concerning the ap-

propriateness of the requested entrapment charge. According to counsel for Gaito:

> Gaito's expressed interest in (sic) selling merchandise.... Sabol used the promise of providing him [Gaito] with merchandise and coupled that with the requests to reach out, contact (sic) ... Vittorio, relay messages to ... Vittorio, make sure that ... Vittorio gets the various things (sic). In that way, ... Gaito was brought into meetings in which drugs and guns were discussed and ultimately delivered.

Trial Tr. at 3031. In response, the court inquired:

> "[A]ssum[ing] for the sake of argument that [inducement] has been established ... [w]here have you ... demonstrate[d] non-predisposition?" *Id.*

In an attempt to establish Gaito's non-predisposition, counsel argued:

> There [were] several instances. First of all, there [was] absolutely no evidence whatsoever that [Gaito] was involved with firearms prior to this incident.
>
> And the evidence with regard to drugs, the only instance that [was] discussed ... is the ... alleg[ation] that ... Gaito introduced a ... Tony Hoit ["Hoyt" [80]] to ... Sabol. Sabol testified that ... Gaito got a thousand dollars for that, [but] when he was attempting to confirm that in the conversation on the 21st of September ... Gaito clearly said nobody got any money. So there [was] no evidence that ... Gaito was predisposed for (sic) guns and drugs.

*Id.* at 3031–32.

Gaito was instructed that the court was inclined to deny his request for an entrapment defense charge. *Id.* at 3032. Nonetheless, counsel for Gaito was invited to make a showing, by way of a written submission, of the appropriateness of such charge. *Id.* On 27 June 1995, counsel for Gaito submitted a four page handwritten "memo in support of Mr. Gaito's request for an entrapment charge" (the "27 June 1995 Entrapment Memo").[81]

According to counsel for Gaito "evidence" of non-predisposition, which allegedly satisfies Gaito's burden of production for an entrapment defense charge concerning firearm and drug related charges, includes the following:

1. On September 27, 1993, [107 TR at 4], Mr. Gaito tells Mr. Sabol "no drugs, no stocks, no bonds."

2. On a meeting on October 5, 1993, Mr. Gaito stated he was not allowed to deal drugs. [Trial Tr. at 387].

3. On October 13, 1993, Mr. Sabol asked Mr. Gaito if Eric could get "shake" (drugs). Mr. Gaito told him to "leave the kid alone." Gaito tape exhibits 5 and 6.

4. Mr. Gaito interrupted a discussion about Pakistani heroin to discuss a sweatshirt deal. During that discussion, Mr. Gaito stated "I'm not doing this" referring to the drug discussion. [142 TR at 39].

5. Mr. Sabol brought Mr. Gaito into the meetings with Mr. Vittorio by offering him merchandise to sell, not by offering him an opportunity to buy or sell drugs or guns.

6. A review of the conversation on September 21, 1993, [105 TR], shows no reference whatsoever relating to Mr. Gaito's involvement in any prior instances of possession or distribution of firearms.

7. The only indication that Mr. Gaito had any prior involvement in drugs was the trial testimony that Mr. Gaito introduced ... Hoyt to Mr. Sabol so that ... Hoyt could obtain drugs for a customer through Mr. Sabol. Mr. Sabol testified that Gaito received $1,000 for that introduction.

 That testimony was contradicted by the tape conversation [105 TR at 11–12]. There Mr. Gaito stated no one received any money.

8. Mr. Sabol never asked Mr. Gaito to provide drugs or guns and Mr. Gaito

---

80. It appears the correct spelling of this individual's name is "Hoyt."

81. The 27 June 1995 Entrapment Memo is incorrectly dated 27 July 1993.

never asked for an opportunity to possess or distribute guns or drugs.

9. Mr. Gaito received no money for his participation in the drugs or weapons. Mr. Vittorio kept the $600 profit from the ounce sale [164 TR at 20]. Furthermore, Mr. Vittorio kept the $1400 for the firearms transactions.

27 June 1995 Entrapment Memo at 1–3.

█ With regard to Gaito's reference to "no drugs, no stocks, no bonds[,]" 107 TR at 4, a review of the context of this remark reveals that it is not "evidence" of non-predisposition. It appears Gaito is relaying an instruction from Giampa. This remark is made while Gaito is discussing with Sabol what activities Giampa approves or disapproves [82] and how often Giampa wants Gaito to see him and give Giampa "an envelope." *See id.*

It also appears Gaito is referring to general rules followed by organized crime, rather than to his own "non-predisposition" to engage in certain conduct. According to the testimony of the Government's organized crime expert Kenneth McCabe ("McCabe"), a criminal investigator with the Office of the United States Attorney in the Southern District of New York, it appears Gaito's remarks were consistent with rules of organized crime, which are often broken.[83] Trial Tr. at 2858 (explaining that rules in organized crime that are "often broken" include "not to traffic in narcotics[,]" and "not to deal in [G]overnment securities or bonds").

Significantly, before Gaito made the reference at issue, he was laughing. 107 TR at 4. Such behavior appears inconsistent with a characterization of his remarks as revealing a lack of predisposition to engage in the conduct described.

As for Gaito's remark that he was not allowed to do drugs, this also appears to be indicative of either the rules of organized crime or of one of Gaito's superiors. This reference does not indicate non-predisposition. Counsel for Gaito never argued, nor does it appear applicable, that this reference indicates that Gaito is himself opposed to engaging in drug related activity if he were allowed to do so.

It appeared, that Gaito was involved in drug related transactions. For example when inquiring about the Government's plan at a certain point in the investigation to have Sabol deal directly with Giampa rather than always going through Gaito, counsel for Gaito inquired: "Now that decision was made despite the fact that Mr. Gaito had been present at several meetings in which an ounce of heroin had been delivered to you...." Trial Tr. at 1895. Additionally, counsel for Gaito pointed out that "Gaito ... certainly didn't appear to have any concerns about discussing ... prior [drug] transactions with you...." *Id.* at 1952.

The third reference in the 27 June 1995 Entrapment Memo is where Gaito said "leave the kid alone" when Sabol inquired as to

---

**82.** For example, later in the discussion, Sabol asked Gaito: "But why no stock and bonds?" 107 TR at 15. Gaito replied: "Just telling you what he told me. No stocks and bonds. That must be, that must be a rule. There must of been a lot of heat, you know." *Id.*

**83.** A review of the recorded conversation, subsequent to the reference at issue, further demonstrates the failure to establish non-predisposition:

J. Gaito: No drugs (laughs).
R. Sabol: Hey John Gotti deals drugs. Why can't I ...?
J. Gaito: No drugs. You can do it if you want to, I don't know.
R. Sabol: Listen, when I was with his son [Vittorio] I dealt drugs. I dealt kilos. You understand?
J. Gaito: Yeah.
R. Sabol: I'll be sitting in LaGuardia Airport with a ... hotel full of ... kilos.... His son

[Vittorio] introduced me to a lot of people on Westchester Avenue (UI). I mean, they all say oh, I don't do it, I don't do it, but, you know.
J. Gaito: Yeah, I know.
....
R. Sabol: ... I had this guy.... Fifty kilos, a 100 kilos, no problem. I carried $300,000 for the guy, no problem....
J. Gaito: That much money, Richie?
....
J. Gaito: Did he know what was going on?
R. Sabol: The father?
J. Gaito: The Kid knows....
J. Gaito: Right.
....
R. Sabol: His father knows ...
J. Gaito: Right.
107 TR at 23.

whether "Eric" (the kid referred to) could get drugs. Counsel for Gaito failed to explain, nor is it apparent, how such reference has any bearing on *Gaito's* non-predisposition to engage in drug related activity.

With regard to Gaito's remark, "I'm not doing this," 142 TR at 39, it does not appear that this refers to Gaito's sentiment regarding the discussion of Pakistani heroin, as is contended. 27 June 1995 Entrapment Memo at 2. Prior to this reference there was a discussion of Pakistani heroin. 142 TR at 37–39. The subject of discussion, however, appears to shift to a sweatshirt deal around the time where Gaito made the remark at issue. *Id.* at 39.

The transcript of the recorded conversation at issue provides in relevant part:

R. Sabol: You know? If it's good, or a $100. I want to get the guy as a customer. I don't want to overshoot the price. You understand? If I get a, um, 100, make 15,000. Hey, a couple times a week, that's bad?

J. Gaito: No, (laughs).

G. Vittorio: He said there'd be two key a week.

R. Sabol: Maybe more.

J. Gaito: Ah.

. . . .

G. Vittorio: Samples?

. . . .

R. Sabol: Beep the . . . kid now.

G. Vittorio: Alright.

R. Sabol: Let, let's, let's find out if, we, I could see you later.

G. Vittorio: Okay.

R. Sabol: You know what I'm talking about? I mean, you get a rent-a-car, you're not paying for the mileage, you might as well, get, get, use out of the . . . thing.

J. Gaito: Yeah, I don't care, whatever.

R. Sabol: Oh, look at this kid. On a napkin.

G. Vittorio: Pakistani—3½.

J. Gaito: Rich, you know, ah.

R. Sabol: Who's that, hey, mo?

J. Gaito: Those sweatshirts.

R. Sabol: Huh? Yeah, I got a lot of things.

J. Gaito: Well, just tell me. I'm not doing this. I told him the same . . . thing.

R. Sabol: I got a lot of things, Joey.

J. Gaito: You want a 1,000.

*Id.* at 38–39.

As indicated, counsel for Gaito argued that the discussion of Pakistani heroin was still ongoing when Gaito interrupted to discuss a sweatshirt deal. Counsel for Gaito then contended "[d]uring that discussion [presumably the sweatshirt discussion], . . . Gaito stated 'I'm not doing this.'" 27 June 1995 Entrapment Memo at 2 (quoting 142 TR at 39). The argument that this remark refers to the drug discussion appears inconsistent with the contention (and as it appears from the transcript) that the conversation at this point concerned a sweatshirt deal.

Regardless of whether the conversation shifted from drugs to sweatshirts, or whether Gaito interrupted the drug discussion to discuss sweatshirts, it appears Gaito's remark concerned the sweatshirt deal rather than drugs. Accordingly, the reference at issue is not evidence of Gaito's non-predisposition to engage in drug related activity. Nevertheless, as indicated above, just prior to this remark Gaito appears to be discussing, with approval, a drug transaction. 142 TR at 38.

Next, counsel for Gaito contended Sabol brought Gaito into meetings with Vittorio by offering him merchandise to sell, not by offering him an opportunity to buy or sell drugs or firearms. 27 June 1995 Entrapment Memo at 2. Even assuming this were accurate, it does not bear on Gaito's non-predisposition to engage in criminal conduct relating to drugs or firearms.

The argument that a 21 September 1993 conversation, 105 TR, does not refer to Gaito's prior involvement in the possession or distribution of firearms, similarly does not help to demonstrate non-predisposition. First, it appears there are other references that do concern Gaito's prior involvement with firearms. For example, counsel for Gaito, during cross examination of Sabol, inquired about the Government's apparent shift in the investigation away from Gaito

"despite the fact that ... Gaito had been present at several meetings ... in which various firearms had been delivered to [Sabol]." Trial Tr. at 1895. Further, counsel for Gaito discussed an incident where Sabol gave Gaito $1400.00 to give to Vittorio for the purchase of two pistols with silencers. *Id.* at 2073. Sabol indicated that Gaito and Vittorio brought him a machine gun with a silencer instead. *Id.* Also, as indicated, Gaito was accidently shot when unloading a gun from the trunk of a car with Vittorio. *See supra* at 295–296.

Even if it were established that Gaito had no prior involvement with firearms, as indicated, this is not dispositive on the issue of non-predisposition. *See Fedroff,* 874 F.2d at 183 ("[L]ack of prior illegal conduct alone will not satisfy the defendant's burden of production on non-predisposition.").

Counsel for Gaito argued the only prior involvement Gaito had with drugs was his introduction of Hoyt to Sabol, for the purpose of putting a drug transaction together. 27 June 1995 Entrapment Memo at 2. As counsel pointed out, Gaito denied having received $1000.00 for such introduction as Sabol testified. *Id.;* Trial Tr. at 1947–50.

Counsel for Gaito argued the failure of Gaito to be compensated for the introduction of Hoyt evidenced his non-predisposition to engage in narcotics trafficking. In support of this contention counsel for Gaito maintained Gaito, discussing the transaction with Hoyt, said to Sabol: "[N]o one received any money." 27 June 1995 Entrapment Memo at 2 (citing 105 TR at 11–12). This reference, however, is misquoted. What Gaito said, when discussing his introduction of Hoyt with Sabol, was "nobody made no money." 105 TR at 11–12; Trial Tr. at 1949. This reference does not support non-predisposition based on a lack of profit motive. Additionally, as counsel for Gaito pointed out, Gaito stated with regard to another drug transaction: "I just hope everybody's happy, makes money, and nobody gets in trouble." 105 TR at 12.

■ Even if Gaito did not receive money for his role in a particular narcotics transaction, it would not be enough to satisfy his burden of production on non-predisposition.

While, as mentioned, one of the factors to be considered in the instant analysis is whether Gaito was engaged in the criminal activity for profit, *Wright,* 921 F.2d at 45, it appeared from the references relied on by counsel for Gaito, as well as other taped conversations in evidence, that Gaito's involvement with drugs was profit driven. Moreover, as indicated, there were other references to Gaito's involvement in narcotics transactions which were inconsistent with a showing of non-predisposition.

Counsel for Gaito further contended Sabol never asked Gaito to provide drugs or guns and that Gaito never requested the opportunity to possess or distribute guns or drugs. 27 June 1995 Entrapment Memo at 3. As discussed, however, the record is replete with references to Gaito's involvement in both drug and firearm transactions. *See, e.g., infra* at 316–317. Accordingly, such argument does not aid Gaito in establishing his burden of production on non-predisposition.

Finally, counsel for Gaito contended "Gaito received no money for his participation in the drugs or weapons." *Id.* at 4. Counsel for Gaito argued that Vittorio kept a $600.00 profit from the sale of an ounce of heroin and $1400.00 from a firearms transaction. *Id.* During cross examination, Sabol explained that "it was a mistake" that Gaito did not get his share of the $600.00 profit from the heroin sale. Trial Tr. at 2074. Further, counsel for Gaito pointed out that Sabol "instructed ... Vittorio on at least several occasions to give ... Gaito a share of the profit from that drug deal." *Id.* at 2075. As discussed above, even if Gaito did not receive compensation from a particular transaction, it is clear that his involvement was profit driven. *See supra* at 315. Accordingly, Gaito's failure to get his share of the profit in this instance does not bear on non-predisposition.

It is not clear whether Gaito received any proceeds from the $1400.00 which was given to him by Sabol for the purpose of acquiring two pistols with silencers through Vittorio. Sabol testified that he could not "recall if [Gaito] received money from this [transaction] or whatever they did, how he picked up the machine gun with the silencer[ ] and how

much it cost him. He might have split the money with [Vittorio]." *Id.* at 2073. As discussed above, even assuming Gaito was not compensated for his participation in this particular transaction, such fact is not, by itself, evidence of non-predisposition.

### 3. *Gaito's Initiation of Contact With Sabol*

In *United States v. Pervez*, 871 F.2d 310 (3d Cir.), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989), the defendant was convicted on charges of conspiracy to defraud the Government, attempted exportation of beryllium in violation of export laws and submission of false statements to the department of Commerce. The defendant argued on appeal that he was entitled to an acquittal, as a matter of law, based on an entrapment defense. *Id.* at 314. The Circuit, which did not find entrapment established as a matter of law, explained:

> Indeed, there is no evidence that [G]overnment agents induced [the defendant] to conspire with them to defraud the [G]overnment. To the contrary, there is abundant evidence that [the defendant] actively pursued his business association with Carpenter [an informant corporation] and [G]overnment agents in order to consummate the sale of maraging steel to his co-defendant in Pakistan and also to reap a healthy commission.

*Id.* at 316.[84]

Similarly in *United States v. Bay*, 852 F.2d 702, 705 (3d Cir.1988), the Circuit explained: "[T]he record shows that [the defendant] initiated the conversations which led to his indictment and conviction, which shows [the defendant] did not lack the predisposition to commit the crimes."

▆▆ In the instant case, the initiative that Gaito took throughout the investigation to contact Sabol is inconsistent with an entrapment defense. While Gaito was a party to dozens of recorded conversations with Sabol, he personally made nineteen recorded telephone calls to Sabol.[85] *See* 115 TR; 118 TR; 119 TR; 120 TR; 122 TR; 123 TR; 126 TR; 130 TR; 131 TR; 132 TR; 133 TR; 135 TR; 138 TR; 139 TR; 140 TR; 144 TR; 145 TR; 147 TR; 148 TR. Moreover, there were eight recorded instances where Gaito showed up at a meeting where Sabol was present. 105 TR; 107 TR; 117 TR; 129 TR; 134 TR; 142 TR; 152 TR; 153 TR.

There were numerous references to narcotics and firearms in these telephone calls and meetings. *See, e.g.*, 104 TR at 81 (discussing the purchase of "two pistols"); 107 TR at 26–30, 59–62 (referring to "kilos" and "30 or 40 kilos" and "heroin"); *id.* at 30, 43 (referring to "guns" and the "gun man"); 129 TR at 15–16, 34, 36–37 (discussing prices for gram and kilogram quantities of narcotics such as "coke"); *id.* at 21, 36–37 (discussing prices for "silencers," and "[w]hy don't we just get them silencers and kill the guy"); 134 TR at 5–7, 14, 33, 37, 42, 46, 51 (referring to quantities of narcotics such as "gram," "key," "kilo," "ounce," "quarter" and to "coke"); 142 TR at 5–7, 11–16, 20–21, 23–24, 37–39 (making such references as "700 gram units," "Pakistan stuff," "a whole key," "kilo," "balloons," "dealing drugs" and "snort[ing] coke off our heads"); 145 TR at 6, 9, 12 (discussing, among other things, obtaining silencers referred to as the "quiet ones" or "quiet things" and explaining that "the quiet ones [were] more threatening than anything"); 148 TR at 4 (discussing the difficulty in obtaining the "quiet ones" and a plan to obtain "regular ones," so that "some guy [they knew could] fit them"); 152 TR at 8–9, 17–27, 51–68 (referring to "blow," "heroin," "cocaine," "key" and explaining methods of importation, for example "from Columbia . . . they ship it, . . . they swallow it, and they bring it in"); 153 TR at 2–3, 12–14 (discuss-

---

**84.** The Circuit did, however, remand the case because the district court applied an incorrect "pre-*Mathews* standard." *Pervez*, 871 F.2d at 316. This standard did not allow a defendant to plead inconsistent defenses, thus requiring a defendant to admit commission of an offense charged in order to assert an entrapment defense. *Id.*

**85.** The transcripts of these recorded conversations demonstrate the initiative Gaito took in the instant case. *See, e.g.*, 120 TR at 5 ("Yeah, alright, Rich, call me [Gaito] later. Call me at home."); 123 TR at 3 ("Yeah, I [Gaito] mean, what should I do call you [Sabol] or what?").

ing the size, use and effectiveness of a "silencer").

■ Gaito has failed to meet his burden of production on non-predisposition to entitle him to an entrapment defense charge. *Wright,* 921 F.2d at 44; *Fedroff,* 874 F.2d at 181; *Marino,* 868 F.2d at 551 n. 3. Instead, it appears from the record that the Government merely provided the opportunity for various criminal activity, which is not enough to warrant an entrapment defense instruction. *Mathews,* 485 U.S. at 66, 108 S.Ct. at 888; *Marino,* 868 F.2d at 552. Accordingly, Gaito's request for an entrapment defense charge was denied. On 29 June 1995, during a sidebar conference, the court informed counsel for Gaito of such ruling. Trial Tr. at 3976.

### 4. *Motion for Reconsideration*

In the afternoon of Friday, 7 July 1995, counsel for Gaito notified the court that he intended to move for reconsideration of the ruling denying Gaito's request for an entrapment charge (the "Motion for Reconsideration").[86] Counsel for Gaito also informed the court that he would give notice to the Government, that he would be submitting papers in support of the Motion for Reconsideration and that he requested to be heard at 8:00 o'clock a.m., on Monday, 10 July 1995.

On 7 July 1995, at 2:30 o'clock p.m., counsel for Gaito hand delivered a letter-brief in support of the Motion for Reconsideration, dated 6 July 1995 (the "Reconsideration Memo").[87] Notwithstanding the timing of the Reconsideration Memo, the court re-

viewed the submission and held a hearing as requested on 10 July 1995 at 8:00 o'clock a.m. (the "10 July 1995 Reconsideration Hearing").[88]

The Motion for Reconsideration, for the most part, reiterates the contention that Gaito has met his burden of production on the issues of inducement and non-predisposition to warrant an entrapment defense charge. According to counsel for Gaito, "there is sufficient evidence on the record from which a reasonable jury could find that Gaito was not predisposed to possess and distribute firearms and drugs and that his involvement in these activities was the result of governmental inducement."[89] Reconsideration Memo at 2.

Counsel for Gaito argued: "There is no evidence that Gaito ever supplied anyone with firearms or drugs during the 15 to 20 years that Sabol knew him. Sabol testified that 'I only knew ... Gaito my whole entire adult life as a bookmaker and gambling.'" *Id.* (quoting Trial Tr. at 1249). Additionally, counsel for Gaito contended:

Gaito's lack of involvement in the possession and distribution of drugs and firearms was confirmed by the fact that neither Sabol nor Gaito raised the topics in meetings on September 21 and September 17, 1993 [105 TR and 107 TR]. If Gaito had been involved in these activities, Sabol, who was attempting to corroborate information he had given about Gaito's criminal activities could have been expected to raise the topic. Additionally, if Gaito had been

**86.** As of 7 July 1995, it appeared the court would be charging the jury in a few days; there remained to be heard only one defense summation and the Government's rebuttal. In fact, the jury was charged on 12 July 1995. Nonetheless, 7 July 1995, was the first time the court received notice of counsel for Gaito's intention to submit the Motion for Reconsideration of the 29 June 1995 ruling.

**87.** On 10 July 1995, the Government submitted a letter-brief in opposition to the Motion for Reconsideration, dated 10 July 1995 (the "Opp. Memo").

**88.** At the 10 July 1995 Reconsideration Hearing, counsel for Gaito and the Government were asked whether there was anything else they wanted to be heard on. Trial Tr. at 4116. Coun-

sel for Gaito replied: "I think I basically set forth my arguments in [the Reconsideration Memo]...." *Id.* The Government replied in a similar manner. *Id.* The court indicated that all submissions would be reviewed, although the inclination at that point was to deny the Motion for Reconsideration.

**89.** Most of the examples that counsel for Gaito relies upon were mentioned in the 27 June 1995 Entrapment Memo and are addressed above in the context of the initial denial of the request for an entrapment defense charge. To the extent the Reconsideration Memo provided new examples in support of the Motion for Reconsideration, these are addressed below.

interested in these activities, he would have likely raised the topics.

*Id.*

The Government argued there "is ample support in the record of this trial to establish that Gaito was predisposed to traffic in drugs and firearms." Opp. Memo at 2. As the Government pointed out, there was in fact evidence of Gaito's involvement in a prior drug transaction with Sabol and Hoyt.[90] *Id.* In a recorded conversation, on 27 September 1993, Gaito explains to Sabol that "he never had any luck" with drugs. 107 TR at 28. The Government contended this suggests that Gaito's prior involvement in drug dealing may not be limited to the transaction with Sabol and Hoyt. According to the Government: "To downplay his participation in this prior drug conspiracy, Gaito now contends that he simply introduced Sabol to Hoyt and that he never received any proceeds from the drug sale." Opp. Memo at 2.

As discussed in the context of the initial denial of the requested charge, even if Gaito did not receive money for his role in this particular transaction, it would not be enough to satisfy his burden of production on non-predisposition. *See supra* at 315 (explaining that while one of the factors to be considered in the instant analysis is whether Gaito was engaged in the criminal activity for profit, *Wright,* 921 F.2d at 45, it appears his involvement with drugs was profit driven).[91] Further, as the Government pointed out:

> Whether Gaito was a supplier of drugs, a purchaser of drugs, or a conduit between a supplier and a purchaser, the evidence demonstrates that he knowingly played a role in a prior drug transaction with Sabol and Hoyt. Thus, his claim that he had no prior involvement in the drug trade is be-

lied by the evidence—including his own words.

Opp. Memo at 2–3.

With regard to Gaito's involvement with firearms, the Government pointed out that there is evidence in the record concerning the accidental shooting of Gaito "during a clandestine delivery of illegal weapons." *Id.* at 3 (citing 160 TR; 161 TR; 162 TR; 164 TR). "These tapes demonstrate that Gaito and ... Vittorio were involved in an unrelated conspiracy to transport and distribute firearms during the investigation of this case." *Id.* These and other references in the record, like those concerning narcotics, appear to be inconsistent with the contention that there is no evidence of Gaito's prior involvement in such criminal activities.

■ Even if it were established that Gaito had no prior involvement with narcotics or firearms, as indicated, this is not dispositive on the issue of non-predisposition. *See Fedroff,* 874 F.2d at 183 ("[L]ack of prior illegal conduct alone will not satisfy the defendant's burden of production on non-predisposition."). As indicated above, there were numerous instances in the record where Gaito is either an active participant in, or present during, recorded conversations regarding narcotics and firearms. *See supra* at 312–317.

After review of the record and Gaito's submissions with regard to his initial request for an entrapment defense charge, and those submitted in the Motion for Reconsideration, it is apparent that Gaito has failed to meet his burden of production on non-predisposition. *Wright,* 921 F.2d at 44; *Fedroff,* 874 F.2d at 181; *Marino,* 868 F.2d at 551 n. 3. Accordingly, the initial denial of such request having been appropriate, the Motion for Reconsideration was denied.

---

90. In the Motion for Reconsideration, counsel for Gaito again argued the only prior involvement Gaito had with drugs was his introduction of Hoyt to Sabol, for the purpose of putting a drug transaction together. Reconsideration Memo at 2; 27 June 1995 Entrapment Memo at 2. As counsel pointed out, Gaito denied having received $1000.00 for such introduction as Sabol testified. Reconsideration Memo at 2; 27 June 1995 Entrapment Memo at 2.

91. As discussed, the reference relied upon to argue that Gaito was not compensated for his introduction of Hoyt was Gaito's remark that "nobody made no money." 105 TR at 11–12; Trial Tr. at 1949. This reference was not, as contended by counsel, that "no one received any money." 27 June 1995 Entrapment Memo at 2; Reconsideration Memo at 2.

### D. *Motions for Judgment of Acquittal Under Rule 29(a)*

At the close of the Government's case-in-chief, the Defendants made motions on 23 June 1995 and 26 June 1995, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure ("Rule 29") [92], for judgment of acquittal (the "Rule 29 Motions"). *See* Trial Tr. at 2878–94, 2904–32. On 26 June 1995, the court reserved on the Rule 29 Motions, pursuant to Rule 29(b) [93]. *Id.* at 2933–34, 3139–40. The parties were instructed to submit briefs, by 14 July 1995,[94] to elaborate both factually and legally on their arguments concerning the Rule 29 Motions.[95] *Id.* at 3140.

According to the Third Circuit: "[A] judgment of acquittal should be entered only upon consideration of the sufficiency of the *Government's* evidence." *United States v. Giampa,* 758 F.2d 928, 934–35 (3d Cir.1985) (emphasis in original) (citing *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 571, 97 S.Ct. 1349, 1354–55, 51 L.Ed.2d 642 (1977); *United States v. Horton,* 180 F.2d 427 (7th Cir.1950)); *United States v. Goldblatt,* 813 F.2d 619, 621 (3d Cir.1987); *Government of the Virgin Islands v. Williams,* 739 F.2d 936, 940 (3d Cir.1984). "[T]he district court must determine whether the Government has adduced sufficient evidence re-

specting each element of [an] offense charged to permit jury consideration." *Giampa,* 758 F.2d at 934. Nonetheless, the Circuit has explained that "[t]he district court cannot and should not weigh the evidence.... Nor ... is the district court permitted to make credibility determinations. The district court is confined solely to its assessment of the sufficiency of the Government's evidence." *Id.* at 934–35.

"The test for denial of a judgment of acquittal pursuant to Rule 29 ... is the same as the test for reviewing a claim that the evidence is insufficient to support a conviction." *United States v. Abner,* 35 F.3d 251, 253 (6th Cir.1994); *United States v. Freter,* 31 F.3d 783, 785 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 646, 130 L.Ed.2d 551 (1994). "A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Casper,* 956 F.2d 416, 421 (3d Cir.1992); *see United States v. McGlory,* 968 F.2d 309, 321 (3d Cir.1992), *cert. denied,* 507 U.S. 962, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993); *United States v. Gonzalez,* 918 F.2d 1129, 1132 (3d Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1637, 113 L.Ed.2d 733 (1991).

When reviewing the sufficiency of evidence "the relevant question is whether, after viewing the evidence in the light most

**92.** Rule 29(a) provides:

Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the [G]overnment is not granted, the defendant may offer evidence without having reserved the right.
Fed.R.Crim.P. 29(a).

**93.** Rule 29(b) provides:

The court may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the

basis of the evidence at the time the ruling was reserved.
Fed.R.Crim.P. 29(b).

**94.** At the request of defense counsel, this deadline was extended to 19 July 1995.

**95.** In support of the Rule 29 Motions, Defendants submitted: letter-brief on behalf of Segarra, dated 13 July 1995 (the "Segarra Rule 29 Brief"); letter-brief on behalf of McManus, dated 17 July 1995 (the "McManus Rule 29 Brief"); letter-brief on behalf of Giampa, dated 18 July 1995 (the "Giampa Rule 29 Brief"); letter-brief on behalf of Vittorio, dated 18 July 1995 (the "Vittorio Rule 29 Brief"); letter-brief on behalf of Gaito, dated 18 July 1995 (the "Gaito Rule 29 Brief"). Capra and Porco declined to submit briefs in support of their Rule 29 Motions.

In opposition to the Rule 29 Motions the Government submitted: Memorandum of Law of the United States in Opposition to Defendants' Motions for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29 (the "Government Rule 29 Brief").

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. "When examining the sufficiency of the evidence, the court reviews the totality of the circumstances." *United States v. Leon,* 739 F.2d 885, 891 (3d Cir.1984); *see Government of the Virgin Islands v. Greene,* 708 F.2d 113, 115 (3d Cir.1983), *cert. denied,* 465 U.S. 1008, 104 S.Ct. 1004, 79 L.Ed.2d 236 (1984). "The evidence is to be viewed 'not in isolation but in conjunction.'" *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)).

In the context of a motion for acquittal after the return of a jury's guilty verdict [96], the Circuit has explained: "[T]he trial court [is] obliged to uphold the jury's verdict unless no rational jury could have concluded beyond a reasonable doubt" that the defendant committed the crimes charged. *United States v. Ashfield,* 735 F.2d 101, 106 (3d Cir.), *cert. denied,* 469 U.S. 858, 105 S.Ct. 189, 83 L.Ed.2d 122 (1984); *see United States v. Obialo,* 23 F.3d 69, 72 (3d Cir.1994) ("The question before us is whether there was substantial evidence upon which a reasonable jury could have based its verdict."); *McGlory,* 968 F.2d at 322.

As the Supreme Court has stated, "such a decision will be confined to cases where the prosecution's failure is clear." *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *see Government of the Virgin Islands v. Brathwaite,* 782 F.2d 399, 404 (3d Cir.1986). "In making this determination, 'the court must view the evidence and the inferences logically deducible therefrom in the light most favorable to the

[Government]....'" *United States v. Wright,* 845 F.Supp. 1041, 1055 (D.N.J.) (quoting *United States v. McNeill,* 887 F.2d 448, 450 (3d Cir.1989), *cert. denied* 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990)), *aff'd,* 46 F.3d 1120 (1994); *see also Obialo,* 23 F.3d at 71–72 ("In considering [defendant's] argument that there was insufficient evidence to support his conviction on the conspiracy charge, we must view the evidence in the light most favorable to the [G]overnment as the verdict winner.").

A jury's verdict need only be supported by a threshold quantum of evidence in order to be sustained. "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore,* 910 F.2d 1084, 1129 (3d Cir.1990), *cert. denied,* 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *see Obialo,* 23 F.3d at 72; *Leon,* 739 F.2d at 891. "Only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt," may a verdict be overturned. *McNeill,* 887 F.2d at 450.

### 1. *Count One: Conspiracy to Engage in Racketeering*

Count One alleges Defendants conspired to participate, directly and indirectly, in the affairs of an enterprise, namely the Lucchese Crime Family, through a pattern of racketeering activity. Count 1. According to Count One the Defendants "did agree, together, with each other and with other co-conspirators, that members and associates of the Lucchese Crime Family would commit and aid, abet, counsel, command, induce, procure and willfully cause the commission of at least two [r]acketeering [a]cts," as set forth in 18 U.S.C. § 1961(1).[97] Count 1,

---

**96.** Rule 29(c) provides that "a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period." Fed.R.Crim.P. 29(c).

**97.** To establish Count One the Government is required to prove:

(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity.

¶ 160. Count One describes eight acts of racketeering allegedly committed by Defendants: (1) a conspiracy to import and distribute narcotics, 21 U.S.C. §§ 846, 846, (2) the distribution of heroin, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, (3) a scheme to steal and transport stolen property, 18 U.S.C. §§ 2, 659, 2314, 2315, (4) a scheme to export stolen vehicles, 18 U.S.C. § 2312, (5) a scheme to establish an illegal gambling business, 18 U.S.C. §§ 1955, 1955(b)(1), (6) a conspiracy to establish import/export company through extortionate loan, 18 U.S.C. §§ 892, 2, (7) a scheme to deal in counterfeit money, 18 U.S.C. § 473, and (8) a scheme to conceal evidence, 18 U.S.C. §§ 1512(b), 2. *Id.*, ¶¶ 161–68.

#### a. *Giampa's Rule 29 Motion on Count One*

In Giampa's motion for judgment of acquittal ("Giampa's Rule 29 Motion") as to Count One, counsel for Giampa argued the Government "did not submit any proof aliundo (sic), an independent source for any involvement of ... Giampa in this conspiracy." Trial Tr. at 2879; *see also* Giampa Rule 29 Brief at 1 ("[T]he Government never established by *proof aliunde* (independent proof) that a conspiracy was proven as a condition precedent to the admissibility of numerous tape recordings which were admitted into evidence in the within case.").[98] According to counsel for Giampa, "other than the comments of ... Giampa on the tape, there was no independent proof of a conspiracy in this case without the tapes themselves." Trial Tr. at 2879.

#### b. *Vittorio's Rule 29 Motion on Count One*

In Vittorio's motion for judgment of acquittal ("Vittorio's Rule 29 Motion"), counsel for Vittorio argued such motion was appropriate with regard to Count One because there was no "evidence to show that the— that whatever enterprise may have existed here, if there was one, was the Lucchese [C]rime [F]amily." *Id.* at 2907; Vittorio Rule 29 Brief at 2. Further, counsel for Vittorio contended: "This was an operation masterminded by ... Sabol and controlled by ... Sabol," and that there was no evidence to support that the crimes charged in the Redacted Superseding Indictment were done to further the interests of the Lucchese Crime Family. Trial Tr. at 2908; Vittorio Rule 29 Brief at 2.

#### c. *Gaito's Rule 29 Motion on Count One*

In Gaito's motion for judgment of acquittal ("Gaito's Rule 29 Motion"), counsel for Gaito argued: "The evidence that has been presented here shows that at best this was an organization that was constructed by ... Sabol.... The proof [was] that ... Gaito knew none of these individuals, with the possible exception of ... Giampa, until October 4th [1993]...." Trial Tr. at 2905. Further, counsel for Gaito contended "there [was] no evidence of an independent, ongoing organization that exist[s] independently of the substantive crimes that ... Sabol was attempting to have committed." *Id.;* Gaito Rule 29 Brief at 2. Counsel for Gaito contended that, "despite [Gaito's] claims of organized crime ties[,]" he was not part of the Lucchese Crime Family, did not pay tribute to anyone, and did not divulge the source of merchandise he sold to other members of the crew, in violation of obligations imposed upon associates of an organized crime family. Gaito Rule 29 Brief at 2.

---

*United States v. Console,* 13 F.3d 641, 653 (3d Cir.1993) (citations omitted), *cert. denied,* ⎯ U.S. ⎯, 114 S.Ct. 1660, 128 L.Ed.2d 377 (1994).

Satisfaction of the second element, or the "association" requirement, requires a showing that the defendant was " 'aware of at least the general existence of the enterprise named in the indictment.' " *Eufrasio,* 935 F.2d at 577 n. 29 (quoting *United States v. Castellano,* 610 F.Supp. 1359, 1401 (S.D.N.Y.1985)).

"Similarly, a conviction under 18 U.S.C. § 1962(d) for conspiracy to violate [S]ection 1962(c) requires proof 'that the individual defendants *knowingly agreed* to participate in the "enterprise" through a pattern of racketeering.' " *Console,* 13 F.3d at 653 (quoting *Riccobene,* 709 F.2d at 220–21) (emphasis in original). Proof that an "overt act" was committed in furtherance of the RICO conspiracy is not required. *United States v. Local 560, Int'l Bd. of Teamsters,* 581 F.Supp. 279, 332 (D.N.J.1984), *aff'd,* 780 F.2d 267 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).

**98.** *See infra* at 333 (discussing this argument as advanced by counsel for Segarra).

**d.** *McManus' Rule 29 Motion on Count One*

In McManus' motion for judgment of acquittal ("McManus' Rule 29 Motion"), counsel for McManus argued, with respect to Count One that "there [was] absolutely no evidence of an independent, ongoing enterprise that was profited (sic) as a result of talk or, in fact, acts that were alleged in ... [the Redacted Superseding] [I]ndictment." Trial Tr. at 2915.

**e.** *Segarra's Rule 29 Motion on Count One*

In Segarra's motion for judgment of acquittal ("Segarra's Rule 29 Motion"), counsel for Segarra argued the evidence does not establish Segarra's participation in the "enterprise" because the three predicate acts alleged—conspiracy to import drugs, conspiracy to establish gambling operations and conspiracy to transport stolen vehicles—have not been proven. *Id.* at 2892–93; Segarra Rule 29 Brief at 4. With regard to the conspiracy to import drugs, counsel for Segarra argued the only evidence presented was that Segarra showed up to a meeting on 6 January 1994, where no one discussed drugs. Trial Tr. at 2983. As for conspiracy to establish gambling operations, counsel for Segarra contended only bingo was discussed in Segarra's presence. *Id.* Finally, Counsel for Segarra argued, there was no reference in the record to stolen automobiles. *Id.*

**f.** *Porco's Rule 29 Motion on Count One*

In Porco's motion for judgment of acquittal ("Porco's Rule 29 Motion"), counsel for Porco argued that "the Government's proof has failed to establish the existence of the criminal enterprise as alleged in the [Redacted Superseding] [I]ndictment and as ... Porco and ... Capra are charged in [C]ount [O]ne. *Id.* at 2924.

**g.** *Capra's Rule 29 Motion on Count One*

In Capra's motion for judgment of acquittal ("Capra's Rule 29 Motion"), counsel for Capra contended there was no evidence that Porco and Capra were participating in the conduct of the Lucchese Crime Family. *Id.* at 2928. Counsel for Capra argued that despite the allegations of the Redacted Superseding Indictment of a highly structured organization, where tribute is paid, there was no evidence of tribute paid by Sabol, nor was there any tribute paid by Porco to Capra or Capra to anyone. *Id.* Further, counsel for Capra argued that there was no evidence of reporting from Capra or Porco to anybody else in this alleged highly structured organization. *Id.*

The Government contended:

> The numerous references in the tape[s] to Lucchese [C]rime [F]amily, testimony not only from ... Sabol, but testimony through the mouths of the [D]efendants during the course of this case can also be ruled that they were engaging in activities that are listed under Section [1961 of Title 18] as racketeering acts. They agreed to commit them.

*Id.* at 3129; Government Rule 29 Brief at 3–4. According to the Government, given that the evidence in a light most favorable to the Government for the purposes of the Rule 29 Motions, "there can be little doubt that there [was] an enterprise that's established here." Trial Tr. at 3129. Further, the Government argued that "with respect to ... Vittorio, ... Giampa, and ... McManus, that some of these racketeering acts were actually committed before the case was compromised." *Id.*

There were, as the Government pointed out, numerous references in the record either directly or indirectly to the Lucchese Crime Family made by the Defendants themselves. For example, Sabol said to Gaito "Serge is doing good. He's got a $400,000 house. Married into Lucchese Family. He's got a girl, got a beautiful wife." 107 TR at 55. To this Gaito responds: "Yeah, is that us? Lucchese. What are we?" *Id.*

Another example was found during a recorded conversation between McManus and a man identified as Nicky:

NICKY LNU: I, I think they're all, what do you call it, they are, they're all Gerry's, ah, same family.

J. McMANUS: Yeah.

NICKY LNU: Yeah.

J. McMANUS: Yeah.

NICKY LNU: 'Cause I remember them, ah, bringing up the name.

J. McMANUS: Yeah, who Gerry's?

NICKY LNU: No, the, the "L" name.

J. McMANUS: Oh, the other guy?

NICKY LNU: The family name.

J. McMANUS: Oh, yeah?

NICKY LNU: Yeah.

J. McMANUS: Yeah, so.

258 TR at 10.

Still another example occurred in a discussion between Gaito and Sabol:

J. GAITO: Now, look I'm very friend, friend, very friendly with a couple of wise guys. One guy I'm with them all the time.

R. SABOL: Who's this?

J. GAITO: At night he comes to the track. I got very friendly with him. Mikey Cap.[99] The other guy is the guy I'm supposed to be with. Joey G. You know Joey G?

R. SABOL: Giampa?

J. GAITO: Yeah.

R. SABOL: Giampa?

J. GAITO: Yeah.

R. SABOL: You're with him?

J. GAITO: Yeah.

R. SABOL: I know his son, Gerry, real good.

. . . .

J. GAITO: Now, who do you think Charlie was with?

R. SABOL: Charlie was with, that's Lucchese.

J. GAITO: Well, yeah.

R. SABOL: I thought he was Genovese.[100]

J. GAITO: No, he was with Joey.

R. SABOL: Oh.

J. GAITO: They, that's how I got to meet Joey through Charlie. We did something in Chinatown.

. . . .

J. GAITO: I made, I made, maybe 15,000 in two days, you know, with the guy. We had had to go straighten a few Chinaman out, because they was bulls____ting.

105 TR at 26–27.

In another recorded conversation Vittorio explained to Sabol that he was about to be promoted from an associate to a made member of the Lucchese Crime Family. *See* 129 TR at 23 ("This isn't . . . 1991 no more. I moved up now. I'm up for it pretty soon.") Additionally, it appears during this conversation that Vittorio explained to Sabol and Gaito that Gaito will soon be a made member as well. *See id.* ("We'll get, we'll get Joey to shave his mustache, we'll bring him around, too. Gotta shave the mustache though.").[101]

As the Government pointed out, Vittorio "vouched" for McManus in a recorded conversation with Sabol on 22 November 1993. Trial Tr. at 3075; 134 TR at 63–64. In this conversation, Sabol asked Vittorio "how's this Irish kid?" 134 TR at 63. Vittorio responds: "He's down, he 100% down, I want you to meet him, he's a good kid. I, I'd trust him with my life. He sees my father all the time. He's very well liked." *Id.* at 63–64.

In a conversation between McManus, Vittorio and Sabol regarding opening an import/export company, recorded on 21 December 1993, McManus told Sabol about Porco and his relationship with Capra:

J. McMANUS: Is, ah, there's, ah, the guy, Elliot, he knows him, tons of money, tons of . . . money. He's around a guy, though.[102] Which will make things a little complicated, because.

---

99. According to the testimony of the Government's organized crime expert, McCabe, "Mikey Cap" is Michael Capra, an acting captain in the Lucchese Crime Family. Trial Tr. at 2857.

100. According to McCabe, there are five traditional New York based organized crime families: Bonano, Columbo, Gambino, Genovese and the Lucchese Crime Family. Trial Tr. at 2822.

101. According to McCabe: "Facial hair is taboo with Cosa Nostra and when a person is proposed, ready to be made, they tell them to shave their facial hair." Trial Tr. at 2858.

102. McCabe explained that to be "around" someone means to be associated with a made member in an organized crime family. Trial Tr. at 2823 ("[T]o become a member of Cosa Nostra,

R. Sabol: Who's he around? I'd like to know . . .

J. McManus: Johnny Hooks.

R. Sabol: Huh?

J. McManus: Johnny this guy, Johnny Hooks.

R. Sabol: Johnny Hooks. I know Johnny, Johnny Capra.

J. McManus: Yeah.

164 TR at 45.

The above conversation continued with an explanation by McManus that Porco and Capra are from a different factions of the Lucchese Crime Family:

R. Sabol: This kid, Elliot, what they want to do, they.

J. McManus: Listen.

R. Sabol: They want to put up money for an export?

J. McManus: Yeah, but, what I'm trying to say is it's gonna contradict what, you know.

R. Sabol: There's so many different ways we can go.

J. McManus: No, there's nothing, I got to, we got to look at what's the best way over here right? Rich, we're all gonna make money, but what I'm saying is it's gonna contradict your father. You understand? Johnny and your father.

R. Sabol: Yeah, two different groups.

J. McManus: Yeah.

R. Sabol: Genovese, and ah . . .

J. McManus: No, no, same.

G. Vittorio: They're both Lucchese Family.

J. McManus: But.

G. Vittorio: Maybe it won't. Maybe it could be a joint venture. (UI) can eat, everyone's happy, and a lot of people involved.

*Id.* at 70–71.

With regard to Segarra, there were references that appeared to evidence his association with Capra and Porco. It appeared McManus indicated one must go through Porco to contact Segarra. An example of this relationship was found in the following excerpt of a recorded conversation:

R. Sabol: Ah, (coughs). Also, Guy said he might be able to help me out with that problem with Benny.

J. McManus: Yeah?

R. Sabol: He might be able to get me one of them things.

J. McManus: Well, he, no this guy can get it. He didn't give Elliot his beeper number yet. Ah, he said, he got to get him. I don't know.

241 TR at 7. Further, McManus explained: "He switches his beepers. He's always, he's never, ever, around. You got to catch him through Elliot." 297 TR at 7. The Government contended this was another reference to Segarra. Trial Tr. at 3079.

In a recorded conversation between McManus and Sabol, McManus discussed Capra and Giampa and described some of the hierarchy in the Lucchese Crime Family:

R. Sabol: Maybe they don't want to listen to Johnny [103].

J. McManus: Well, the father-in-law got demoted.

R. Sabol: He got demoted?

J. McManus: He's a regular soldier.

R. Sabol: Oh, really?

J. McManus: Yeah.

R. Sabol: Why did that happen?

J. McManus: Because, well, Bo-, Bowat was the underboss.

R. Sabol: Huh?

J. McManus: Bowat.

R. Sabol: Oh, I don't know.

J. McManus: And, he went away.

R. Sabol: Yeah.

J. McManus: And, and, in the interim when all the different people were taking over, you know, I'm the boss. I'm the boss. Well, the new, new . . . counselor comes in. You know?

R. Sabol: Yeah.

you become an associate, or you're with them, or around them. You must be proposed for membership by a member.")

103. "Johnny" refers to Capra.

J. McManus: So, they, you know, he still was respected and all that. . . .

R. Sabol: Yeah.

J. McManus: But, ah, he just got demoted.

R. Sabol: Well, where do we stand?

J. McManus: We stand where we always stand. It doesn't affect us.

R. Sabol: Yeah. But how's Gerry's father?

J. McManus: Oh. He's up there.

R. Sabol: Ha, ha.

J. McManus: He's the, he's the regime. You know?

. . . .

R. Sabol: Yeah, I mean, is he getting closer to the top. . . .

J. McManus: Oh, yeah, yeah, he's getting close, yeah.

294 TR at 13–15.

Additionally, McManus made references to Giampa and the protection Giampa gives to those who engage in activities on his behalf. For instance, according to McManus: "If, if, someone pops out of the blue, we go to the father." 258 TR at 4. Additionally, during one recorded conversation Sabol asked McManus: "The father ever go out with you with the mask on your head?" 276 TR at 7. To this, McManus responded: "No, no, never . . . [h]e sits home and he laughs. . . . [I]f we get in trouble, he has to take care of it. (laughs)." *Id.*

Similarly, McManus described to Sabol the relationship between Capra and Porco: "I told you it was like a father and son. He, he, listens to Daddy. If Daddy says to do it, he does it. It's not Johnny's money. . . . Who do you think makes all that money? . . . If it wasn't for that kid sitting there, he has nothing." 183 TR at 4.

This relationship between Capra and Porco was described by counsel for Porco in his opening statement in this case. According to counsel for Porco: "Capra is not an associate of [Porco]. He's like a father figure, like an uncle, closest type of relative you can have. In fact, you're going to hear from the evidence that . . . Capra is the godfather of [Porco's] baby boy." Opening Statements Tr. at 93. Counsel for Porco continued: "If [Porco] could sit in . . . Capra's chair at this trial, he would. In fact, he does. They're together in this case, because of their relationship." *Id.* at 94. Additionally, counsel for Porco stated: "His [Porco's] relationship with . . . Capra was so solid that he would never do anything without [Capra]. . . . The evidence will show how inextricably tied [Porco] is to . . . Capra. They're together, in a good way." *Id.* at 105.

When viewing the evidence in a light most favorable to the Government, as required in the instant Rule 29 Motions, *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, it is apparent that there was sufficient evidence in the record for jury submission as to whether the Defendants conspired to associate with the Lucchese Crime Family as alleged in Count One. The recorded conversations in this case reveal numerous references made by the Defendants to the Lucchese Crime Family and to their relationships with one another and with the Lucchese Crime Family. Further, as discussed below, there was sufficient evidence to survive the Rule 29 Motions regarding the predicate acts alleged and, therefore, that the participation of the Defendants in the Lucchese Crime Family was through a pattern of racketeering activity. Accordingly, the Defendants Rule 29 Motions as to Count One are denied.

### 2. *Count Two: Substantive RICO*

Count Two alleges Giampa, Vittorio and McManus "committed and aided and abetted, counseled, commanded, induced, procured and willfully caused the commission of the [r]acketeering [a]cts set forth below." Count 2, ¶ 3. Count Two lists five racketeering acts, which are described in Count One, allegedly committed by Giampa, Vittorio and McManus in violation of 18 U.S.C. § 1962(c): (1) a conspiracy to import and distribute narcotics, (2) the distribution of heroin, (3) a scheme to steal and transport stolen property, (4) a scheme to establish import/export company through extortionate loan, and (5) a scheme to conceal evidence. *Id.*, ¶ 3.

#### a. *Giampa's Rule 29 Motion on Count Two*

In Giampa's Rule 29 Motion as to Count Two, counsel for Giampa argued the Govern-

ment has failed to prove two predicate acts. Trial Tr. at 2879; Giampa Rule 29 Brief at 1.

#### b. *Vittorio's Rule 29 Motion on Count Two*

The basis of Vittorio's Rule 29 Motion as to Count Two, like his argument as to Count One, was that there was no "evidence to show that the—that whatever enterprise may have existed here, if there was one, was the Lucchese [C]rime [F]amily." Trial Tr. at 2907. Further, counsel for Vittorio contended there was no evidence to support that the crimes charged in the Redacted Superseding Indictment were done to further the interests of the Lucchese Crime Family. *Id.* at 2908; Vittorio Rule 29 Brief at 2.

#### c. *McManus' Rule 29 Motion on Count Two*

Counsel for McManus made the same argument in McManus' Rule 29 Motion with respect to Count Two as made concerning Count One. Counsel for McManus contended "there [was] absolutely no evidence of an independent, ongoing enterprise that was profited (sic) as a result of talk or, in fact, acts that were alleged in ... [the Redacted

Superseding] [I]ndictment." Trial Tr. at 2915.

 As discussed below, when viewing the evidence in a light most favorable to the Government, *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, there was sufficient evidence that Giampa, Vittorio and McManus committed two of the racketeering acts alleged in Count Two. Accordingly, it was appropriate to submit Count Two of the Superseding Indictment to the jury and, therefore, the Rule 29 Motions as to Count Two are denied.

#### *The Narcotics Counts (Counts Three Through Five)*

#### 3. *Count Three: Conspiracy to Distribute Narcotics*

 Count Three alleges Vittorio, Gaito and McManus, in violation of Section 846 of Title 21 of the United States Code, "knowingly and intentionally did combine, conspire, and agree with each other, and with others, to distribute, and to possess with intent to distribute, more than 5 kilograms of heroin ... [and] cocaine ... contrary to Title 21, United States Code, Section 841(a)(1)." [104] Count 3, ¶ 2.

---

**104.** The Third Circuit has recently approved the following recitation of the elements of a conspiracy charge:

> "The Government has to prove ... in order to make out its conspiracy charge that there was an agreement for an illegal purpose, ... that that conspiracy was wilfully formed and was existing on or about the time alleged in the indictment and that ... the defendant[] wilfully became a member of the conspiracy with the intent of furthering its unlawful purpose...."

*Price,* 13 F.3d at 724 (quoting with approval district court's instructions to jury in context of a charge of conspiracy to distribute, or possess with intent to distribute, a controlled substance); *see McGlory,* 968 F.2d at 321; *United States v. Salmon,* 944 F.2d 1106, 1113 (3d Cir.1991) ("A conspiracy conviction requires that one agreed to commit an unlawful act and intended to commit the underlying offense."), *cert. denied,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *Gonzalez,* 918 F.2d at 1134 (same); *United States v. American Investors of Pittsburgh, Inc.,* 879 F.2d 1087, 1100 (3d Cir.) (same), *cert. denied,* 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989); *Wright,* 845 F.Supp. at 1057. As indicated by this standard, a conspiracy conviction "requires that one had 'knowledge of the illegal objective contemplated by the conspiracy.'" *Salmon,* 944 F.2d at 1113 (emphasis

omitted) (quoting *United States v. Wexler,* 838 F.2d 88, 91 (3d Cir.1988)). Also, the Government must show that the alleged conspirators "shared a 'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward that goal." *Wexler,* 838 F.2d at 90–91; *see McGlory,* 968 F.2d at 321; *Wright,* 845 F.Supp. at 1057.

"[A]n overt act [in furtherance of the conspiracy] is not a necessary element for a violation...." *Price,* 13 F.3d at 724; *see United States v. Johnstone,* 856 F.2d 539, 542 (3d Cir. 1988) ("It is neither an element of [the conspiracy charge] nor a constitutional requirement that a defendant have committed an overt act in furtherance of the conspiracy."); *United States v. Bey,* 736 F.2d 891, 894 (3d Cir.1984) (same); *Wright,* 845 F.Supp. at 1057.

"The elements of a conspiracy may be proven entirely by circumstantial evidence." *Wexler,* 838 F.2d at 90; *see McGlory,* 968 F.2d at 321; *Gonzalez,* 918 F.2d at 1134. As the Circuit has explained:

> The existence of a conspiracy can be inferred "from evidence of related facts and circumstances from which it appears as a reasonable inference, that the activities of the participants ... could not have been carried on except as

### a. Vittorio's Rule 29 Motion on Count Three

In Vittorio's Rule 29 Motion, counsel for Vittorio argued such motion was appropriate with regard to Count Three, and as to Count Five (importation), because there was no evidence of any agreement as to price, a specific quantity, place of delivery or the frequency of importation. Trial Tr. at 2909; Vittorio Rule 29 Brief at 5–6. Counsel for Vittorio argued: "Under those circumstances, although there [was] a great deal of drug talk, there [was] no conspiracy...." Trial Tr. at 2909.

### b. Gaito's Rule 29 Motion on Count Three

In Gaito's Rule 29 Motion, counsel for Gaito argued with regard to Count Three, and as to all counts alleging Gaito conspired to possess or distribute narcotics or firearms, that there was no evidence of Gaito's participation in these conspiracies "beyond running errands for ... Sabol." *Id.* at 2905.

Counsel for Gaito contended the proof merely showed that Gaito followed the instructions of Sabol to relay messages to Vittorio, to make sure Vittorio followed Sabol's instructions and to bring Vittorio to meetings with Sabol. *Id.* According to counsel for Gaito: "Gaito followed these instructions in the hope of continuing to receive merchandise from ... Sabol to sell.... Gaito showed no interest in participating in a conspiracy for the possession and distribution of drugs or guns ... [and] did not share in any of the proceeds of these conspiracies." *Id.* at 2905–06; *see* Gaito Rule 29 Brief at 3.

### c. McManus' Rule 29 Motion on Count Three

In McManus' Rule 29 Motion, counsel for McManus joined in Vittorio's Rule 29 Motion with regard to Count Three and Count Five. Trial Tr. at 2916. Counsel for McManus similarly argued that there was insufficient evidence of an agreement as to either distribution (Count Three) or importation (Count Five). *Id.*

In response to the Rule 29 Motions as to Count Three, the Government explained that the actual quantity discussed or the fact that five kilograms of either heroin or cocaine were never actually delivered was not an essential element of the instant offense. *Id.* at 3131.

According to the Government, "it [was] clear that from October, 1993 through December, 1993, ... Vittorio, McManus and Gaito were involved in plans to distribute large quantities of heroin and cocaine." Government Rule 29 Brief at 6.

As the Government pointed out, in this case there was evidence of "much discussion, especially beginning in December 1993, about the distribution of heroin which was repeatedly referred to as the 'Pakistani' or 'Pakistani heroin.'" Trial Tr. at 3087. Additionally, at a meeting on 15 December 1993, attended by Sabol, Vittorio, Gaito, McManus and Fatato, there was discussion of the distribution of kilogram quantities of cocaine on a weekly basis. *See* 152 TR at 10 (Fatato explained to Vittorio, McManus and Gaito that he "personally [distributed] five [kilograms] a week"); *see also id.* at 8–9, 17–27, 51–68 (referring to "blow," "heroin," "cocaine," "key," and explaining methods of im-

the result of a preconceived scheme or common understanding."
*McGlory,* 968 F.2d at 321 (quoting *United States v. Kapp,* 781 F.2d 1008, 1010 (3d Cir.), *cert. denied,* 475 U.S. 1024, 106 S.Ct. 1220, 89 L.Ed.2d 330 (1986)); *see United States v. Torres,* 862 F.2d 1025, 1027 (3d Cir.1988); *Wright,* 845 F.Supp. at 1057. The Circuit has observed, moreover, that "[a] conspiracy is by its very nature clandestine. Thus circumstantial evidence is sometimes the sole support for a conviction." *McGlory,* 968 F.2d at 322; *Wright,* 845 F.Supp. at 1057.
"The [G]overnment need not prove the existence of a formal agreement...." *United States*

*v. Simmons,* 918 F.2d 476, 484 (5th Cir.1990); *see United States v. Nolan,* 718 F.2d 589, 595 (3d Cir.1983). Rather, "it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty,* 867 F.2d 759, 763 (2d Cir.1989); *see Gonzalez,* 918 F.2d at 1134; *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988); *Wright,* 845 F.Supp. at 1057. "[K]nowledge of all the particular aspects, goals, and participants of a conspiracy ... is not necessary to sustain a conviction." *Adams,* 759 F.2d at 1114; *see Nusraty,* 867 F.2d at 763; *Theodoropoulos,* 866 F.2d at 593; *Wright,* 845 F.Supp. at 1057–58.

portation, for example, "from Columbia ... they ship it, ... they swallow it, and they bring it in").

When viewed in a light most favorable to the Government, it is apparent there was sufficient evidence from which a rational trier of fact could find the essential elements of Count Three beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Abner*, 35 F.3d at 253; *Freter*, 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Count Three, are denied.

### 4. *Count Four: Distribution of Heroin*

Count Four charges that Vittorio, Gaito and McManus "knowingly and intentionally did possess, with intent to distribute, one ounce of heroin" in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count 4, ¶ 2.

Vittorio has not moved on Count Four, Trial Tr. at 2909–10; Gaito and McManus moved on Count Four.

#### a. *Gaito's Rule 29 Motion on Count Four*

As indicated, counsel for Gaito advanced the same argument, with regard to all the narcotics and firearm counts Gaito was charged with in the Redacted Superseding Indictment. Counsel for Gaito maintained that Gaito's participation was no more than that of "running errands for ... Sabol," with the hope of receiving merchandise for Sabol to sell and that Gaito never shared in the proceeds of any alleged illegal activity. *Id.* at 2905–06; *see* Gaito Rule 29 Brief at 3.

#### b. *McManus' Rule 29 Motion on Count Four*

Counsel for McManus contended there was insufficient evidence to hold McManus responsible as to Count Four. Counsel for McManus contended McManus' Rule 29 Motion as to Count Four should be granted because the distribution of heroin occurred on 22 November 1993 and McManus did not meet Sabol until 15 December 1993. Trial Tr. at 2915; McManus Rule 29 Brief at 1.

Despite Gaito's argument to the contrary, there was sufficient evidence in the record indicating he was present and often actively participated in numerous recorded conversa-tions concerning various narcotic related activity including the distribution of heroin as alleged in Count Four. On cross examination Sabol was asked by counsel for Gaito, with regard to a Government plan at a certain point in the investigation to have Sabol deal directly with Giampa rather than always going through Gaito: "Now that decision was made despite the fact that Mr. Gaito had been present at several meetings in which an ounce of heroin had been delivered to you...." Trial Tr. at 1895. In response, Sabol testified that Gaito was never removed from the investigation, rather, Sabol "could have still met with ... Gaito, [but] ... was supposed to deal directly with ... Giampa[,]" and that had Gaito not been accidentally shot he would have still been an active participant in the various schemes charged in the Redacted Superseding Indictment. *Id.; see also* 142 TR at 37–39 (laughing, Gaito agrees with Sabol that narcotics activity can be profitable, after which Gaito says "Ah"—it appears he approves of a discussion between Vittorio and Sabol regarding "two key a week," "maybe more" and obtaining "samples").

Additionally, the Government explained, the "numerous references by ... Vittorio that the sample came for the Irish kid, as well as ... McManus' own admission that he got nothing for that pellet that was delivered, indicates his involvement in that distribute scheme." Trial Tr. at 3130; *see* 209 TR at 9 ("I [McManus says to Sabol] didn't make nothing. That other thing that I gave you. Remember that little round ball, that, that Pakistan thing? ... I didn't make a dollar.").

When viewed in a light most favorable to the Government, there was sufficient evidence in the record that a rational trier of fact could find the essential elements of Count Four beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Abner*, 35 F.3d at 253; *Freter*, 31 F.3d at 785. As indicated, there was evidence of Sabol's payment of $5,000.00 to Vittorio for the one ounce sample of heroin, with Gaito present, and of the delivery by Gaito and Vittorio of the sample to Sabol. 129 TR at 2;

Trial Tr. at 482. Additionally, the evidence described above regarding the participation of McManus in such distribution made his Rule 29 Motion inappropriate. Accordingly, the Rule 29 Motions on Count Four are denied.

### 5. Count Five: Conspiracy to Import Narcotics

Count Five charges that Giampa, Vittorio, McManus, Porco and Capra, in violation of Section 963 of Title 21 of the United States Code, "knowingly and intentionally did combine, conspire, and agree with each other, and with others, to import more than 5 kilograms of heroin ... [and] cocaine ... from a place outside the United States, contrary to Title 21, United States Code, Section 952." [105] Count 5, ¶ 2.

#### a. Giampa's Rule 29 Motion on Count Five

Counsel for Giampa contended the allegations of Count Five were contradicted by the testimony of Sabol who indicated that he had not talked to Giampa about importation of narcotics. Trial Tr. at 2880; Giampa Rule 29 Brief at 1. According to counsel for Giampa, during cross examination "Sabol acknowledged that as far as he knew, ... Giampa was not involved in any heroin, not involved in any cocaine, not involved in any discussion, not involved, certainly, with ... Vittorio or ... McManus with respect to any of their activities...." Trial Tr. at 2880.

#### b. Vittorio's Rule 29 Motion on Count Five

As indicated, in Vittorio's Rule 29 Motion with regard to Count Five, counsel for Vittorio made the same argument as made with regard to Count Three (distribution). Counsel for Vittorio contended there was no evidence of any agreement as to price, a specific quantity, place of delivery or the frequency of importation. Id. at 2909; Vittorio Rule 29 Brief at 5–6. "Under those circumstances, although there [was] a great deal of drug talk, there [was] no conspiracy...." Trial Tr. at 2909.

#### c. McManus' Rule 29 Motion on Count Five

As discussed, counsel for McManus joined in Vittorio's Rule 29 Motion with regard to Counts Three and Five. Id. at 2916. Counsel for McManus similarly argued that there was insufficient evidence of an agreement as to either distribution (Count Three) or importation (Count Five). Id.

#### d. Porco's Rule 29 Motion on Count Five

Counsel for Porco argued Porco's Rule 29 Motion with regard to Count Five was appropriate because "there [was] absolutely no testimony at all to establish that ... Porco and ... Capra entered into any conspiracy with anybody to import narcotics...." Id. at 2920–21. Further, counsel for Porco contended "Sabol admitted that he never discussed drugs with ... Porco[,]" and that Sabol was told that "Porco does not do drugs and that [Porco] could not help Sabol in any scheme or plan to get drugs." Id. at 2921.

#### e. Capra's Rule 29 Motion on Count Five

Counsel for Capra argued: "There [was] no evidence of any agreement whatsoever with regard to drugs and among these five defendants [charged in Count Five] in any manner, shape or form which connects ... Capra or ... Porco to drugs." Id. at 2929. According to counsel for Capra, Sabol indicated that Capra said nothing about drugs and McManus' statement that Porco does not do drugs, but might if he gets to know you, was not enough to establish an agreement between Capra and Porco or anyone else. Id.

There was evidence of a narcotics importation scheme whereby balloons filled with narcotics were swallowed by drug couriers from Columbia. For example a discussion of such importation method can be found on a recorded conversation which took place in the presence of Vittorio and McManus and Gaito. See 152 TR at 8–9, 17–27, 51–68 (referring to "blow," "heroin," "cocaine," "key" and explaining methods of importation, for example, "from Columbia ... they ship it, ... they

---

**105.** See supra note 104.

swallow it, and they bring it in"); *see also* 117 TR at 59–61 (meeting attended by Vittorio and Gaito; Vittorio importation of narcotics from Columbia and how the drug couriers "pack it in balloons" and "swallow it").

With regard to Giampa, Porco and Capra, the Government pointed out that while these defendants were not heard discussing drugs, they "knew or cast a blind eye towards these other defendants' involvement in narcotics...." Trial Tr. at 3131–32. McCabe testified that one of the general rules of organized crime, which are "often broken," is "not to traffic in narcotics." *Id.* at 2858. According to Vittorio, people involved in organized crime "put a facade on" that they are not involved with drug trafficking, but he explained "it's like ... everyone cheats on their wife and the guy says no, no, I don't cheat on my wife, but everybody does." *Id.* at 3094–95.

There was evidence in the record which suggests that Giampa was aware that the "no narcotics rule" is often broken. For example, Giampa, with Vittorio and McManus present, cautions Sabol not to refer to "grams" on the telephone, despite the fact that Sabol was discussing the weight of tee-shirts:

J. Giampa: But, when you let me know on the telephone don't go saying grams.

R. Sabol: Oh.

G. Vittorio: (Laughs)

J. McManus: (Laughs)

J. Giampa: Please, ha, you know what I mean?

R. Sabol: No, that, that's, how they measure t-shirts.

J. Giampa: Yeah, well, they'll think it's ... junk talk. Right?

232 TR at 69–70.

As for Porco and Capra, as mentioned, they were characterized, even by counsel as "inextricably tied." Trial Tr. at 105. According to counsel for Porco, Porco "would never do anything without [Capra]." *Id.* As the Government explained, there was evidence that Porco, McManus and Vittorio ac-

knowledged that any activity involving Porco required the approval of Capra. 171 TR at 21; 182 TR at 4.

McManus explained that Porco would be interested in various narcotics activity if done discretely:

R. Sabol: Alright, listen, what about this, ah, Columbian kid. Did you talk to ... Elliot or anything?

J. McManus: Ah, ah, he dabbles in it. You know?

R. Sabol: Yeah.

J. McManus: Ah, but, ah.

R. Sabol: You're not supposed to say nothing.

J. McManus: Yeah, it's a QT thing with me and him.

R. Sabol: Yeah so when, when, do I get to talk to him to see if he's interested, you know.

J. McManus: I know he's interested.

R. Sabol: Oh, he is?

J. McManus: Yeah, but you can't, don't bring it up, because then he's gonna be perturbed.

R. Sabol: Yeah, yeah, is he talking about, ah the other stuff....

J. McManus: Doesn't make a difference.

173 TR at 15.

 When viewed in a light most favorable to the Government, it is apparent there was sufficient evidence from which a rational trier of fact could find the essential elements of Count Five beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Count Five, are denied.

*The Firearms Counts (Counts Six Through Eleven)*

6. *Count Six: Conspiracy to Deal in Firearms*

 Count Six alleges Vittorio, Gaito, McManus and Segarra, in violation of Section 371 of Title 18 of the United States Code,[106]

---

**106.** "The three elements of a Section 371 conspiracy are: 1) the existence of an agreement, 2) an overt act by one of the conspirators in furtherance of the objective, and 3) an intent on the part

knowingly and willfully did combine, conspire, confederate and agree with each other, to:

a. transport in interstate commerce a fully automatic RPB Industries .9mm submachine gun, contrary to Title 18, United States Code, Section 922(a)(4);

b. sell and otherwise dispose of a firearm and ammunition, to a person, knowing, and having reasonable cause to believe that such person has been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, contrary to Title 18, United States Code, Section 922(d)(1);

c. knowingly transport, ship and receive in interstate commerce a firearm which had the manufacturer's serial number removed, obliterated and altered, contrary to Title 18, United States Code, Section 922(k);

d. to transfer unregistered firearms in violation of Title 26, United States Code, Section 5841, namely a fully automatic RPB Industries .9mm submachine gun and silencer, contrary to Title 26, United States Code, Section 5861(e).

Count 6, ¶ 2.

### 7. *Count Seven: Transfer of Machine Gun*

Count Seven alleges Vittorio, Gaito, McManus and Segarra "knowingly and willfully did transport in interstate commerce a fully automatic RPB Industries .9mm submachine gun. In violation of Title 18, United States Code Sections 922(a)(4) and 2." Count 7, ¶ 2.

### 8. *Count Eight: Selling Firearm to a Felon*

Count Eight alleges Vittorio, Gaito and McManus, in violation of Sections 922(d)(1) and (2) of Title 18 of the United States Code, "knowingly and willfully did sell and other-

wise dispose of a" Rossi .38 caliber revolver and hollow tip bullets "to a person, knowing, and having reasonable cause to believe, that such person has been convicted in a court of a crime punishable by imprisonment for a term exceeding one year." Counts 8–9, ¶ 2.

### 9. *Count Nine: Selling Firearm to a Felon*

Count Nine alleges Vittorio, Gaito, McManus and Segarra, in violation of Sections 922(d)(1) and (2) of Title 18 of the United States Code, "knowingly and willfully did sell and otherwise dispose of a" RPB Industries .9mm submachine gun, ammunition and a silencer "to a person, knowing, and having reasonable cause to believe, that such person has been convicted in a court of a crime punishable by imprisonment for a term exceeding one year." Counts 8–9, ¶ 2.

### 10. *Count Ten: Shipping Gun with Altered Serial Number*

Count Ten alleges Vittorio, Gaito and McManus, "did knowingly and willfully transport, ship and receive in interstate commerce a firearm, namely a Rossi .38 caliber revolver, which had the manufacturer's serial number removed, obliterated and altered. In violation of Title 18, United States Code, Sections 922(k) and 2." Count 10, ¶ 2.

### 11. *Count Eleven: Transferring Unregistered Machine Gun*

Count Eleven alleges Vittorio, Gaito, McManus and Segarra "knowingly and willfully did transfer unregistered firearms in violation of Title 26, United States Code, Section 5841, namely a fully automatic RPB Industries .9mm submachine gun and silencer. In violation of Title 26, United States Code, Section 5861(e) and Title 18, United States Code, Section 2." Count 11, ¶ 2.

of the conspirators to agree as well as to defraud the United States. *United States v. Rankin,* 870 F.2d 109, 113 (3d Cir.1989) (citing *United States v. Shoup,* 608 F.2d 950, 956 (3d Cir.1979)); *see also United States v. Small,* 472 F.2d 818, 819–20 (3d Cir.1972) ("Commission of an overt act by one of the conspirators is an essential element of the crime of conspiracy.").

"[O]ne who willfully enters an agreement to commit a crime remains a participant in the agreement unless and until he [or she] communicates or otherwise objectively manifests a decision to renounce the agreement." *Rosa,* 891 F.2d at 1069. Accordingly, "[k]nowledge of all the particular aspects, goals, and participants of a conspiracy … is not necessary to sustain a conviction." *Adams,* 759 F.2d at 1114.

Vittorio has not moved on Count Six or on Counts Eight through Eleven, Trial Tr. at 2910; Vittorio does move on Count Seven. Gaito and McManus moved on Counts Six through Eleven and Segarra moved on Counts Six, Seven, Nine and Eleven.

### a. *Vittorio's Rule 29 Motion on the Firearms Counts*

Counsel for Vittorio argued, with regard to Count Seven, that "although the Government certainly established that these defendants lived in New York, they did not establish that ... they transported the [machine] gun in interstate commerce." Trial Tr. at 2910; Vittorio Rule 29 Brief at 6.

### b. *Gaito's Rule 29 Motion on the Firearms Counts*

Counsel for Gaito advanced the same argument, with regard to Counts Six through Eleven, as he has throughout Gaito's Rule 29 Motion. Counsel for Gaito maintained that Gaito's participation was no more than that of "running errands for ... Sabol," with the hope of receiving merchandise for Sabol to sell and that Gaito never shared in the proceeds of any alleged illegal activity. Trial Tr. at 2905–06; *see* Gaito Rule 29 Brief at 4.

### c. *McManus' Rule 29 Motion on the Firearms Counts*

Counsel for McManus contended, with regard to Count Six, if the Government can establish any agreement that McManus was a party to it would only be based on Sabol giving McManus $2,000.00 for two pistols. Trial Tr. at 2916; McManus Rule 29 Brief at 2. "Any agreement that may have existed [was] between the agent provocateur and [McManus] ... [and] falls short of a conspiracy." Trial Tr. at 2916; *see* McManus Rule 29 Brief at 2.

Counsel for McManus contended, with regard to Count Seven, McManus was not present at the 15 December 1993 meeting, where the machine gun was delivered to Sabol. Trial Tr. at 2917; McManus Rule 29 Brief at 2. Further, counsel for McManus

argued there was "no evidence that [McManus] had anything to do with the transfer of the machine gun." [107] Trial Tr. at 2917; *see* McManus Rule 29 Brief at 2 ("The [G]overnment's *only* proof of ... McManus' involvement in transporting or transferring [was] a statement by McManus to Sabol that 'it was a gift for him.' ").

Counsel for McManus contended the evidence establishes that McManus did not know Sabol until 15 December 1995, while the transfer of the revolver charged in Count Eight occurred on 13 December 1993. Trial Tr. at 2917; McManus Rule 29 Brief at 2–3. According to counsel for McManus, while Sabol discussed his criminal activities with McManus on 15 December 1993, there was no evidence that prior to this date McManus knew Sabol was a convicted felon. Trial Tr. at 2917; McManus Rule 29 Brief at 3. Additionally, Counsel for McManus argued the evidence establishes McManus "had no part in the transfer of the gun to Sabol." McManus Rule 29 Brief at 3.

Counsel for McManus contended, as in Count Eight, that the transfer of the revolver on 13 December 1993 preceded the date McManus met Sabol. Trial Tr. at 2917. According to counsel for McManus: "There [was] absolutely no evidence in this case to indicate that [McManus] had any knowledge of that particular act." *Id.* at 2918; McManus Rule 29 Brief at 3. Additionally, counsel for McManus contended there was no evidence offered that McManus was aware the revolver had an obliterated serial number. McManus Rule 29 Brief at 3.

### d. *Segarra's Rule 29 Motion on the Firearms Counts*

Counsel for Segarra argued "there has been absolutely no proof whatsoever adduced during the course of this trial, other than through alleged co-conspirator statements, that [Segarra] was a member of any conspiracy. He certainly agreed to nothing." *Id.* at 2891–92; *see* Segarra Rule 29 Brief at 2. Counsel for Segarra contended the co-con-

---

**107.** Counsel for McManus indicated that this argument was adopted with regard to Counts Nine

and Eleven. Trial Tr. at 2917–18.

spirator statements relied on by the Government were not properly admitted under FRE 801(d)(2)(E) [108] because "there must also be proof aliunde, apart from the proffered statements, of the existence of the conspiracy." [109] Segarra Rule 29 Brief at 2. According to counsel for Segarra, without the co-conspirator statements Segarra's Rule 29 Motion was appropriate as it concerns Counts Six, Seven, Nine and Eleven. *Id.* at 3.

Counsel for Segarra relied on *Gambino*, 926 F.2d at 1361, to support this argument, which was also advanced in the context of Segarra's request for a *James* hearing on the admissibility of co-conspirator statements. *See* Segarra *In Limine* Brief at 1–2 (acknowledging that the hearsay statements themselves may be examined, *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781, but arguing "there must also exist proof aliunde, apart from the proffered statements, of the existence of the conspiracy and the defendant's and declarant's involvement in it" and that "[t]he proffered statements standing alone, are insufficient to sustain the [G]overnment's burden" (relying on *Gambino*, 926 F.2d at

1361 n. 5)); Segarra Rule 29 Brief at 3 (contending that *Gambino* "reviews this Circuit's requirement of proof aliunde despite the adoption of [FRE] 104(a), in order to admit alleged coconspirator statements pursuant to [FRE] 801(d)(2)(E)"). A review of *Bourjaily* and *Gambino*, two cases relied on by counsel for Segarra, reveals that the argument, regarding the need for "proof aliunde," is without merit.[110] Nonetheless, as seen further below there was independent evidence of Segarra's involvement in the conspiracy.

As the Government pointed out, there was evidence in the record concerning the involvement of Vittorio, Gaito, McManus and Segarra in the activity charged in Counts Six through Eleven. For example, during cross examination of Sabol, Sabol acknowledged that he gave Gaito $1400.00 to give to Vittorio for the purchase of two pistols with silencers. Trial Tr. at 2072–73; *see* 136 TR at 8. As Sabol indicated, Gaito and Vittorio delivered a machine gun with a silencer and ammunition to him instead.[111] Trial Tr. at

---

**108.** As discussed, FRE 801(d)(2)(E) provides that a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy[,]" is not hearsay. Fed.R.Evid. 801(d)(2)(E). As the Circuit has explained:

> In determining whether the co-conspirator exception applies in a particular case, the trial court must determine, by a preponderance of the evidence, that there was a conspiracy between the declarant and the party against whom the evidence is offered; and that the hearsay statements sought to be admitted were made during the course of the conspiracy and in furtherance of its goals.

*Gambino*, 926 F.2d at 1360 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987)).

**109.** As indicated, counsel for Giampa advanced a similar argument. *See supra* at 321.

**110.** The Third Circuit in *Gambino* explained:

> Before the adoption of [FRE] 104(a), proof of a conspiracy required evidence external to the hearsay statement itself. This rule was premised on the belief that a statement should not be able to "lift itself by its own bootstraps to the level of competent evidence." *Glasser v. United States*, 315 U.S. 60, 75 [62 S.Ct. 457, 467, 86 L.Ed. 680] (1942). *Bourjaily* made clear, however, that the adoption of [FRE] 104(a) changed the earlier rule, and that the co-conspirator's hearsay statement could be used to establish the existence of a conspiracy.

> In *Bourjaily*, the Court expressly declined to decide whether a trial court could rely "solely upon [the declarant's] hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence." *Bourjaily*, 483 U.S. at 181 [107 S.Ct. at 2781]. Here there is sufficient evidence external to the hearsay statement itself, so we need not address that issue today.

*Gambino*, 926 F.2d at 1361 (footnote omitted).

The Circuit further explained that the "pre-*Bourjaily* requirement of proof *aliunde* was premised on the presumptive unreliability of coconspirator hearsay." *Id.* at 1361 n. 5 (citing *Bourjaily*, 483 U.S. at 179, 107 S.Ct. at 2780–81). According to the Circuit, the Supreme Court "did not alter that presumption, but held that the ways in which it could be rebutted had been expanded by the adoption of [FRE] 104(a)." *Id.* "[A] piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence." *Bourjaily*, 483 U.S. at 180, 107 S.Ct. at 2781; *Gambino*, 926 F.2d at 1361 n. 5.

**111.** Counsel for Gaito asked Sabol: "Now, is there any evidence that ... Gaito received any money from this gun transaction?" Trial Tr. at 2073. In response, Sabol testified that he could not "recall if [Gaito] received money from this [transaction] or whatever they did, how he picked up the machine gun with the silencer[] and how much it cost him. He might have split the money with [Vittorio]." *Id.*

2703; Government Rule 29 Brief at 30; Government Exhibits 38–42. Prior to the delivery of the silencer equipped machine gun, Vittorio told Sabol he had access to such a gun, 149 TR at 59, and acknowledged that "Benny" was the source. 151 TR at 9.

In one recorded conversation Sabol inquired about silencers and Vittorio informs Sabol that he can supply a gun with a silencer:

> R. Sabol: I know it has to sound like this, you see this, this is how it sounds. (Clapping sounds) Just like that.
>
> G. Vittorio: Hey, I got a ... what do you call it, um, a 380 pistol but it's, it's, it looks like a Mac–10, with a silencer.
>
> R. Sabol: But, but, I'll take that much.
>
> G. Vittorio: I got to talk to that Benny tonight. I'll be, call me tomorrow morning. I'll be up early. that (UI).

149 TR at 59.

At a videotaped meeting on 15 December 1993, Vittorio and Gaito delivered the machine gun to Sabol and discussed its operation:

> G. Vittorio: Don't keep it pressed. If you're gonna use it go (slap).
>
> R. Sabol: I know.
>
> G. Vittorio: Go (slap, slap, slap).
>
> R. Sabol: I know space.
>
> J. Gaito: Also, move to the right, too, Rich.
>
> R. Sabol: Which.
>
> G. Vittorio: Yeah, you got to get close, with those things on they don't come out strai-, they come out a little off.
>
> R. Sabol: Well, it doesn't matter when you're this close.
>
> G. Vittorio: Bang (UI).
>
> J. Gaito: No, he showed it to us. It, it, it don't matter.

153 TR at 12.[112]

Counsel for Gaito inquired about the Government's apparent shift in the investigation away from Gaito "despite the fact that ... Gaito had been present at several meetings ... in which various firearms had been delivered to [Sabol]." Trial Tr. at 1895. In response Sabol testified that Gaito was never removed from the investigation, rather Sabol "could have still met with ... Gaito, [but] ... was supposed to deal directly with ... Giampa[,]" and that had Gaito not been accidentally shot he would have still been an active participant in the schemes charged in the Redacted Superseding Indictment. *Id.; see also, e.g.,* 149 TR at 62–63 (meeting on 13 December 1993 where Vittorio and Gaito deliver a .38 caliber revolver to Sabol).

In a recorded conversation, which took place on 10 January 1994, McManus explained to Sabol his involvement in the delivery of the .38 caliber revolver the previous month:

> R. Sabol: You know what I mean, but, you know, I showed it—
>
> J. McManus: You have the other little one, right?
>
> R. Sabol: What, ah, the throw away? The .38?
>
> . . . .
>
> J. McManus: Hey, 'cause that was mine, that per, that was personally mine that one.

226 TR at 15.[113]

Additionally, in a meeting on 6 January 1994, Sabol made reference to $2,000.00 he gave to McManus for pistols. 217 TR at 23–24. At this meeting, Sabol explained to Giampa: "[A]nd then uh, Jimmy, I gave him uh, a couple of thousand the other day to do something...." *Id.* at 23.

With regard to Segarra, there were numerous references in the record made by the Defendants indicating that he was the source for silencers. For instance:

> G. Vittorio: Hey, I got a ... what do you call it, um, a 380 pistol but it's, it's, it looks like a Mac–10, with a silencer.

---

**112.** Government firearms expert Geoffrey Descheemaeker ("Descheemaeker"), testified that the machine gun had a partially obliterated serial number and that no records existed, nor could they have existed, for the lawful transfer of such firearm. Trial Tr. at 2703–14.

**113.** Descheemaeker, testified that the serial number on the .38 caliber revolver which was transferred had been obliterated and that no records existed or could have existed for a lawful transfer. Trial Tr. at 2701–02, 2712–13.

R. Sabol: But, but, I'll take that much.

G. Vittorio: I got to talk to that Benny tonight. I'll be, call me tomorrow morning. I'll be up early. that (UI).

R. Sabol: But, but, I'll take that much.

G. Vittorio: I got to talk to that Benny tonight.

R. Sabol: Can you get that tomorrow? Cause the quicker I get this ...

G. Vittorio: I have ...

R. Sabol: Then we have Christmas for everybody. We don't have to ... worry about robbing and stealing.

G. Vittorio: Let me, I got to talk to the guy Benny tonight (UI) in touch with him, (UI)

149 TR at 59–60.

Another recorded conversation, which references Segarra as a source for firearms, provides:

J. McManus: I heard this story, the guy, an old man he has, you know, 25's with the things, alright? But he loves them. He, he's, those are his toys. He's saving them.

R. Sabol: For what? How old is this guy?

J. McManus: 50 something, but he does a lot of work. Tons of work you know, that's his forte, and and, ah.

R. Sabol: You know this guy he's talking about?

J. McManus: He knows him.

G. Vittorio: Yeah.

J. McManus: Yeah, [t]his, this is his thing. That's it. That's all he's good for.

R. Sabol: (Laughs).

G. Vittorio: He is just an assassin.

J. McManus: Yeah, that's it, and, ah, but he, you know, I got a lot of.

164 TR at 7.

Nonetheless, counsel for Segarra argued, but for Segarra showing up for lunch at the Plaza Diner on 6 January 1994, there was nothing to link Segarra to the crimes charged in the Redacted Superseding Indictment. *See, e.g.,* Trial Tr. at 3411 ("[N]o one expected ... Segarra to show up that day.... Segarra was unknown to anyone prior to January 6, 1994."). According to counsel for Segarra it was unclear that the Benny referenced above was Segarra, rather than some other person named Benny. *Id.* at 3421 ("[I]f some guy named Ben Schwartz had sat down [at the Plaza Diner on 6 January 1994], he would be seated behind me, or Ben O'Reilly. If they dug up Ben Franklin and he walked in there, he would be in this courtroom charged....").[114]

The Government pointed out, however, that a recorded conversation between Sabol and McManus, which discusses Segarra's presence at the Plaza Diner on 6 January 1994, indicated that the Defendants were indeed talking about Segarra in the above references as the source of the silencers and as an "assassin." Trial Tr. at 4436–38. This conversation provided, in relevant part:

R. Sabol: But, you know, I didn't like to be put in this ... trap today with the three other guys, and—

J. McManus: I, yeah, that.

R. Sabol: —and, and, (UI) [a]nd then you got Benny.

J. McManus: Yeah (laughs).

R. Sabol: What the ...!

J. McManus: (Laughs)

R. Sabol: You know what I mean?

J. McManus: Yeah, I know. No.

---

**114.** Besides the remarks made by Defendants, which the Government argued were evidence of the identification of Segarra as the "Benny" referred to as the firearms source, *see infra,* as the Government pointed out remarks made by Capra upon Segarra's arrival at the diner appear inconsistent with the arguments that Segarra was unknown prior to 6 January 1994 and that he simply showed up unexpectedly for a "grilled cheese sandwich." Trial Tr. at 4462. The Government contended, Capra invited Segarra to the meeting on 6 January 1994 to go over various proposals, and Segarra arrived late. *Id.* at 4462. The Government argued this was demonstrated by Capra's apparent reprimand when Segarra arrives: " 'Everybody's got to come on time.' " *Id.* (quoting 206 TR at 23). The Government pointed out that Segarra then offers an excuse, saying " '[i]t's the traffic.' " *Id.* (quoting 206 TR at 23).

R. Sabol: I don't know if there's to put two in the coconut for me. You know what I mean?

J. McManus: Ah, yeah, I know what you're saying.

R. Sabol: You know—

J. McManus: Well, in the diner you don't have nothing to worry about.

R. Sabol: Yeah, that's what you think.

J. McManus: Just don't take any rides for dinner.

218 TR at 9–10. Viewing the above reference in a light most favorable to the Government, it appears McManus and Sabol were identifying Segarra as the "Benny" who was referred to as the firearms source.

With regard to the charges of selling firearms to a felon, Counts Eight and Nine, the Government pointed out that there were numerous references in evidence which concern the Defendants knowledge of Sabol and his criminal record. Government Rule 29 Brief at 31 n. 9.

 When viewed in a light most favorable to the Government, it is apparent there was sufficient evidence from which a rational trier of fact could find the essential elements of Counts Six through Eleven beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Counts Six through Eleven are denied.

### Stolen Fur Counts—(Counts 12–14)

12. *Count Twelve: Conspiracy to Steal and Transport Stolen Property*

Count Twelve charges that Giampa, Vittorio, Gaito and McManus, in violation of Section 371 of Title 18 of the United States Code,[115]

knowingly and willfully did combine, conspire, confederate and agree with each other, and with others, to:

a. embezzle, steal and unlawfully take and carry away and conceal, and by fraud and deception did obtain, from a storage facility, with intent to convert to his own use, goods and chattels moving as, and which were a part of and which constituted, an interstate shipment of freight, express and property, contrary to Title 18, United States Code, Section 659.

b. transport, transmit and transfer in interstate commerce goods, wares and merchandise having a value of more than $5,000, knowing that the goods, wares and merchandise was stolen, converted and taken by fraud, contrary to Title 18, United States Code, Section 2314.

c. receive, possess, conceal, store, barter, sell and dispose of goods, wares and merchandise having a value of more than $5,000, which have crossed a [s]tate boundary after being stolen, unlawfully converted and taken, and knowing that the goods, wares and merchandise was stolen, unlawfully converted and taken, in violation of Title 18, United States Code, Sections 2315 and 2.

Count 12, ¶ 2.

13. *Count Thirteen: Transportation of Stolen Property*

Count Thirteen alleges Giampa, Vittorio and McManus, in violation of Sections 2314 and 2 of Title 18 of the United States Code "knowingly and willfully did transport, transmit and transfer in interstate commerce goods, wares and merchandise having a value of more than $5,000, namely, fur coats from Filenes Basement, knowing that [the] fur coats were stolen, converted and taken by fraud." Count 13, ¶ 2.

14. *Count Fourteen: Possession of Stolen Property*

Count Fourteen alleges Giampa, Vittorio and McManus, in violation of Sections 2315 and 2 of Title 18 of the United States Code, "knowingly and willfully did receive, possess, conceal, store, barter, sell and dispose of goods, wares and merchandise having a value of more than $5,000, which have crossed a [s]tate boundary after being stolen, unlawfully converted and taken, and knowing that the goods, wares and merchandise was stolen,

---

115. *See supra* note 106.

unlawfully converted and taken." Count 14, ¶ 2.

Giampa, Vittorio and McManus[116] moved on Counts Twelve through Fourteen; Gaito moved on Count Twelve.

### a. *Giampa's Rule 29 Motion on the Stolen Fur Counts*

Counsel for Giampa contended Sabol instructed other defendants not to tell Giampa about the alleged conspiracy to steal and transport stolen property and that there was no evidence of Giampa's involvement in such conspiracy. Trial Tr. at 2881; Giampa Rule 29 Brief at 2 ("[Giampa] never discussed with any co-defendants any crimes alleged in Counts 13, 14 and 15. These charges are without any factual foundation whatsoever."). Counsel for Giampa argued the only evidence of Giampa's involvement in the substantive allegations concerning the stolen furs was that Sabol was instructed to give Giampa $500.00 and inform him that it was from the stolen furs. Trial Tr. at 2882. Also, counsel for Giampa contended the furs were allegedly sold for $2,000.00 not for more than $5,000.00 as charged. *Id.*

### b. *Vittorio's Rule 29 Motion on the Stolen Fur Counts*

Counsel for Vittorio contended there was no evidence that the defendants charged in Counts Twelve through Fourteen had anything to do with the stolen fur coats other than the four coats which actually moved in interstate commerce. Vittorio Rule 29 Brief at 6–8. Additionally, counsel for Vittorio argued the $5,000.00 minimum has not been established. *Id.*; Trial Tr. at 2911.

### c. *Gaito's Rule 29 Motion on the Stolen Fur Counts*

Counsel for Gaito, with regard to Count Twelve, contended there was no evidence that Gaito was aware the merchandise was stolen. Trial Tr. at 2906; Gaito Rule 29 Brief at 3–4. "In fact, at various times [Gaito] was repeatedly assured that it was legitimate." Trial Tr. at 2906. Additionally,

counsel for Gaito argued that the evidence has failed to establish that the value of the merchandise exceeded $5,000.00. *Id.*; Gaito Rule 29 Brief at 3–4.

Government Exhibit 25 is a handwritten inventory list of the 230 furs stolen from Filenes Basement. Trial Tr. at 3162. The inventory list categorizes the coats and indicates their value. *Id.* As the Government pointed out, from the inventory list the furs were valued at $761,000.00. *Id.* at 3163.

With regard to Giampa, the Government pointed out that "his willing acceptance of $500 as his cut, ... or tribute from the sale of those fur coats demonstrates his involvement in that scheme and support ... [Counts Twelve through Fourteen] going to the jury." *Id.* at 3134. In a recorded conversation, on 6 January 1994, McManus and Sabol discussed the amount of to be paid to Giampa and Vittorio from the fur coats:

R. Sabol: I'll hold 5. I'll give him 5, and the father 5.

J. McManus: Right.

R. Sabol: Okay?

J. McManus: Alright.

R. Sabol: 'Cause out of the 5 that I'm giving Gerry. I'm giving his brother Joey a 100 for going to put this together.

J. McManus: Right.

213 TR at 9.

At a meeting later that evening at Truffles Restaurant in Fort Lee, New Jersey, Sabol and Giampa discussed the stolen fur coat scheme and Giampa's payment of $500.00 from such scheme:

R. Sabol: I dropped them off. I went down. I seen the guy. "Oh, yeah, Rich," he said, "They'll probably take the coats." I says, "Okay. Give me a 150, 160,000 for the jackets." The guy only wants $100,000 for the coats, there worth a million and something, and ah, retail about 600 wholesale or whatever.

J. Giampa: Yeah.

---

**116.** Counsel for McManus joined in with counsel for Vittorio as to Counts Twelve through Four- teen. Trial Tr. at 2918.

R. Sabol: So, that's all he wants. I says, fine. I give it to the guy, and now all of a sudden Jimmy and Ger, "Ah, where's, now where's, the money I, ah," I says . . . you got to wait. Now, they're trying to pressure me to sell the, the, coats. They gave me 4, 4 jackets as samples, so, he says, "Just, . . . get 500, 400 a coat." I got the money. I give you your 5, ha. I give them their 5 . . . .

J. Giampa: Yeah.

217 TR at 19.

The above reference to what the furs were worth compared with what Sabol was trying to sell them for was a clear indication that Giampa knew the furs were stolen. Trial Tr. at 4447–48.

Vittorio's share from the fur coat scheme, as discussed in the above quoted reference, was further discussed between Sabol and Giampa:

J. Giampa: Who, Gerry?

R. Sabol: Yeah, I told him I'd give him some money from, you know, from this thing . . . .

J. Giampa: You got money for Gerry tonight you supposed to give him?

R. Sabol: Yeah, I was gonna give it to him. But he's gotta pay his rent.

J. Giampa: Give it to me, I'll give it to him.

217 TR at 23–24.

According to the Government, the evidence establishes that Vittorio and McManus delivered four coats to Sabol on 29 December 1993. Trial Tr. at 3163–64. The above recorded discussion between Sabol and Giampa was an example of such evidence as Sabol discussed the delivery of the four coats from McManus and Vittorio. 217 TR at 19 (Sabol to Giampa: "Jimmy and Ger, 'Ah, where's, now where's, the money I, ah,' I says . . . you got to wait. Now, they're trying to pressure me to sell the, the, coats. They gave me 4, 4 jackets as samples . . . .").

The Government argued that while Gaito was not specifically involved in the fur coat scheme, his involvement in the conspiracy to steal and transport stolen property was evidenced by his conspiring to distribute other merchandise described by Sabol as stolen. Trial Tr. at 3133; Government Rule 29 Brief at 13–14 (citing 152 TR at 76 as an example of Sabol explaining to Gaito, at a meeting with Vittorio, McManus and Fatato, that merchandise he provided to Gaito was stolen). Further, the Government pointed out that there were taped references to Gaito giving money to Giampa from the sale of property, which they both believed was stolen. Government Rule 29 Brief at 14 (citing 140 TR at 8).

 When viewed in a light most favorable to the Government, it is apparent there was sufficient evidence from which a rational trier of fact could find the essential elements of Counts Twelve through Fourteen beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Abner*, 35 F.3d at 253; *Freter*, 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Counts Twelve through Fourteen, are denied.

15. *Count Fifteen: Conspiracy to Transport Stolen Vehicles*

Count Fifteen alleges Giampa, Vittorio, McManus, Segarra, Porco and Capra, in violation of Section 371 of Title 18 of the United States Code,[117] "knowingly and willfully did combine, conspire confederate and agree with each other, and with others, to transport, in interstate and foreign commerce, motor vehicles, knowing that the motor vehicles were stolen, contrary to Title 18, United States Code, Section 2312." Count 15, ¶ 2.

Giampa, Vittorio, Segarra, Porco and Capra moved on Count Fifteen.[118]

a. *Giampa's Rule 29 Motion on Count Fifteen*

Counsel for Giampa contended that there was no conspiracy established. Trial Tr. at 2883. According to counsel for Giampa: "[T]here was no intention and absolutely no

---

117. *See supra* note 106.

118. It appears counsel for McManus did not move on Count Fifteen because there was no mention of this count on the record during discussion of McManus' Rule 29 Motion. *See* Trial Tr. at 2915–19. Additionally, Count Fifteen was not briefed. *See* McManus Rule 29 Brief.

contention even by [Sabol] that ... Giampa was involved or that it was ever discussed with ... Giampa any type of transportation of stolen vehicles." *Id.; see* Giampa Rule 29 Brief at 2.

### b. *Vittorio's Rule 29 Motion on Count Fifteen*

Counsel for Vittorio contended "the evidence [was] insufficient to show that [Vittorio] entered into any conspiracy to transport stolen vehicles. If there was a conspiracy, [Vittorio's] participation was not proven...." Trial Tr. at 2911; Vittorio Rule 29 Brief at 8.

### c. *Segarra's Rule 29 Motion on Count Fifteen*

Counsel for Segarra argued: "In view of the fact that no coconspirator spoke about ... Segarra in connection with Counts One, Fifteen and Sixteen, the Government can only point to ... Segarra's appearance on January 6, 1994 at the Plaza Diner and speculate [as to why he was there]...." Segarra Rule 29 Brief at 4. Accordingly, counsel for Segarra contended Segarra's Rule 29 Motion should be granted as to Counts One, Fifteen and Sixteen. *Id.*

### d. *Porco and Capra's Rule 29 Motions on Count Fifteen*

According to counsel for Porco, in the recorded conversation on 6 January 1994, which was the only meeting Capra and Porco had together with Sabol, there was no reference "either directly or indirectly, that supports the notion that ... Capra and ... Porco agreed to export stolen vehicles, or to have anything to do with stolen vehicles...." Trial Tr. at 2921. Further, counsel for Porco contended any discussions Capra and Porco may have had regarding automobiles "involved the legitimate, legitimate purchase of the vehicles for export abroad." *Id.* at 2922 (citing Trial Tr. at 2512, 2515–16).

Counsel for Capra argued there were no references to stolen vehicles in this case. *Id.* at 2930. Counsel for Capra contended McManus, at one point says "we're going to go buy vehicles," and when McManus "reports to ... Giampa ... he doesn't mention stolen vehicles." *Id.*

The first reference to importing or exporting automobiles appears in a meeting between Vittorio, McManus, Porco and Sabol:

> E. Porco: Yeah, I'm gonna meet someone tomorrow that has, ah, usually keeping, um, he's Lebanese and he's, he's, going to import/exporting Jeeps, Cherokee Jeeps to the communist countries. And, I don't even know the number he's been doing, but he's doing like maybe 2 or 300 a month. I mean he's doing this with big numbers.

171 TR at 27.

As the Government pointed out, the proposal concerning the transportation of stolen vehicles was further explained by Capra at the 6 January 1994 meeting at the Plaza Diner in the presence of Porco and Segarra:

> J. Capra: I got a guy strictly from Lebanese, goes right into the country. He has, he can ship anything (UI). He don't need a bill of sale. He don't need....
>
> R. Sabol: He, he's clear with the ports, and all that other stuff.
>
> J. Capra: Oh yes, definitely.
>
> ....
>
> R. Sabol: How many cars would this guy be looking to take?
>
> J. Capra: Don't know whatever ...
>
> R. Sabol: Does it matter what type of cars you want to ship over there, they gotta be new, or they gotta be used.
>
> J. Capra: No, they have to be used.
>
> R. Sabol: No new cars.
>
> ....
>
> J. Capra: You gotta take and drive them around. Put a thousand miles on it. (UI)

206 TR at 52–56.

The Government pointed out that, during this 6 January 1994 meeting, Capra gave Sabol the authority to deal with Porco in the future with regard to the import/export schemes. Trial Tr. at 4473–74. This recorded conversation provided, in relevant part:

> J. Capra: (UI).
>
> R. Sabol: I'll deal with him directly about, go partners with the company.

E. Porco: Yeah (UI).

R. Sabol: Deal directly with you about the company.

E. Porco: Yeah.

206 TR at 59. According to the Government, while counsel for Capra and counsel for Segarra argued there were no further meetings between these defendants and Sabol after 6 January 1994, "it [was] pretty clear from [the above reference], as well as . . . Sabol's testimony, which [was] corroborated by [the above reference], he wasn't supposed to. He was supposed to go through . . . Porco." Trial Tr. at 4474.

 When the evidence in the record is viewed in a light most favorable to the Government, it is apparent a rational trier of fact could find the essential elements of Count Fifteen beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Count Fifteen, are denied.

16. *Count Sixteen: Conspiracy to Establish Gambling Operations*

Count Sixteen alleges Giampa, Vittorio, McManus, Segarra, Porco and Capra, in violation of Section 371 of Title 18 of the United States Code,[119] "knowingly and willfully did combine, conspire, confederate and agree with each other, and with others, to conduct, finance, manage, supervise, direct and own all of and part of an illegal gambling business," as defined in 18 U.S.C. § 1955(b)(1), and contrary to 18 U.S.C. § 1955. Count 16, ¶ 2.

Giampa, Vittorio, Segarra[120], Porco and Capra moved on Count Sixteen.[121]

a. *Giampa's Rule 29 Motion on Count Sixteen*

According to counsel for Giampa, Count Sixteen concerns Bingo, which Sabol ac-

knowledged was legal. Trial Tr. at 2887–88. Counsel for Giampa contended:

[W]e have the unusual situation, the anomaly, if you will, of a Government witness proposing to the defendants that a certain idea and concept is legal and that when it's adopted allegedly by these defendants, then the defendants themselves are accused of conspiring with one another to violate the law. . . . [I]f [Sabol] indicated clearly in cross-examination that he has proffered this in such a way that the idea itself was legal, then the concept of a conspiracy is an impossibility.

*Id.* at 2888; *see* Giampa Rule 29 Brief at 2–3.

b. *Vittorio's Rule 29 Motion on Count Sixteen*

Counsel for Vittorio made a similar argument: "[T]here [was] a fair amount of evidence that much of what was discussed in terms of gambling operations was professed to be legal by . . . Sabol." Trial Tr. at 2912; *see* Vittorio Rule 29 Brief at 8. Counsel for Vittorio argued there was no evidence that Vittorio "conspired or entered into any agreement to do anything illegal with regard to the gambling operations." Trial Tr. at 2912; *see* Vittorio Rule 29 Brief at 8.

c. *Porco's Rule 29 Motion on Count Sixteen*

Counsel for Porco contended that in a meeting on 27 December 1993 Porco "discusses his interest in obtaining a license for beginning bingo and legalizing machines." Trial Tr. at 2923. Further, counsel for Porco argued on 6 January 1994, "when Sabol even suggests that the bingo proposal may be something less than honest, . . . Capra . . . tells Sabol, 'Nobody robs and steals.'" *Id.* (quoting 206 TR at 36).

d. *Capra's Rule 29 Motion on Count Sixteen*

Counsel for Capra contended the only thing Capra agreed to, if anything, on 6

---

119. *See supra* note 106.

120. As indicated, counsel for Segarra made the same argument with respect to Count Sixteen as made with regard to Count Fifteen. Segarra Rule 29 Brief at 4; *see supra* at 338.

121. It appears counsel for McManus did not move on Count Sixteen because there was no mention of this count on the record during discussion of McManus' Rule 29 Motion. *See* Trial Tr. at 2915–19. Additionally, Count Sixteen was not briefed. *See* McManus Rule 29 Brief.

January 1994, was to run bingo through a tax exempt organization. *Id.* at 2930–31. "[T]he only agreement ... Capra could possibly have agreed to on January 6 [was] by its very nature excluded from the gambling laws.... There [was] no other gambling involved on January 6.... Capra sa[id] no to machines ... no to Las Vegas nights." *Id.* at 2931.

The argument that Sabol was going to legalize gambling machines is without merit. As the Government pointed out, the Defendants were aware of Sabol's criminal past and believed during this time period that he was in a work release program. *Id.* at 4459. Additionally, the Government pointed out there was evidence in the record regarding Porco's illegal "slot" machines. Government Rule 29 Brief at 21; 170 TR at 93 (Porco explained that he was talking about "slot" machines); 155 TR at 24–25 (McManus and Vittorio explain to Sabol that Porco's machines in one location made $90,000.00 in one month). Further, McManus and Vittorio tell Sabol that they go on "machine raids" for Porco to collect money from his gambling machines in New York. 149 TR at 63; 152 TR at 112.

The Government argued: "The evidence shows that Capra, Porco, and Segarra intended to expand their illegal gambling operations to New Jersey through a joint venture with Giampa, McManus, Vittorio and Sabol." Government Rule 29 Brief at 22 (citing 188 TR at 6). According to the Government: "Giampa gave Vittorio, McManus, and Sabol permission to proceed with the [gambling] operation and offered protection in the event that they had problems with Capra, Porco, and Segarra." *Id.* (citing 217 TR at 12–13).

As for the argument that bingo is legal, the Government contended the bingo plan discussed was not within the meaning of Section 1955(e) of Title 18, which exempts bingo from the gambling laws when the profits go to a tax exempt charity. Trial Tr. at 4460; Government Rule 29 Brief at 21. The questionable legality of the bingo plan was demonstrated in a conversation Sabol had with Capra and Porco:

> R. Sabol: [W]ell the way we get around it is once you establish the bingo thing, all's we're doing is leasing them the equipment. We charge a lessee's fee which is, say 80% of the profits that you made on the bingo.
>
> E. Porco: The machines will be on the (UI).
>
> R. Sabol: And, everything's, ah, ah, we're allowed to lease them like the bingo chips, the cards.
>
> J. Capra: Right.

206 TR at 16.

 When viewed in a light most favorable to the Government, it is apparent there was sufficient evidence from which a rational trier of fact could find the essential elements of Count Sixteen beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Count Sixteen, are denied.

17. *Count Seventeen: Conspiracy to Make Extortionate Loan*

Count Seventeen alleges Giampa and Vittorio, in violation of Section 371 of Title 18 of the United States Code,[122] "knowingly and willfully did conspire to make a $10,000 extortionate extension of credit." Count 17, ¶ 2.

a. *Giampa's Rule 29 Motion on Count Seventeen*

Counsel for Giampa contended "the $10,-000.00 was clearly something which ... Sabol had submitted to ... Giampa would be an investment in the warehouse which he defined ... as being totally legal to ... Giampa." Trial Tr. at 2883–84. Further, counsel for Giampa argued it was not until the time the money was passed to Sabol by Vittorio that the terms of the loan were mentioned and "Giampa was not involved in the incident at all...." *Id.* at 2884. Additionally, counsel for Giampa argued there was no evidence Giampa adopted the terms of the loan, as described to Sabol by Vittorio, or that Giampa intended to make an extortionate loan. Giampa Rule 29 Brief at 3.

122. *See supra* note 106.

b. *Vittorio's Rule 29 Motion on Count Seventeen*

Counsel for Vittorio contended the $10,-000.00 did not come from Vittorio, but rather he borrowed it from someone. *Id.* at 2912. "[B]ecause the evidence indicates that [Vittorio] and ... Sabol were supposedly responsible for paying [the money] back to whoever had loaned it, ... Vittorio [was] not part of the conspiracy to make an extortionate loan. He [was] one of the people that [was] supposed to pay the money back." *Id.; see* Vittorio Rule 29 Brief at 9.

As the Government explained, there was evidence in the record which established that $10,000.00, which Vittorio transferred to Sabol, came from Giampa. Trial Tr. at 3226. For example, at a meeting on 21 January 1994, Sabol said: "Whatever you want, I, I, be responsible for half of the 5 if you want. I'll make the payment. This way, you know, at least you're getting it from me. You understand Joe?" 274 TR at 21. To this, Giampa replied: "You'll have the ten on Monday." *Id.*

In a conversation between McManus and Sabol on 13 January 1994, McManus indicated that Giampa was the source of the loan and that there would be "juice" or interest owed:

J. McManus: Well, yeah, he said he could get it for us.

R. Sabol: Oh. Did he also, do we got to pay juice on it?

J. McManus: Yeah. We're gonna pay juice on it.

R. Sabol: What a ..., huh?

J. McManus: (Laughs)

R. Sabol: Huh? Charging his own son juice, huh?

241 TR at 15. At a meeting on 24 January 1994, when the $10,000.00 was transferred to Sabol, Vittorio explained that the interest on the loan was a "point" or $100.00 a week:

R. Sabol: See that guy's hat?

J. Giampa: F.B.I. (UI). It's almost like his. Forget about it.

G. Vittorio: The guy's follow (UI). Um

. . .

R. Sabol: Ha.

J. Giampa: I don't think he's following us. What's the difference (UI).

. . . .

J. Giampa: Go in the bathroom with Gerry.

G. Vittorio: Yeah. Follow me to the bathroom.

(R. Sabol and G. Vittorio walk in to bathroom)

G. Vittorio: I got it for a point.

R. Sabol: Huh?

G. Vittorio: Got it for a point.

R. Sabol: How much are the points?

G. Vittorio: Ten dollars a thousand. That ain't bad, right?

284 TR at 12.

As the Government pointed out, a recorded conversation on 24 January 1994, between McManus and Vittorio, demonstrated that it was Giampa who made the decisions with regard to this loan and that it did not appear to be legitimate. Trial Tr. at 3230–31.

G. Vittorio: I don't know. Me and Richie are responsible for the money, so, we're gonna put half in each.

J. McManus: Huh?

G. Vittorio: Me and Richie are responsible for the money.

J. McManus: Yeah, I'll put my end in.

G. Vittorio: Huh? No, no, we'll take care of it.

J. McManus: How come?

G. Vittorio: I don't know. That's what the old man wanted to do.

J. McManus: Yeah?

. . . .

J. McManus: What's the juice on it every week?

G. Vittorio: I, I, don't know. I'll talk to you in person.

J. McManus: Alright.

G. Vittorio: Why do you talk like this on the phone for? You know better.

287 TR at 3.

■ When the evidence in the record is viewed in a light most favorable to the Government, it is apparent a rational trier of fact could find the essential elements of Count

Seventeen beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Count Seventeen, are denied.

18. *Count Eighteen: Conspiracy to Deal in Counterfeit Money*

Count Eighteen alleges Vittorio, in violation of Section 371 of Title 18 of the United States Code [123],

knowingly and willfully did combine, conspire, confederate and agree with others, to buy, sell, exchange, transfer, receive and deliver false, forged, counterfeited and altered obligations of the United States with the intent that such obligations be passed, published and used as true and genuine, contrary to Title 18, United States Code, Section 473.

Count 18, ¶ 2.

*Vittorio's Rule 29 Motion on Count Eighteen*

Counsel for Vittorio contended Sabol wanted samples of counterfeit money and there was no evidence that there was any decision made as to the two counterfeit ten dollar bills referred to in a 25 January 1994 conversation between Vittorio and Sabol. Trial Tr. at 2913. According to counsel for Vittorio, there was "no evidence to indicate that ... Vittorio intended to pass or intended anyone else to pass the two $10 bills that he's talking about in that January 25 conversation[,]" as required by the statute. *Id.*

According to the Government: "The evidence shows that Vittorio conspired with ... Fatato and ... Dorval to deal in counterfeit money.... Fatato told Sabol that he could obtain counterfeit $10 bills. Subsequently, Vittorio told Sabol that he saw Fatato at a club and that Fatato gave him some 'size 10 Reeboks.'" Government Rule 29 Brief at 27 (quoting 303 TR at 7).

The reference to the size ten Reeboks, during the 25 January 1994 conversation at issue between Sabol and Vittorio, appears to be a code for counterfeit $10 bills. Trial Tr.

at 4491. The conversation at issue provides in relevant part:

R. Sabol: Yeah. So, did you see them things though? The Reeboks?

G. Vittorio: Yep. I seen them. He gave me a pair.

R. Sabol: Oh you have? How many do you have?

G. Vittorio: One pair.

R. Sabol: Just one?

G. Vittorio: Yeah.

R. Sabol: Or two?

G. Vittorio: He only had size 10.

. . . .

R. Sabol: Yeah. I, I, I understand that, but what we could do something with them. Alright?

G. Vittorio: I know. I know. But I don't know if I like them, 'cause they're, they're kind of like ... cheap looking.

R. Sabol: Well, I.

G. Vittorio: Yeah, maybe it's 'cause I, maybe it's 'cause I, because I know they're ... bootleg. You know what I'm saying?

R. Sabol: Yeah, well, you know what you do? I, ah, I, I, had the large size. The 100's.

G. Vittorio: No good.

R. Sabol: No I had them. You Know?

G. Vittorio: Yeah.

. . . .

R. Sabol: Hey. Let me see them Reeboks, though tomorrow.

G. Vittorio: Okay.

R. Sabol: Okay? I really want to see that.

G. Vittorio: Good.

303 TR at 5–8; *see also* 290 TR at 3–7 (Fatato described to Sabol the "counterfeit ... 10's" he had and how he was able to pass them off as genuine).

█ When viewed in a light most favorable to the Government, it is apparent there was sufficient evidence from which a rational trier of fact could find the essential elements of Count Eighteen beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at

123. *See supra* note 106.

2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Count Sixteen, are denied.

*The Concealing Evidence Counts (Counts Nineteen and Twenty)*

19. *Count Nineteen: Conspiracy to Conceal Evidence*

Count Nineteen alleges Giampa, Vittorio and McManus, in violation of Section 371 of Title 18 of the United States Code,[124]

did knowingly and willfully combine, conspire, confederate and agree with each other, and with others, to corruptly persuade [Sabol], and engage in misleading conduct toward Sabol, with intent to 1) influence, delay and prevent Sabol's testimony in an official proceeding; 2) cause and induce Sabol to conceal an object, namely, $10,000 in U.S. currency, with intent to impair the integrity and availability of the currency for use in an official proceeding; and 3) hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission of a Federal offense, contrary to Title 18, United States Code, Section 1512(b).

Count 19, ¶ 2.

20. *Count Twenty: Attempt to Conceal Evidence*

Count Twenty alleges Giampa, Vittorio and McManus

did knowingly and willfully corruptly persuade [Sabol], and engage in misleading conduct toward Sabol, with intent to 1) influence, delay and prevent Sabol's testimony in an official proceeding; 2) cause and induce Sabol to conceal an object, namely, $10,000 in U.S. currency, with intent to impair the integrity and availability of the currency for use in an official proceeding; and 3) hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission of a Federal offense. In violation

of Title 18, United States Code, Section 1512(b) and 2.

Count 20, ¶ 2.

a. *Giampa's Rule 29 Motion on Counts Nineteen and Twenty*

Counsel for Giampa contended, although Vittorio and McManus may have spoke to Sabol, there was no evidence that Giampa had any contact with Sabol after 24 January 1994. Trial Tr. at 2885. According to counsel for Giampa, the only proof that might suggest Giampa's involvement in this conspiracy was Vittorio's acknowledgement to Sabol that he had talked to Giampa. *Id.* at 2886. Counsel for Giampa argued: "[T]he most that's ever, that's ever proven with respect to [Giampa] that involves any of the conspiracies is simply his alleged knowledge of the incidents.... [This] is not enough and does not suffice as proof of the conspiracy...." *Id.*

b. *Vittorio's Rule 29 Motion on Counts Nineteen and Twenty*

Counsel for Vittorio contended there was no evidence in the record, beyond an attempt to get the $10,000.00 back from Sabol, which would indicate an intention to obstruct the investigation in this case. *Id.* at 2907. According to counsel for Vittorio, if the attempt to get the money back was so it could not be admitted in evidence at trial, Vittorio "surely would have asked for the return of the same $10,000 previously given to Sabol." Vittorio Rule 29 Brief at 10. Further, counsel for Vittorio argued even if the money had been returned there would have no obstruction of the investigation because "the money was photographed right after being received[,]" and those photographs were entered in evidence. Trial Tr. at 2907; Vittorio Rule 29 Brief at 10–11.

c. *McManus' Rule 29 Motion on Counts Nineteen and Twenty*

Counsel for McManus contended "McManus' continued discussions with ... Sabol, knowing he was an informant [was] an act of stupidity, not concealment." McManus Rule 29 Brief at 4. Further, counsel for McManus

---

**124.** *See supra* note 106.

argued there was no evidence that McManus ever asked for the money back or that he conspired to or attempted to impair the investigation of this case. *Id.*

On 27 January 1994, Vittorio attempted to get the $10,000.00 back from Sabol:

G. Vittorio: Remember that thing I gave you in the bathroom?

R. Sabol: Yeah.

G. Vittorio: Get that back for me for a couple of days. I'll get it back to you Monday. Okay?

R. Sabol: I can't do that, mo.

G. Vittorio: Why?

R. Sabol: Because I gave 4,000 to the realtor.

G. Vittorio: Get it back from him.

316 TR at 3. According to the Government, at this point Vittorio believed Sabol was an informant. Trial Tr. at 3246. Additionally, the Government contended Vittorio "probably [knew] the [above] conversation [was] being recorded. So he[ ] [was] very conscious now about trying to insulate his father from further exposure." [125] *Id.*

The above conversation, which appears to support the Government's contentions, continued as follows:

R. Sabol: Let me talk to your father first. I'm responsible for that.

G. Vittorio: I'm responsible—I, I, my father didn't give that to you. I gave that to you.

R. Sabol: Yeah, but I'm saying we got.

G. Vittorio: I'm responsible for it. Believe me.

R. Sabol: Yeah.

G. Vittorio: Richie, I'm responsible for it. That came from me.

R. Sabol: Yeah.

G. Vittorio: That didn't come from him.

316 TR at 3.

The Government contended, thereafter Vittorio was trying to set up a meeting with Sabol and McManus to get the $10,000.00 back so that the money would be unavailable as evidence in this case. Trial Tr. at 4492. As the Government pointed out, Vittorio called McManus to inform him that the meeting was off:

G. Vittorio: Ah, did you hear form that other party out over, over, the bridge?

J. McManus: No, no.

G. Vittorio: I didn't hear from him either.

J. McManus: No.

G. Vittorio: Ah, you gonna, are you gonna be home? You know what you do, the, the, other friend's beeper number?

J. McManus: Yeah.

G. Vittorio: Beep him and tell him, ah, that it got rained out.

320 TR at 2.

 When the evidence in the record is viewed in a light most favorable to the Government, it is apparent a rational trier of fact could find the essential elements of Counts Nineteen and Twenty beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Counts Nineteen and Twenty, are denied.

*The Travel/Telephone Counts (Counts Twenty–One Through Forty–Six)*

21. *Counts Twenty–One Through Forty–Six: Travel/Telephone Use in Aid of Racketeering*

 Counts Twenty–One through Forty–Six allege the Defendants, with the exception of Capra,

---

**125.** As discussed, there was evidence in the record that the $10,000.00, which Vittorio transferred to Sabol, came from Giampa. At a meeting on 21 January 1994, Sabol said to Giampa: "Whatever you want, I, I, be responsible for half of the 5 if you want. I'll make the payment. This way, you know, at least you're getting it from me. You understand Joe?" 274 TR at 21. To this, Giampa replied: "You'll have the ten on Monday." *Id.; see also* 241 TR at 15 (McManus and Sabol discussing that Giampa was "[c]harging his own son juice [interest]" on the loan); 284 TR at 12 (Vittorio explaining to McManus that he (Vittorio) and Sabol "were responsible for the money, ... [and would] put half in each[,]" and that McManus was not to "put [his] end in" because "[t]hat's what the old man wanted to do").

knowingly and willfully did travel in interstate commerce and use a facility in interstate commerce, and caused the travel in interstate commerce and use of a facility in interstate commerce, with the intent to promote, manage, establish and carry on, and facilitate the promotion, management, establishment and carrying on, of an unlawful activity, and thereafter did perform, attempt to perform, and cause the performance of, an act to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity....
In violation of Title 18, United States Code, Sections 1952 and 2.

Counts 21–46, ¶ 2.[126]

### a. *Giampa's Rule 29 Motion on the Travel/Telephone Counts*

Giampa is charged in Counts Thirty–Six, Forty and Forty-Two with telephone use, and in Count Thirty–Four with interstate travel, in furtherance of gambling activity. Counts 34, 36, 40, 42. Giampa moved on each of these counts. Counsel for Giampa contended, as above, that "there was no illegal gambling." Trial Tr. at 2889. "[S]ince the requisite criminal intent never was established by the Government, these counts must be dismissed...." Giampa Rule 29 Brief at 3.

### b. *Vittorio's Rule 29 Motion on the Travel/Telephone Counts*

Vittorio is charged in Counts Twenty–One and Twenty–Six with telephone use, and in Counts Twenty–Two through Twenty–Five, Twenty–Seven and Twenty–Nine with interstate travel, in furtherance of narcotics activity. Counts 21–27, 29. Also, the Vittorio is charged in Count Forty–Three with telephone use, and Counts Twenty–Nine, Thirty and Thirty–Seven with interstate travel, in

furtherance of gambling activity. *Id.*, Counts 29, 30, 37, 43.

It appears Vittorio only moved as to Counts Twenty–Nine, Thirty and Thirty–Seven.[127] As for Count Twenty–Nine, counsel for Vittorio contended the meeting in question did not concern narcotics as is charged in the Redacted Superseding Indictment. Trial Tr. at 2914. With regard to the allegations of interstate travel in furtherance of gambling activities, as charged in Counts Twenty–Nine, Thirty and Thirty–Seven, counsel for Vittorio contended there was no evidence that Vittorio "participated in or sought to further any sort of illegal gambling in connection with any travel to New Jersey at any time charged in the [Redacted Superseding] [I]ndictment." *Id.* "[T]here [was] insufficient evidence to support the claim that any interstate travel or telephone calls proven here were carried out or furthering of any 'unlawful activity' within the meaning of 18 U.S.C. § 1952." Vittorio Rule 29 Brief at 11.

### c. *Gaito's Rule 29 Motion on the Travel/Telephone Counts*

Gaito is charged in Counts Twenty–Two through Twenty–Five and Twenty–Seven with interstate travel in furtherance of narcotics activity. Counts 22–25, 27. It does not appear that Gaito moved on any of these counts; counsel for Gaito did not so indicate during the discussion on the record of Gaito's Rule 29 Motion. Trial Tr. at 2904–06. Nonetheless, counsel for Gaito contended: "As there [was] insufficient evidence to show underlying criminal conduct, as set forth above, the travel counts must also fail." Gaito Rule 29 Brief at 5.

### d. *McManus' Rule 29 Motion on the Travel/Telephone Counts*

McManus is charged in Counts Twenty–Seven and Twenty–Nine, with interstate

---

**126.** To establish Counts Twenty–One through Forty–Six, the Government is required to prove: "(1) interstate travel or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of the unlawful activity." *United States v. Zolicoffer,* 869 F.2d 771, 774 (3d Cir.) (citing *United States v. Wander,* 601 F.2d 1251, 1255 (3d Cir. 1979)), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3172, 104 L.Ed.2d 1034 (1989).

**127.** Counsel for Vittorio indicated during the discussion of Vittorio's Rule 29 Motions that Vittorio did not move on Counts Twenty–One, Twenty–Two, Twenty–Three, Twenty–Six and Twenty–Seven. Trial Tr. at 2914. There was no mention of the additional Counts in which Vittorio is charged. *See id.*

travel, and Counts Twenty–Eight, Thirty–One, Thirty–Two, with telephone use, in furtherance of narcotics activity. Counts 27–29, 31, 32. Also McManus is charged in Counts Twenty–Nine, Thirty and Thirty–Seven with interstate travel, and Counts Thirty–Eight, Forty–One and Forty–Four through Forty–Six with telephone use, in furtherance of gambling activity. Counts 29, 30, 37, 38, 41, 44–46.

McManus moved on Counts Forty–One, and Forty–Four through Forty–Six. Trial Tr. at 2918–19. Counsel for McManus contended the telephone calls at issue in Counts Forty–One and Forty–Four do not mention any illegal activity, instead they refer to activities such as "bingo," "machines" and "Las Vegas coupons." *Id.* at 2918; *see also* McManus Rule 29 Brief at 4 (arguing, with regard to the telephone call alleged in Count Forty–One, that all McManus said was "right" in discussion about placing machines in New York "whorehouses" and, with regard to the Count Forty–Four, arguing that telephone discussing "betting" was unrelated to any charges in the Redacted Superseding Indictment).

Counsel for McManus argued Count Forty–Five, contained "insufficient evidence with respect to ... a gambling count." Trial Tr. at 2919. Counsel for McManus contended the telephone conversation between McManus and Sabol, charged in Count Forty–Five, only refers to McManus having in the past acquired inside information which proved helpful in betting on professional football. *Id.*; McManus Rule 29 Brief at 5. As for Count Forty–Six, counsel for McManus argued there were no "calls or any evidence whatsoever to support that count." Trial Tr. at 2919; *see also* McManus Rule 29 Brief at 5 (arguing the telephone call alleged in Count Forty–Six concerns McManus placing a bet unrelated to the Redacted Superseding Indictment).

### e. *Segarra's Rule 29 Motion on the Travel/Telephone Counts*

Segarra is charged in Count Thirty–Three with interstate travel in furtherance of gambling activity. Count 33. Segarra moved on Count Thirty–Three. Counsel for Segarra contended "[t]here was nothing discussed in [Segarra's] presence that he agreed to, either directly or indirectly, to an illegal gambling operation being established." Trial Tr. at 2893.

### f. *Porco's Rule 29 Motion on the Travel/Telephone*

Porco is charged in Counts Twenty–Nine and Thirty–Three with interstate travel, and Counts Thirty–Five and Thirty–Nine with telephone use, in furtherance of gambling activity. Counts 29, 33, 35, 39. Also Porco is charged in Count Twenty–Nine with interstate travel in furtherance of narcotics activity. Count 29.

Porco moved on each of these counts. According to counsel for Porco: "Since the Government has failed to prove any of the predicate acts alleged in the [Redacted Superseding] [I]ndictment, ... or the existence of the enterprise, all counts against ... Porco involving travel or the use of the telephone in aid of racketeering should likewise be dismissed." Trial Tr. at 2924.

As the Government pointed out, all that is necessary to establish Counts Twenty–One through Forty–Six is for the jury to "find that ... a particular defendant used the [tele]phone, [or interstate] travel, to promote gambling or narcotics...." *Id.* at 4486. As seen above the numerous recorded telephone conversations and meetings, admitted as evidence in this case, were replete with references to narcotics and gambling.

As is apparent, many of the arguments in favor of dismissal of Counts Twenty–One through Forty–Six, mirrored the arguments discussed above concerning the narcotics and gambling counts in the Redacted Superseding Indictment. Only those arguments, which have not been discussed above in the context of the Rule 29 Motions, with regard to other counts, are addressed here.

With regard to McManus' Rule 29 Motion on Count Forty–Five, a review of the recorded conversation referred to by counsel (276 TR) indicates that there were references to the bingo operation, and not only to prior bets placed on professional football by McManus. *See* Trial Tr. at 2919; McManus

Rule 29 Brief at 5. This recorded conversation between McManus and Sabol provided in relevant part:

> R. Sabol: Ah, now another thing is, ah, I got a meeting with the bingo people Monday morning.
>
> J. McManus: Okay.
>
> R. Sabol: Now, I might ask the father to come there. I'm not sure yet.
>
> J. McManus: Right, well.
>
> . . . .
>
> R. Sabol: And, I told them we're gonna renovate the whole joint.
>
> J. McManus: Right.
>
> . . . .
>
> J. McManus: Well, if he, you know, how we could do that without any money out of our pocket?
>
> R. Sabol: What?
>
> J. McManus: We tell Elliot, in order to come in, he, he does these deals like. In order, like, for Elliot to put his machines in a gambling place let's say.
>
> R. Sabol: Yeah.
>
> J. McManus: He'll give the guy a *gift* of $10,000.

276 TR at 14–15.

With regard to Count Forty–Six, the Government contended that, on 24 January 1994, McManus participated in a telephone call, which refers to gambling activity alleged in the Redacted Superseding Indictment. Government Rule 29 Brief at 35. The Government relied on 294 TR for Count Forty–Six, *id.*, rather than 288 TR, which counsel for McManus argued concerns unrelated activity. McManus Rule 29 Brief at 5.

 When viewed in a light most favorable to the Government, it is apparent there is evidence from which a rational trier of fact could find the essential elements of Counts Twenty–One through Forty–Six beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Abner,* 35 F.3d at 253; *Freter,* 31 F.3d at 785. Accordingly, the Rule 29 Motions, with regard to Counts Twenty–One through Forty–Six, are denied.

## III. *Post Trial Motions*

### A. *Declaration of Mistrial as to Dead-locked Counts*

In the instant action the jury commenced deliberations on 12 July 1995.[128] On 27 July 1995, at 3:50 o'clock a.m., during the eleventh day of jury deliberations,[129] the jury indicated that it was deadlocked and additional instructions were given. The jury wrote: "The jury has concluded its deliberation and has reached a decision on all counts; unanimous on 39 counts, not unanimous on seven." Trial Tr. at 4769.[130] In response, the following instruction was given:

> Now, I intend to give [the jury] the charge authorized by the [C]ircuit in *Fioravanti* [*United States v. Fioravanti,* 412 F.2d 407, 416 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969).].
>
> I can take a partial verdict on the 39, tell them to come back tomorrow or just give them the charge, bring them back tomorrow morning and have them continue deliberating. I'll hear you.

Trial Tr. at 4769; *see infra* at 349–350 (reproducing supplemental instructions given and discussing *Fioravanti*). The Government and the defense counsel requested that a partial verdict not be taken at that time. Accordingly, it was explained:

> I'm going to give [the jury] that so-called *Fioravanti* charge, give them the opportunity if they would like to stay and continue deliberating today or it's ten of four now, if they want to go home now and come back tomorrow morning, with a *view* toward deliberating on the seven they have not reached unanimous verdicts.

**128.** The jury began deliberations each day (Monday through Friday) at 9:00 o'clock a.m. and ended at 4:00 o'clock p.m. The jury was given one hour for lunch each day and a ten minute break each morning and afternoon.

The jury was provided with six copies (they were offered twelve) of the transcripts of all audio and video taped evidence admitted. In addition, the jury had most of the audio tapes in the jury room and the equipment necessary to listen to such tapes as they wished. The video tapes, and the few audio tapes which were not in the jury room, were available for review in the courtroom, at the request of the jury. Similarly, physical evidence and trial transcripts were provided upon request. *See infra* note 132.

**129.** On 26 July 1995, the jury did not deliberate because one of the jurors had a family medical emergency. Trial Tr. at 4764–65.

**130.** The Government and counsel for defense were asked:

As I mentioned to you, it is your duty as jurors to consult with one another and to *deliberate with a view towards reaching an agreement, if you can do so without doing violence to your individual judgment.*

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence, with the other members of the jury.

In the course of your deliberations, as I've explained to you, you should not hesitate to reexamine your own views and change your opinion if you are convinced it's erroneous, *but do not surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of other members of the jury or for the mere purpose of returning a verdict.*

I stress to you that you are not partisans. You are judges of the facts in this case. As such, you're to use your good, common sense in being fair and impartial in this case.

I also mentioned to you that when you received the printed form of the instructions I gave to you, that you are not to select any one or fewer than all of the instructions and place any undue emphasis on such instructions. You are to take those instructions to be a whole package and to apply them to the facts as you found the facts to be in this case.

*I also pointed out to you that you had to consider each count separately and you had to consider and have to consider each defendant separately.*

I pointed out to you that I could not accept non-unanimous verdicts. Such is not legal.

Now, I'm going to give you the option, if you would like to continue deliberating today with regard to the verdicts you have not reached unanimity or come back tomorrow morning.

If you want to continue today, we can, If you want to come back tomorrow, that's what we'll have to do.

Trial Tr. at 4770.

Non-unanimous verdicts cannot be accepted.

I'll excuse you and send me another note if you want to continue or go home how. Go back to the jury room.

*Id.* at 4770–72 (emphasis added). The jury was excused for the day, and instructed to return the following day to resume deliberations, after the jury wrote: "Jury wishes to stop deliberation for today and start again on Friday." *Id.* at 4773–74.

The following morning, prior to deliberations, the jury was again instructed as follows:

As I mentioned to you yesterday, and I just want to go over briefly with you, it's your duty as jurors to consult with one another and to *deliberate with a view toward reaching an agreement, if you can do so without violence to your individual judgment.*

Each of you must decide the case yourself, but do so only after impartial consideration of all of the evidence in the case with the other members of the jury.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if you are convinced it's erroneous, *but do not surrender your honest conviction as to the weight or the effect of the evidence because of the opinion of other members of the jury or for the mere purpose of returning a verdict.*

As I've stressed to you, you are not partisans. You are judges of the facts. You are to use your own good common sense in being fair and impartial.

As I mentioned to you several times, you're not to select one or fewer than all of these charges I've given to you and that you have in the jury room and place any undue emphasis on such charge or charges. You're to use the charges as a whole package.

Apply those instructions to the facts as you find the facts to be. You're to consider each defendant individually and each count as to each defendant individually.

Now, I ask that you retire to the jury room [and] recommence your deliberations. . . .

Thank you.

*Id.* at 4788–89 (emphasis added).

In lieu of an *Allen* charge,[131] the Third Circuit has suggested that, "if there is any disposition to instruct jurors to consult with others in the deliberative process," trial judges should use the following charge:

It is your duty, as jurors, to consult with one another, and to deliberate with a view toward reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

*Fioravanti,* 412 F.2d at 420 n. 32 (quoting Mathes & Devitt, *Federal Jury Practice and Instructions* ¶ 79.01 (1965)).

The supplemental instructions in this case deliberately tracked the language suggested by the Circuit in *Fioravanti.* Jurors were instructed to deliberate with a view toward reaching an agreement, *only* if they could "do so without violence to [their] individual judgment." Trial Tr. at 4788, 4770; *see Fioravanti,* 412 F.2d at 420 n. 32. In addition, jurors were specifically cautioned *not* to

surrender their individual judgments "solely because of the opinion of other members of the jury or for the mere purpose of returning a verdict." *Id.* at 4771, 4789.

On 2 August 1995, after the fifteenth day of deliberations, the jury was advised that if they wished the deliberating hours could be extended each day. The jury was instructed as follows:

Ladies and gentlemen, before we go for the evening, I want to point out to you that should you decide to do so, you have the right to extend your day by either starting earlier or staying later or doing both. That's up to you. I assume you'll let me know if you want to do that.

*Id.* at 4826; *see also id.* at 4833 ("Now, it's five to four. I want to give you the option to go back, you're certainly welcome to do so or end for the day and come back tomorrow morning."). The hours of deliberation, however, were never extended because the jury did not express the desire to do so.

In the afternoon on 7 August 1995, the eighteenth day of deliberations, a note was received from the jury stating: "Jury is unable to reach unanimous decision on all 46 counts. We are hopelessly deadlocked. Present position is unanimous on 34 counts, unable to agree on 12 counts."[132] *Id.* at 4849.

At this point counsel for Giampa moved for a mistrial on all counts of the Redacted Superseding Indictment. *Id.* at 4850–51. When asked what the basis was for such request, counsel for Giampa responded:

Well, they're hopelessly deadlocked. They say that. The jury is unable to reach

---

131. An *Allen* charge, *see Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), is a "device to generate verdicts, and thus eliminate hung juries." *Fioravanti,* 412 F.2d at 416. An *Allen* charge essentially instructs a juror "to distrust his own judgment if he [or she] finds a large majority of jurors taking a view different from his [or her]." *Id.* at 420. In the Third Circuit, the giving of an *Allen* charge is "normally reversible error." *Id.; accord United States v. Graham,* 758 F.2d 879, 883 (3d Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985).

132. The two notes received from the jury concerning their deadlock, were two among almost

two dozen communication received from the jury. Some of the communications sought explanations of legal terms or other aspects of the jury charge. Additionally, the jury requested to view seven video tapes and two audio tapes, which were not available for their review in the jury room. Also the jury requested to examine physical evidence such as the ten thousand dollars in cash, two firearms and an ounce of heroin. Upon request, the jury was also provided with copies of hundreds of pages of trial transcript concerning the testimony of Government expert McCabe, a witness for Giampa and the cross examination of Sabol by counsel for Giampa and Capra.

unanimous decision on all 46 counts. We're hopelessly deadlocked. Present position is unanimous on 34 counts, unable on 12 counts.

I'm not so certain what that means and I'm not so clear on what that means, and as far as I'm concerned, what it really means, given the context of the charges, and I'm not so sure what the verdicts are so it's hard for me to articulate my position, but one thing is clear, my position is as to all counts for all defendants I move for a mistrial.

*Id.* at 4851. After being asked again what the basis was for the instant request, counsel for Giampa explained: "Inability to decide the case, your Honor, with respect to all counts." *Id.* The request for mistrial as to all counts was denied. *Id.*

The jury was then brought into the courtroom and given the following instruction:

Let me mention something to you and ask you a question. I want you to respond to me from the jury room.

Now, you communicated that you're not unanimous as to a certain number of counts. If any of those counts charge more than one defendant, you should be aware that it is possible for you to be unanimous as to one or more defendants in a count but not as to all defendants in that count. If you are unanimous as to one or more defendants but not as to all defendants in a count, then the verdict sheet should reflect which defendants you are unanimous on.

Now, in light of where we are at this point, I'm going to ask that you go back to the jury room and communicate with me through a note as to whether additional time would assist you in breaking your deadlock. Just respond to me in light of what I've just told you.

Thank you.

*Id.* at 4853–54.

Shortly thereafter, the jury wrote: "The jury has made a decision on all defendants for all counts. We do not need any additional time." *Id.* at 4856. The jury was then brought into the courtroom and the following was inquired of the foreperson:

Q Has the jury reached unanimous verdicts on all counts on all defendants?

A Not on all defendants.

Q You have reached unanimous counts?

A Yes.

It does not make sense to deliberate further.

*Id.* The verdict was then taken.

The jury was unable to reach a unanimous decision as to Giampa on Counts One, Two, Five, Twelve, Fifteen and Seventeen. *Id.* at 4857–65. Giampa was found not guilty on Counts Thirteen, Fourteen, Nineteen and Twenty. *Id.* at 4863–65. Giampa was found guilty on Counts Sixteen, Thirty–Four, Thirty–Six, Thirty–Seven, Forty, Forty–Two. *Id.* at 4864–68.

The jury was unable to reach a unanimous decision as to Vittorio on Counts One, Two, Seventeen and Eighteen. *Id.* at 4857–65. Vittorio was found not guilty on Counts Nineteen through Twenty–Two and Thirty. *Id.* at 4865–67. Vittorio was found guilty on Counts Three, Four, Five, Six, Seven through Eleven, Twelve, Thirteen through Sixteen, Twenty–Three through Twenty–Seven, Twenty–Nine, Thirty–Seven and Forty–Three. *Id.* at 4858–68.

The jury was unable to reach a unanimous decision as to Gaito on Count One. *Id.* at 4857. Gaito was found not guilty on Count Twenty–Two. *Id.* at 4866. Gaito was found guilty on Counts Three, Four, Six, Seven through Eleven, Twelve, Twenty–Three through Twenty–Five and Twenty–Seven. *Id.* at 4858–66.

The jury was unable to reach a unanimous decision as to McManus on Counts One and Two. *Id.* at 4857–58. McManus was found not guilty on Counts Six, as to paragraph A, C and D, Seven through Eleven, Nineteen, Twenty and Thirty. *Id.* at 4859–62, 4865, 4867. McManus was found guilty on Counts Three, Four, Five, Six, as to paragraph B, Twelve, Thirteen through Sixteen, Twenty–Seven through Twenty–Nine, Thirty–One, Thirty–Two, Thirty–Seven, Thirty–Eight, Forty–One and Forty–Four through Forty–Six. *Id.* at 4858–64, 4866–69.

Segarra was found not guilty on Counts One, Six, Seven, Nine, Eleven, Fifteen, Sixteen and Thirty–Three. *Id.* at 4857–65, 4867.

The jury was unable to reach a unanimous decision as to Porco on Counts One, Five, Sixteen, Twenty–Nine, Thirty–Three, Thirty–Five and Thirty–Nine. *Id.* at 4857–59, 4864–65, 4867–68. Porco was found not guilty on Count Thirty. *Id.* at 4867. Porco was found guilty on Count Fifteen. *Id.* at 4864.

The jury was unable to reach a unanimous decision as to Capra on Counts One, Five, and Sixteen. *Id.* at 4857–59, 4864–65. Capra was found guilty on Count Fifteen. *Id.* at 4864.

After taking the verdict the jury was discharged. *Id.* at 4871. There were no objections raised by defense counsel to the discharge of the jury which, as indicated, was deadlocked on portions of twelve counts.

In the context of a double jeopardy analysis, the Supreme Court has explained:

> At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial. The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the court have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial.

*Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978) (footnote omitted).

In *Richardson v. United States,* 468 U.S. 317, 326, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984), the Court "reaffirm[ed] the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected." The trial court in *Richardson* declared a mistrial as to the counts which the jury was unable to reach a verdict. *Id.* at 319, 104 S.Ct. at 3082–83. Rejecting the defendant's double

jeopardy argument concerning retrial on the undecided counts, the *Richardson* Court explained:

> It has been established for 160 years, since the opinion of Justice Story in *United States v. Perez,* 9 Wheat 579 [6 L.Ed. 165] (1824), that a failure of the jury to agree on a verdict was an instance of "manifest necessity" which permitted a trial judge to terminate the first trial and retry the defendant because "the ends of public justice would otherwise be defeated."

*Id.* at 323–24 (quoting *Perez,* 9 Wheat at 580); *Console,* 13 F.3d at 663; *accord United States v. McKoy,* 591 F.2d 218, 222 (3d Cir. 1979).

■ "The trial judge's decision to declare a mistrial when he considers the jury deadlocked is ... accorded great deference by a reviewing court." *Arizona,* 434 U.S. at 510, 98 S.Ct. at 832. Although trial judges have "significant discretion in deciding to discharge juries which appear to have become hopelessly deadlocked," there are limits placed on such discretion. *United States ex rel. Webb v. Court of Common Pleas,* 516 F.2d 1034, 1041 (3d Cir.1975). According to the Circuit:

> Early in the history of the Fifth Amendment Mr. Justice Story declared in [*Perez* ] that if the accused is to be reprosecuted, the trial court must exercise a "sound discretion" in discharging a jury which has not reached a verdict. "To be sure," he said, "the power [to dismiss the jury] ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious reasons."

*Id.* The *Webb* court, reversing the denial of a writ of habeas corpus based on the premature discharge of a deadlocked jury, explained that "the absence of a unanimous verdict after approximately six and one-half hours of deliberations is not irreconcilable with the jury's ability to arrive at a unanimous verdict within a reasonable time." *Id.* at 1044.

"No mechanical formula exists for weighing the length of the deliberations relative to the length of the trial." *United States v. Crosley,* 634 F.Supp. 28, 33 (E.D.Pa.1985), *aff'd,* 787 F.2d 584 (3d Cir.1986). In *Crosley,*

the jury had deliberated more than ten hours over two days, which the court held was "a sufficient period of time." *Id.* The *Crosley* court explained:

> Most significant, however, is the fact that the deliberations were lengthy enough for the jury to return a verdict on 14 of 23 counts presented to it, and to twice report an impasse on the remaining nine counts. Thus, th[e] jury had clearly deliberated long enough to resolve all the issues presented to it, to render whatever verdicts it was able to, and to determine its collective judgment.

*Id.*

In the instant case the jury was discharged after almost eighteen days of deliberations and only after it indicated it was "hopelessly deadlocked" as to portions of twelve counts. Trial Tr. at 4849. As discussed, the jury first indicated it was deadlocked, after the eleventh day of deliberations, writing it had "concluded its deliberation and has reached a decision on all counts; unanimous on 39 counts, not unanimous on seven." *Id.* at 4769. The jury was twice given instructions consistent with those given by the Circuit in *Fioravanti. Id.* at 4770–72, 4788–89.

The jury had more than enough time to deliberate and review the evidence, most of which was at there disposal in the jury room. *See supra* note 128. Moreover, as mentioned, during deliberations the jury requested to review hundreds of pages of trial transcripts; numerous audio and videotaped evidence, which they did not have in the jury room; and physical evidence such as cash, narcotics and firearms. *See supra* note 132.

The time expended by the jury, and the wealth of evidence they reviewed, evidenced the care with which they deliberated and their extraordinary efforts to reach agreement. In the end, despite their best efforts, the jury was able to reach unanimous verdicts, as to all defendants, charged in thirty-four of the forty-six counts, while failing to reach unanimous verdicts, as to particular defendants, charged in the remaining twelve counts. *C.f. Crosley*, 634 F.Supp. at 33 (holding that ten hours over two days was "a sufficient period of time" and explaining that "[m]ost significant ... [was] the fact that the deliberations were lengthy enough for the jury to return a verdict on 14 of 23 counts presented to it, and to twice report an impasse on the remaining nine counts").

■■■ The indication from the jury, after almost eighteen days of careful deliberation, that they were "hopelessly deadlocked," Trial Tr. at 4849, and that additional time would not assist them in breaking the deadlock, *id.* at 4856, was "an instance of 'manifest necessity,'" which warranted discharging the jury. *Richardson*, 468 U.S. at 323–24, 104 S.Ct. at 3085 (quoting *Perez*, 9 Wheat at 580). Accordingly, a mistrial is granted as to the portions of the twelve counts in which the jury was unable to reach unanimous verdicts.[133]

### B. *Motions for Judgment of Acquittal Under Rule 29(c)*

After the verdict was taken, defense counsel indicated they intended to make additional motions for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(c) (the "Rule 29(c) Motions"). Trial Tr. at 4887. With regard to the Rule 29(c) Motions, it was explained that such motions were expected, along with supporting briefs (the "Rule 29(c) Briefs"), by the close of business on 14 August 1995.[134] *Id.* at 4889.

Rule 29(c) provides:

---

**133.** On 15 August 1995, the Government submitted an application and order of dismissal of the charges the jury was unable to reach a unanimous decision.

**134.** Giampa, Vittorio, Gaito, McManus, Porco and Capra filed Rule 29(c) Motions. In support of the Rule 29(c) Motions the following was submitted: letter-brief in support of Giampa's Rule 29(c) Motion, dated 14 August 1995 (the "Giampa Rule 29(c) Brief"); letter-brief in support of Vittorio's Rule 29(c) Motion, dated 14 August 1995 (the "Vittorio Rule 29(c) Brief"); Memorandum in Support of Post–Conviction Motions Filed on Behalf of Joseph Gaito, dated 14 August 1995 (the "Gaito Rule 29(c) Brief"); letter-brief in support of McManus' Rule 29(c) Motion, dated 11 August 1995 (the "McManus Rule 29(c) Brief").

On 15 August 1995, counsel for Capra submitted a Memorandum of Law in Support of Capra's and Porco's Motions for Judgments of Acquittal and Bail Pending Sentence and Appeal (the "Capra and Porco Post–Trial Brief"); Affidavit of

If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court the court may enter judgment of acquittal.

Fed.R.Crim.P. 29(c).

 As indicated, in the initial denial of the Rule 29 Motions, the "test for denial of a judgment of acquittal pursuant to Rule 29 ... is the same as the test for reviewing a claim that the evidence is insufficient to support a conviction." *Abner*, 35 F.3d at 253; *Freter*, 31 F.3d at 785. Further, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden." *Casper*, 956 F.2d at 421; *see McGlory*, 968 F.2d at 321; *Gonzalez*, 918 F.2d at 1132.

As discussed, when reviewing the sufficiency of evidence "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original); *Abner*, 35 F.3d at 253; *Freter*, 31 F.3d at 785. As the Circuit has explained: "[T]he trial court [is] obliged to uphold the jury's verdict unless no rational jury could have concluded beyond a reasonable doubt" that the defendant committed the crimes charged. *Ashfield*, 735 F.2d at 106; *see Obialo*, 23 F.3d at 72 ("The question before us is whether there was substantial evidence upon which a reasonable jury could have based its verdict."); *McGlory*, 968 F.2d at 322.

As the Supreme Court has stated, "such a decision will be confined to cases where the prosecution's failure is clear." *Burks*, 437 U.S. at 17, 98 S.Ct. at 2150; *see Brathwaite*, 782 F.2d at 404. "In making this determination, 'the court must view the evidence and the inferences logically deducible therefrom in the light most favorable to the [Government].... '" *Wright*, 845 F.Supp. at 1055 (quoting *McNeill*, 887 F.2d at 450; *see also Obialo*, 23 F.3d at 71–72 ("In considering [defendant's] argument that there was insufficient evidence to support his conviction on the conspiracy charge, we must view the

---

George L. Santangelo, Esq., counsel for Capra, in support of the Bail Applications and Rule 29(c) Motions of Capra and Porco (the "Santangelo Affidavit"); Affidavit of Bruce Cutler Esq., (the "Culter Aff.") (indicating that he joins in the relief requested by the joint motion of Capra and Porco).

The Santangelo Affidavit appears to violate the prohibitions of Rule 27A of the General Rules Governing the United States District Court for the District of New Jersey ("Rule 27A"), which provides:

Affidavits shall be restricted to statements of fact within the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in affidavits. Legal arguments and summations in affidavits will be disregarded by the court and may subject the affiant to appropriate censure, sanction or both.

Rule 27A. While the Santangelo Affidavit includes statements of fact not within the personal knowledge of the affiant and arguments of the facts and the law, it was nonetheless considered.

With the exception of joining in a submission concerning the joint pre-trial motions of Capra and Porco, *see* Capra and Porco Brief, and the instant joint application of Capra and Porco for post-trial relief, counsel for Porco has not offered any written submissions in this case, despite being given numerous opportunities to do so. In fact, the two joint applications appear to have been drafted by counsel for Capra.

Counsel for Porco never submitted a memorandum of law, never submitted a letter-brief or even a letter, which contained any legal or factual analysis, pertaining to any of the numerous issues which arose at any stage of this case. Also, counsel for Porco did not participate in the Objection Hearings.

Throughout this case, as with the requests for post-trial relief, counsel for Porco has repeatedly declined to submit anything on behalf of his client. Instead, his practice has generally been to indicate by letter or, as done with regard to the requested post-trial relief, by affidavit, *see* Cutler Aff., that he joins in the submissions of Capra.

In opposition to the Rule 29(c) Motions and other post-trial relief sought, the Government submitted a Memorandum of Law in Opposition to Defendants' Motions for Judgment of Acquittal Pursuant to Fed.R.Crim.P. 29(c) and for a New Trial, Pursuant to Fed.R.Crim.P. 33, dated 16 August 1995.

evidence in the light most favorable to the [G]overnment as the verdict winner.").

A jury's verdict need only be supported by a threshold quantum of evidence in order to be sustained. "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *Pungitore,* 910 F.2d at 1129; *see Obialo,* 23 F.3d at 72; *Leon,* 739 F.2d at 891. "Only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt," may a verdict be overturned. *McNeill,* 887 F.2d at 450.

In Giampa's Rule 29(c) Motion, counsel for Giampa reiterated the arguments advanced in the Rule 29 Motion and explained that Giampa "relies upon the [Giampa Rule 29 Brief] which was submitted in support of

[Giampa's] prior applications for judgments of acquittal at the end of the Government's case." Giampa Rule 29(c) Brief at 1. According to counsel for Giampa, with respect to Giampa's conviction on Count Sixteen, "[i]t is submitted that the jury's conviction of ... Giampa was without requisite evidence and is frankly astounding." [135] *Id.* at 2.

With regard to the instant Rule 29(c) Motion, counsel for Vittorio explained that Vittorio would rely on his earlier submissions concerning his Rule 29 Motion. Vittorio Rule 29(c) Brief at 1 (referring to Vittorio Rule 29 Brief). Further, counsel for Vittorio argued the Federal firearm statutes underlying Counts Six through Eleven are unconstitutional [136] or, alternatively, there was insufficient evidence of interstate commerce to justify Vittorio's conviction on Counts Six through Eleven.[137] *Id.* at 4–5.

**135.** Additionally, counsel for Giampa indicated in a "Notice of Motion for a New Trial" (the "Giampa Notice of Motion") that Giampa sought a new trial because the convictions returned against Giampa were "against the weight of the evidence" and because "[t]he gambling operation which was the alleged object to the conspiracy was lawful pursuant to 18 U.S.C. § Section 1955(e)." Giampa Notice of Motion at 2. Such bases for a new trial were considered as part of Giampa's Rule 29(c) Motion and were addressed in connection with Giampa's initial Rule 29 Motion.

Giampa also moved for a new trial because of the admission of various FRE 404(b) material. *Id.* For the reasons stated above concerning the propriety of admission of FRE 404(b) material, *see supra* at 293–297, the instant motion for a new trial is denied.

Moreover, as discussed, with regard to Giampa, as with all of the Defendants, a review of the audio and video taped evidence in this case demonstrates why all of the admitted material was relevant. Without it, it would not have been possible, for example, for the Government to demonstrate how and why the relationships, and resulting trust, between and among the Defendants and Sabol developed. Without this background the existence of the various conspiracies could not have been explained or proved.

**136.** Vittorio relied on *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) for this proposition. "The holding of *United States v. Lopez* renders unconstitutional the statutes under which ... Vittorio was convicted in Counts 6 through 11." Vittorio Rule 29(c) Brief at 5. This argument is without merit. The Supreme Court in *Lopez* struck down the Gun–Free School Zones Act of 1990, 18 U.S.C.

§ 922(q), because the Court found it exceeded Congress' power under the Commerce Clause to control purely intra-state affairs. —— U.S. ——, ——–——, 115 S.Ct. 1624, 1630–31, 131 L.Ed.2d 626. It is unclear how the holding in *Lopez* in any way affects the constitutionality of the statutes Vittorio was convicted of violating in Counts Six through Eleven.

Additionally, counsel for Vittorio argued that in the instant case there was insufficient evidence that the firearms were transferred in interstate commerce. Vittorio Rule 29(c) Brief at 5. It was, however, a fair inference for the jury to make that the firearms, which were delivered to Sabol in New Jersey, came from New York. As indicated, Gaito, McManus and Vittorio, who were involved in the acquisition and delivery of the firearms, were from New York. Also, Gaito was accidently shot in New York while unloading a duffle bag, containing a gun, from the trunk of a car.

**137.** Additionally, Vittorio contended the convictions returned by the jury against Vittorio should be dismissed because of "outrageous" Government conduct. *Id.* at 2–3. This argument was advanced by Gaito prior to trial, seeking to dismiss the Redacted Superseding Indictment for "outrageous" Government Conduct. *See supra* at 269–270; *see also supra* note 36 (explaining that all Defendants were deemed to have joined in all pre-trial motions, as appropriate). For the reasons set forth above denying the motion made by Gaito, the instant motion by Vittorio to dismiss his convictions because of "outrageous" conduct is denied.

Vittorio also moved for a new trial because of the admission of various FRE 404(b) material. Vittorio Rule 29(c) Brief at 4. For the reasons stated above concerning the propriety of admis-

Counsel for Gaito contended Gaito's convictions on Counts Three, Six through Twelve and Twenty–Three through Twenty–Five should be set aside because there is insufficient evidence to support such convictions. Gaito Rule 29(c) Brief at 1–6. The arguments advanced in Gaito's Rule 29(c) Motion, like those of Giampa and Vittorio, mirrored those advanced in support of his previous Rule 29 Motion.[138]

Counsel for McManus argued McManus' convictions on Counts Three, Five, Six, Paragraph B, Fifteen, Sixteen, Forty–One and Forty–Four through Forty–Six "were against the weight of the evidence." McManus Rule 29(c) Brief at 1–3. The arguments relied on in McManus' Rule 29(c) Motion parallel those advanced by McManus in his initial Rule 29 Motion.[139]

Counsel for Capra and Porco contended the convictions of Capra and Porco on Count Fifteen should be set aside because "there was no competent evidence in the record to establish beyond a reasonable doubt that Porco and Capra knew the vehicles that were proposed to be shipped by Sabol, would be stolen." Capra and Porco Post–Trial Brief at 4. The arguments advanced by counsel for Capra and Porco, in their Rule 29(c) Motions, were similar to those advanced in their initial Rule 29 Motions, as well.

For the reasons set forth above, denying the Rule 29 Motions of Giampa, Vittorio,

Gaito, McManus Capra and Porco, the instant Rule 29(c) Motions are denied. McManus is granted leave to submit to the court any further arguments concerning his Rule 29(c) Motion, which his counsel would have advanced had she been available on 15 August 1995. *See infra* at 360–361 & note 147.

### C. *Motions for Bail Pending Sentencing*

After the jury was excused, counsel for Giampa, Gaito, McManus, Porco and Capra moved to continue each client's release on bail pending sentencing (the "Bail Applications").[140] Trial Tr. at 4871–89. After giving defense counsel an opportunity to be heard on the Bail Applications (the "7 August Bail Hearing"), it was explained: "As it stands now, bail is set aside and each of the convicted defendants is remanded forthwith to the custody of the marshals." *Id.* at 4889.

Upon denying the Bail Applications, it was explained that counsel should include a section in the Rule 29(c) Briefs if they wished to renew their Bail Applications. Trial Tr. at 4889. Additionally, by letter of the court, dated 8 August 1995, the parties were informed that they would have a second opportunity to be heard concerning bail at a hearing scheduled for 15 August 1995 (the "15 August Bail Hearing"). *See* transcript of the 15 August Bail Hearing, dated 15 August 1995 (the "15 August Bail Hearing Tr.").[141]

---

sion of FRE 404(b) material, *see supra* at 293–297, the instant motion for a new trial is denied.

**138.** Additionally, Gaito contended the convictions returned by the jury against him should be dismissed because of "outrageous" Government conduct. Gaito Rule 29(c) Brief at 7–10. As discussed, this argument was advanced by Gaito prior to trial, seeking to dismiss the Redacted Superseding Indictment for "outrageous" Government Conduct. *See supra* at 269–270. For the reasons set forth above denying the motion made by Gaito, the instant motion by Gaito to dismiss his convictions because of "outrageous" conduct is denied.

**139.** Counsel for McManus indicated that she would be unavailable for oral argument on McManus' Rule 29(c) Motion or McManus' application for bail and would rely on her prior written and oral submissions. McManus Rule 29(c) Brief at 1. Nonetheless, McManus indicated their might be additional arguments, concerning his post-trial motions, which he sought to ad-

vance through his attorney. *See infra* at 360–361 & note 147.

**140.** Vittorio has been in custody throughout trial and did not make an application for bail post-conviction.

**141.** In support of the Bail Applications, the following was submitted: letter-brief in support of Giampa's bail application, dated 14 August 1995 (the "Giampa Bail Brief"), attaching letter from Giampa's Pretrial Services Officer (the "Pretrial Services Letter"); Capra and Porco Post–Trial Brief; Santangelo Affidavit. Although, Gaito's notice of motion concerning his post-trial motions requested bail pending sentencing, Gaito's Rule 29(c) Brief did not, nor did any other written submission, cover such application.

In opposition to the Bail Applications, the Government submitted a letter-brief, dated 15 August 1995 (the "Government Bail Brief").

Also considered, with regard to the Bail Applications, were the Pretrial Services Reports for Giampa, Gaito, McManus, Porco and Capra.

*1. 18 U.S.C. § 3143(a)*

The Bail Reform Act of 1984 (the "1984 Act") provides, in relevant part:

(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence ... be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under [S]ection 3142(b) or (c)....

(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of [S]ection 3142 [142] and is awaiting imposition or execution of sentence be detained unless—

(A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

(ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

(B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a).

■■■ Section 3143(a) creates a presumption in favor of detention pending sentencing. *Government of Virgin Islands v. Clark*, 763 F.Supp. 1321, 1323 (D.V.I.1991), *aff'd*, 989 F.2d 487 (3d Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 3012, 125 L.Ed.2d 702 (1993); *see also United States v. Miller*, 753 F.2d 19,

Counsel for Vittorio did not submit anything concerning the Bail Applications, despite being given the opportunity to do so. At the 15 August Bail Hearing, counsel for Vittorio indicated that no application was being made on behalf of Vittorio. 15 August Bail Hearing Tr. at 11. As indicated, Vittorio had been in custody throughout the trial.

Counsel for McManus indicated that, while renewing McManus' application for bail, she relied on the arguments advanced at the 7 August Bail Hearing and had "no new information for the [c]ourt." McManus Rule 29(c) Brief. *See infra* at 360–361.

22 (3d Cir.1985) ("The [1984 Act] was enacted because Congress wished to reverse the presumption in favor of bail that had been established under the prior statute, the Bail Reform Act of 1966."); *Bertoli*, 854 F.Supp. at 1157.

"[I]t is the defendant's burden to prove by clear and convincing evidence that he [or she] is not likely to flee or pose a danger to the community." *Clark*, 763 F.Supp. at 1323; *United States v. Strong*, 775 F.2d 504, 508 (3d Cir.1985). The Circuit has explained:

Unlike a defendant who has not yet been convicted and for whom the [1984 Act] gives a presumption for bail except in certain circumstances, *see* 18 U.S.C. § 3142(b), once a defendant has been convicted, albeit not yet sentenced, the burden shifts to defendant. The court "shall order" detention unless the defendant shows by "clear and convincing evidence" that (1) s/he is not likely to flee or (2) pose a danger to the safety of the community or any person therein if released.

*Strong*, 775 F.2d at 505.

In making a determination concerning whether there are conditions of release, which will assure the future appearance of a convicted defendant and the safety of the community, the *Clark* court explained that the factors enumerated in Section 3142(g), regarding bail pending trial, must be considered. *Clark*, 763 F.Supp. at 1323. Section 3142(g) provides that the court must consider available information regarding:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

142. Subsection (f)(1) of Section 3142 provides, in relevant part:

(A) a crime of violence;
(B) an offense for which the maximum sentence is life imprisonment or death;
(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), [or] the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.)....

18 U.S.C. § 3142(f)(1)(A)–(C).

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release....

18 U.S.C. § 3142(g).[143]

### a. *The Risk of Flight*

 The factors to be considered in assessing the risk of flight include: (1) the nature and circumstances of the offense, (2) the defendant's family ties, (3) the defendant's employment status, (4) the defendant's financial resources, (5) the defendant's character and mental condition, (6) the length of defendant's residence in the community, (7) any prior criminal record and (8) any flight or failures to appear in court proceedings prior to or during the time of trial. *Bertoli,* 854 F.Supp. at 1158; *United States v. Lamp,* 606 F.Supp. 193, 200 (W.D.Tex.1985), *aff'd,* 868 F.2d 1270 (5th Cir.1989); *see also* 18 U.S.C. § 3142(g) (setting forth similar considerations with respect to bail pending trial).

### b. *Danger to the Community*

 When assessing danger to the community, "danger may, at least in some cases, encompass pecuniary or economic harm." *United States v. R.G. Reynolds,* 956 F.2d 192, 192 (9th Cir.1992) (denying bail pending appeal to defendant convicted of mail fraud); *see United States v. Provenzano,* 605 F.2d 85, 95 (3d Cir.1979) ("We ... hold that a defendant's propensity to commit crime generally, even if the resulting harm would not be solely physical, may constitute a sufficient risk of danger to come within the contemplation of the Act."); *United States v. Leonetti,* No Crim. 88–003, 1988 WL 61738 at *2 (E.D.Pa. 9 June 1988) (*Provenzano* "instructed that community danger not only meant a crime of physical violence, but also included the commission of future economic crimes as well."); *United States v. Moss,* 522 F.Supp. 1033, 1035 (E.D.Pa.1981) (same), *aff'd,* 688 F.2d 826 (3d Cir.1982); *see also Strong,* 775 F.2d 504, 507 (3d Cir.1985).

### 2. *Inappropriateness of Bail in the Instant Case* [144]

### a. *Giampa*

At the 7 August Bail Hearing counsel for Giampa argued Giampa should be continued on bail pending sentencing, with a reduction of his then current bail restrictions. Trial Tr. at 4873 ("I think at the very least his bail status should continue and I think in all fairness to my client ... that certainly at this point in time he should be permitted to leave the house....").

In further support of Giampa's application for bail, counsel for Giampa contended: "If the Government decides not to re-try [Giampa], then his entitlement to a reduction of the bail and removal of the restrictive bail condi-

---

**143.** As discussed further below, defense counsel only superficially, if at all, addressed these factors. Further, defense counsel offered neither affidavit nor testimony to carry the burden of establishing by clear and convincing evidence that neither risk of flight nor danger to the community would result from granting the Bail Applications.

As mentioned, counsel for Capra did submit an affidavit on behalf of Capra and Porco, which was considered. *See supra* note 134.

**144.** As indicated, with the exception of the Santangelo Affidavit, *see supra* note 134, defense counsel never offered any evidence, by way of affidavit or testimony, to establish by clear and convincing evidence that no risk of flight nor danger to the community would result from granting the Bail Applications.

tions is manifest." Giampa Bail Brief at 2. Further, counsel for Giampa argued: "Assuming that the Government decides to retry ... Giampa, it is submitted that he is entitled to a continuation of his pre-trial status." *Id.* Counsel for Giampa provided no case or statutory support (it appears there is none) for these conclusory statements.

Counsel for Giampa only addressed the risk of flight issue at the 7 August Bail Hearing. Counsel for Giampa argued:

> I think the whole purpose of the bail status is to insure that my client will respond to the process of the court. He always has....
>
> I maintain now that whenever your Honor decides that the sentencing date is, he will be there at the time of sentencing. He has certainly no reason to run, no reason to hide from his wife and family and all those who love him.

Trial Tr. at 4874. Further, counsel for Giampa contended Giampa, has no prior convictions, has lived in New York with his family for twenty-five years and has been employed as a bricklayer and/or shop steward during such period. Giampa Bail Brief at 3. Additionally, counsel for Giampa argued $1.7 million dollars in property was posted by Giampa's friends and family to secure his appearance. *Id.* Also, counsel for Giampa contended the Pretrial Services Letter indicates that Giampa "scrupulously adhered to the bail conditions and cooperated fully ... while on bail awaiting trial." [145] *Id.* at 1, 3.

■■■ Even assuming *arguendo* Giampa established, by clear and convincing evidence, that he was not a flight risk,[146] he did not establish that he was not a danger to the community. His burden is to do so by clear and convincing evidence to defeat the presumption in favor of detention. While counsel for Giampa addressed the danger to the community issue in Giampa's written submis-

sion, the argument advanced was not consistent with Section 3143(a) or case law interpretation:

> Since [Giampa] was already released (with bail conditions) prior to trial, the first issue is whether, given his present convictions, should the pre trial determination by the Magistrate that [Giampa] is not a danger to any person or the community still stand? The answer is clearly in the affirmative. [Giampa] has not now become a danger to the community because he was found guilty of a conspiracy to operate an illegal bingo game and related telephone and travel counts. There are no allegations of violence, threats or any other physically intimidating behavior. Additionally, the [c]ourt was able to observe the demeanor of [Giampa] while on trial and saw that [Giampa], at all times, conducted himself as a gentleman and never detracted from the dignity of the [c]ourt.

Giampa Bail Brief at 2.

■■■ As discussed, however, Section 3143(a) creates a presumption in favor of detention pending sentencing. *Clark,* 763 F.Supp. at 1323; *Miller,* 753 F.2d at 22; *Bertoli,* 854 F.Supp. at 1157. Further, notwithstanding the argument of counsel for Giampa, the analysis of Giampa's bail application is in fact different post-conviction than it was pre-trial. *Strong,* 775 F.2d at 505 ("Unlike a defendant who has not yet been convicted and for whom the [1984 Act] gives a presumption for bail except in certain circumstances, *see* 18 U.S.C. § 3142(b), once a defendant has been convicted, albeit not yet sentenced, the burden shifts to defendant. The court 'shall order' detention unless the defendant [makes the proper showing] by 'clear and convincing evidence....' ").

■■■ Danger to the community does not include only physical harm or violent behav-

---

**145.** According to the Pretrial Services Letter: "Since his release on [26 August 1994], ... Giampa has made a satisfactory adjustment to supervision in that he has complied with the directions of the court without incident." Pretrial Services Letter.

**146.** The Government explained that for the purposes of the Bail Applications, it did not dispute that Giampa, Capra and Porco could "establish

by clear and convincing evidence that they pose little risk of flight." Government Bail Brief at 2. Nonetheless, the Government argued that these defendants did in fact pose a danger to the community. *Id.* at 2–3. Further, the Government indicated that it intended to move for an upward departure at the sentencing of Giampa, Capra and Porco. *Id.* at 2 n. 1.

ior. *Reynolds,* 956 F.2d at 192 ("danger may, at least in some cases, encompass pecuniary or economic harm"); *Provenzano,* 605 F.2d at 95 ("defendant's propensity to commit crime generally, even if the resulting harm would not be solely physical, may constitute a sufficient risk of danger to come within the contemplation of the Act").

As mentioned, there was evidence admitted at trial that Giampa provided protection to those who engage in illegal activities on his behalf. For example, according to McManus: "If, if, someone pops out of the blue, we go to the father [Giampa]." 258 TR at 4. Additionally, during one recorded conversation Sabol asked McManus: "The father [Giampa] ever go out with you with the mask on your head?" 276 TR at 7. To this, McManus responded: "No, no, never ... [h]e sits home and he laughs.... [I]f we get in trouble, he has to take care of it. (laughs)." *Id.*

Additionally, there were numerous references to Giampa being a "captain," "capo" or "skipper" in the Lucchese Crime Family and to individuals giving him a share in the proceeds ("tribute" or an "envelope") of illegal activities conducted with Giampa's approval. *See, e.g.,* 105 TR at 26–27 (Gaito explained to Sabol that an individual named Charlie was not with the Genovese Crime Family, but rather was "with" Giampa and the Lucchese Crime Family); 164 TR at 70–71 (McManus explained that Porco and Capra were with a different faction of the Lucchese Crime Family, and they had to be careful that any dealings with this other faction would not "contradict your [Vittorio's] father"); 294 TR at 13–15 (McManus explained that Giampa is "up there" in the Lucchese Crime Family hierarchy and that he is "the regime"); 105 TR at 78–79 (Gaito told Sabol that when he introduced him to Giampa, Gaito would tell Giampa Sabol was "a mover" who "need[ed] a little protection," and that Giampa would "get a piece every week from him"). Giampa has not established by clear and convincing evidence that if released on bail pending sentencing such activity would not continue.

■■■ Based on the foregoing, Giampa has failed to establish by clear and convincing evidence that he is not a flight risk and

does not pose a danger to the community, which is his burden. Accordingly, his motion for bail pending sentencing is denied. *Strong,* 775 F.2d at 508; *Clark,* 763 F.Supp. at 1323.

b. *Gaito*

Because Gaito was convicted of, among other offenses, conspiring to distribute heroin and cocaine, Count Three, and of distributing heroin, Count Four, his application for bail is governed by Section 3143(a)(2) of Title 18. 18 U.S.C. § 3143(a)(2). As indicated, this provision provides that the court "shall order" detention unless

(A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

(ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

(B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a)(2).

■■■ In the instant case, the Government indicated that it will recommend that a sentence of imprisonment be imposed on Gaito. Government Bail Brief at 2. Accordingly, the only issue which remained was whether it appeared there was a substantial likelihood that a motion for acquittal or new trial would be granted. In light of the denial of Gaito's Rule 29 Motion, Rule 29(c) Motion and the other post-trial relief requested by Gaito, there is no likelihood of success on motions for acquittal or for a new trial. Accordingly, Gaito's application for bail is denied.

c. *McManus*

As discussed, counsel for McManus indicated that, while renewing McManus' application for bail, she would be unavailable for the 15 August Bail Hearing and relied on the arguments advanced at the 7 August Bail Hearing. McManus Rule 29(c) Brief at 1; *see also id.* (explaining that she would be out of the country and, therefore, unavailable for the 15 August Bail Hearing and, regarding

McManus' Rule 29(c) Motion, would rely on her written submission). Counsel for McManus explained that she had "no new information for the [c]ourt." *Id.*

Nonetheless, at the 15 August Bail Hearing, McManus indicated there might be further arguments he wished to advance through his attorney on his application for bail and his Rule 29(c) Motion. 15 August Bail Hearing Tr. at 49–50. McManus' post-trial motions are addressed in this opinion. As McManus was advised at the 15 August Bail Hearing, however, he is granted leave to submit to the court any further arguments concerning his application for bail and his Rule 29(c) Motion that would have been advanced by his counsel had she been available on 15 August 1995.[147] *See id.*

With regard to McManus' application for bail, like Gaito, such application is governed by Section 3143(a)(2) of Title 18. McManus was convicted of, among other offenses, conspiring to import and distribute heroin and cocaine as charged in Counts Three and Five and of distribution of heroin as charged in Count Four. 18 U.S.C. § 3143(a)(2).

The Government has indicated that it will recommend that a sentence of imprisonment be imposed on McManus. Government Bail Brief at 2. Accordingly, as with Gaito, the only remaining issue was whether it appeared there was a substantial likelihood a motion for acquittal or new trial would be granted. In light of the denial of McManus' Rule 29 Motion and Rule 29(c) Motion, there does not appear to be a substantial likelihood that upon further argument by his counsel McManus would be successful on motions for acquittal or for a new trial. Accordingly, McManus' application for bail is denied.

### d. *Capra and Porco*

Counsel for Porco, at the 7 August Bail Hearing and at the 15 August Bail Hearing,

argued Porco was not a flight risk because he had strong family ties, including being married for four years and having two young children. Trial Tr. at 4883–84; 15 August Bail Hearing Tr. at 20–22. Additionally, counsel for Porco contended family members of Porco had pledged their homes to secure a $1 million personal recognizance bond. Trial Tr. at 4883; 15 August Bail Hearing Tr. at 21.

Similarly, counsel for Capra argued Capra had strong family ties and that his future appearance in court was insured by a bond, which was secured by the homes of family and friends. Trial Tr. at 4886–87; 15 August Bail Hearing Tr. at 25–26.

Counsel for Porco and Capra argued their clients would not pose a danger to the community, if released on bail, because there was no allegation of violent behavior and because the jury did not convict either Porco or Capra on the RICO or the narcotics counts they had been charged with. Trial Tr. at 4884–85, 4887; 15 August Bail Hearing Tr. at 21–22, 25–26. Further, counsel for Porco and Capra contended that the Government's decision not to retry Porco and Capra on the counts charged, after the jury was unable to return a unanimous decision, demonstrates, by clear and convincing evidence, that they would not pose a danger to the community if released on bail. 15 August Bail Hearing Tr. at 21, 24–25.

As with Giampa, assuming *arguendo* that Porco and Capra established, by clear and convincing evidence, that they were not a flight risk, *see supra* note 146 and accompanying text, they did not establish that they were not a danger to the community. As discussed, it is their burden to do so by clear and convincing evidence to defeat the presumption in favor of detention.[148]

---

**147.** As was explained to McManus, any references made to him at the 15 August Bail Hearing, whether by the Government or defense counsel, were not considered in any way in ruling on his post-trial motions. 15 August Bail Hearing Tr. at 50.

**148.** With regard to the Government's dismissal of the counts in the Redacted Superseding Indictment, which the jury was unable to reach a

unanimous decision, *see supra* note 133, the Government explained:

> The Government's proposed dismissal should not be seen as any concession by the Government as to the validity of the allegations. If anything, after presenting the proof that the Government did at trial, the Government stands very strongly ... behind the validity of those allegations.

As discussed, danger to the community does not include only physical harm or violent behavior. *Reynolds,* 956 F.2d at 192; *Provenzano,* 605 F.2d at 95. Further, as the Government pointed out, there was evidence adduced at trial which indicated that

> Capra and Porco are engaged in importing narcotics on an ongoing basis, 171 TR at 109; 173 TR at 15; 183 TR at 12, have operated a large-scale gambling operation in New York for the past 12 Years, 171 TR at 20, and employ men like ... Vittorio and McManus to "shake down" locations in which their gambling machines have been placed, 149 TR at 63; 152 TR at 112; 153 TR at 16; 155 TR at 3–4, 23–24.

Government Bail Brief at 3.

As discussed, McManus described to Sabol the relationship between Capra and Porco: "I told you it was like a father and son. He, he, listens to Daddy. If Daddy says to do it, he does it. It's not Johnny's money.... Who do you think makes all that money? ... If it wasn't for that kid sitting there, he has nothing." [149] 183 TR at 4.

Further, in a conversation between McManus, Vittorio and Sabol regarding opening an import/export company, recorded on 21 December 1993, McManus told Sabol about Porco and his relationship with Capra:

> J. McManus: Is, ah, there's, ah, the guy, Elliot, he knows him, tons of money, tons of ... money. He's around a guy, though.[150] Which will make things a little complicated, because.
>
> R. Sabol: Who's he around? I'd like to know ...

> J. McManus: Johnny Hooks.
>
> R. Sabol: Huh?
>
> J. McManus: Johnny this guy, Johnny Hooks.
>
> R. Sabol: Johnny Hooks. I know Johnny, Johnny Capra.
>
> J. McManus: Yeah.

164 TR at 45.

The above conversation continued with an explanation by McManus that Porco and Capra are from a different factions of the Lucchese Crime Family:

> R. Sabol: This kid, Elliot, what they want to do, they.
>
> J. McManus: Listen.
>
> R. Sabol: They want to put up money for an export?
>
> J. McManus: Yeah, but, what I'm trying to say is it's gonna contradict what, you know.
>
> R. Sabol: There's so many different ways we can go.
>
> J. McManus: No, there's nothing, I got to, we got to look at what's the best way over here right? Rich, we're all gonna make money, but what I'm saying is it's gonna contradict your father. You understand? Johnny and your father.
>
> R. Sabol: Yeah, two different groups.
>
> J. McManus: Yeah.
>
> R. Sabol: Genovese, and ah ...
>
> J. McManus: No, no, same.
>
> G. Vittorio: They're both Lucchese Family.
>
> J. McManus: But.

---

149. As discussed, the relationship between Capra and Porco was described by counsel for Porco in his opening statement in this case. According to counsel for Porco: "Capra is not an associate of [Porco]. He's like a father figure, like an uncle, closest type of relative you can have. In fact, you're going to hear from the evidence that ... Capra is the godfather of [Porco's] baby boy." Opening Statements Tr. at 93. Counsel for Porco continued: "If [Porco] could sit in ... Capra's

> The Government will be making the application to the [c]ourt for the purposes of judicial economy and purposes of conserving other public resources ... not [because of] concerns about any other underlying fault in the proofs adduced.

15 August Bail Hearing Tr. at 26–27.

chair at this trial, he would. In fact, he does. They're together in this case, because of their relationship." *Id.* at 94. Additionally, counsel for Porco stated: "His [Porco's] relationship with ... Capra was so solid that he would never do anything without [Capra].... The evidence will show how inextricably tied [Porco] is to ... Capra. They're together, in a good way." *Id.* at 105.

150. McCabe explained that to be "around" someone means to be associated with a made member in an organized crime family. Trial Tr. at 2823 ("[T]o become a member of Cosa Nostra, you become an associate, or you're with them, or around them. You must be proposed for membership by a member.")

G. Vittorio: Maybe it won't. Maybe it could be a joint venture. (UI) can eat, everyone's happy, and a lot of people involved.

*Id.* at 70–71.

There was further evidence adduced at trial, which indicated that Capra was in charge of various illegal activities and directed other individuals (including Porco) to act on his behalf. For example, it appeared Capra was running the meeting on 6 January 1994, in which various schemes were discussed. This was demonstrated by Capra's apparent reprimand of Segarra, who arrived late to the meeting: "Everybody's got to come on time." 206 TR at 23. Segarra then offers an excuse for his tardiness, saying "[i]t's the traffic." 206 TR at 23.

Other evidence introduced at trial, with regard to the danger to the community if Porco and Capra were released on bail, concerned Porco's gambling machine business and the "machine raids," which McManus and Vittorio conducted on Porco's (and derivatively on Capra's) behalf:

G. Vittorio: Well, this guy, a friend of mine, Elliot has a machine route. Because we go and he gives a couple hundred for the day.

R. Sabol: Why? He's afraid he's gonna get robbed?

G. Vittorio: Yeah, so we go over, me and Jimmy. Once a week, ah, once a month, whatever, once every two weeks. Whatever he wants to do.

153 TR at 16. As discussed, Sabol explained that the "he" referred to Porco and the "getting robbed" referred to "[s]omebody sticking [Porco] up for the money, coming out of the machines, the gambling machines." Trial Tr. at 607; *see also* 170 TR at 93 (Porco explained that he was talking about "slot" machines); 155 TR at 24–25 (McManus and Vittorio explain to Sabol that Porco's machines in one location made $90,000.00 in one month); 149 TR at 63 (Vittorio explained to Sabol that he and McManus go on "machine raids" for Porco to collect money from his gambling machines in New York); 152 TR at 112 (same).

Porco and Capra have not established by clear and convincing evidence that if released on bail pending sentencing the activities described above would not continue. Based on the foregoing, Porco and Capra have failed to establish by clear and convincing evidence that they are not flight risks and do not pose a danger to the community, which is their burden. Accordingly, their motions for bail pending sentencing are denied. *Strong,* 775 F.2d at 508; *Clark,* 763 F.Supp. at 1323.

*Conclusion*

For the reasons set forth above, the pretrial motions were granted in part and denied in part. Specifically, the following motions were granted:

1. The requests to join in all appropriate pre-trial motions filed by co-defendants.

2. The requests to file additional motions as to new materials obtained in discovery, if appropriate.

3. The motions for immediate notification of FRE 404(b) material; the Government was directed to provide the Defendants with notice of the general nature of the FRE 404(b) evidence two weeks prior to trial; determination of the admissibility of prior bad acts under Rule 404(b) was deferred until trial.

4. The Government's request for reciprocal discovery was granted; Defendants were directed to provide the Government with pretrial discovery within fifteen days of trial.

The following motions were denied:

1. The motions for severance, pursuant to Rule 14.

2. The motions for severance from the trial of McManus, pursuant to *Bruton.*

3. Gaito's motion to dismiss the Redacted Superseding Indictment for "outrageous" governmental conduct.

4. The motions to dismiss the Redacted Superseding Indictment for failure to plead the crimes charged.

5. The request to strike surplusage.

6. McManus' motion to suppress the Second Redacted McManus Statement.

7. Vittorio's motion to suppress the Second Redacted McManus Statement.

8. Capra's motion to suppress the Second Redacted McManus Statement.

9. McManus' motion to dismiss the Redacted Superseding Indictment for failure to bring him before a magistrate without "unnecessary delay."

10. Vittorio's motion to suppress the evidence obtained through the use of the Lanteri Wiretap.

11. The requests for a bill of particulars.

12. The requests for early disclosure of *Giglio* material.

13. The request for early disclosure of Jencks Act material.

14. The request for an order compelling the Government to comply with the Discovery Order.

15. The request for disclosure of all statements by co-conspirators which the Government intended to introduce pursuant to FRE 801(d)(2)(E).

16. The requests for disclosure of grand jury material.

17. *In Limine* motions concerning the admissibility of FRE 404(b) Material.

The following motions became moot:

1. The requests for early disclosure of *Brady* material.

2. The request for disclosure of the identities of confidential informants.

3. McManus' motion to suppress evidence obtained from a search of his automobile.

4. The request for a date certain for the production of transcripts of recorded materials.

5. The requests to preserve rough notes and reports by Government agents.

6. Segarra's motion to exclude references in the taped evidence to a pending case in the United States District Court for the Southern District of New York.

For the reasons set forth above, the following trial motions and requests were denied:

1. The motions for mistrial of Giampa.

2. The motions for mistrial of Vittorio.

3. The motion for mistrial of Segarra.

4. The motion for mistrial of Capra.

5. Requests by Gaito for an entrapment defense charge.

For the reasons set forth above, the following post-trial motions are denied:

1. The Rule 29 Motions.

2. The Rule 29(c) Motions.

3. The Bail Applications.

4. The motions made by Vittorio and Gaito to dismiss the convictions returned by the jury against them because of "outrageous" Governmental conduct.

5. The motions by Vittorio and Giampa for a new trial because of the admission of various FRE 404(b) materials.